**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| 3DT HOLDINGS LLC,<br><br>Plaintiff,<br><br>v.<br><br>BARD ACCESS SYSTEMS, INC.,<br><br>Defendant. | ) | Case No. 1:17-cv-05463-LJL |

**MEMORANDUM OF LAW IN SUPPORT OF**
**BARD ACCESS SYSTEMS, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**



ME1 36118866v.5

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

FACTUAL BACKGROUND ..... 3

I. Bard's August 2013 Acquisition of the Precisive Navigation Technology ..... 3

II. Governing Agreements ..... 5

A. Financial Terms ..... 5

B. Development Agreement and Bard's [redacted] ..... 6

C. Governing Law and Forum ..... 8

III. The Penske Project Team ..... 8

IV. Penske's Initial Stages ..... 10

V. The FDA Regulatory Process – Background on 510(k) Clearance ..... 12

VI. Developing a [redacted] Technology – Specific Development Efforts ..... 13

A. [redacted] ..... 14

B. [redacted] ..... 15

C. [redacted] ..... 16

D. Prioritization of the [redacted] ..... 16

E. [redacted] ..... 17

F. [redacted] ..... 20

VII. [redacted] (2013-present) ..... 22

A. [redacted] ..... 22

B. [redacted] ..... 23

VIII. [redacted] (2015-2016) ..... 25

IX. Penske Concept Phase Continues ..... 26

X. Non-Disclosure Agreement ..... 31

XI. Penske Activities After the August 2016 Anniversary of the Parties' Agreement ............31

XII. The Parties' Letters ............33

LEGAL STANDARD ............36

ARGUMENT ............37

I. THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN BARD'S FAVOR BECAUSE BARD FULFILLED ITS OBLIGATIONS UNDER THE GOVERNING AGREEMENTS AS A MATTER OF LAW ............37

A. The Contractual Standard for Commercially Reasonable Development Efforts is [redacted], Which Bard Satisfied as a Matter of Law ............38

B. Bard Provided Commercially Reasonable [redacted] ............43

C. After the [redacted]. ............51

D. Bard Does Not Owe 3DT [redacted] Has Not Been Achieved ............53

E. Bard Does Not Owe 3DT [redacted] Provision Does Not Apply On These Facts ............54

II. BARD IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ............54

A. The Claim is Duplicative of its Breach of Contract Claim ............54

B. 3DT Impermissibly Seeks to Create New Contractual Rights and Contradict the Express Language of the Agreement ............55

CONCLUSION ............57

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*,
No. 03 Civ. 8259 (CSH), 2007 WL 1988150 (S.D.N.Y. July 9, 2007) ....................41

*Bryant v. Maffucci*,
923 F.2d 979 (2d Cir. 1991) ....................36

*Champagne v. United States*,
15 F. Supp. 3d 210 (N.D.N.Y. 2014) ....................54, 55

*Clalit Health Servs. v. Israel Humanitarian Found.*,
395 F. Supp. 2d 21 (S.D.N.Y. 2005) ....................56

*D'Amico v. City of New York*,
132 F.3d 145 (2d Cir. 1998) ....................36

*Fischer & Mandell LLP v. Citibank, N.A.*,
632 F.3d 793 (2d Cir. 2011) ....................37

*Holland Loader Co., LLC v. FLSmidth A/S*,
313 F. Supp. 3d 447 (S.D.N.Y. 2018) ....................39, 40, 47

*In Touch Concepts, Inc. v. Cellco P'ship*,
949 F. Supp. 2d 447 (S.D.N.Y. 2013) ....................55

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*,
655 F.3d 136 (2d Cir. 2011) ....................40

*Leigh Co. v. Bank of N.Y.*,
617 F. Supp. 147 (S.D.N.Y. 1985) ....................39

*M/A-COM Sec. Corp. v. Galesi*,
904 F.2d 134 (2d Cir. 1990) ....................40

*Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ....................36

*Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*,
No. 08 Civ. 4341 (RJS), 2009 WL 1054830 (S.D.N.Y. Apr. 17, 2009) ....................57

*Sekisui Am. Corp. v. Hart*,
15 F. Supp. 3d 359 (S.D.N.Y. 2014) ....................39, 45

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
441 F. Supp. 3d 1 (S.D.N.Y. 2020) ....................39, 41

**State Cases**

*Fesseha v. TD Waterhouse Inv. Servs., Inc.*,
761 N.Y.S.2d 22 (1st Dep't 2003) ....................55

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
87 A.D.3d 287 (1st Dep't 2011) ....................54, 55

*ProSource Tech., LLC v. Housing Trust Fund Corp.*,
No. 5972-14, 2015 WL 5797028 (N.Y. Sup. Ct. Albany Cty. Oct. 2, 2015) ....................40, 42, 47

*Slamow v. Delcol*,
584 N.Y.S.2d 424 (N.Y. 1992) ....................40

**Federal Statutes**

21 U.S.C. §§ 630(k), 360(n), 360c(f) (1) & 360c(i) (1) (A) ....................47

**Rules**

Fed. R. Civ. P. 56 ....................36

**Regulations**

21 C.F.R. § 807.92(a) (3) ....................47

## PRELIMINARY STATEMENT

This action arises out of the sale of a technology intended to allow clinicians to locate the [redacted]. Bard Access Systems, Inc. ("Bard"), a major medical device developer and manufacturer, purchased this technology, called the Precisive Navigation Technology (or Penske, its internal project name), from 3DT Holdings, LLC ("3DT") in 2013, with the hopes of [redacted]. Indeed, Bard was eager to acquire this [redacted] payment to 3DT for [redacted]. What is more, upon Bard's receipt of an [redacted] incorporating the Precisive Navigation Technology, Bard agreed to pay 3DT [redacted]

It is no surprise that Bard's bargained-for Development Agreement vested Bard with [redacted] In relevant part, the Development Agreement required that Bard provide [redacted] "Commercially reasonable" performance under New York law is a low threshold, even in cases where the contract language does not provide a party with similar flexibility. Bard amply exceeded this standard by, among other things, quickly assembling a cross-functional team, hiring new engineers who worked on the project, [redacted]

[redacted] investing significant time and effort to determine [redacted] to allow Bard to market the device. [redacted]

Despite these challenges, [redacted]

[redacted]

The undisputed material facts demonstrate that Bard's conduct conformed with its contractual obligations, and 3DT's claims for breach of contract and the implied covenant of good faith and fair dealing fail as a matter of law. If anyone was (and is) highly incentivized to develop the technology, it was Bard. To date, Bard has not yet been able to [redacted]. That is why Bard remains hopeful that a product [redacted]

## FACTUAL BACKGROUND

### I. Bard's August 2013 Acquisition of the Precisive Navigation Technology

[redacted] (Joint 56.1 Statement ("Joint SUMF") ¶ 3 (ECF No. 73), App. Ex. 1, Purchase Agreement Recitals (ECF No. 73-1).) [redacted] Joint SUMF ¶ 4, App. Ex.[1] 4, Kassab Dep. Tr. 24:1-14, 37:1-13, 51:6-8 (ECF No. 73-4); *see also* App. Ex. 2, Development Agreement Section 2.1 (ECF No. 73-2).) [redacted] (Joint SUMF ¶ 5, App. Ex. 4, Kassab Dep. Tr. 51:20-52:6.)

[redacted]

[1] Exhibits to the Joint Appendix of Exhibits in Support of Joint Rule 56.1 Statement of Facts are cited herein as "App. Ex.".

[redacted] (Joint SUMF ¶ 6, App. Ex. 4, Kassab Dep. Tr. 59:22-60:5), [redacted] (*id.* at Kassab Dep. Tr. 60:23-61:1), [redacted] (*id.* at Kassab Dep. Tr. 61:2-21).

Bard's financial commitment was both significant and [redacted] (Bard Local Rule 56.1 Statement ("Bard SUMF") ¶ 3, Joint SUMF ¶¶ 9-10, App. Ex. 1, Purchase Agreement, Section 2.04.) [redacted] was a motivating factor in 3DT's selection [redacted] Dr. Kassab, 3DT's sole member (Joint SUMF ¶ 1, App. Ex. 4, Kassab Dep. Tr. 7:25, ECF. No. 46-1, ¶¶ 3-4), stated that the [redacted] (Bard SUMF ¶ 4, App. Ex. 4, Kassab Dep. Tr. 61:2-14.) [redacted] (Bard SUMF ¶ 5, App. Ex. 4, Kassab Dep. Tr. 60:6-9; *see also generally* Joint SUMF ¶ 7, App. Ex. 1, 2, 3.) However, he recognized that [redacted] (Bard SUMF ¶ 4, App. Ex. 4, Kassab Dep. Tr. 61:16-20.) Dr. Kassab stated this [redacted] (Bard SUMF ¶ 4, App. Ex. 4, Kassab Dep. Tr. 61:20-21.)

