**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| 3DT Holdings LLC, | ) | |
| | ) | Civil Action No. 1-17-cv-05463-LJL-GWG |
| Plaintiff, | ) | |
| | ) | |
| Bard Access Systems Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**PLAINTIFF 3DT HOLDINGS, LLC'S**

**MEMORANDUM OF LAW IN OPPOSITION TO**

**BARD ACCESS SYSTEMS INC.'S MOTION FOR SUMMARY JUDGMENT**

Table of Contents

**TABLE OF AUTHORITIES** .......... 3

**Cases** .......... 3

**I. STATEMENT OF FACTS** .......... 4

***The Parties*** .......... 4

***Sale of Precisive Navigation Technology*** .......... 4

***Purchase Agreement*** .......... 5

***Development Agreement*** .......... 6

***Statement of Work*** .......... 7

***Development of Precisive Navigation Technology*** .......... 7

***Communications Between 3DT and Bard*** .......... 21

***Alleged Issues with Precisive Navigation Technology*** .......... 25

[redacted] .......... 25

***Penske Development Since 2016*** .......... 27

**II. PROCEDURAL HISTORY** .......... 28

**III. SUMMARY JUDGMENT STANDARD** .......... 29

**IV. ARGUMENT** .......... 30

**A. Bard Never Determined that [redacted] and, Therefore, Bard Did Not Properly Stop Development of the Penske Project.** .......... 30

**B. Bard Failed to Provide [redacted] as Required by the Agreement.** .......... 35

**i. Commercially Reasonable Standard** .......... 36

**ii. Bard Unquestionably Stopped Providing [redacted] Development of Penske Prior to [redacted], the [redacted] of the Development Agreement.** .......... 37

**iii. A Question of Fact Exists as to Whether Bard Ever Provided Commercially Reasonable Resources to Penske.** .......... 43

**C. Bard is not Entitled to Judgment as a Matter of Law with Respect to 3DT's Claim for Breach of the Duty of Good Faith and Fair Dealing.** .......... 50

**V. Conclusion** .......... 54

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).................................................. 30
*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F.Supp.2d 596, 601 (S.D.N.Y.2012)... 30, 31
*Betances v. Fischer*, 403 F.Supp.3d 212, 221 (S.D.N.Y 2019) .................................................. 30
*Bear, Stearns Funding, Inc. v. Interface Grp. – Nevada, Inc.*, 2007 WL 1988150, at *22 (S.D.N.Y July 10, 2007)........................................................................................................ 37
*Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F.Supp.2d 912, 926 (E.D. Cal. 2010) ...................... 37
*Holland Loader Company, LLC v. FLSmidth*, 313 F.Supp.3d 447, 469 (S.D.N.Y.2018) 37, 43, 44
*Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986) ........................................................................ 30
*Lasalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2nd Cir. 2005)...... 34
*Matter of Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 763 (N.Y. App. Div. 2003) 32
*Nomura Credit & Capital, Inc.*, 92 N.E.3d 743, 747 (N.Y. App. Div. 2017) ............................. 32
*Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534 (N.Y. App. Div. 1996) .............................. 32
*UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.*, 660 F.3d 643, 649 (2nd Cir. 2011) ........................................................................................................................ 31
*United Rentals (North America), Inc. v. Conti Enters., Inc.,* 293 F.Supp.3d 447, 451 (S.D.N.Y.2018) .......................................................................................................... 30
*Washington v. Kellwood Co.*, 2009 WL 855652, at *6 (S.D.N.Y. 2009) ................................... 50

## Other Resources

PRACTICABLE, Black's Law Dictionary (11th ed. 2019)....................................................... 34

## Rules

Federal Rule of Civil Procedure 56 ......................................................................................... 30

# I. STATEMENT OF FACTS

***The Parties***

3DT Holdings, LLC ("3DT") is an innovation engine that looks for unmet needs in the medical community and develops technologies and solutions to meet those needs. (Dkt. Nos. 75-76, Declaration of Daniel Gibson [Gibson Dec.] Ex. 1, Kassab Dep. Tr. 22:7-23:25.) 3DT's primary area of focus is the heart and blood vessels. (Dkt. Nos. 75-76, Gibson Dec. Ex. 1, Kassab Dep. Tr. 22:17-18.) Bard Access Systems, Inc. ("Bard") is a medical device manufacturer with expertise in heart catheter navigation and tip location. (Dkt. Nos. 75-76, Gibson Dec. Ex. 1, Kassab Dep. Tr. 60:23-61:1.)

***Sale of Precisive Navigation Technology***

[redacted]. (Dkt. No. 72 ¶ 3; Parties Joint Statement of Facts and Joint Appendix [J.A.] Ex. 2, Purchase Agreement Recitals.) [redacted]. (Dkt. No. 72 ¶ 4; J.A. Ex. 2 § 2.1) [redacted]. (Dkt. No. 72 ¶ 5; J.A. Ex. 4, Kassab Dep. Tr. 51:20-52:6.)

[redacted] (Dkt. No. 72 ¶ 6; J.A. Ex. 4, Kassab Dep. Tr. 59:22-60:5, 60:23-61:1, 62:2-

21.) On August 29, 2013, 3DT and Bard formalized Bard's acquisition of the Precisive Navigation Technology through several agreements, including specifically: (1) the Asset Purchase Agreement ("Purchase Agreement"); (2) the Design, Development and Services Agreement ("Development Agreement"); and (3) the Statement of Work. (Dkt. No. 72 ¶ 7; J.A. Ex.'s 1, 2, 3.)

***Purchase Agreement***

Section 2.04(b) of the Purchase Agreement provides [redacted]" (Dkt. No. 72 ¶ 10; J.A. Ex. 1)

Section 2.04(b) of the Purchase Agreement further states, [redacted] (Dkt. No. 72 ¶ 11; J.A. Ex. 1.)

Section 8.06 of the Purchase Agreement provides that the Agreement will be governed by and construed and interpreted in accordance with the substantive laws of the State of New York. (J.A. Ex. 1 p. 33).

### ***Development Agreement***

The Development Agreement sets forth the agreement of the parties with respect to [redacted] (Dkt. No. 72 ¶ 13; J.A. Ex. 2.)

Section 2.1 of the Development Agreement provides:

[redacted]

Section 2.1 of the Development Agreement further states:

[redacted]

(Dkt. No. 72 ¶ 14; J.A. Ex. 2.) The "third (3rd) anniversary of the Effective Date" occurred on August 29, 2016. (Dkt. No. 72 ¶ 15; J.A. Ex. 2.) Section 9.1 of the Development Agreement provides: [redacted] (Dkt. No. 72 ¶ 16; J.A. Ex.2)

***Statement of Work***

The Statement of Work ("SOW"), [redacted] (Dkt. No. 72 ¶ 18; J.A. Ex. 3.)

[redacted] (Dkt. No. 72 ¶ 19; J.A. Ex. 3.)

***Development of Precisive Navigation Technology***

Bard used the name "Penske" internally to refer to the Precisive Navigation Technology and the team dedicated to its development. (Dkt. No. 72 ¶ 20; J.A. Ex. 5, Misener Dep. Tr. 43:21-44:7.)

**Penske Team**

Bard assigned Anthony Misener to be the project leader for Penske. (Dkt. No. 72 ¶ 21; J.A.

Ex. 5, Misener Dep. Tr. 47:11-15.) Bard assembled a cross-functional team that included the following key members:

a. Anthony Decheek, then a product manager in marketing with six years' experience as a contracts manager. (Dkt. No. 72 ¶ 23(a); J.A. Ex. 6, Decheek Dep. Tr. 9:17-10:7.) Mr. Decheek was assigned to other projects in addition to Penske, which Decheek felt was "pretty standard." (Dkt. No. 72 ¶ 23(a); J.A. Ex. 6, Decheek Dep. Tr. 20:12-23.)

b. Chris Phillips as a Regulatory Specialist II. (Dkt. No. 72, ¶ 23(b); J.A. Ex. 7, Phillips Dep. Tr. 12:11-24.) Mr. Phillips was assigned to four or five other projects in addition to Penske, which he stated was "our target." (Dkt. No. 72 ¶ 23(b); J.A. Ex. 7, Phillips Dep. Tr. 38:17-22.)

c. Zach Davis as a Research and Development engineer with a background in electromagnetics. (Dkt. No. 72 ¶ 23(c); J.A. Ex. 9, Davis Dep. Tr. 7:2-3.) Penske was Mr. Davis' first engineering medical device development project. (Dkt. No. 72 ¶ 23(c); J.A. Ex. 9, Davis Dep. Tr. 7:18-22.) Davis was a new hire for Bard and was not devoted solely to the Penske project. (Dkt. Nos. 75-76 Gibson Dec. Ex. 2, Misener Dep. Tr. 81:14-24.)

d. Brian Cieselwicz as a Research and Development engineer. (Dkt. No. 72 ¶ 23(d); J.A. Ex. 5, Misener Dep. Tr. 81:7-15.) Cieselwicz was a new hire for Bard and was not devoted to the Penske project. (Dkt. Nos. 75-76 Gibson Dec. Ex. 2, Misener Dep. Tr. 81: 14-24.)

e. Brad Zentgraf as a Research and Development engineer assigned to Penske in 2015 with a background in bioengineering. (Dkt. No. 72 ¶ 23(e); J.A. Ex. 8,

Zentgraf Dep. Tr. 7:8-16.)