[redacted] (Bard SUMF ¶ 1, attached to the Declaration of Natalie H. Mantell, Esq., ("Mantell Decl.") as Ex. A, Kassab Dep. Tr. 22:21-23.) [redacted] (*Id.* at Kassab Dep. Tr. 22:21-23:17.) [redacted] (Bard SUMF ¶ 2, Mantell Decl., Ex. A, Kassab Dep. Tr. 34:3-9.)

## II. Governing Agreements

On August 29, 2013, 3DT and Bard executed various agreements to formalize Bard's acquisition of the Precisive Navigation Technology, including ancillary documents memorializing 3DT's transfer of all intellectual property rights related to the Precisive Navigation Technology to Bard, and the following: (1) Asset Purchase Agreement ("Purchase Agreement") (Joint SUMF ¶ 7, App. Ex. 1); (2) Design, Development and Services Agreement ("Development Agreement") (*id.*, App. Ex. 2); and (3) Statement of Work (*id.*, App. Ex. 3 (ECF No. 73-3)). Indeed, the Purchase Agreement provided that Bard [redacted] (Joint SUMF ¶ 8, App. Ex. 1, Purchase Agreement, Section 2.01; *see also id.* ¶ 12, App. Ex. 1, Purchase Agreement, Section 4.05 [redacted]

### A. Financial Terms

[redacted] As for financial compensation, the Purchase Agreement memorialized Bard's

significant monetary commitment, providing for a potential total Purchase Price of [redacted] to be paid by Bard to 3DT, with [redacted] to be paid at the Closing. (Joint SUMF ¶ 9, App. Ex. 1, Purchase Agreement Section 2.04.) The Purchase Agreement also provided for [redacted] (Joint SUMF ¶ 10, App. Ex. 1, Purchase Agreement Section 2.04(b).)

**B. Development Agreement and Bard's Release from Obligations**

***Development Agreement***. The Development Agreement sets forth the agreement of the parties with respect to [redacted] (Joint SUMF ¶ 13, App. Ex. 2, Development Agreement Preamble.) The Development Agreement explicitly acknowledged [redacted] (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.)

[redacted]

[2] Section 1.01 of the Purchase Agreement defines [redacted] as follows: [redacted]
(Joint SUMF ¶ 10 n.2, App. Ex. 1, Purchase Agreement Section 1.01.)

[redacted] (*Id.* (emphasis added); *see also* App. Ex. 1, Purchase Agreement Section 2.04(b) [redacted]

[redacted] In certain circumstances, Bard is relieved from [redacted] Section 2.1 of the Development Agreement provides:

[redacted]

(Joint SUMF ¶ 14, App. Ex. 2, Development Agreement, Section 2.1.) Thus, the Development Agreement [redacted]

[redacted]

[redacted]

(Joint SUMF ¶ 11, App. Ex. 1, Purchase Agreement Section 2.04(b).) 3DT alleges that Bard breached this provision and payment is owed to 3DT (*see, e.g.*, Compl. ¶¶ 15, 22, 27, 33, ECF No. 1), but as demonstrated herein, the provision is not applicable here.

### C. Governing Law and Forum

Section 12.11 of the Development Agreement provides:

[redacted]

(Bard SUMF ¶ 11, App. Ex. 2, Development Agreement, Section 12.11).

## III. The Penske Project Team

Bard used the name "Penske" internally to refer to the Precisive Navigation Technology and the team dedicated to its development. (Joint SUMF ¶ 20, App. Ex. 5, Misener Dep. Tr. 43:21-44:7.) Bard assembled a cross-functional team to drive development efforts.

- At the helm was project leader Anthony Misener, the Research and Development Program Manager for the tip location and central ultrasound side of the Vascular Access Technologies Platform, who has been a program manager for the tip location side of the platform since approximately 2010. (Joint SUMF ¶ 21, App. Ex. 5, Misener Dep. Tr. 10:8-11:2; 47:11-15.) Mr. Misener has an engineering background, and Bard initially hired him as a Senior Engineer. (*Id*. at Misener Dep. Tr. 11:15-12:23.)
- Anthony Decheek was then a product manager in marketing with six years of prior experience as a contracts manager. Mr. Decheek holds an undergraduate degree in mechanical engineering and a Master's in Business Administration, and currently serves as Senior Marketing Manager at Bard. (Joint SUMF ¶ 23, App. Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5) Mr. Decheek was assigned to other projects in addition to Penske, which he said felt "pretty standard." (*Id*. at Decheek Dep. Tr. 20:12-23.)
- Chris Phillips, then a Regulatory Specialist II, was added to the team, having eight years of prior experience in the regulatory and quality fields. Mr. Phillips holds an undergraduate degree in biotechnology business management, a Master's degree in Health Sciences, focusing on regulatory affairs, and a Regulatory Affairs Certification and a Medical Device Auditor Certification through two industry groups. Currently, Mr. Phillips serves as a Senior Manager of Regulatory Affairs at Bard. (Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15) Mr. Phillips was assigned to four or five other projects in addition to Penske, which he stated was "our target." (Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 38:17-22.)
- In 2013, Bard hired two full-time engineers, Zach Davis and Brian Cieselwicz, who worked on the project. (Joint SUMF ¶ 22, App. Ex. 5, Misener Dep. Tr. 80:21-81:15.) Zach Davis is an R&D engineer with a background in electromagnetics and prior

experience at Bard as a Quality Engineer. Penske was his first engineering medical device development project. (Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22). Brian Cieselwicz was an R&D Engineer who has since left employment at Bard. (Joint SUMF ¶ 23, App. Ex. 5, Misener Dep. Tr. 81:7-15; 104:7-8.)

- Brad Zentgraf is an R&D engineer who was assigned to Penske in 2015, and had prior experience working on catheter products at Bard. Mr. Zentgraf holds undergraduate and Master's degrees in Bioengineering, and currently serves as Senior R&D Engineer at Bard. (Joint SUMF ¶ 23, App. Ex. 8, Zentgraf Dep. Tr. 7:8-16; 8:4-5, 23-24; 10:22-25, 14:11-16.)

"[T]he team members changed at various stages during the project based on other needs. … [For example, Anthony Misener knew they] had other members from some of [the] catheter groups as well. But they changed as well at various stages depending on business and other project needs." (Bard SUMF ¶ 12, Mantell Decl., Ex. C, Misener Dep. Tr. at 51:16-25.)

## IV. Penske's Initial Stages

The "entire team" tried to meet once per week. (Joint SUMF ¶ 24, App. Ex. 5, Misener Dep. Tr. 79:2-4.) Tony Decheek testified that the Penske integration meetings would occur "[m]aybe weekly." (Joint SUMF ¶ 24, App. Ex. 6, Decheek Dep. Tr. 27:12-18.) Mr. Misener was trying to keep the minutes for Penske cross-functional team meetings, and "for a lot of the full team meetings, … certainly generated minutes." (Joint SUMF ¶ 25, App. Ex. 5, Misener Dep. Tr. 79:20-23.)

[redacted] (Joint SUMF ¶ 26, App. Ex. 5, Misener Dep. Tr. 89:16-22.) He explained that [redacted] (*Id.* at Misener

Dep. Tr. 89:22-24.) According to Mr. Misener, [redacted] (*Id*. at Misener Dep. Tr. 89:25-90:8.) Dr. Kassab predicted a similar [redacted] (Bard SUMF ¶ 10, Mantell Decl., Ex. A, Kassab Dep. Tr. 80:16-81:7.)

[redacted] (Joint SUMF ¶ 27, App. Ex. 5, Misener Dep. Tr. 43:5-20; 52:22-53:11; App. Ex. 7, Phillips Dep. Tr. 128:21-129:11.) [redacted] (Joint SUMF ¶¶ 18-19, App. Ex. 3, Statement of Work Sections 1. General Description, 2. Deliverable/Task/Responsible Parties and 2.1. Deliverables/Tasks; Joint SUMF ¶ 28, App. Ex. 5, Misener Dep. Tr. 57:13-21; 58:22-25.) [redacted] (*id*. at Misener Dep. Tr. 57:13-21) [redacted] (Joint SUMF ¶ 29, App. Ex. 5, Misener Dep. Tr. 58:22-25.)

Bard's R&D group's design control process typically begins with [redacted] (Joint SUMF ¶ 35, App. Ex. 5, Misener Dep. Tr. 19:1-5, 17-24.) [redacted]

[redacted] (Joint SUMF ¶ 36, App. Ex. 10, BAS 3DT 0021225.)