The cross-functional team tried to meet once per week in what Bard called Penske Integration Meetings. (Dkt. No. 72 ¶ 24; J.A. Ex. 5, Misener Dep. Tr. 79:2-4; J.A. Ex. 6, Decheek Dep. Tr. 27:12-18.) Typically, research and development employees of Bard are assigned to work on at least two projects, if not more. (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. p. 17:21-24.) Misener felt very understaffed and in need of more help considering Bard's portfolio of projects. (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. pp. 82:1-84:21.)

**Initial Scope and Timeline**

[redacted]. (Dkt. No. 72 ¶ 27; J.A. Ex. 5, Misener Dep. Tr. 43:5-20, 52:22-53:11; J.A. Ex. 7, Phillips Dep. Tr. 128:21-129:11.) [redacted] (Dkt. No. 72 ¶ 28.) [redacted] (Dkt. No. 72 ¶ 26; J.A. Ex. 5, Misener Dep. Tr. 89:25-90:8.)

**Bard's Design Control Process**

[redacted]. (Dkt. No. 72 ¶ 35; Dkt. No. 72-6, Misener Dep. Tr. 19:1-5, 17-24.) The 510(k) phase is a process to obtain the Food and Drug Administration's permission to market a medical device by submitting testing and other documentation to the FDA demonstrating the device "to be substantially equivalent to an existing product that has been approved or cleared by

the FDA[.]" (Dkt. No. 72 ¶ 30; J.A. Ex. 7, Phillips Dep. Tr. 23:23-24:2, 24:11-12.)

[redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 3, Zentgraf Dep. Tr. 54:6-16.) [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 3, Zentgraf Dep. Tr. 59:4-14.) [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. 156:3-12.)

**Bard Development Efforts (Acquisition through 2015)**

[redacted] (Dkt. No. 72 ¶ 48; J.A. Ex. 5, Misener Dep. Tr. 91:2-6.) On February 23, 2015, Anthony Misener wrote to members of the team, "[redacted]" (Dkt. No. 72 ¶ 48; J.A. Ex. 9, Davis Dep. Ex. 3.) Dr. Kassab testified that he was informed by Anthony Misener [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 1, Kassab Dep. Tr. 111:9-22.) Misener testified that the decision [redacted]. (Declaration of Daniel J. Gibson in Opposition to Defendant's Motion for Summary Judgment ["Gibson Opp. Dec."] Ex. 4, Misener Dep. Tr. 193:11-194:25.)

The Penske Integration Meeting minutes dated January 7, 2015, [redacted]

[redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 4, January 2015 Penske Integration Meeting Minutes.) [redacted]

(Dkt. No. 72 ¶ 77; J.A. Ex. 7, Phillips Dep. Ex. 4.)

[redacted]." (Dkt. No. 72 ¶ 54; J.A. Ex. 7, Phillips Dep. Tr. 72:7-15, Phillips Dep. Ex. 4.)

Chris Phillips testified that by [redacted] (Dkt. No. 72 ¶ 79; J.A. Ex. 7, Phillips Dep. Tr. 78:7-18, Phillips Dep. Ex. 7.) Chris Phillips testified the [redacted]

(Dkt. No. 72 ¶ 80; J.A. Ex. 7, Phillips Dep. Tr. 26:6-10, 27:1-9, 34:9-13.)

[redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 5, Phillips Dep. Tr. pp. 90:10-91:4, Phillips Dep. Ex.'s 11, 13.) [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 5, Phillips Dep. Tr. pp. 90:10-93:14.)

At least one Penske concept design review meeting was held in July 2015, and another was held in October 2015. (Dkt. No. 72 ¶ 78; J.A. Ex. 7, Phillips Dep. Tr. 78:3-6, 78:19-22; J.A. Ex. 9, Davis Dep. Tr. 110:8-19.) [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 6, Penske Animal Study Summary.) [redacted] (Dkt. No. 72 ¶ 82; J.A. Ex. 8, Zentgraf Dep. Ex. 2.) [redacted]. (Dkt. No. 72 ¶ 81; J.A. Ex. 5, Misener Dep. Tr. 155:18-20; J.A. Ex. 7, Phillips Dep. Tr. 110:21-111:5.)

[redacted]. (Dkt. No. 72 ¶ 83; J.A. Ex. 6, Decheek Dep. Ex. 11.) The December 17, 2015, Penske Integration Meeting Minutes [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 7, December 2015 Penske Integration Meeting Minutes.

**Penske Development 2016**

From the end of 2015 to January 2016, Bard began the process of acquiring another unrelated technology, Nautilus Delta, a project Bard referred to as "[redacted]" (Dkt. No. 72 ¶ 73; J.A. Ex. 5, Misener Dep. Tr. 217:9-10; J.A. Ex. 6, Decheek Dep. Ex. 12.) The January 2016 Marking Monthly Report stated that [redacted] due diligence was completed. (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Ex. 12.) On January 11, 2016, Misener informed Decheek that Ed Burnside (Bard VP of Research and Development) was "[redacted]" and "[redacted]" (Dkt. Nos. 75-76, Gibson Dec. Ex. 9, January 11, 2016 Email between Misener and Decheek.)

On the same date, Luke Tedesco – Senior Financial Analyst – asked Misener whether [redacted]" Ed Burnside then responded that Misener should [redacted]." (Dkt. Nos. 75-76, Gibson Dec. Ex. 10, January 11, 2016 Bard Email.)

In January 2016, Zach Davis was "redirected to not forget about Penske, but to work on some other business critical items too" (Dkt. No. 72 ¶ 74; J.A. Ex. 9, Davis Dep. Tr. 9:20-10:5.) "with the emphasis being put on the Nautilus Delta project that had popped up." (Dkt. No. 72 ¶ 74; J.A. Ex. 9, Davis Dep. Tr. 17:19-23.) Brad Zentgraf does not recall Anthony Misener ever telling him that the Penske project was put on hold – "I don't remember him saying those specific words. You know, he let me know that I needed to focus my time to [redacted] and the Nautilus

Delta projects, but it was my expectation that I would be told to work on something else at a later date." (Dkt. No. 72 ¶ 75; J.A. Ex. 8, Zentgraf Dep. Tr. 34:14-20.)

On January 25, 2016, Misener sent an email stating that in PSR tomorrow he would report "the significant delay to Penske…completely due to the [redacted] project." (Dkt. No. 72 ¶ 76; J.A. Ex. 5, Misener Dep. Tr. 230:15-16, Misener Dep. Ex. 3.) PSR is a monthly project review with the Management Board consisting of "the VP and general manager in Salt Lake and then the vice presidents of quality, regulatory, research and development and marketing and sales." ((Dkt. No. 72 ¶ 76; J.A. Ex. 5, Misener Dep. Tr. 23:14-17.) According to Anthony Misener, resources were being diverted from Penske to [redacted] thereby causing the delay. (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. p. 238:8-16.)

The Project Status Report for Penske dated January 25, 2016, moved the projected Penske [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 11, January 25, 2016 Project Status Report.) [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Ex.'s 12, 13; Gibson Dec. Ex. 12, March 2016 Marketing Monthly Report.)

On January 25, 2016, Davis reported to a third-party vendor [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Ex. 5.) On February 9, 2016, Randi Cleverly asked Misener via email [redacted]." Misener responded by stating that [redacted]

[redacted].” (Dkt. Nos. 75-76, Gibson Dec. Ex. 13 February 9, 2016 Email between Misener and Cleverly.)