## V. The FDA Regulatory Process – Background on 510(k) Clearance

To obtain the FDA's permission to market a medical device incorporating the Penske technology pursuant to section 510(k) of the Food, Drug and Cosmetic Act, Bard had to submit testing and other documentation to the FDA demonstrating that device "to be substantially equivalent to an existing product that has been approved or cleared by the FDA[.]" (Joint SUMF ¶ 30, App. Ex. 7, Phillips Dep. Tr. 23:23-24:2, 24:11-12.) "Clearance [through the FDA's 510(k) process] means that the device is seen in the FDA's eyes to be equivalent to something else, to a predicate model that exists" on the market. (Joint SUMF ¶ 31, App. Ex. 7, Phillips Dep. Tr. 30:9-21.) As a part of this process, Bard "review[s] potential predicates in greater detail, to review the different challenges associated with the device to understand the technology on a more intimate level, and to figure out what the different challenges are going to be as we approach a regulatory body." (Joint SUMF ¶ 32, App. Ex. 7, Phillips Dep. Tr. 23:8-13.) These efforts culminate in "a regulatory submission [to] get … through an approval or clearance." (Joint SUMF ¶ 33, App. Ex. 7, Phillips Dep. Tr. 23:14-15.) "[T]he main document … used to put that together is the regulatory strategy document, or the [redacted] (*Id.* at Phillips Dep. Tr. 23:16-18.) At the time the parties entered into the Agreements, they contemplated that the Bard device incorporating the Precisive Navigation Technology would obtain FDA 510(k) clearance. (Joint SUMF ¶ 10, App. Ex. 1, Purchase Agreement Section 2.04(b) ([redacted]).

Other FDA clearance or approval pathways exist – like the premarket approval (or PMA) process and de novo review – which depend, in part, on the risk posed by a device and its equivalence to previous devices already approved: "high-risk device[] approvals … can be sought

through what is called a premarket approval, PMA process. For devices that may not really be high risk but for which a predicate doesn't exist, there's another process called the de novo submission. The FDA allows that. [A de novo submission is] essentially, quite similar in terms of content to a PMA in terms of cost to submit. It is more similar to a PMA than a 510(k). But it allows you to take a medium-risk product for which there is no good comparatives on the market allowed by FDA at that time and to get a designation of that product in the future, would be a Class II product for which a 510(k) pathway is possible." (Joint SUMF ¶ 34, App. Ex. 7, Phillips Dep. Tr. 25:3-16.)

The cost of seeking the FDA's blessing outside of the standard 510(k) process is significant. As Chris Phillips observed, "if you get kicked into a more challenging review process, the costs can increase by . . . a factor of ten." (Bard SUMF ¶ 13, Mantell Decl., Ex. B, Phillips Dep. Tr. 55:19-24.) Similarly, Dr. Kassab acknowledged that a de novo 510(k) application would require more work, and more work would mean more money. (Bard SUMF ¶ 14, Mantell Decl., Ex. A, Kassab Dep. Tr. 119:8-11.)

## VI. Developing a Next Generational Technology – Specific Development Efforts

The Precisive Navigation Technology was a [redacted] (Bard SUMF ¶ 15, Mantell Decl., Ex. D, Decheek Dep. Tr. 26:12-18.) Mr. Decheek believed that [redacted] (Bard SUMF ¶ 16, Mantell Decl., Ex. D, Decheek Dep. Tr. 26:18-24.)

To develop the technology, the Penske team conducted [redacted] performed work in connection with [redacted], engaged [redacted] pursued CVC and PICC applications, developed a [redacted] including by [redacted], and conducted [redacted]. (Joint SUMF ¶ 37, *see* citations to the record that follow in sections below.)

**A.** [redacted]

Dr. Kassab noted that the [redacted] (Joint SUMF ¶ 39, App. Ex. 4, Kassab Dep. Tr. 66:24-68:9.)

[redacted] (Joint SUMF ¶ 38, App. Ex. 4, Kassab Dep. Tr. 83:2-3.) [redacted] (*Id.* at Kassab Dep. Tr. 83:4-7.)

Bard performed additional [redacted] (Joint SUMF ¶ 40, App. Ex. 5, Misener Dep. Tr. 245:18-20; App. Ex. 9, Davis Dep. Ex. 5.) [redacted] (Joint SUMF ¶ 42, App. Ex. 9, Davis Dep. Ex. 4), [redacted] (Joint SUMF ¶ 41, App. Ex. 9, Davis Dep. Tr. 40:5-8.) [redacted]

[redacted] (Joint SUMF ¶ 43, App. Ex. 7, Phillips Dep. Tr. 63:5-6, 63:13-21.) Indeed, Mr. Davis observed, [redacted] (Bard SUMF ¶ 17, Mantell Decl., Ex. E, Davis Dep. Tr. 41:10-22.)

In fact, Mr. Misener noted, [redacted] (Joint SUMF ¶ 44, App. Ex. 5, Misener Dep. Tr. 116:20-24.) [redacted] (Bard SUMF ¶ 18, Mantell Decl., Ex. C, Misener Dep. Tr. 117:7-10.) When asked if 3DT was [redacted] Mr. Misener stated that he [redacted] (Bard SUMF ¶ 19, Mantell Decl., Ex. C, Misener Dep. Tr. 117:13-118:2.)

**B.** [redacted]

In addition, Mr. Davis was working on [redacted] (Joint SUMF ¶ 45, App. Ex. 9, Davis Dep. Tr. 10:13-18.) He noted that Bard had [redacted]

[redacted] (Joint SUMF ¶ 46, App. Ex. 9, Davis Dep. Tr. 19:22-24.) Mr. Davis described his efforts: [redacted] (Bard SUMF ¶ 20; App Ex. 9, Davis Dep Tr. 18:20-21.) He explained that, [redacted] (Bard SUMF ¶ 20; App. Ex. 9, Davis Dep Tr. 19:12-21.)

**C.** [redacted]

Bard also engaged [redacted], (Joint SUMF ¶ 47, App. Ex. 5, Misener Dep. Tr. 107:22-108:9), [redacted] (*id.* at Misener Dep. Tr. 241:17-20).

**D.** [redacted]

[redacted] (Joint SUMF ¶ 48, App. Ex. 5, Misener Dep. Tr. 91:2-6.) [redacted] (Joint SUMF ¶ 48, App. Ex. 9, Davis Dep. Ex. 3, BAS-3DT 0053803.)

[redacted] (Joint SUMF ¶ 49, App. Ex. 5, Misener Dep. Tr. 108:25-109:4.) [redacted]

[redacted] (*Id.* at Misener Dep. Tr. 111:16-17.) [redacted] (Joint SUMF ¶ 50, App. Ex. 5, Misener Dep. Tr. 111:3-7.) [redacted] (Joint SUMF ¶ 51, App. Ex. 7, Phillips Dep. Tr. 64:22-23.) [redacted] (Bard SUMF ¶ 21; App. Ex. 7, Philips Dep. Tr. 64:8-13.)

Mr. Davis testified that they [redacted] (Bard SUMF ¶ 22, Mantell Decl., Ex. E, Davis Dep. Tr. 67:6-9.) When asked why not, Zach Davis responded, [redacted] (*Id.* at Davis Dep. Tr. 67:10-12.)

**E.** [redacted]

***Beginning Stages***. Dr. Kassab confirmed that 3DT did not have [redacted] (Bard SUMF ¶ 8, Mantell Decl., Ex. A, Kassab Dep. Tr. 76:11-77:19.) Dr. Kassab expected that when Bard purchased the PNT from 3DT that it would [redacted] (Bard SUMF ¶ 9, Mantell Decl., Ex. A, Kassab Dep. Tr. 77:20-23.)

And that is what Bard did. Mr. Phillips, who spearheaded the regulatory efforts, [redacted] (Joint SUMF ¶ 52, App. Ex. 7, Phillips Dep. Tr.

54:11-14.) In particular, he [redacted] (Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 54:11-14.) The idea was to have a [redacted] (*Id.* at Phillips Dep. Tr. 51:12-15.)

In addition, Mr. Phillips described [redacted] (Bard SUMF ¶ 27; App. Ex. 7, Phillips Dep. Tr. 54:15-22.)

[redacted] (Joint SUMF ¶ 54, App. Ex. 7, Phillips Dep. Tr. 72:7-15; *id.* at. Ex. 4.)

Mr. Philips provided additional information about [redacted]

[redacted] (Bard SUMF ¶ 23, Mantell Decl., Ex. B, Phillips Dep. Tr. 91:12-25.) [redacted] (Bard SUMF ¶ 24; App. Ex. 7, Phillips Dep. Tr. 51:21-24.)

[redacted] (Joint SUMF ¶ 55, App. Ex. 7, Phillips Dep. Tr. 37:4-10.) Mr. Phillips explained that [redacted] (Joint SUMF ¶ 56, App. Ex. 7, Phillips Dep. Tr. 127:13-20.) He stated, [redacted] (Bard SUMF ¶ 26; Mantell Decl. Ex. B, Phillips Dep. Tr. 126:21-25, App. Ex. 7, Phillips Dep. Tr. 127:1-12.)

[3]An NSE designation is a ruling by the FDA that the device is not substantially equivalent. (Bard SUMF ¶ 26 n.3, App. Ex. 7, Phillips Dep. Tr. 30:18-19.)