On February 16, 2016, Davis reported to another third-party vendor [redacted].” (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. p. 234:1-235:9, Misener Dep. Ex. 4.) On February 17, 2016, Davis again reported to a third-party vendor that [redacted].” (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Ex. 6.) On February 19, 2016, Misener continued to report on the slowdown in Penske development [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. 216:17-21, Misener Dep. Ex. 1.) On February 19, 2016, Davis reported to a third-party vendor [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 14, Davis Dep. Tr. pp. 63 :3-14, Davis Dep. Ex. 2.)

On March 8, 2016, Zentgraf sent an email to [redacted] (i.e., Trunk Cable Development):” The email further states “[redacted].” (Dkt. Nos. 75-76, Gibson Dec. Ex. 15, March 8, 2016 Email between Zentgraf and Tino.)

On March 11, 2016, Anthony Misener asked Kerrie Hamblin and Chris Phillips via email "[redacted]?" (Dkt. No. 72 ¶ 86; J.A. Ex. 7, Phillips Dep. Ex. 17.)

During an April 1, 2016 teleconference, it was reported that the timeline for the expected launch or commercialization of Penske [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Tr. pp. 72:20-73:11, Decheek Dep. Ex. 15.) According to Decheek, [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Tr. pp. 86:7-10, 88:25-89:5, Decheek Dep. Ex. 19.) [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 16, April 2016 Marketing Monthly Report.)

On April 26, 2016, Ashley Krogh, a Senior Financial Analyst at Bard, emailed Anthony Misener copying Daniel Read, asking, "Can you please update us on the Penske PICC project? Will you be submitting an AFE for this[?] If so when do you project you will spend on this? Let us know if this project is cancelled or pushed out to 2017." On April 26, 2016, Anthony Misener responded, "[t]his project has been pushed out to 2017." (Dkt. No. 72 ¶ 87; J.A. Ex. 5, Misener Dep. Ex. 2.)

[redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 17, May 2016 Marketing Monthly Report.) On June 8, 2016, Decheek stated that Bard [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep.

Ex. 18.) On June 30, 2016, Misener reported to Luke Tedesco [redacted].” (Dkt. Nos. 75-76, Gibson Dec. Ex. 18, June to August Email Communications between Misener and Tedesco.) [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Ex. 20.) On August 23, 2016, Misener reported [redacted]”. (Dkt. Nos. 75-76, Gibson Dec. Ex. 18, June to August Email Communications between Misener and Tedesco.)

On July 25, 2016, William Roeca circulated an updated [redacted].” (Dkt. Nos. 75-76, Gibson Dec. Ex. 19, July 25, 2016 Roeca Email.) On July 27, 2016, Poliac – a third-party vendor [redacted]” (Dkt. Nos. 75-76, Gibson Dec. Ex. 20, July 27, 2016 Poliac Engineer Resources Email.) [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 21, August 2016 Marketing Monthly Report.)

On August 31, 2016, Paul Morgan requested that Anthony Decheek add [redacted]” (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Ex. 21.)

On September 15, 2016, Anthony Misener sent an email to a colleague, Luke Tedesco, copying Shayne Messerly and Tony Decheek, "[redacted] (Dkt. No. 72, ¶ 95; J.A. Ex. 5, Misener Dep. Ex. 7.)

On November 14, 2016, Luke Tedesco asked Anthony Decheek whether [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Ex. 23.)

[redacted]. (Dkt. No. 72 ¶ 98; J.A. Ex. 8, Zentgraf Dep. Ex. 2.) [redacted]. (Dkt. No. 72 ¶ 99; J.A. Ex. 8, Zentgraf Dep. Ex. 2.) [redacted]." (Dkt. Nos. 75-76, Gibson Dec. Ex. 5, Phillips Dep. Tr. 101:1-8.) Phillips testified that he would not call the [redacted]

[redacted] (Gibson Opp. Dec. Ex. 1, Phillips Dep. Tr. 100:5:16.)

[redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 5, Phillips Dep. Tr. 114:5-9; Gibson Opp. Dec. Ex. 1, Phillips Dep. Tr. 40 :7-18.) [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 5, Phillips Dep. Tr. pp. 101:14-102:6.) [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 5, Phillips Dep. Tr. 44:14-20.)

[redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. 273:4-20.) [redacted] (Gibson Dec. Ex. 2, Misener Dep. Tr. 273:22-24.) Tom Waddell, 3DT's retained expert, [redacted]. (Affidavit of Thomas Waddell ¶ 25.)

Waddell further testified that by [redacted]. (Waddell Aff. ¶ 25.) Bard's own expert, Gregory Haas, [redacted]." (Dkt. Nos. 75-76, Gibson Dec. Ex. 22, Hass Dep. Tr. 117:12-119:3.)

[redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. 276:24-277:12.) [redacted]" (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. 277:14-16.)

[redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 14, Davis Dep. Tr. 17:25-20:21.) [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 3, Zentgraf Dep. Ex. 3.) [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 3, Zentgraf Dep. Tr. 66:5-67:2.)

Anthony Misener testified that "[redacted] (Dkt. No. 72 ¶ 100; J.A. Ex. 5, Misener Dep. Tr. 161:2-5.) In this context, [redacted] (Dkt. No. 72 ¶ 100; J.A. Ex. 5, Misener Dep. Tr. 161:6-16.)

***Communications Between 3DT and Bard***

On March 6, 2015, Kassab contacted Misener via email to confirm that Bard had everything it need from 3DT. (Gibson Opp. Dec. Ex. 2, Kassab Dep. Tr. Ex. 3.) Misener responded on March 27, 2015 and stated that the project has taken longer than anticipated to get some of the design aspects/requirements finalized. (Id.) Misener further stated that Bard had everything it needed from 3DT, but some question may come up as [redacted]. (Id.) Kassab was under the impression that Bard was simply trying to "dot the I's and cross the T's….and that the [redacted] were being created to validate the technology." (Gibson Opp. Dec. Ex. 2, Kassab Dep. Tr. 98:2-99:19.) Kassab believed that Bard would have informed 3DT of any [redacted]. (Gibson Opp. Dec. Ex. 2, Kassab Dep. Tr. 99:10-19.)

On January 12, 2016, Kassab emailed Misener asking when the Precisive Navigation Technology will be in the market. (Gibson Opp. Dec. Ex. 2, Kassab Dep. Ex. 4.) Misener responded on January 18, 2016 asking whether Kassab would be interested in doing consulting for Bard. (Id.) The SOW already provided [redacted]. (J.A. Ex. 3, Statement of Work § 5.1.) Misener further stated that Bard [redacted]. (Gibson Opp. Dec. Ex. 2, Kassab Dep. Ex. 4.) This was the first indication 3DT had that the Precisive Navigation Technology development had not progressed as far as Kassab assumed through 2015. (Gibson Opp. Dec. Ex. 2, Kassab Dep. Tr. 101:15-17.)

On March 31, 2016, Kassab emailed Misener to check-in regarding Misener's prior request for assistance. (Gibson Opp. Dec. Ex. 2, Kassab Dep. Ex. 5.) Kassab confirmed his prior statement from a call that he was happy to help and pull in some other resources. (Id.) Kassab requested a summary of the work completed so far, successes/challenges and objectives/next steps so that he

could provide suggestions. (Id.) Finally, Kassab asked whether Misener felt he had the resources he needed internally in terms of hours availability. (Id.) Misener responded on April 4, 2016 stating that he was "really sorry we move so slowly" and informing Kassab that he needed a new NDA to "discuss things more openly." (Id.)

Kassab did not think that an NDA was required due to the SOW. (Gibson Opp. Dec. Ex. 2, Kassab Dep. Tr. 104:9-22.) On May 6, 2016, Anthony Misener emailed Dr. Kassab a draft of a nondisclosure agreement. (Dkt. No. 72 ¶ 88, J.A. Ex. 4, Kassab Dep. Ex. 6.) On May 12, 2016, 3DT's counsel provided comments on the proposed nondisclosure agreement to Anthony Misner. On May 17, 2016, 3DT's counsel followed up on her comments and, on May 20, 2016, Anthony Misener said he would review and get back with her. (Dkt. No. 72 ¶ 89, J.A. Ex. 13, 3DT Prod. 0000101-0000103.)

On August 5, 2016, Anthony Misener emailed a revised draft of the NDA to Dr. Kassab based upon the comments from 3DT's counsel. Anthony Misener apologized for being "completely side-tracked by other priorities." (Dkt. No. 72 ¶ 90, J.A. Ex. 14, BAS-3DT 0034929.) On August 8, 2016, 3DT provided minor comments, and Anthony Misener responded that same day, stating, "[i]f Ghassan is ready to sign, then would you send me a scan of the signed complete document and I will get the fully executed document back to the two of you." (Dkt. No. 72 ¶ 91, J.A. Ex. 14, BAS-3DT 0034928-0034929.)