Mr. Phillips is not aware of any other projects he has worked on with Bard [redacted] (Bard SUMF ¶ 25, Mantell Decl., Ex. B, Phillips Dep. Tr. 131:15-19.) [redacted]: Mr. Phillips testified, [redacted] (Bard SUMF ¶ 25; App. Ex. 7, Phillips Dep. Tr. 128:24-129:11.)

**F.** [redacted]

Dr. Kassab knew when he sold the Precisive Navigation Technology to Bard in 2013 that Bard indicated [redacted] (Bard SUMF ¶ 6, Mantell Decl., Ex. A, Kassab Dep. Tr. 70:3-10.) For example, he expected Bard to [redacted] (Bard SUMF ¶ 7, Mantell Decl., Ex. A, Kassab Dep. Tr. 69:18-70:2.)

According to Mr. Decheek, the team was focused on [redacted] (Joint SUMF ¶ 59, App. Ex. 6, Decheek Dep. Tr. 21:10-19.)

Mr. Decheek testified to Bard's efforts: [redacted] (Joint SUMF ¶ 58, App. Ex. 6, Decheek Dep. Tr. 23:5-9.)

[redacted] Mr. Decheek indicated, [redacted] (Joint SUMF ¶ 60, App. Ex. 6, Decheek Dep. Tr. 23:14-19.) [redacted] (*Id.* at Decheek Dep. Tr. 23:20-24.) Mr. Decheek did not [redacted] (Joint SUMF ¶ 61, App. Ex. 6, Decheek Dep. Tr. 24:11-20.)

Mr. Phillips provided additional insight into [redacted] "There were fundamental questions [redacted] (Bard SUMF ¶ 28, Mantell Decl., Ex. B, Phillips Dep. Tr. 88:7-25.)

**VII. [redacted] (2013-present)**

[redacted] (Joint SUMF ¶ 62, App. Ex. 16, Ex. 5, Misener Dep. Ex. 8 at 4). [redacted] (Joint SUMF ¶ 63, App. Ex. 7, Phillips Dep. Tr. 20:17-21:1.) Mr. Phillips, who worked on both [redacted] (Joint SUMF ¶ 64, App. Ex. 7, Phillips Dep. Tr. 18:18-23, 19:3-8.)

[redacted] (Joint SUMF ¶ 65, App. Ex. 5, Misener Dep. Tr. 74:16-22; Ex. 11, BAS-3DT 0059430; Ex. 12, BAS-3DT 0061106.) [redacted] (Joint SUMF ¶ 66, App. Ex. 5, Misener Dep. Tr. 72:1-4.) [redacted] (Joint SUMF ¶ 68, App. Ex. 6, Decheek Dep. Tr. 43:11-16; Decheek Dep. Ex. 4 ([redacted]).

In Mr. Misener's experience, [redacted] (Joint SUMF ¶ 67, App. Ex. 5, Misener Dep. Tr. 261:19-262:4.) Mr. Decheek testified that [redacted] (Bard SUMF ¶ 33; App. Ex. 6, Decheek Dep. Tr. 43:5-9.) As between [redacted], Mr. Decheek stated did not know if the [redacted], but he thinks they were [redacted] (Bard SUMF ¶ 33; App. Ex. 6, Decheek Dep. Tr. 43:11-16.) Indeed, in a May 7, 2015 email from Mr. Decheek to Mr. Misener, Mr. Decheek stated, [redacted] (Bard SUMF ¶ 29; App. Ex. 6, Decheek Dep. Ex. 4, BAS-3DT 0058898.) Mr. Misener stated, [redacted] (Bard SUMF ¶ 34, Mantell Decl., Ex. C, Misener Dep. Tr. 210:6-16.)

[redacted] (Bard SUMF ¶ 32, Mantell Decl., Ex. A, Kassab Dep. Tr. 121:1-4), [redacted] (*id.* at Kassab Dep. Tr. 121:5-11), and [redacted] (*id.* at Kassab Dep. Tr. 124:3-8).

[redacted] (Joint SUMF ¶ 69, App. Ex. 7, Phillips Dep. Tr. 123:16-20.) Mr. Phillips elaborated that [redacted]

[redacted] (Joint SUMF ¶ 70, App. Ex. 7, Phillips Dep. Tr. 21:10-20.) [redacted] (*Id.* at Phillips Dep. Tr. 21:21-22:9.)

In a similar vein, Mr. Phillips explained, [redacted]

(Bard SUMF ¶ 30; App. Ex. 7, Phillips Dep. Tr. 128:6-20.)

Mr. Phillips explained [redacted]

[redacted] (Bard SUMF ¶ 31; App. Ex. 7, Phillips Dep. Tr. 19:11-20:2.)

[redacted] (Joint SUMF ¶ 71, App. Ex. 5, Misener Dep. Tr. 200:8-19.) In addition, [redacted] (*Id*. at Misener Dep. Tr. 200:22-25.)

Mr. Misener further testified that [redacted] (Joint SUMF ¶ 72, App. Ex. 5, Misener Dep. Tr. 201:20-202:24.)

**VIII. [redacted] (2015-2016)**

From the end of 2015 to January 2016, Bard began the process of acquiring another unrelated technology, Nautilus Delta, a project it referred to as "[redacted] (Joint SUMF ¶ 73, App. Ex. 5, Misener Dep. Tr. 217:9-10; App. Ex. 6, Decheek Dep. Ex. 12 (January 2016 BAS Marketing Monthly Report stating that [redacted] "Due Diligence completed").)

In January 2016, Zach Davis was "redirected to not forget about Penske, but to work on some other business critical items too" (Joint SUMF ¶ 74, App. Ex. 9, Davis Dep. Tr. 9:20-10:5)

"with emphasis being put on the Nautilus Delta project that had popped up." (*Id*. at Davis Dep. Tr. 17:19-23.) Brad Zentgraf does not recall Anthony Misener ever telling him that the Penske project was put on hold --"I don't remember him saying those specific words. You know, he let me know that I needed to focus my time to [redacted] and the Nautilus Delta projects, but it was my expectation that I would be told to work on something else at a later date." (Joint SUMF ¶ 75, App. Ex. 8, Zentgraf Dep. Tr. 34:14-20.)

On January 25, 2016, Misener sent an email stating that in the PSR tomorrow, which is a monthly project review with the Management Board (Joint SUMF ¶ 76, App. Ex. 5, Misener Dep. Tr. 230:15-16), consisting of "the VP and general manager in Salt Lake and then the vice presidents of quality, regulatory, research and development and marketing and sales" (*id*. at Misener Dep. Tr. at 23:14-17), he would report "the significant delay to Penske.... completely due to the anticipated [redacted] project" (*id*. at Misener Dep. Ex. 3).

**IX. Penske Concept Phase Continues**

[redacted]

(Joint SUMF ¶ 77, App. Ex. 7, Phillips Dep. Ex. 4, BAS-3DT 0040344.) Dr. Kassab agrees that [redacted] (Bard

SUMF ¶ 35, Mantell Decl., Ex. A, Kassab Dep. Tr. at 44:24-45:5.) Bard followed this common practice. Indeed, as described herein, the Penske team [redacted]

At least one Penske concept design review meeting was held in July 2015, and another was held in October 2015. (Joint SUMF ¶ 78, App. Ex. 7, Phillips Dep. Tr. 78:3-6; 78:19-22; App. Ex. 9, Davis Dep. Tr. 110:8-19.)

[redacted] (Joint SUMF ¶ 79, App. Ex. 7, Phillips Dep. Tr. 78:7:18; App. Ex. 7, Phillips Dep. Ex. 7, BAS-3DT 0046505.) [redacted] (Joint SUMF ¶ 80, App. Ex. 7, Phillips Dep. Tr. 26:6-10; 27:1-9, 34:9-13). [redacted] (Joint SUMF ¶ 81, App. Ex. 5, Misener Dep. Tr. 155:18-20; App. Ex. 7, Phillips Dep. Tr. 110:21-111:5.) [redacted] (Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 110:21-111:5.)

As reflected in a September 4, 2015 email, Mr. Phillips stated that [redacted] (Bard SUMF ¶ 42, Mantell Decl., Ex. B, Phillips Dep. Tr. 90:10-17.) As of September 4, 2015, he testified that [redacted]

[redacted] (Bard SUMF ¶ 42, Mantell Decl., Ex. B, Phillips Dep. Tr. 90:22-91:8.) He "believ[ed] there was a [redacted] (Bard SUMF ¶ 42, Mantell Decl., Ex. B, Phillips Dep. Tr. 97:19-21.)

[redacted] (Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-3.) [redacted] (*Id.* at Phillips Dep. Tr. 101:4-8.) [redacted] (Joint SUMF ¶ 82, App. Ex. 8, Zentgraf Dep. Ex. 2.)

[redacted] (Joint SUMF ¶ 83, App. Ex. 6, Decheek Dep. Ex. 11.)