On August 19, 2016, Anthony Misener followed up with Dr. Kassab via email saying, "Just checking in. Let me know if you are the [sic] ok with this latest version of the NDA." (Dkt. No. 72 ¶ 92, J.A. Ex. 14, BAS-3DT 0034929.) Dr. Kassab executed the NDA that day. (Id.) On August 23, 2016, Anthony Misener emailed Dr. Kassab the fully executed NDA. (Dkt. No. 72 ¶ 93, J.A. Ex. 14, BAS-3DT 0034928.)

After the NDA was executed, 3DT did not hear anything further, so Kassab emailed Misener on September 19, 2016 asking whether they should "chat to outline next steps." (Gibson Opp. Dec. Ex. 2, Kassab Dep. Tr. 107:12-108:6., Kassab Dep. Ex. 7.) Misener responds and claims that he is working with his "team to try and bring together some information from our past work to provide context to our questions." (Gibson Opp. Dec. Ex. 2, Kassab Dep. Ex. 7.) Misener further stated "that one thing that I would like to better understand is the lower level theory behind the experimental set-up and the assumptions made to simplify the approach." (Id.)

On December 6, 2016, 3DT sent a letter to Bard's President, John P. Groetelaars, inquiring about the [redacted]. (Dkt. No. 72 ¶ 102; J.A. Ex. 15.) On December 20, 2016, Rob Fredericks, Vice President & General Manager at Bard, responded by letter stating, among other things, "[redacted]." (Dkt. No. 72, ¶¶ 62,104; J.A. Ex. 16.)

On February 21, 2017, [redacted]. (Dkt. No. 72 ¶ 62; J.A. Ex. 5, Misener Dep. Ex. 8.) In addition, Bard claimed that it [redacted] (Id. at Misener Dep. Ex. 8.) While Davis and Cieselwicz were hired early in the Penske development, neither were devoted entirely to Penske. (Dkt. Nos. 75-76 Gibson Dec. Ex. 2, Misener Dep. Tr. 81: 14-24.)

[redacted]

[redacted]

(Dkt. No. 72 ¶ 62; J.A. Ex. 5, Misener Dep. Ex. 8.)

Misener testified, however, that Cieselwicz was the only Senior Engineer assigned to Penske, but he was [redacted] because he had other projects to which he was assigned. (Gibson Opp. Dec. Ex. 4, Misener Dep. Tr. 283:2-285:1, 289:3-14.). Misener further testified that Davis was the Engineer II, but he had other priorities just like all other team members. (Id. at Misener Dep. Tr. 290:24-292:22.) In fact, at one point Davis [redacted] to Penske, which Misener admits is not full-time. (Id. at Misener Dep. Tr. 293:1-18.) Misener cannot recall who the Associate Engineer assigned for 6 months would have been. (Misener Dep. Tr. 290:9-23.) Misener admitted that none of the R&D team members were devoted full-time to Penske. (Id. at Misener Dep. Tr. 291:10-292:22.)

Bard also stated that [redacted]

[redacted]

(Dkt. No. 72 ¶ 62; J.A. Ex. 5, Misener Dep. Ex. 8.) Decheek testified that he can only think of one – perhaps two – person(s) that would have filled the marketing associate positions – one of which was an intern. (Gibson Opp. Dec. Ex. 3, Decheek Dep. Tr. 119:25-121:13.)

***Alleged Issues with Precisive Navigation Technology***

With respect to [redacted]. (Dkt. No. 72 ¶ 61, J.A. Ex. 6, Decheek Dep. Tr. 24:11-20.) [redacted]. (Gibson Opp. Dec. Ex. 4, Misener Dep. Tr. 171:3-6.)

With respect to [redacted].'" (Dkt. No. 72 ¶ 42, J.A. Ex. 9, Davis Dep. Ex. 4.) Bard noted that during [redacted]." (Id. at Davis Dep. Ex. 4.) Bard's [redacted]. (Dkt. No. 72, J.A. Ex. 9, Davis Dep. Ex. 5.) Zentgraf was not aware of [redacted]. (Gibson Opp. Dec. Ex. 5, Zentgraf Dep. Tr. 70:13-71:3.)

[redacted]

[redacted]. (Dkt. No. 72 ¶ 62.) [redacted] (Dkt. No. 72, ¶ 63, J.A. Ex. 7, Phillips Dep. Tr. 20:17-21:1.) [redacted]. (Dkt. No. 72 ¶ 65, J.A. Ex. 5, Misener Dep. Tr. 74:16-22; J.A. Ex. 11, BAS-3DT 0059430; J.A. Ex. 12, BAS-3DT 0061106.) In May 2015, Bard

presented [redacted]" (Dkt. No. 72, J.A. Ex. 6, Decheek Dep. Ex. 4.)

When asked whether he had an opinion as to whether [redacted]" (Dkt. No. 72, J.A. Ex. 5, Misener Dep. Tr. 200:8-15.) Anthony Misener further testified that [redacted] (Dkt. No. 72 ¶ 71, J.A. Ex. 5, Misener Dep. Tr. 200:8-19.) In addition, [redacted] (Id. at Misener Dep. Tr. 200:20-22.) Anthony Misener also testified that [redacted] (Id. at Misener Dep. Tr. 200:22-25.)

Anthony Misener further testified that [redacted] (Dkt. No. 72 ¶ 72, J.A. Ex. 5, Misener Dep. Tr. 201:20-202:24.) Further, Misener testified that both [redacted]. (Gibson Opp. Dec. Ex. 4, Misener Dep. Tr. 205:14-206:18.)

With respect to [redacted], to which he

responded: "Not really. We continued to push each one forward, you know, as we could given where it was at." (Id. at Misener Dep. Tr. 209:21-210:3.) Misener further testified that he does not remember [redacted]. (Id. at Misener Dep. Tr. 210:11-211:8.) Decheek does not recall if [redacted]. (Gibson Opp. Dec. Ex. 3, Decheek Dep. Tr. 44:18-22.)

***Penske Development Since 2016***

Currently, [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Tr. 112:22-113:14.) On December 7, 2016, [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 23-1, December 7, 2016 Email with Project Status List, 23-2, Project Status List.) Misener testified that [redacted]. (Gibson Opp. Dec. Ex. 4, Misener Dep. Tr. 113:2-8.)

[redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. 162:14-21.) [redacted]. (Dkt. Nos. 75-76 Gibson Dec. Ex. 5, Phillips Dep. Tr. 106:3-7.) [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Tr. 105:3-8) [redacted]

[redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 22, Haas Dep. Tr. 53:21-54:3.)

[redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 22, Haas Dep. Tr. 106:11-107:2.)

In its Answers of Defendant Bard Access Systems, Inc. to Plaintiff's Interrogatories, Bard states that [redacted]." (Dkt. Nos. 75-76 Gibson Dec. Ex. 24, Bard's Answers to Interrogatories, p. 8 Answer No. 9.) Bard further stated in its Answers to Interrogatories that [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 24, Bard's Answers to Interrogatories, pp. 8-9 Answer No. 10.)

## II. PROCEDURAL HISTORY

3DT filed its Complaint on July 18, 2017 asserting claims for breach of contract and breach of the covenant of good faith and fair dealing. (Dkt. No. 1.) Bard filed its Answer on September 12, 2017. (Dkt. No. 14.) Fact discovery and depositions were completed by July 31, 2020. (Dkt. No. 55.) 3DT served its Rule 26(a)(2) Expert Disclosure on August 31, 2020 (Dkt. No. 54), and

Bard served its Rule 26(a)(2) Expert Disclosure on October 30, 2020 (Dkt. No. 57.) 3DT serviced its Rebuttal Expert Disclosure on November 30, 2020. (Dkt. No. 58.)

On December 23, 2020, 3DT and Bard filed separate letters expressing each party's intention to file motions for summary judgment. (Dkt. Nos. 60, 61.) A post-discovery status conference was held on January 11, 2021 during which a briefing schedule for summary judgment motions was discussed. On March 10, the parties filed their Joint Rule 56.1 Statement of Facts along with a Joint Appendix of Exhibits. (Dkt. Nos. 70, 72.)

3DT filed its Motion for Summary Judgment with respect to its claim for breach of contract on March 26, 2021. (Dkt. Nos. 75-76.) Bard filed its Motion for Summary Judgment with respect to 3DT's claims for breach of contract and breach of covenant of good faith and fair dealing on March 26, 2021. (Dkt. Nos. 77-78.) 3DT now files its Memorandum of Law in Opposition to Bard's Motion for Summary Judgment and Response to Bard's Rule 56.1 Statement of Undisputed Material Facts.