Mr. Davis testified that [redacted] (Joint SUMF ¶ 84, App. Ex. 9, Davis Dep. Tr. 18:2-20:21.) [redacted] Zach Davis explained the process as follows: [redacted]

[redacted] (*Id*. at Davis Dep. Tr. 20:22-21:7.)

[redacted] Mr. Misener stated [redacted] (Bard SUMF ¶ 38, Mantell Decl., Ex. C, Misener Dep. Tr. 156:22-157:6.) In his view, [redacted] (Bard SUMF ¶ 39, Mantell Decl., Ex. C, Misener Dep. Tr. 157:13-19.) [Attorneys' Eyes Only Portion]. [redacted] (Bard SUMF ¶ 40, Mantell Decl., Ex. C, Misener Dep. Tr. 157:20-158:4.) Mr. Phillips stated similarly. [redacted] (Bard SUMF ¶ 41, Mantell Decl., Ex. B, Philips Dep. Tr. 121:9-15.)

Mr. Misener testified that [redacted]

[redacted] (Joint SUMF ¶ 85, App. Ex. 5, Misener Dep. Tr. 276:21-277:16.) Indeed, [redacted] (Joint SUMF ¶ 86, App. Ex. 7, Phillips Dep. Ex. 17.)

On April 26, 2016, Ashley Krogh, a Senior Financial Analyst at Bard, emailed Mr. Misener copying Daniel Read, asking, "Can you please update us on the Penske PICC project? Will you be submitting an AFE for this[?] If so when do you project you will spend on this? Let us know if this project is cancelled or pushed out to 2017." (Joint SUMF ¶ 87, App. Ex. 5, Misener Dep. Ex. 2, BAS-3DT 0056218.) On April 26, 2016, Mr. Misener responded, "[t]his project has been pushed out to 2017." (*Id.*) On July 18, 2016, Mr. Misener emailed Ms. Krogh confirming that the Penske project [redacted] (Bard SUMF ¶ 43, Mantell Decl., Ex. F, BAS-3DT 0056304.) On July 19, 2016, Ms. Krogh asked Mr. Misener for [redacted] (Bard SUMF ¶ 43, Mantell Decl., Ex. F, BAS-3DT 0056304.) The following day, Mr. Misener requested [redacted] (Bard SUMF ¶ 44, Mantell Decl., Ex. F, BAS-3DT 0056333.)

## X. Non-Disclosure Agreement

One of the things that Mr. Misener did to [redacted] was to reach out to Dr. Kassab. (Bard SUMF ¶ 19, Mantell Decl., Ex. C, Misener Dep. Tr. 117:1-118:2.) However, Mr. Misener's team could not have had meaningful discussions with Dr. Kassab without entering into a non-disclosure agreement. On May 6, 2016, Anthony Misener emailed Dr. Kassab a draft of a nondisclosure agreement. (Joint SUMF ¶ 88, App. Ex. 4, Kassab Dep. Ex. 6.) On May 12, 2016, 3DT's counsel provided comments on the proposed nondisclosure agreement to Anthony Misner. On May 17, 2016, 3DT's counsel followed up on her comments and, on May 20, 2016, Anthony Misener said he would review and get back with her. (Joint SUMF ¶ 89, App. Ex. 13, 3DT Prod. 0000101-0000103.) On August 5, 2016, Anthony Misener emailed a revised draft of the NDA to Dr. Kassab based upon the comments from 3DT's counsel. Anthony Misener apologized for being "completely side-tracked by other priorities." (Joint SUMF ¶ 90, App. Ex. 14, BAS-3DT 0034929.) On August 8, 2016, 3DT provided minor comments, and Anthony Misener responded that same day, stating, "[i]f Ghassan is ready to sign, then would you send me a scan of the signed complete document and I will get the fully executed document back to the two of you." (Joint SUMF ¶ 91, App. Ex. 14, BAS-3DT 0034928-0034929.) On August 19, 2016, Anthony Misener followed up with Dr. Kassab via email saying, "Just checking in. Let me know if you are the [sic] ok with this latest version of the NDA." (Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929.) Dr. Kassab executed the NDA that day. (*Id.* at BAS-3DT 0034929.) On August 23, 2016, Anthony Misener emailed Dr. Kassab the fully executed NDA. (Joint SUMF ¶ 93, App. Ex. 14, BAS-3DT 0034928.)

## XI. Penske Activities After the August 2016 Anniversary of the Parties' Agreement

The third anniversary of the parties' Development Agreement was August 29, 2016. (Joint SUMF ¶ 94; *see also* App. Ex. 2.)

On September 15, 2016, Mr. Misener sent an email to a colleague, Luke Tedesco, copying Shayne Messerly and Mr. Decheek, [redacted] (Joint SUMF ¶ 95, App. Ex. 5, Misener Dep. Ex. 7.) [redacted] (*Id.*) Mr. Misener testified that [redacted] (Joint SUMF ¶ 95, App. Ex. 5, Misener Dep. Tr. 261:19-262:4.)

On September 19, 2016, Dr. Kassab emailed Mr. Misener asking "[s]hould we chat to outline next steps per earlier email?" (Joint SUMF ¶ 96, App. Ex. 4, Kassab Dep. Ex. 7.) On September 30, 2016, Anthony Misener responded to Dr. Kassab stating: "I am working with my team to try to bring together some information from our past work to provide context to our questions. We are having a meeting next week to bring everything together and distill it down to the key issues. I can tell you that one thing that I would like to better understand is the lower level theory behind the experimental set -up and the assumptions made to simplify the approach." (Joint SUMF ¶ 97, App. Ex. 4, Kassab Dep. Ex. 7.)

[redacted] (Joint SUMF ¶ 98, App. Ex. 8, Zentgraf Dep. Ex. 2.) [redacted] (Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2.) [redacted]

[redacted] (Joint SUMF ¶¶ 98-99, Ex. 8, Zentgraf Dep. Ex. 2.)

Anthony Misener testified that [redacted] (Joint SUMF ¶ 100, App. Ex. 5, Misener Dep. Tr. 161:2-5.) [redacted] (Joint SUMF ¶ 100, App. Ex. 5, Misener Dep. Tr. 161:6-16.)

[redacted] (Joint SUMF ¶ 101, App. Ex. 5, Misener Dep. Tr. 162:14-21; App. Ex. 6, Decheek Dep. Tr. 105:3-8; App. Ex. 7, Phillips Dep. Tr. 106:3-7.)

**XII. The Parties' Letters**

On December 6, 2016, over three months after the third anniversary of the Development Agreement, 3DT sent Bard the first in a series of letters exchanged by the parties regarding [redacted] (Joint SUMF ¶¶ 102-08, App. Ex. 15, December 6, 2016 3DT Letter, App. Ex. 16, December 20, 2016 Bard Letter, App. Ex. 5, Misener Dep. Ex. 8, App. Ex. 17, May 10, 2017 3DT Letter, App. Ex. 18. May 19, 2017 Bard Letter.) In this December 6, 2016 letter to Bard's President, John P. Groetelaars, 3DT inquired [redacted]

[redacted] (Joint SUMF ¶ 102, App. Ex. 15, December 6, 2016 3DT Letter.)

On December 20, 2016, Rob Fredericks, Vice President & General Manager at Bard, responded by letter stating, among other things, "[redacted] The letter further stated, [redacted] (Joint SUMF ¶ 103, App. Ex. 16, December 20, 2016 Bard Letter.)

In the December 20, 2016 letter, Mr. Fredericks wrote, [redacted] (Joint SUMF ¶ 104, App. Ex. 16, December 20, 2016 Bard Letter.)

In a February 21, 2017 letter, Bard wrote that it prepared [redacted] (Joint SUMF ¶ 105, App. Ex. 5, Misener Dep. Ex. 8 at 1.) Fredericks wrote in the letter that Bard [redacted]

[redacted] (*Id.* at 2-4.)

[redacted] Rob Fredericks wrote that [redacted] (Joint SUMF ¶ 106, App. Ex. 5, Misener Dep. Ex. 8 at 4.)

On May 10, 2017, 3DT's counsel wrote to Bard claiming that Bard [redacted] (Joint SUMF ¶ 107, App. Ex. 17, May 10, 2017 3DT Letter.) The letter further requests that Bard [redacted]

[redacted] (*Id.*)

Bard responded on May 19, 2017, by stating the following to 3DT in a letter: [redacted] (Joint SUMF ¶ 108, App. Ex. 18, May 19, 2017 Bard Letter.)

**LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). After "the movant has established a prima facie case demonstrating the absence of a genuine issue of material fact," the "nonmoving party must come forward with enough evidence to support a jury verdict in its favor" to defeat grant of summary judgment. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). Critically, the party opposing the motion may "not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). In addition, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ." *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## ARGUMENT

### I. THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN BARD'S FAVOR BECAUSE BARD FULFILLED ITS OBLIGATIONS UNDER THE GOVERNING AGREEMENTS AS A MATTER OF LAW

Under New York law, to prevail on its breach of contract claim, 3DT must prove (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages. *Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (citations omitted). Bard does not dispute the existence of valid contracts between the parties. Rather, the undisputed material facts demonstrate that Bard did not breach its contractual obligations to 3DT. Thus, 3DT cannot sustain its burden on that element and its claim fails as a matter of law. To the contrary, Bard [redacted], more than satisfying the contractual [redacted] (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1 (emphasis added).) This standard of commercial reasonableness is [redacted] That low standard has clearly been exceeded here.