## III. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), a party seeking summary judgment must demonstrate that there is 'no genuine dispute as to any material fact' and that the part is 'entitled to a judgment as a matter of law.'" *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F.Supp.2d 596, 601 (S.D.N.Y.2012) citing Fed R.Civ.P.56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Betances v. Fischer*, 403 F.Supp.3d 212, 221 (S.D.N.Y 2019) citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"The moving party has the burden 'to show initially the absence of a genuine issue concerning any material fact.'" *Id.* citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). "If

the moving party satisfies its burden, the nonmoving party must provide specific facts showing that there is a genuine issue for trial in order to survive the motion for summary judgment." *Id.* citing *United Rentals (North America), Inc. v. Conti Enters., Inc.,* 293 F.Supp.3d 447, 451 (S.D.N.Y.2018).

## IV. ARGUMENT

### A. Bard Never Determined that [redacted] and, Therefore, Bard Did Not Properly Stop Development of the Penske Project.

The Development Agreement requires Bard to [redacted]. (Dkt. No. 72 ¶ 14, J.A. Ex. 2, Development Agreement § 2.1.) The development obligations set forth in the Development Agreement read in conjunction with the Purchase Agreement provide that Bard [redacted]. (Dkt. No. 72 ¶ 11, J.A.Ex. 1, Purchase Agreement § 2.04(b); Dkt. No. 72 ¶ 14, J.A. Ex. 2, Development Agreement § 2.1.) (emphasis added.)

Bard readily admits that it [redacted]. (Dkt. No. 82, Bard's MSJ pp. 37-38.) While the parties disagree as to when Bard stopped providing [redacted], Bard admits that "[redacted]t. (Id. at 38.) According to Bard, its decision to [redacted]

[redacted]." (Id. at p. 2.) Bard's argument ignores the clear and unambiguous language of the Development Agreement.

"Under New York law… 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" *Assured Guar. Mun. Corp.*, 892 F.Supp.2d at 601 citing *UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.*, 660 F.3d 643, 649 (2nd Cir. 2011). "[C]ourts should read a contract 'as a harmonious and integrated whole to determine and give effect to its purpose and intent." *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 92 N.E.3d 743, 747 (N.Y. App. Div. 2017), citing *Matter of Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 763 (N.Y. App. Div. 2003).

"Courts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreement." *Id.* (citations omitted) "In that regard, a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect.'" *Id.* citing *Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534 (N.Y. App. Div. 1996).

Section 2.1 of the Development Agreement is clear and unambiguous on its face and provides as follows:

[redacted]

> [redacted] (Dkt. No. 72 ¶ 14; J.A. Ex. 2) (emphasis added.)

To stop development of Penske pursuant to Section 2.1, Bard must: (1) [redacted] (2) and demonstrate that the [redacted] (Dkt. No. 72 ¶ 14; J.A. Ex. 2.) (emphasis added.)

Nowhere in the Development Agreement is Bard permitted [redacted], particularly when it has not made this required determination. (Dkt. No. 72 ¶ 14; J.A. Ex. 2.) Yet, that is exactly that conclusion that Bard is asking this Court to reach.

In fact, Bard does not even attempt to argue that it [redacted]." (Dkt. No. 72 ¶ 14; J.A. Ex. 2.) Rather, Bard simply disregards that key requirement and, instead, argues that this provision allows Bard to [redacted].

To reach that conclusion, this Court would have to completely ignore the clear and unambiguous language that requires Bard to determine [redacted] (Dkt.

No. 72 ¶ 14; J.A. Ex. 2.) Of course, this Court cannot reach that conclusion because doing so would render the express language in Section 2.1 meaningless – a complete derogation of well-established New York law. The Development Agreement does not permit Bard [redacted]

Of course, Bard has no choice but to ignore the plain language of the Development Agreement because the designated evidence demonstrates a determination that Penske was no [redacted] was never made. "In interpreting a contract under New York law, words or phrases…should be given their plain meaning." *Lasalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2nd Cir. 2005) (citation omitted). The term "practicable" is defined as "reasonably capable of being accomplished; feasible in a particular situation." PRACTICABLE, Black's Law Dictionary (11th ed. 2019).

Considering the plain meaning of this term in conjunction with the remainder of the provision, Section 2.1 of the Development Agreement could not be clearer. [redacted]. (Dkt. No. 72 ¶ 14; J.A. Ex. 2.)

Yet, in its Memorandum of Law Bard concedes that further development [redacted]. Specifically, Bard states that it "remains hopeful that a product

[redacted]" (Dkt. No. 82, Bard's MSJ p. 3.) This admission – which is wholly inconsistent with a [redacted] – is supported by the testimony of the core Penske development team members.

Misener, Bard's 30(b)(6) representative, testified that Bard never [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. 162:14-21.) Misener informed Bard's retained expert that Penske was "[redacted]" (Dkt. Nos. 75-76, Gibson Dec. Ex. 22, Haas Dep. Tr. 53:21-54:3.) Phillips, Bard's 30(b)(6) representative, testified to his belief that it is still [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 22, Phillips Dep. Tr. 106:3-7.) Finally, Decheek confirmed Bard's continued hope that [redacted]. (Gibson Dec. Ex. 8, Decheek Dep. Tr. 105:3-8.)

Bard's admission and the designated testimony of its own development team demonstrates that Bard has not made the contractually required [redacted] – let alone that it is [redacted]. In fact, the designated evidence demonstrates – at a minimum – that a question of fact remains as to whether Bard's [redacted] – in direct contradiction to Bard's repeated statements to 3DT and arguments to this Court.

As explained more fully below, [redacted]. In addition, Misener – the 30(b)(6) representative for Bard on this very topic – could not testify that [redacted]. In fact, [redacted]

[redacted]. However, the [redacted]. (Dkt. No. 72, J.A. Ex. 5, Misener Dep. Tr. 200:8-202:24.) Nothing suggests that the [redacted] have any [redacted]. Further, Misener – Bard's 30(b)(6) representative – testified that both [redacted]. (Gibson Opp. Dec. Ex. 4, Misener Dep. Tr. 205:14-206:18.) Most importantly, however, both Misener and Decheek testified that they [redacted]. (Id. at Misener Dep. Tr. 209:21-210:3, 210:11-211:8; Id. at Ex. 3, Decheek Dep. Tr. 44:18-22.)

Simply put, Bard cannot cease development under Section 2.1 of the Development Agreement unless after three (3) years it determines [redacted]. (Dkt. No. 72 ¶ 14; J.A. Ex. 2.) The designated evidence clearly demonstrates that this requisite determination was not made. Without this determination, [redacted] – which it undisputedly has not done. For this reason, Bard's Motion for Summary Judgment completely lacks merit and should be summarily denied.

**B. Bard Failed to Provide [redacted] as Required by the Agreement.**

Putting aside Bard's failure to make the [redacted] under Section 2.1 of the Development Agreement, Bard's Motion for Summary Judgment likewise fails because it has not – and cannot – demonstrate as a

matter of law that it [redacted]. (Dkt. No. 72 ¶ 11; J.A. Ex. 1; Dkt. No. 72 ¶ 14; J.A. Ex. 2.)

The Development Agreement requires Bard to [redacted], and the Purchase Agreement provides that Bard's failure to develop [redacted]. (Dkt. No. 72 ¶ 11; J.A. Ex. 1; Dkt. No. 72 ¶ 14; J.A. Ex. 2.) Thus, if Bard did not [redacted]

At a minimum, the designated evidence creates a question of fact as to whether Bard provided [redacted]. More importantly, the designated evidence clearly demonstrates that Bard [redacted]. For those reasons, Bard's Motion for Summary Judgment should be denied.

**i. Commercially Reasonable Standard**

Courts have found that "[t]here is no settled or universally accepted definition of the term 'commercially reasonable efforts.'" *Holland Loader Company, LLC v. FLSmidth*, 313 F.Supp.3d 447, 469 (S.D.N.Y.2018) quoting *Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F.Supp.2d 912, 926 (E.D. Cal. 2010). Where, as here, "the term 'commercially reasonable efforts' is not defined by the contract, courts in this district require the party seeking to enforce the efforts provision to establish the objective standard by which the breaching party's efforts are to be judged, in the

context of the particular industry.'" *Id.* citing *Sekisui Am. Corp. v. Hart*, 15 F.Supp.3d 359, 382 (S.D.N.Y.2014).