In addition, the Development Agreement vested Bard with [redacted] for a period of time. (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.) That is exactly what it did. The undisputed material facts

demonstrate that Bard satisfied the applicable deferential standard of commercial reasonableness as a matter of law, and [redacted]

Further, the Development Agreement expressly contemplates the circumstances present in this case -- [redacted] The Agreement makes clear that if and when Bard [redacted] (*See* Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1) Because that condition precedent to payment has not occurred, no portion of [redacted] is yet due and owing to 3DT. Finally, because Bard appropriately invoked its [redacted] does not apply. Based on the foregoing and following, summary judgment in favor of Bard is just.

### A. The Contractual Standard for Commercially Reasonable Development Efforts is [redacted] Which Bard Satisfied as a Matter of Law

The Agreements incorporate several legal standards, all of which provided [redacted] to develop the Precisive Navigation Technology. [redacted] Bard was well within its contractual rights to determine [redacted]. That is exactly what Bard did.

Notably, "where[, as here,] the material facts are undisputed, the Court may decide as a matter of law that [Bard's] actions were commercially reasonable." *Leigh Co. v. Bank of N.Y.*, 617 F. Supp. 147, 153 (S.D.N.Y. 1985) (citations omitted). "The standard for satisfying commercial reasonability under New York law is a fairly lenient one[.]" *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020). A party to a contract requiring commercial reasonableness must show "'some conscious exertion to accomplish the agreed goal.'" *Id.* (quoting *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 473 (S.D.N.Y. 2018)). Where "[a]t a minimum, . . . a promise to use commercially reasonable efforts requires that the promising party undertake at least *some* activity," Bard's substantial investment of time and resources certainly satisfied this standard. *Holland Loader*, 313 F. Supp. 3d at 473 (citing *SATCOM Int'l Grp., PLC v. ORBCOMM Int'l Partners, L.P.*, No. 98CIV.9095(DLC), 2000 WL 729110, at *20 (S.D.N.Y. June 6, 2000)) (emphasis added). For example, in *Sekisui Am. Corp. v. Hart*, the court determined a party could not recover on its counterclaim for breach of contract for failure to provide commercially reasonable efforts to market a breast cancer diagnostic assay and to take actions to obtain FDA approval. 15 F. Supp. 3d 359, 362, 370, 381 (S.D.N.Y. 2014). Even under a contractual standard unqualified by [redacted] the *Sekisui* court held that "considerable efforts" to obtain FDA clearance via the 510(k) process were taken. *Id.* at 381. Such efforts included "re-creating files" of data and traveling to Germany in unsuccessful attempts to obtain clinical data, until the company concluded that it would need new clinical studies performed in the United States costing $3.2 million and taking more than three years. *Id.* at 379, 381. Certainly, Bard performed more work on the Penske project than in *Sekisui*, given that *Sekisui* involved a 510(k) submission already made and under FDA review, [redacted]

Moreover, the [redacted] many of the contractual standards discussed in case law because the plain language of the Agreement explicitly provides Bard [redacted] "In any number of contexts, reasonable discretion is commonly understood to allow a decision maker to choose from a broad range of choices not conflicting with law or reason." *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 146 (2d Cir. 2011) (citations omitted); *see also ProSource Tech., LLC v. Housing Trust Fund Corp.*, No. 5972-14, 2015 WL 5797028, at *12 (N.Y. Sup. Ct. Albany Cty. Oct. 2, 2015) (contract requiring "exercise of 'reasonable discretion' [is] an express promise that [a party] will not act arbitrarily, irrationally or without reasonable basis"). Indeed, "[a] good faith standard has been held to apply when a contractual provision leaves implementation decisions to the discretion of the promisor." *Holland Loader*, 313 F. Supp. 3d at 471 (citation omitted); *see also Slamow v. Delcol*, 584 N.Y.S.2d 424, 425 (N.Y. 1992) ("The best evidence of what parties to a written agreement intend is what they say in their writing."). Good faith, however, "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 46 (1972)) (internal quotation marks omitted).

The contractual standard also [redacted] The "business-judgment rule" is "[t]he judicial presumption that in making business decisions not involving direct self-interest or self-dealing, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest." Business-Judgment Rule, Black's Law Dictionary (11th ed. 2019). Here, [redacted]

[redacted] The Penske project did not exist in a vacuum.

Guided by its expertise in developing hundreds of medical devices, Bard agreed to—and did—[redacted] 3DT can point to no evidence of bad faith, because there is none. On the contrary, the evidence demonstrates that Bard [redacted]

An evaluation of Bard's conduct "does not involve a hindsight comparison of the party's actual conduct to that which could have been undertaken to produce a better result; *a court should evaluate only whether the party's actual conduct was sufficient*." *Frieze Events, Inc.*, 441 F. Supp. 3d at 3 (citation and internal quotations omitted) (emphasis added); *Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, No. 03 Civ. 8259 (CSH), 2007 WL 1988150, at *22 (S.D.N.Y. July 9, 2007) ("[a] violation of the good faith duty to . . . use commercially reasonable efforts to obtain the best price – cannot be established simply by observing, in hindsight, that [a party] could have done something differently that would have produced a better result" and plaintiff exercised "commercially reasonable efforts"). Bard's efforts were plainly sufficient here, and indeed 3DT

has presented no evidence that Bard could have obtained a better result with greater effort. [redacted]

Moreover, the undisputed material facts establish that Bard did exactly what it always does to develop medical devices. [redacted] (Joint SUMF ¶ 65, App. Ex. 5, Misener Dep. Tr. 74:16-22; App. Ex. 11, BAS-3DT 0059430; App. Ex. 12, BAS-3DT 0061106; Joint SUMF ¶ 66, App. Ex. 5, Misener Dep. Tr. 72:1-4.) Mr. Decheek described this [redacted] (Bard SUMF ¶ 33; App. Ex. 6, Decheek Dep. Tr. 43:11-16; *see also* Bard SUMF ¶ 29; App. Ex. 6, Decheek Dep. Ex. 4, BAS-3DT 0058898.) Thus, it was typical for [redacted] (Bard SUMF ¶ 33; App. Ex. 6, Decheek Dep. Tr. 43:5-9.) In Mr. Misener's experience at Bard, [redacted] (Joint SUMF ¶ 67, App. Ex. 5, Misener Dep. Tr. 261:19-262:4 (emphasis added).) In addition, every project Mr. Misener works on, [redacted] (Joint SUMF ¶ 34, Mantell Decl., Ex. C, Misener Dep. Tr. 210:12-16.) [redacted] There is nothing "arbitrary, irrational, or without reasonable basis" about this business practice. *See ProSource Tech., LLC*, 2015 WL 5797028, at *12. On the contrary, it helps Bard [redacted] Neither the law nor the Development Agreement, [redacted] permit 3DT to second-guess Bard's sound business practices. Accordingly, this Court

should hold that Bard meets the [redacted] as a matter of law, and grant summary judgment for Bard.

[redacted] **Bard Provided Commercially Reasonable** [redacted]

As noted above, the Development Agreement provides Bard with [redacted] Bard undertook significant efforts in good faith, described in this section, to develop the Penske technology. These efforts, described in more detail below, easily exceeded the low threshold for commercial reasonableness, particularly because [redacted] Accordingly, Bard respectfully requests that this Court grant its motion for summary judgment.

[redacted] – *far more* than the "*some* activity" required to meet the commercial reasonableness standard. Bard's work was performed by skilled team members across a variety of disciplines, whose dedication reflected the enormous financial commitment Bard made in acquiring the technology. Consistent with its normal business practices, within two weeks of the acquisition, Bard assembled a cross-functional team with on-the-job expertise and educational background in project management, research and design, marketing, and regulatory affairs – all of the major aspects of the development pathway. (*See* Joint SUMF ¶ 27, App. Ex. 5, Misener Dep. Tr. 43:5-20; 52:22-53:11; App. Ex. 7, Phillips Dep. Tr. 128:21-129:11; *see also* Joint SUMF paragraphs discussing the Penske team members, their specialties, education, and prior experience: Joint SUMF ¶ 21, App. Ex. 5, Misener Dep. Tr. 10:8-11:2; 11:15-12:23; 47:11-15;

Joint SUMF ¶ 23, App. Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5; Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15; Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22; App. Ex. 8, Zentgraf Dep. Tr. 7:8-16; 8:4-5, 23-24; 10:22-25, 14:11-16; App. Ex. 5, Misener Dep. Tr. 81:7-15; 104:7-8.) Mr. Misener felt fortunate to have two additions to the R&D engineering team to help get the work done, particularly where it was atypical for him to obtain increased headcount during that time. (*See* App. Ex. 5, Misener Dep. Tr. at 85:8-21; 86:25-87:5.) The entire team met regularly on this project. (Joint SUMF ¶ 24, App. Ex. 5, Misener Dep. Tr. 79:2-4; Joint SUMF ¶ 24, App. Ex. 6, Decheek Dep. Tr. 27:12-18.) [redacted] (Joint SUMF ¶ 47, App. Ex. 5, Misener Dep. Tr. 107:22-108:9; *id*. at Misener Dep. Tr. 241:17-20.)