"A Court's evaluation of a party's compliance with a 'commercially reasonable efforts' requirement does not involve a hindsight comparison of the party's actual conduct to what which could have been undertaken to produce a better result; a court should only evaluate whether the party's actual conduct was sufficient." *Id.* citing *Bear, Stearns Funding, Inc. v. Interface Grp. – Nevada, Inc.*, 2007 WL 1988150, at *22 (S.D.N.Y July 10, 2007). "At a minimum, though, a promise to use commercially reasonable efforts requires that the promising party undertake at least some activity." *Id.* citing *SATCOM Int's Grp. PLC v. ORBCOMM Int'l Partners, L.P.,* 2000 WL 729110, at *20 (S.D.N.Y. June 6, 2000). "In sum, compliance with a 'commercially reasonable efforts' clause requires at the very least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests. A contracting party's efforts are to be judgments objectively in light of proven standards." *Id.*

**ii. Bard Unquestionably Stopped Providing [redacted] Development of Penske Prior to [redacted], the [redacted] of the Development Agreement.**

A simple review of Bard's own internal documents demonstrates that Bard [redacted]. Specifically, in January 2016, [redacted] and by March 2016 – at the latest – other projects prevented Bard from [redacted] (Dkt. No. 72, J.A. Ex. 5, Misener Dep. Ex. 7; Dkt. Nos. 75-76, Gibson Dec. Ex. 15, March 8, 2016 Email between Zentgraf and Tino.) (emphasis added). A review of the following internal Bard documents clearly demonstrates this fact:

- On January 11, 2016, Misener discussed [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 9, January 11, 2016 email between Misener and Decheek, Ex. 10, January 11, 2016 Bard Email.)

- On January 26, 2015, Misener reported [redacted] (Dkt. No. 72 J.A. Ex. 5, Misener Dep. Ex. 3.)

- The January 2016, February 2016 and March 2016 Marketing Monthly Reports all [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Ex.'s 12, 13; Gibson Dec. Ex. 12, March 2016 Marketing Monthly Report.)

- On January 25, 2016, David reported to [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Ex. 5.)

- On February 9, 2016, a Bard employee asked Misener about the Penske Integration Meeting [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 13, February 9, 2016 Email between Misener and Cleverly.)

- February 19, 2016, Misener again reported a slowdown in Penske because [redacted] was consuming the Penske R&D **resources**. (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. 216:17-21, Misener Dep. Ex. 1) (emphasis added.)

- In March 2016, Zentgraf reported to a third-party vendor [redacted]." (Dkt. Nos. 75-76, Gibson Dec. Ex. 15, March 8, 2016 Email between Zentgraf and Tino.) (emphasis added).

- On April 26, 2016, a Bard finance employee asked whether [redacted]. (Dkt. No. 72, J.A. Ex. 5, Misener Dep. Ex. 2.)

- The April 2016 Marketing Monthly Report [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 16, April 2016 Marketing Monthly Report.)

- Penske [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 17, May 2016 Marketing Monthly Report.)

- On June 8, 2016, [redacted]" (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Ex. 18.)

- [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Ex. 20; Gibson Dec. Ex. 21, August 2016 Marketing Monthly Report.)

- During the month of June Misener also described the status of Penske "[redacted]." (Dkt. Nos. 75-76, Gibson Dec. Ex. 18, June to August Email Communications between Misener and Tedesco.)

- On July 27, 2016, Misener reported to a third-party vendor [redacted]" and that "Penske had been put [redacted]" (Dkt. Nos. 75-76, Gibson Dec. Ex. 20, July 27, 2016 Poliac Engineer Resources Email) (emphasis added.)

- Another July 2016 email accompanying [redacted]t [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 19, July 25, 2016 Roeca Email.)

All these statements are documented in Bard's internal records prior to August 29, 2016, and none of these statements are addressed in Bard's motion. Tellingly, Bard makes little mention of the development in the 2016-time frame. (Dkt. No. 82, Bard's MSJ pp. 43-50.) Specifically, Bard only [redacted] (Id. at p. 49), that [redacted], that Bard worked to negotiate and sign a new NDA with Kassab, and that [redacted]. (Id. at pp. 49-50.)

Apparently, Bard is asking this Court to overlook its own statements demonstrating a lack of [redacted] based upon this scant evidence combined with the fact that nobody was expressly stated that Penske was abandoned or shelved. Bard's argument

disregards the overwhelming evidence to the contrary – that Bard [redacted].

An express statement that Penske was abandoned or shelved is not required to demonstrate that Bard stopped [redacted]. And merely [redacted]. Spending several months "negotiating" an unnecessary NDA is wholly irrelevant when the consulting that was to result from that NDA was never requested by Bard.

Obtaining signatures on the [redacted]. (Dkt. No. 72 ¶ 82, J.A. Ex. 8, Zentgraf Dep. Ex. 2.) This is especially true given that [redacted]. (Dkt. Nos. 75-76 Gibson Dec. Ex. 5, Phillips Dep. Tr. 101:1-8, 101:14-102:6, 114:5-9.)

Bard briefly references [redacted]. (Dkt. No. 82, Bard's MSJ p. 42.) Regardless of Bard's standard business practices, the Development Agreement does [redacted]. Rather, the Development Agreement [redacted].

Nonetheless, the [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Ex.'s 12, 13; Gibson Dec. Ex. 12, March 2016 Marketing Monthly Report.) The initial estimated [redacted]. (Dkt. Nos. 75-76 Gibson Dec. Ex. 11, January 25, 2016 Project Status Report.) By April 1, 2016, th3 shift of resources lead to a [redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Tr. pp. 72:20-73:11, Decheek Dep. Ex. 15.) Bard does not identify another development project that experienced [redacted].

This Court cannot ignore the fact that Zentgraf reported in March 2016, that [redacted]." (Dkt. Nos. 75-76, Gibson Dec. Ex. 15, March 8, 2016 Email between Zentgraf and Tino.) (emphasis added). Misener's informed a third-party vendor in July 2016 [redacted]" and that "Penske had been put [redacted]" (Dkt. Nos. 75-76 Gibson Dec. Ex. 20, July 27, 2016 Poliac Engineer Resources Email.) (emphasis added). These emails alone demonstrate that Bard [redacted].

Further bolstering the conclusion that Bard stopped [redacted] email accompanying [redacted] (Dkt. Nos. 75-76 Gibson Dec. Ex. 19, July 25, 2016 Roeca Email.) [redacted]. (Dkt. Nos. 75-76 Gibson Dec. Ex. 14, Davis Dep. Tr. 17:25-20:21.) [redacted] (Dkt. Nos. 75-76 Gibson Dec. Ex. 3, Zentgraf Dep. Dep. Tr. 66:5-67:2., Zentgraf Dep. Ex. 3.)

Just a few days after the 3rd anniversary of the Effective Date of the Development Agreement, a Bard employee noted [redacted] (Gibson Dec. Ex. 8, Decheek Dep. Ex. 21.) On September 15, 2016, Misener confirmed the lack of resources being provided to Penske throughout 2016 by stating that Penske has been "put on life support ever since Nautilus Delta came into the picture" in [redacted]. (Dkt. No. 72, J.A. Ex. 5, Misener Dep. Ex. 7.)

The only logical conclusion that can be reached from this evidence is that Bard [redacted] Regardless of the discretion afforded Bard in determining the [redacted] A commercial reasonableness performance standard requires at the very least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests. *Holland Loader*, 313 F.Supp.3d at 469.

The agreed goal was the [redacted] that constitutes a conscious exertion of effort to accomplish that goal. Both parties' experts agree [redacted]. (Dkt. Nos. 75-76, Waddell Aff. ¶ 25; Gibson Dec. Ex. 22, Hass Dep. Tr. 117:12-119:3.)

[redacted]. (Dkt. Nos. 75-76 Gibson Dec. Ex. 13, February 9, 2016 Email between Misener and Cleverly; Ex. 8, Decheek Dep. Ex.'s 12, 13; Ex. 12, March 2016 Marketing Monthly Report; Ex. 8, Decheek Dep. Ex. 20; Ex. 21, August 2016 Marketing Monthly Report.) [redacted]" Misener said it best – Penske was placed on life support. (Dkt. Nos. 75-76 Gibson Dec. Ex. 8, Decheek Dep. Ex. 18; J.A. Ex. 5, Misener Dep. Ex. 7.)