As described in detail above, these team members conducted broad-based efforts across multiple disciplines – [redacted] in an attempt to develop a product that could be cleared and commercialized [redacted]

***1.*** [redacted]

[redacted] (Joint SUMF ¶ 105, App. Ex. 5, Misener Dep. Ex. 8 at 3) [redacted] (Joint SUMF ¶ 40, App. Ex. 5, Misener Dep. Tr. 245:18-20; App. Ex. 9, Davis Dep. Ex. 5). [redacted] (Joint SUMF ¶ 43, App. Ex. 7, Phillips Dep. Tr. 63:5-6, 63:13-21; Joint SUMF ¶ 44, App. Ex. 5, Misener Dep. Tr. 116:20-24; Bard SUMF ¶ 18, Mantell Decl., Ex. C, Misener Dep. Tr. 117:7-10.) [redacted]

[redacted] (Joint SUMF ¶ 45, App. Ex. 9, Davis Dep. Tr. 10:13-18.) [redacted] (Bard SUMF ¶ 20; App. Ex. 9, Davis Dep Tr. 18:20-21; Bard SUMF ¶ 20; App. Ex. 9, Davis Dep Tr. 19:12-22.) To be commercially reasonable, Bard's efforts need not be successful; they must exist. *See Sekisui Am. Corp.*, 15 F. Supp. 3d at 378, 381 (despite unsuccessful attempts to obtain clinical data, company's work was commercially reasonable as a matter of law, requiring dismissal).

During this time, Bard (a company that had been developing and manufacturing PICC devices for years) made the reasonable business decision to [redacted] (*See* Bard SUMF ¶ 22, Mantell Decl., Ex. E, Davis Dep. Tr. 67:6-9; Joint SUMF ¶ 48, App. Ex. 5, Misener Dep. Tr. 91:2-6; Joint SUMF ¶ 48, App. Ex. 9, Davis Dep. Ex. 3, BAS-3DT 0053803). Importantly, this decision was in line with the Parties' Agreement. The Purchase Agreement contemplates [redacted] (Joint SUMF ¶ 9, App. Ex. 1, Purchase Agreement Section 1.01.) Under the circumstances, Bard's decision to [redacted]

Still, the team [redacted] (Joint SUMF ¶ 49, App. Ex. 5, Misener Dep. Tr. 111:16-17; Joint SUMF ¶ 50, App. Ex. 5, Misener Dep. Tr. 111:3-7; *see also* Joint SUMF ¶ 51, App. Ex. 7, Phillips Dep. Tr. 64:22-23; Bard SUMF ¶ 21; App. Ex. 7, Phillips Dep. Tr. 64:9-13). [redacted]

[redacted] (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.)

[redacted]s (Joint SUMF ¶¶ 57, 58, App. Ex. 6, Decheek Dep. Tr. 22:25-23:9), [redacted] (Joint SUMF ¶ 61, App. Ex. 6, Decheek Dep. Tr. 24:11-20; Bard SUMF ¶ 28; Mantell Decl., Ex. B, Phillips Dep. Tr. 88:7-25.) Those efforts likewise constituted [redacted]

***3.*** [redacted]

No product – even if safe and effective in practice – can be brought to market without the FDA's blessing. (Joint SUMF ¶ 30, App. Ex. 7, Phillips Dep. Tr. 23:23-24:2, 24:11-12; *see generally* Joint SUMF ¶¶ 30-34.) [redacted]

[redacted] (Joint SUMF ¶ 55, App. Ex. 7, Phillips Dep. Tr. 37:4-10; Joint SUMF ¶ 56, App. Ex. 7, Phillips Dep. Tr. 127:13-20.) [redacted] (*See* Bard SUMF ¶ 26; App. Ex. 7, Phillips Dep. Tr. 126:21:127:12.) Such concern is commercially reasonable as a matter of law, even without regard to the deferential standard that applies under the Agreements at issue here. *See Holland Loader*, 313 F. Supp. 3d at 474 (no breach of contract where defendant turned down a business opportunity for which it could not meet deadlines while following internal process, as it "operated for 135 years and has a reputation in the global mining market that it seeks to uphold[,] requir[ing] that any product or system that it sells comply with its internal safety, design, and engineering specifications"). [redacted] That concern was reasonable and warranted. By no means was Bard acting "arbitrarily, irrationally or without reasonable basis," as required for 3DT to prevail on its breach of contract claim. *See ProSource Tech., LLC,* 2015 WL 5797028, at *12.

[redacted] (Bard SUMF ¶¶ 1, 2, Mantell Decl., Ex. A, Kassab Dep. Tr. 34:3-9; 22:21-23:17.) [redacted] (Bard SUMF ¶ 2, Mantell. Decl. Ex. A, Kassab Dep. Tr. 34:3-9.)

Specifically, to obtain 510(k) clearance, federal statutes and FDA regulations require Bard to demonstrate that its new device is "substantially equivalent" to a legally marketed "predicate" device. 21 U.S.C. §§630(k), 360(n), 360c(f) (1) & 360c(i) (1) (A); 21 C.F.R. §807.92(a) (3).

[redacted] (Bard SUMF ¶ 8, Mantell Decl., Ex. A, Kassab Dep. Tr. 76:11-77:19, Bard SUMF ¶ 9, Mantell Decl., Ex. A, Kassab Dep. Tr. 77:20-23, Bard SUMF ¶ 23, Mantell Decl., Ex. B, Phillips Dep. Tr. 91:12-25) [redacted] (Bard SUMF ¶ 8, Mantell Decl., Ex. A, Kassab Dep. Tr. 76:11-77:19; Bard SUMF ¶ 9, Mantell Decl., Ex. A, Kassab Dep. Tr. 77:20-23.)

[redacted] (Joint SUMF ¶ 52, App. Ex. 7, Phillips Dep. Tr. 54:11-14; Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 54:11-14; Bard SUMF ¶ 27, App. Ex. 7, Phillips Dep. Tr. 54:15-22.) [redacted] (Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 51:12-15.) [redacted] (Bard SUMF ¶ 30, App. Ex. 7, Phillips Dep. Tr. 128:6-20.) [redacted] As both Bard and Dr. Kassab understood, if the FDA deemed the identified predicates inappropriate or the submission insufficient, the product would be subjected to a more stringent FDA review process, and costs would increase exponentially. (Bard SUMF ¶ 13, Mantell Decl., Ex. B, Phillips Dep. Tr. 55:19-24; Bard SUMF ¶ 14, Mantell Decl., Ex. A, Kassab Dep. Tr. 119:8-11.) [redacted]

[redacted] (Joint SUMF ¶ 81, App. Ex. 5, Misener Dep. Tr. 155:18-20; App. Ex. 7, Phillips Dep. Tr. 110:21-111:5; Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 110:21-111:5; *see also* Joint SUMF ¶ 81, App. Ex. 8, Zentgraf Dep. Ex. 2 ([redacted].)

As with any new product, Bard's regulatory strategy for Penske was memorialized in document called a [redacted] (Bard SUMF ¶ 25, App. Ex. 7, Phillips Dep. Tr. 128:24-129:11.) [redacted] (Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-8.) [redacted] (Bard SUMF ¶ 38, Mantell Decl., Ex. C, Misener Dep. Tr. 156:22-157:6; Bard SUMF ¶ 39, Mantell Decl., Ex. C, Misener Dep. Tr. 157:13-19; Bard SUMF ¶ 40, Mantell Decl., Ex. C, Misener Dep. Tr. 157:20-158:4.; Bard SUMF ¶ 41, Mantell Decl., Ex. B, Phillips Dep. Tr. 121:9-15.) [redacted] (Joint SUMF ¶ 85, App. Ex. 5, Misener Dep. Tr. 276:21-277:16; Joint SUMF ¶ 86, App. Ex. 7, Phillips Dep. Ex. 17.)

***4.*** [redacted]

[redacted] (Joint SUMF ¶ 98, App. Ex. 8, Zentgraf Dep. Ex. 2; Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2.) Further, Bard worked to negotiate and sign a new NDA with Dr. Kassab to allow him to assist. (Joint SUMF ¶ 88, App. Ex. 4, Kassab Dep. Ex. 6; Joint SUMF ¶ 89, App. Ex. 13, 3DT Prod. 0000101-0000103; Joint SUMF ¶ 90, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 91, App. Ex. 14, BAS-3DT 0034928-0034929.) [redacted] (Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 93, App. Ex. 14, BAS-3DT 0034928; Joint SUMF ¶ 96, App. Ex. 4, Kassab Dep. Ex. 7; Joint SUMF ¶ 97, App. Ex. 4, Kassab Dep. Ex. 7.)