[redacted]. Bard spent the year [redacted]. Bard cannot argue – in good faith – that its efforts in 2016 constitute a conscious exertion of effort [redacted]. Simply put, Bard stopped providing [redacted]. As such, the Purchase Agreement requires Bard to tender the Full Milestone Payment

**iii. A Question of Fact Exists as to Whether Bard Ever Provided Commercially Reasonable Resources to Penske.**

Putting aside Bard's clear-cut failure to [redacted], a question of fact exists as to whether Bard ever [redacted]. As stated above, a party seeking to enforce a

commercially reasonable efforts provision must establish the objective standard by which the breaching party's efforts are to be judged, in the context of the particular industry.'" *Holland Loader*, 313 F.Supp.3d at 469. 3DT has satisfied this obligation.

Specifically, 3DT's medical device development expert, Thomas Waddell, describes the commercial reasonableness standard in this case as the effort and resources that a company with the size and resources of Bard would (and should) devote to successfully develop a product incorporating the Precisive Navigation Technology within a reasonable period. (Dkt. Nos. 75-76, Affidavit of Thomas Waddell ¶ 21.) Moreover, Waddell states there are certain core standards and principles followed in the medical device industry with respect to the resources required to successfully develop a medical device.

These principles/standards include but are not necessarily limited to: (1) assigning personnel with proper experience and expertise; (2) allocating sufficient time for personnel to devote to the development of the project as necessary to overcome challenges that arise; and (3) seeking outside assistance when the internal expertise is insufficient. According to Waddell, these standards/principles are common sense in the medical device industry and essential to successful development of a medical device. If these standards are not followed, Waddell opines, the manufacturer is <u>not exercising reasonable business judgment</u>. (Dkt. Nos. 75-76, Waddell Aff. ¶ 23) (emphasis added.)

Waddell prepared the Waddell Development Plan, which shows a reasonable effort, timeline and cost projection for the successful development of a substantially similar project to Bard's Penske project. (Dkt. Nos. 75-76, Waddell Aff. ¶ 17.) While the Waddell Development Plan explains the commercially reasonable resources of Penske in detail, the specific key points from the Waddell Development Plan are as follows:

- The successful development of the Precisive Navigation Technology requires a systems engineer with experience in biological, electrical and mechanical systems to make sure all components work together properly.

- With reasonable resources and time devoted to development, the concept phase should be completed in 11.5 months, with an opportunity to accelerate completion of the concept phase in 10 months. If the project were a low priority, concept phase could take up to two (2) years.

- The overall development time is approximately 25 months, with an additional clinical study period of 14 months.

- The engineering and development of the product requires the equivalent of three (3) full-time persons per year to successfully develop the project.

(Dkt. Nos. 75-76, Waddell Aff. ¶ 22, Waddell Aff. Ex. B.)

To be granted summary judgment, Bard must establish as a matter of law that it [redacted] from the date it acquired the Precisive Navigation Technology through the date [redacted] efforts (which is tellingly not identified). (Dkt. No. 72 ¶ 14; J.A. Ex. 2.) Notably, Bard does not cite to the testimony of the expert it retained to provide an opinion as to whether Bard provided [redacted]. Nonetheless, Bard attempts to satisfy its burden by generically describing its Penske development efforts and noting development challenges that it confronted.

However, a generic description of work performed does not result in a finding that [redacted] were provided. Rather, the resources provided must be judged objectively in light of the proven standards provided by Waddell. And it is Waddell's expert opinion that Bard failed to allocate [redacted] as required by the Development Agreement. (Dkt. Nos. 75-76, Waddell Aff. ¶ 24; Waddell Aff. Ex.'s B and C.)

Most notably, Waddell identifies [redacted]

[redacted] that failed to satisfy certain core standards and principles followed in the medical device industry with respect to the resources required to successfully develop a medical device. Specifically, Waddell opines that: (1) [redacted] (Dkt. Nos. 75-76 Waddell Aff. ¶ 25, Waddell Aff. Ex. C p. 2.) These deficiencies create a question of fact as to whether [redacted].

With respect to personnel resources, Waddell testifies that it is a core principle in the medical device industry that commercial reasonableness requires the assignment of personnel with proper experience and expertise, and the allocation of sufficient time for the personnel to devote to the development of the project as necessary to overcome challenges that arise. (Dkt. Nos. 75-76 Waddell Aff. ¶ 23.) Bard's expert agreed and testified that commercially reasonable personnel means "personnel are being allocated, being utilized in a way that's working towards the requirement or the business goal of that project." (Dkt. Nos. 75-76 Gibson Dec. Ex. 22, Haas Dep. Tr. 16.)

According to Waddell, Bard violated this basic tenet of commercial reasonableness when it failed to assign [redacted]. (Id.) In addition, the Penske development team [redacted]. (Id.) According to Waddell, [redacted] is not reasonable given that Penske was different than the other technologies in which the team had experience. (Id.) The Waddell

Development Plan called for the equivalent of three (3) persons being devoted to Penske to successfully develop a product. (Id.) By [redacted]. (Id.)

Finally, Waddell testified that it is standard to seek outside assistance when the internal team lacks sufficient expertise. (Id. at ¶ 23.) The evidence demonstrates Bard [redacted] that arose. In fact, Kassab was not [redacted] that Bard was experiencing until January 2016. (Gibson Opp. Dec. Ex. 2, Kassab Dep. Tr. 101:15-17.) According to Waddell, the development process identified the need for additional support on issues that could have been addressed by 3DT, and [redacted]. (Dkt. Nos. 75-76 Waddell Aff. ¶ 25, Waddell Aff. Ex.'s B and C.)

Bard's failure [redacted] is evidenced by the significant [redacted]. For example, Waddell opined that by utilizing commercially reasonable efforts the concept phase could be completed in 11.5 months, and that total development would take approximately 39 months (25 months for development and 14 months for clinical trial). (Id. at Waddell Aff. Ex. B.) At the outset, [redacted] (Dkt. No. 72 ¶ 26; J.A. Ex. 5, Misener Dep. Tr. 89:25-90:8.)

However, Bard did not complete the Penske [redacted]. (Dkt. No. 72 ¶ 78; J.A. Ex. 7, Phillips Dep. Tr. 78:3-6, 78:19-22; J.A. Ex. 9, Davis Dep. Tr. 110:8-19.). [redacted]

[redacted] (Dkt. Nos. 75-76, Gibson Dec. Ex. 18, June to August Email Communications between Misener and Tedesco.)

Bard attempts to justify this substantial failure to [redacted] by pointing to the following factors: (1) [redacted] (Dkt. No. 82, Bard's MSJ p. 44) (2) [redacted] (Id. at p. 45); (3) [redacted] (Id. at 46); (4) the [redacted] (Id. at pp. 46-49.) Not only does Bard overstate the impact of these challenges, but Bard's response to these challenges further [redacted] that were provided.

With respect to animal studies, a question of fact exists as to the existence and nature of the alleged unexplainable test results. To start, [redacted].'" (Dkt. No. 72 ¶ 42, J.A. Ex. 9, Davis Dep. Ex. 4.) Bard noted that during [redacted]." (Id. at Davis Dep. Ex. 4.) In addition, Bard's [redacted]. (Dkt. No. 72, J.A. Ex. 9, Davis Dep. Ex. 5.) It should also be noted that Zentgraf was not aware of [redacted]. (Gibson Opp. Dec. Ex. 5, Zentgraf Dep. Tr. 70:13-71:3.)

With respect to the [redacted] (Dkt. Nos. 75-76, Waddell Aff. Ex. C.) Moreover, Waddell opines [redacted]

[redacted] basic standard of seeking outside assistance when internal expertise is insufficient. (Id.)

[redacted]. (Dkt. No. 72 ¶ 61, J.A. Ex. 6, Decheek Dep. Tr. 24:11-20.)

Finally, Bard's lengthy discussion of the difficultly in [redacted] (Dkt. No. 72 ¶ 79; J.A. Ex. 7, Phillips Dep. Tr. 78:7-18, Phillips Dep. Ex. 7; Dkt Nos. 75-76 Gibson Dec. Ex 5, Phillips Dep. Tr. 90:10-91:4, Phillips Dep. Ex.'s 11, 13.) The evidence further provides that this [redacted]. (Dkt. Nos. 75-76, Gibson Dec. Ex. 5, Phillips Dep. Tr. 101:1-8 ; Gibson Opp. Dec. Ex. 1, Phillips Dep. Tr. 100:5:16.)