[redacted] (Bard SUMF ¶ 44, Ex. F, BAS-3DT 0056333; Joint SUMF ¶ 95, App. Ex. 5, Misener Dep. Tr. 261:19-262:4 (e-mail indicating [redacted])

[redacted] (Joint SUMF ¶¶ 102-08, App. Ex. 15, December 6, 2016 3DT Letter, App. Ex. 16, December 20, 2016 Bard Letter, App. Ex. 5, Misener Dep. Ex. 8, App. Ex. 17, May 10, 2017 3DT Letter, App. Ex. 18. May 19, 2017 Bard Letter.) These letters revealed [redacted]

[redacted] (Joint SUMF ¶ 104, App. Ex. 16, December 20, 2016 Bard Letter), [redacted]

**C. <u>After the</u> [redacted]**

Ultimately, Bard decided [redacted] Importantly, the Development Agreement [redacted] (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.) Specifically, the provision states, in relevant part:

> [redacted]

(*Id.*) As demonstrated herein, this determination was made in good faith, consistent with Bard's reasonable business judgment.

[redacted] (Bard SUMF ¶ 31; App. Ex. 7, Philips Dep. Tr. 19:11-20:2), [redacted]

[redacted] Joint SUMF ¶ 69, App. Ex. 7, Phillips Dep. Tr. 123:16-20; Joint SUMF ¶ 70, App. Ex. 7, Phillips Dep. Tr. 21:21-22:9). [redacted] (Joint SUMF ¶ 70, App. Ex. 7, Phillips Dep. Tr. 21:10-20), [redacted] (Bard SUMF ¶ 31; App. Ex. 7, Phillips Dep. Tr. 19:25-20:2; Joint SUMF ¶ 71, App. Ex. 5, Misener Dep. Tr. 200:22-25.) [redacted]

[redacted] (Joint SUMF ¶ 71, App. Ex. 5, Misener Dep. Tr. 200:8-19.) [redacted] (*Id.* at Misener Dep. Tr. 208:20-22.) Accordingly, on December 20, 2016 [redacted] (Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2) – Rob Fredericks, Vice President & General Manager at Bard, informed 3DT that [redacted] (Joint SUMF ¶ 103, App. Ex. 16, December 20, 2016 Bard Letter.) Bard's February 2017 letter [redacted] (Joint

SUMF ¶ 106, App. Ex. 5, Misener Dep. Ex. 8 at 4.) This decision was more than reasonable, given [redacted]

Dr. Kassab's testimony supports the reasonableness of Bard's decision. He conceded that [redacted] (Bard SUMF ¶ 32, Mantell Decl., Ex. A, Kassab Dep. Tr. 121:1-4), [redacted] (*id.* at Kassab Dep. Tr. 121:5-11), [redacted] (*id.* at Kassab Dep. Tr. 124:3-8). In large [redacted]

**D. Bard Does Not Owe 3DT [redacted] Has Not Been Achieved**

The Purchase Agreement provides for [redacted] (Joint SUMF ¶ 10, App. Ex. 1, Purchase Agreement Section 2.04(b).) Clearly, despite the Penske team's significant efforts, [redacted] Therefore, this [redacted] to 3DT. Instead, the Development Agreement expressly contemplated this situation. The Development Agreement allows [redacted] (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.) It states, in pertinent part:

[redacted]

[redacted]

(*Id.*) Bard intends to make good on its promise and [redacted] in the future.

**E. Bard Does Not Owe 3DT [redacted] Does Not Apply On These Facts**

As discussed extensively above, Bard availed itself of the provision in the Development Agreement permitting it to [redacted] While there is also a provision in the Purchase Agreement allowing Bard to [redacted] (Joint SUMF ¶ 11, App. Ex. 1, Purchase Agreement Section 2.04(b).) For all the reasons stated above, this [redacted] provision simply does not apply to these facts. Bard's concerted efforts to develop the Precisive Navigation Technology [redacted] fit squarely within the parameters of Section 2.1 of the Development Agreement. Therefore, Bard is relieved of its obligation to [redacted]

## II. BARD IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### A. The Claim is Duplicative of its Breach of Contract Claim

New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when it is based on the same facts as the breach of contract[.]" *Champagne v. United States*, 15 F. Supp. 3d 210, 221 (N.D.N.Y. 2014) (quoting *Washington v. Kellwood Co.*, No. 05 CIV. 10034 (DAB), 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009) (internal quotations omitted). For example, in *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, the First Department held that a "cause of action for breach of the implied duty of

good faith and fair dealing should have been dismissed in its entirety" because "[t]he allegation that defendant exercised its discretion in bad faith merely restate[d] the contract-based claims[.]" 87 A.D.3d 287, 297 (1st Dep't 2011). This is essentially what 3DT claims here. 3DT alleges "that it "initially … received occasional requests for assistance with the project from Bard" (Compl. ¶ 17), but that "[p]rior to August 29, 2016, Bard stopped requesting assistance from 3DT, and provided no information regarding its efforts to advance the Precisive Navigation Technology, commercialize the Products, and obtain FDA approval for the Products," (*id.* ¶ 19) "in order to avoid payment of the Full Milestone Payment" (*id.* ¶ 22).

Here, the Development Agreement expressly requires [redacted]. Therefore, any claim of an implied duty of good faith is duplicative of the breach of contract claim. This Court should dismiss this claim as a matter of law.

**B. 3DT Impermissibly Seeks to Create New Contractual Rights and Contradict the Express Language of the Agreement**

Moreover, a plaintiff cannot prevail on a claim for breach of the implied covenant of good faith and fair dealing unless: "(1) defendant must owe plaintiff a duty to act in good faith and conduct fair dealing; (2) defendant must breach that duty; and (3) the breach of duty must proximately cause plaintiff's damages." *Champagne*, 15 F. Supp. 3d at 221 (citation omitted). "The implied 'covenant [of good faith and fair dealing] embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 466 (S.D.N.Y. 2013) (subsequent history omitted) (citing *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (N.Y. 2002)).

The scope of this implied covenant has limits, however. It "cannot be construed so broadly as effectively … to create independent contractual rights." *Fesseha v. TD Waterhouse Inv. Servs., Inc.*, 761 N.Y.S.2d 22, 23 (1st Dep't 2003) (citations omitted). Further, conduct expressly

sanctioned by the contract cannot form the basis for an alleged breach. *See, e.g.*, *Clalit Health Servs. v. Israel Humanitarian Found.*, 395 F. Supp. 2d 21, 23 (S.D.N.Y. 2005) (citing 23 Richard A. Lord, Williston on Contracts § 63:22 (4th ed. 2004) ("There can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged[.]")).

The Development Agreement governs the agreement of the parties with respect to [redacted] (Joint SUMF ¶ 13, App. Ex. 2, Development Agreement Preamble.) This language neither requires Bard to keep 3DT informed about its Penske development activities and actions to obtain FDA approval prior to the third anniversary, (Compl. ¶ 39), nor requires Bard to "provide to 3DT the information necessary to ascertain the validity of Bard's assertion that it had allegedly identified a technology that is superior to the Precisive Navigation Technology" (*id*. at 40). Indeed, as explained above, the Agreements vest Bard with [redacted] Bard was under no obligation to provide such information to 3DT under the governing agreements, and any refusal to do so could not, and did not, deprive 3DT of the fruits of the contract, [redacted] The language of the Development Agreement expressly defers to [redacted]. (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.) The implied covenant "does not operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly

bargained-for benefits." *Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, No. 08 Civ. 4341 (RJS), 2009 WL 1054830, at *5 (S.D.N.Y. Apr. 17, 2009). The Development Agreement's bargained-for terms expressly [redacted]. This also makes sense, because Bard had substantial experience in bringing a medical device to market, whereas 3DT had none. Similarly, even if Bard had a duty to keep 3DT informed or otherwise provide information to 3DT about the Penske project, 3DT cannot demonstrate damages flowing from any breach because any purported lack of information was not the cause of, and is wholly unrelated to, 3DT's purported harm.

## CONCLUSION

For the foregoing reasons, Defendant Bard Access Systems, Inc. respectfully requests that this Court grant its Motion for Summary Judgment on all claims in the Complaint.

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

By: /s/ *Natalie* H. Mantell
Natalie H. Mantell

Natalie H. Mantell
Meghan McSkimming
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
Facsimile: (973) 624-7070
nmantell@mccarter.com
mmcskimming@mccarter.com

*Attorneys for Defendant*
*Bard Access Systems, Inc.*

Dated: March 26, 2021