Simply put, Bard fails to demonstrate that it [redacted]. The generic description of development activities does not satisfy Bard's burden of demonstrating the nonexistence of a genuine issue of material fact. Bard's internal documents demonstrate that [redacted]

In fact, Waddell opines that the [redacted] demonstrates either incompetency or willful understanding that it was not devoting the [redacted]

[redacted]. (Dkt. Nos. 75-76, Waddell Aff. Ex. C.) Moreover, Waddell opines that by failing to comply with the basic, common sense tenets of [redacted] in the medical device industry, Bard was not exercising reasonable business judgment. (Id. at Waddell Aff. Ex. C.) Accordingly, Bard is not entitled to judgment as a matter of law.

**C. Bard is not Entitled to Judgment as a Matter of Law with Respect to 3DT's Claim for Breach of the Duty of Good Faith and Fair Dealing.**

The elements of a claim for breach of the duty of good faith and fair dealing are: (1) existence of a duty to act in good faith and conduct fair dealing; (2) breach of that duty; and (3) the breach of duty proximately causes damages. *Washington v. Kellwood Co.*, 2009 WL 855652, at *6 (S.D.N.Y. 2009). A claim for breach of the implied duty is viable despite the existence of an express contract if based upon allegations different from those underlying the breach of contract. *Id.* According to Bard, 3DT's claim for breach of the duty of good faith and fair dealing is barred because (1) it is duplicative of the breach of contract claim; and (2) 3DT impermissible seeks to create new contractual rights and contradict the express language of the agreement. (Dkt. No. 82, Bard's MSJ pp. 54-55.) Bard's argument lacks merit.

3DT's claim is not duplicative of its breach of contract claim and does not seek to create new contractual rights. To be clear, 3DT's claim is based upon Bard's lack of transparency with respect to the Penske development activities. To start, Bard's limited communications with 3DT during the first two and a half year of development created the reasonable impression that Penske development was progressing well without any major concerns.

In fact, Kassab expressly asked Misener in March 2015 whether Bard had everything it needed. (Gibson Opp. Dec. Ex. 2, Kassab Dep. Ex. 3.) Misener responded that while the project

was taking longer than anticipated to finalize design aspects/requirements, Bard had everything it needed. (Id.)

Kassab had no further contact with Misener until January 12, 2016, when Kassab emailed Misener to ask [redacted]. (Gibson Opp. Dec. Ex. 2, Kassab Dep. Ex. 4.) Misener responded on January 18, 2016 by vaguely referencing [redacted] (Id.) This was the first time – [redacted]. (Id. at Kassab Dep. Tr. 101:15-17.)

On March 31, 2016, Kassab followed up on Misener's request for assistance and requested a summary of the work completed so far so that he could provide [redacted] (Id. at Kassab Dep. Ex. 5.) Misener responded on April 4, 2016 apologizing for [redacted] and informing Kassab that he needed a new NDA to "discuss things more openly." (Id.) From there, it took five months to complete the NDA because Misener was sidetracked by other projects. (Dkt. No. 72 ¶ 90, J.A. Ex. 14, BAS-3DT 0034929; Gibson Opp. Dec. Ex. 2, Kassab Dep. Ex. 6.))

The NDA was executed by Kassab on August 19th (Id.), but Kassab did not hear anything further and, therefore, reached out to Misener on September 19th to ask whether they should "chat to outline next steps." (Id. at Kassab Dep. Tr. 107:12-108:6, Kassab Dep. Ex. 7.) Misener responds and claims that he is working with his "team to try and bring together some information from our past work to provide context to our questions." (Gibson Opp. Dec. Ex. 2, Kassab Dep. Ex. 7.) Misener further stated "that one thing that I would like to better understand is the lower level theory behind the experimental set-up and the assumptions made to simplify the approach." (Id.) Misener never responded.

Tired of being strung along, on December 6, 2016, 3DT sent a letter to Bard's President, John P. Groetelaars, inquiring about the [redacted]. (Dkt. No. 72 ¶ 102; J.A. Ex. 15.) On December 20, 2016, Rob Fredericks, Vice President & General Manager at Bard, responded by letter promising to "[redacted]." (Dkt. No. 72, ¶¶ 62,104; J.A. Ex. 16.)

On February 21, 2017, [redacted] responded. (Dkt. No. 72 ¶ 62; J.A. Ex. 5, Misener Dep. Ex. 8.) Bard claimed that it "[redacted]." (Id. at Misener Dep. Ex. 8.) While Davis and Cieselwicz were hired early in the Penske development, it is undisputed that neither were devoted entirely to Penske full-time. (Dkt. Nos. 75-76 Gibson Dec. Ex. 2, Misener Dep. Tr. 81: 14-24.)

Bard further claimed in its February 21, 2017 correspondence that the full-time hours of the Imaging R&D personnel included:

[redacted]

(Dkt. No. 72 ¶ 62; J.A. Ex. 5, Misener Dep. Ex. 8.)

Misener testified, however, that Cieselwicz was the only Senior Engineer assigned to Penske, but he was [redacted] as Bard had represented because he had other projects to which he was assigned. (Gibson Opp. Dec. Ex. 4, Misener Dep. Tr. 283:2-285:1, 289:3-14.). Misener further testified that Davis was the Engineer II, but he also was not full-time because had other priorities just like all other team members. (Id. at Misener Dep. Tr. 290:24-

292:22.) At one point Misener said Davis [redacted] – which Misener agrees does not constitute full-time. (Id. at Misener Dep. Tr. 293:1-18.) Misener cannot recall who the Associate Engineer assigned for 6 months would have been. (Misener Dep. Tr. 290:9-23.) In fact, Misener testified that nobody was devoted full-time to Penske. (Id. at Misener Dep. Tr. 291:10-292:22.)

Bard also stated that [redacted]

[redacted]

(Dkt. No. 72 ¶ 62; J.A. Ex. 5, Misener Dep. Ex. 8.) Decheek testified that he can only think of one – perhaps two – person(s) that [redacted]. (Gibson Opp. Dec. Ex. 3, Decheek Dep. Tr. 119:25-121:13.)

The letter further references a [redacted], but Phillips was the only regulatory associate assigned. (Dkt. No. 72 ¶ 62; J.A. Ex. 5, Misener Dep. Ex. 8; Dkt. No. 72, J.A. Ex. 7, Phillips Dep. Tr. 12:11-24, 19:3-8.) Finally, the letter touts Bard's [redacted]. (Dkt. No. 72 ¶ 62; J.A. Ex. 5, Misener Dep. Ex. 8; Dkt. Nos. 75-76 Gibson Dec. Ex. 2, Misener Dep. Ex. 5, Gibson Dec. Ex. 2, Ex. 15.)

While Bard may not have been contractually required to provide details of the development

progress, it does have a duty to deal openly and honestly with 3DT. Kassab was constantly forced to contact Bard for a simple update on the project status. It was not until 2016 that Bard expressed any [redacted], and then it strung Kassab along throughout 2016 without any meaningful communication until – ironically – [redacted]. While Misener promised to provide information [redacted] that never occurred. In fact, it was not until discovery in this litigation that 3DT learned any detail about [redacted].

3DT was forced to seek answers in December 2016, and Bard responded with a promise to summarize the development efforts provided to Penske. While Bard did provide a response, 3DT learned that the efforts described are far from accurate and blatantly overstate Bard's development efforts. Bard's failure to communicate openly and honestly prevented 3DT from assisting Bard in overcoming [redacted] – which was always 3DT's main concern. 3DT's claim is not duplicative of its breach of contract claim and certainly does not create additional contractual obligations. As such, Bard is not entitled to summary judgment on 3DT's claim for breach of duty of good faith and fair dealing.

## V. Conclusion

Bard never determined that Exploitation of a Bard product incorporating the Precisive Navigation Technology is commercially impracticable due to the creation, development and/or commercial availability of Modus II. As such, its admission that it stopped developing Penske without payment of the Full Milestone Payment is a breach of the Development Agreement and Purchase Agreement. Moreover, Bard failed to demonstrate that it provided commercially reasonable resources through August 29, 2016. And a question of fact exists as to whether Bard

breached its good faith and fair dealing. As such, Bard's Motion for Summary Judgment should be denied, and 3DT's Motion for Summary Judgment should be granted.

Respectfully Submitted,

*/s/ Daniel J. Gibson*
Daniel J. Gibson (admitted *pro hac vice)*
Michael T. McNally (admitted *pro hac vice)*
DELK McNALLY, LLP
211 South Walnut Street
Muncie, Indiana 47305
gibson@delkmcnally.com
mcnally@delkmcnally.com
*Attorneys for Plaintiff*

*/s/ Deanna Koestel*
Deanna Koestel, Esq.
PASHMAN STEIN WALDER & HAYDEN
Court Plaza South
21 Main Street, Suite 200
Hackensack, NJ 07601
*Attorneys for Plaintiff*