**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| 3DT HOLDINGS LLC,<br><br>Plaintiff,<br><br>v.<br><br>BARD ACCESS SYSTEMS, INC.,<br><br>Defendant. | ) | Case No. 1:17-cv-05463-LJL |

# MEMORANDUM OF LAW IN OPPOSITION TO 3DT HOLDINGS LLC'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

UNDISPUTED FACTUAL BACKGROUND .......... 4

ARGUMENT .......... 7

I. IN COMPLIANCE WITH THE DEVELOPMENT AGREEMENT, BARD PROPERLY [redacted]. .......... 7

A. After the [redacted] and in Accord with the Development Agreement, Bard [redacted]. .......... 9

1. [redacted] .......... 9

2. Bard [redacted] .......... 11

B. Bard's Hope to [redacted] .......... 16

II. BARD DOES NOT OWE 3DT [redacted] BECAUSE THE CONDITIONS PRECEDENT HAVE NOT OCCURRED. .......... 17

A. [redacted] .......... 18

B. [redacted] .......... 18

III. BARD COMPLIED WITH ITS DEVELOPMENT OBLIGATIONS [redacted] .......... 19

A. The Development Agreement [redacted] .......... 19

B. Bard [redacted] ....................21

1. Bard, At a Minimum, [redacted] ....................21

2. Bard [redacted] ....................25

IV. THE OPINIONS OF 3DT'S EXPERT, MR. WADDELL, ARE IRRELEVANT TO THE COURT'S ANALYSIS OF THE CONTRACTUAL STANDARD BECAUSE IT IS BASED ON FALSE ASSUMPTIONS AND HE HAS NO KNOWLEDGE OF BARD'S BUSINESS. ....................33

V. 3DT IS NOT ENTITLED TO PREJUDGMENT INTEREST ....................37

CONCLUSION ....................37

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*,
821 F.3d 297 (2d Cir. 2016)....................17

*Breezy Point Co-op., Inc. v. Cigna Prop. & Cas. Co.*,
868 F. Supp. 33 (E.D.N.Y. 1994) ....................33

*EMA Fin., LLC v. 5Barz Int'l, Inc.*,
No. 18-CV-4995 (VEC), 2019 WL 8503357 (S.D.N.Y. Sept. 18, 2019)....................37

*Holland Loader Co., LLC v. FLSmidth A/S*,
313 F. Supp. 3d 447 (S.D.N.Y. 2018)....................13, 20, 21, 23, 28, 33

*Int'l Bus. Machs. Corp. v. United Microelectronics Corp.*,
764 F. App'x 9 (2d Cir. 2019) ....................18

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*,
655 F.3d 136 (2d Cir. 2011)....................13

*M/A-COM Sec. Corp. v. Galesi*,
904 F.2d 134 (2d Cir. 1990)....................13

*Munn v. Hotchkiss Sch.*,
24 F. Supp. 3d 155 (S.D.N.Y. 2014)....................36

*In re Namenda Direct Purchaser Antitrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018)....................35

*Sekisui Am. Corp. v. Hart*,
15 F. Supp. 3d 359 (S.D.N.Y.2014)....................20, 26

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
441 F. Supp. 3d 1 (S.D.N.Y. 2020) ....................20

**State Cases**

*Cambridge Petrol. Holdings, Inc. v. Lukoil Americas Corp.*,
11 N.Y.S.3d 58 (N.Y. App. Div. 2015) ....................12

*Ecoline, Inc. v. W.H. Peepels Co.*,
60 N.Y.S.3d 358 (N.Y. App. Div. 2017) ....................37

*NML Cap. v. Republic of Argentina*,
17 N.Y.3d 250 (N.Y. 2011) ....................37

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
86 N.Y.2d 685 (N.Y. 1995) ....................12, 17, 18

*ProSource Tech., LLC v. Housing Trust Fund Corp.*,
No. 5972-14, 2015 WL 5797028 (N.Y. Sup. Ct. Albany Cty. Oct. 2, 2015) ....................13, 29

*S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*,
4 N.Y.3d 272 (N.Y. 2005) ....................12

**Federal Statutes**

21 U.S.C. § 360(k) ....................29

21 U.S.C. § 360(n) ....................29

21 U.S.C. § 360c ....................29

**Rules**

FED. R. EVID. 401 ....................35

FED. R. EVID. 702 ....................34

**Regulations**

21 C.F.R. § 807.92 ....................29

## PRELIMINARY STATEMENT

3DT's motion for summary judgment is nothing more than a desperate attempt to squeeze even more money out of an almost eight-year old deal to fund its struggling business. 3DT cannot prevail in the face of both (1) unambiguous contractual language that [redacted], and (2) case law that establishes a low standard for commercial reasonableness, [redacted], as the contract at issue here does. To avoid these legal standards, which require judgment for Bard, 3DT distorts the operative contractual language, and even improperly attempts to introduce an expert to change the governing legal standard. 3DT's arguments fail as a matter of law.

As set forth herein and in its moving brief in support of its summary judgment motion, Bard properly invoked Section 2.1 of the Development Agreement when, [redacted] 3DT incorrectly argues that Bard was required to make two separate determinations, but 3DT's interpretation is belied by the contractual language itself. [redacted] Moreover, even if 3DT's tortured interpretation were accepted, Bard satisfied its obligation in its December

20, 2016 letter to 3DT, [redacted]. 3DT hangs its hat on the single fact that Bard [redacted], but the Agreement expressly contemplates exactly that circumstance, and [redacted].

In addition, the terms of the Development Agreement logically [redacted] That is exactly what Bard did, and 3DT has no evidence demonstrating otherwise. Moreover, 3DT and Bard are sophisticated parties who were represented by counsel in this arms' length negotiation. 3DT cannot now attempt to change the contractual language, and its attempt to [redacted] into question is misplaced. The undisputed evidence shows that after [redacted] Accordingly, Bard rightfully [redacted]

Finally, unlike the cases 3DT relies on, which discuss industry standards for commercial reasonableness, these Agreements [redacted] Throughout its brief, 3DT ignores this discretion, and attempts to convert the bargained-for contractual language into a self-serving standard that was neither bargained for nor agreed to. In reality, however, 3DT's apparent disappointment in the outcome of this project, and its expert's "opinion" as to how he may have done the project differently (which is riddled with baseless assumptions) are plainly irrelevant to

whether [redacted]

While 3DT nit-picks at Bard's efforts to [redacted] the law is clear that the bar for commercial reasonableness is low. Indeed, it merely requires that a party perform "*at least some activity*," and provide "*some conscious exertion* to accomplish the agreed goal." Here, the undisputed facts prove that Bard met that standard as a matter of law, and in fact went far beyond what is required. It is undisputed that Bard assembled a cross-functional team that held meetings and generated minutes, [redacted] executed a Non-Disclosure Agreement with Dr. Kassab in the days leading up to the third anniversary, and [redacted] These efforts continued until December 2016 – after the third anniversary of the Effective Date – [redacted] and certainly satisfy the standard here. But this is merely an abbreviated version of the full story – Bard well exceeded the commercially reasonable efforts required, [redacted].

Bard fulfilled its contractual obligations in every respect, and the Court should deny 3DT's motion for summary judgment.

**UNDISPUTED FACTUAL BACKGROUND**

Bard hereby incorporates its Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 filed in support of its Motion for Summary Judgment and the parties' Joint 56.1 Statement of Facts. For purposes of this Brief in Opposition to 3DT's Motion for Summary Judgment, Bard provides the following concise Undisputed Factual Background:

Bard staffed a cross-functional Penske team with a program manager as project leader (Joint Rule 56.1 Statement of Facts ("Joint SUMF") ¶¶ 20, 21 App. Ex. 5, Misener Dep. Tr. 10:8-11:2, 47:11-15), a regulatory specialist (Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15), an R&D engineer (Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22), and a product manager (Joint SUMF ¶ 23, App. Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5), and hired two full-time engineers who worked on the project (Joint SUMF ¶ 22, App. Ex. 5, Misener Dep. Tr. 80:21-81:15, Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22, Joint SUMF ¶ 23, App. Ex. 5, Misener Dep. Tr. 81:7-15). Anthony Misener began to hold regular Penske Integration Meetings, which were memorialized in meeting minutes. (Joint SUMF ¶¶ 24, 25 App. Ex. 5, Misener Dep. Tr. 79:2-4, 20-23.)

Bard conducted extensive, wide-ranging development activities. On the R&D front, [redacted] (Joint SUMF ¶ 40, App. Ex. 4, Kassab Dep. Tr. 66:24-68:9.) [redacted] (*See, e.g.*, Joint SUMF ¶ 41, App. Ex. 9, Davis Dep. Tr. 40:5-8; Joint SUMF ¶ 42, App. Ex. 9, Davis Dep. Ex. 4; Joint SUMF ¶ 43, App. Ex. 7, Phillips Dep. Tr. 63:5-6, 63:13-21; Joint SUMF ¶ 44, App. Ex. 5, Misener Dep. Tr. 116:20-24.) The team also [redacted] (Joint SUMF ¶ 45, App. Ex. 9, Davis Dep. Tr. 10:13-18.)

[redacted] (Joint SUMF ¶ 57, App. Ex. 6, Decheek Dep. Tr. 22:25-23:4.) The team also [redacted]. (Joint SUMF ¶ 58, App. Ex. 6, Decheek Dep. Tr. 23:5-9.)

Bard also expended significant time and effort [redacted] Chris Phillips testified that he [redacted] (Joint SUMF ¶ 52, App. Ex. 7, Phillips Dep. Tr. 54:11-14.) In particular, he [redacted]. (Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 54:11-14.) [redacted] (*Id*. at Phillips Dep. Tr. 51:12-15.)

Chris Phillips also [redacted] (Joint SUMF ¶ 55, App. Ex. 7, Phillips Dep. Tr. 37:4-10.) [redacted] (Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-8.)

Notably, Bard negotiated and executed a Non-Disclosure Agreement with Dr. Kassab during the summer of 2016 and in the days leading up to the third anniversary of the Development

Agreement. On May 6, 2016, Anthony Misener emailed Dr. Kassab a draft of a nondisclosure agreement. (Joint SUMF ¶ 88, App. Ex. 4, Kassab Dep. Ex. 6.) On May 12, 2016, 3DT's counsel provided comments on the proposed nondisclosure agreement to Anthony Misner. On August 5, 2016, Anthony Misener emailed a revised draft of the NDA to Dr. Kassab. (Joint SUMF ¶ 90, App. Ex. 14, BAS-3DT 0034929.) On August 8, 2016, 3DT provided minor comments, and Anthony Misener responded that same day, stating, "[i]f Ghassan is ready to sign, then would you send me a scan of the signed complete document and I will get the fully executed document back to the two of you." (Joint SUMF ¶ 91, App. Ex. 14, BAS-3DT 0034928-0034929.) On August 19, 2016, Anthony Misener followed up with Dr. Kassab via email saying, "Just checking in. Let me know if you are the [sic] ok with this latest version of the NDA." (Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929.) Dr. Kassab executed the NDA that day. (*Id.* at BAS-3DT 0034929.)

[redacted] On July 18, 2016, Anthony Misener emailed Ashley Krogh, Sr. Financial Analyst, [redacted] (Bard's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Bard SUMF") ¶ 43, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056304.) On July 19, 2016, Ms. Krogh asked Mr. Misener for [redacted] (*Id.*) On July 20, 2016, Anthony Misener [redacted] (Bard SUMF ¶ 44, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056333.)

The third anniversary of the parties' Agreement was August 29, 2016. (Joint SUMF ¶ 94; *see* App. Ex. 2, Development Agreement.) Now that the Non-Disclosure Agreement between Bard and Dr. Kassab had been executed, on September 19, 2016, Dr. Kassab emailed Anthony Misener asking "[s]hould we chat to outline next steps per earlier email?" (Joint SUMF ¶ 96, App. Ex. 4, Kassab Dep. Ex. 7.) On September 30, 2016, Anthony Misener responded to Dr. Kassab stating:

"I am working with my team to try to bring together some information from our past work to provide context to our questions. We are having a meeting next week to bring everything together and distill it down to the key issues. I can tell you that one thing that I would like to better understand is the lower level theory behind the experimental set-up and the assumptions made to simplify the approach." (Joint SUMF ¶ 97, App. Ex. 4, Kassab Dep. Ex. 7.)

[redacted]. (Joint SUMF ¶ 98, App. Ex. 8, Zentgraf Dep. Ex. 2.) [redacted] (Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2)

**ARGUMENT[1]**

**I. IN COMPLIANCE WITH THE DEVELOPMENT AGREEMENT, BARD PROPERLY [redacted]**

In an apparent attempt to fund its "in the red" business, 3DT argues that Bard must [redacted] 3DT is simply wrong, and its position is based upon a fundamental misunderstanding of the applicable contractual standards. Specifically, Section 2.1 of the Development Agreement provides:

[redacted]

[1] In addition to the arguments set forth herein, Bard incorporates by reference and refers the Court to arguments set forth in its Memorandum of Law in Support of its Motion for Summary Judgment. (ECF No. 78, 82 (under seal).)

[redacted]

(Joint SUMF ¶ 14, App. Ex. 2, Development Agreement, Section 2.1.)

As demonstrated herein, Bard properly [redacted] First, Bard is only required to [redacted]. Contrary to 3DT's claim, Bard's [redacted] Second, as reflected by the language of the operative contractual provision, this determination [redacted], and this Court should deny 3DT's motion.

### A. After the [redacted] and in Accord with the Development Agreement, Bard [redacted]

#### 1. [redacted]

3DT incorrectly reads Section 2.1 of the Development Agreement to require Bard to make two determinations to [redacted] (3DT Br. at 25, 28.) 3DT's interpretation is wrong for several reasons.

First, 3DT ignores that the two phrases it attempts to separate are joined by the words "due to," which means "because of" or "as a result of." *Due to,* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/due%20to (last visited Apr. 15, 2021). Using that definition, the sentence would read:

[redacted]

[redacted] The words "due to" make clear

that [redacted] 3DT's two separate determinations are one and the same.

This interpretation is the only one that makes sense. Recognizing the risk that the Penske project could encounter hurdles during development, particularly in light of the early stage, nascent technology Bard acquired (Bard SUMF ¶ 15, Mantell 3/26 Decl. Ex. D, Decheek Dep. Tr. 26:12-18), Bard and 3DT agreed [redacted] As 3DT notes, an agreement must be enforced according to its plain meaning. (3DT Br. 24.) [redacted]

3DT's position is based in part on tortured readings of Bard's December 20, 2016 and February 21, 2017 letters to 3DT, in which Bard [redacted] 3DT's reading of these letters illustrates its illogical position. 3DT claims that Bard [redacted] (3DT Br. 29.) However, in its December 20, 2016 letter, Bard explicitly quoted and relied upon Section 2.1 of the Development Agreement, including by citing to that very language:

[redacted]

(App. Ex. 16 (emphasis added).) 3DT's contention is without merit.

Moreover, 3DT has no basis to challenge the words Bard used to communicate its determination, when [redacted] Attempting to rewrite the agreement that it negotiated and signed, 3DT baldly asserts, without any support, that [redacted] (3DT Br. 30.) But the Development Agreement does not [redacted] If 3DT wanted [redacted], then it should have negotiated for that right.

**2.** *Bard* [redacted]

[redacted] in Section 2.1 has occurred. The Agreement clearly states, [redacted] That is exactly what Bard did.

[redacted] For example, [redacted]

The Development Agreement logically allows [redacted]

[redacted] Here, 3DT agreed at an arm's length that Bard [redacted] "If [3DT is] dissatisfied with the consequences of [its] agreement, **the time to say so [was] at the bargaining table**." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695 (N.Y. 1995) (third alteration in original) (emphasis added) (citations omitted). 3DT "may not rewrite the terms of an agreement because, in hindsight, it dislikes its terms." *Cambridge Petrol. Holdings, Inc. v. Lukoil Americas Corp.*, 11 N.Y.S.3d 58, 59 (N.Y. App. Div. 2015).

Further, contrary to 3DT's contentions, Bard need not [redacted] Requiring Bard to offer any such proof would rewrite the terms of the Development Agreement. "In cases of contract interpretation, it is well settled that when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms," *S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 277 (N.Y. 2005) (citations omitted), and that this is "particularly important" where "the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length," *id.* Here, two sophisticated parties negotiated and entered into the agreements at issue: 3DT is a self-described "innovation engine that looks for unmet needs in the medical community and develops technologies and solutions" (3DT Br. 4) and Bard is a market leader in the medical device manufacturing space. Both were represented by counsel in the

negotiation of this arm's-length transaction. The Development Agreement must be enforced as written. Thus, [redacted]. 3DT does not get to [redacted] Indeed, good faith "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 46 (N.Y. 1972), *cert. denied*, 409 U.S. 875 (1972)) (internal quotation marks omitted); *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 471 (S.D.N.Y. 2018) (citation omitted) ("A good faith standard has been held to apply when a contractual provision leaves implementation decisions to the discretion of the promisor."); *see also Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 146 (2d Cir. 2011) (citations omitted) ("In any number of contexts, reasonable discretion is commonly understood to allow a decision maker to choose from a broad range of choices not conflicting with law or reason."); *see also ProSource Tech., LLC v. Housing Trust Fund Corp.*, No. 5972-14, 2015 WL 5797028, at *12 (N.Y. Sup. Ct. Albany Cty. Oct. 2, 2015) (contract requiring "exercise of 'reasonable discretion' [is] an express promise that [a party] will not act arbitrarily, irrationally or without reasonable basis").

The contractual standard also incorporates principles from the business judgment rule arising in the corporate governance context, "[t]he judicial presumption that in making business decisions not involving direct self-interest or self-dealing, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest." *Business-Judgment Rule*, BLACK'S LAW DICTIONARY (11th ed. 2019). [redacted]

[redacted]

3DT cannot meet its burden of proving that Bard acted in bad faith, contrary to law, or inconsistent with decisions that could be made pursuant to the business judgment rule. In fact, even 3DT's expert testified that he has no information about Bard "acting in an unfair or deceptive manner," because there is none. (Mantell 4/16/2021 Decl., Ex. J, Waddell Dep. Tr. 93:7-12.) On the contrary, Bard [redacted] (*see* Bard SUMF ¶ 31; App. Ex. 7, Philips Dep. Tr. 19:11-20:2), [redacted] (Joint SUMF ¶ 69, App. Ex. 7, Phillips Dep. Tr. 123:16-20; Joint SUMF ¶ 70, App. Ex. 7, Phillips Dep. Tr. 21:21-22:9). [redacted] (*See* Bard SUMF ¶ 31; App. Ex. 7, Phillips Dep. Tr. 19:25-20:2; Joint SUMF ¶ 71, App. Ex. 5, Misener Dep. Tr. 200:22-25.) [redacted]

In addition, from an R&D perspective, [redacted] (Joint SUMF ¶ 71, App. Ex. 5, Misener Dep. Tr. 200:8-19.) In

[redacted] (*Id.* at Misener Dep. Tr. 208:20-22.) Accordingly, on December 20, 2016 [redacted] (Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2) [redacted] (Joint SUMF ¶ 103, App. Ex. 16, December 20, 2016 Bard Letter.) Bard's February 2017 letter [redacted] (Joint SUMF ¶ 106, App. Ex. 5, Misener Dep. Ex. 8 at 4.) This decision was more than reasonable, given [redacted]

Dr. Kassab's testimony supports [redacted] (Bard SUMF ¶ 32, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 121:1-4), [redacted] (*id.* at Kassab Dep. Tr. 121:5-11), and it [redacted] (*id.* at Kassab Dep. Tr. 124:3-8). In large part, these same considerations weighed [redacted] Its summary judgment motion should be denied.

**B. Bard's Hope to [redacted]**

In an attempt to distract the Court from the salient analysis governed by the contractual language, 3DT makes much of [redacted] (3DT's Br. 27, 29.) 3DT highlights that testimony to argue that Bard [redacted]" but 3DT's position again misunderstands the [redacted]

First, as discussed above, the only relevant determination is [redacted] Indeed, the Agreement itself makes this clear, as it expressly contemplates the situation in which [redacted] is immaterial to the Court's analysis and 3DT's reliance on this testimony is misplaced.

Second, 3DT's reliance on the definition of [redacted] conveniently and improperly ignores the first word in the phrase -- [redacted] -- which describes any [redacted] Black's Law Dictionary defines "commercial," in pertinent part,[2] as "[o]f,

[2] For completeness, the balance of the definition of "commercial" is "1. Of, relating to, or involving the buying and selling of goods; mercantile <commercial advertising>. 2. Resulting or accruing from commerce or exchange <commercial gains>. 3. Employed in trade; engaged in commerce <commercial travelers>. 4. Manufactured for the

relating to, or involving the ability of a product or business to make a profit." *Commercial*, BLACK'S LAW DICTIONARY (11th ed. 2019). 3DT's omission [redacted] is telling. Throughout its brief, 3DT conflates [redacted]

Section 2.1 allows [redacted] The undisputed evidence proves that Bard did exactly what the Development Agreement required – [redacted] Accordingly, summary judgment for Bard is required.

## II. BARD DOES NOT [redacted] BECAUSE THE CONDITIONS PRECEDENT HAVE NOT OCCURRED.

Simply put, Bard does not [redacted] at this time. Neither of the conditions precedent to [redacted] – has occurred. "Under New York law . . . a condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (quoting *Oppenheimer*, 86 N.Y.2d at 690). "'Most conditions precedent describe acts or events

---

markets; put up for trade <commercial products>. . . . 6. Produced and sold in large quantities <commercial cosmetics>. 7. Pejorative. More concerned with money than with quality <he sold out and became commercial>."

which must occur before a party is obliged to perform a promise made pursuant to an existing contract.'" *Int'l Bus. Machs. Corp. v. United Microelectronics Corp.*, 764 F. App'x 9, 12 (2d Cir. 2019) (quoting *Oppenheimer*, 86 N.Y.2d at 690)). As set forth more fully below, it is undisputed that neither of these conditions precedent [redacted] has occurred. Thus, [redacted] 3DT's breach of contract claim fails as a matter of law.

**A.** [redacted]

The Purchase Agreement provides for [redacted] (Joint SUMF ¶ 10, App. Ex. 1, Purchase Agreement Section 2.04(b).) Bard [redacted]

**B.** [redacted]

As discussed extensively above, Bard availed itself of [redacted] (Joint SUMF ¶ 11, App. Ex. 1, Purchase Agreement Section 2.04(b).) [redacted]

[redacted]

## III. BARD COMPLIED WITH ITS DEVELOPMENT OBLIGATIONS [redacted]

As set forth extensively in Bard's Memorandum of Law in Support of its Motion for Summary Judgment, Bard complied with Section 2.1 of the Development Agreement by [redacted]

### A. The Development Agreement [redacted]

3DT misinterprets the relevant contractual language and the governing law related to commercial reasonableness. Here, the contractual standard provides [redacted] (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1) (emphasis added); *see also* App. Ex. 1, Purchase Agreement Section [redacted]) Bard did exactly that.

3DT rests its argument on the fact that New York case law does not precisely define what activities constitute "commercially reasonable efforts," (3DT Br. 31), but the case law *does* define a minimum satisfactory threshold – which Bard clearly met and exceeded here – and the standard in the Development Agreement [redacted]

While Bard must [redacted] 3DT itself concedes that the standard for commercial reasonableness is not a demanding one: "At a minimum, though, a promise to use commercially reasonable efforts requires that the promising party undertake **at least some activity**," and "requires at the very least **some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests**." (3DT Br. 31, 32 (quoting *Holland Loader*, 313 F. Supp. 3d at 473) (emphases added).)

Because "[t]he standard for satisfying commercial reasonability under New York law is a fairly lenient one," *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020), Bard's substantial investment of time and resources certainly satisfied this standard. For example, in *Sekisui Am. Corp. v. Hart*, the court determined a party could not recover on its counterclaim for breach of contract for failure to provide commercially reasonable efforts to market a breast cancer diagnostic assay and to take actions to obtain FDA approval. 15 F. Supp. 3d 359, 362, 370, 381 (S.D.N.Y. 2014). Even under a contractual standard unqualified by [redacted], the *Sekisui* court held that "considerable efforts" to obtain FDA clearance via the 510(k) process were taken. *Id*. at 381. Such efforts included "re-creating files" of data and traveling to Germany in unsuccessful attempts to obtain clinical data, until the company concluded that it would need new clinical studies performed in the United States costing $3.2 million and taking more than three years. *Id*. at 377, 381. Certainly, Bard performed more work on the Penske project than in *Sekisui*, given that *Sekisui* involved a 510(k) submission already made and under FDA review, and [redacted]

**B. Bard [redacted]**

**1.** *Bard, At a Minimum,* [redacted]

As discussed above, the case law involving "commercially reasonable efforts" clauses that [redacted] sets forth a low standard of required minimum efforts. The standard of commercial reasonableness is [redacted] Bard's conduct easily met this standard. 3DT focuses on minutiae in its summary judgment motion, misconstruing the record in an attempt to paint a favorable picture of the factual narrative, leaning heavily on, for example, [redacted] Any attempt at distraction should fail. [redacted] took "some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes [its] business interests." (3DT Br. 31, 32 (quoting *Holland Loader*, 313 F. Supp. 3d at 473).) Bard easily exceeded this threshold.

Bard assembled a cross-functional team consisting of a program leader at the helm, multiple engineers, a regulatory specialist focused on FDA clearance, and a marketing product manager. (Joint SUMF ¶¶ 20, 21 App. Ex. 5, Misener Dep. Tr. 10:8-11:2, 47:11-15; Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15; Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22; Joint SUMF ¶ 23, App. Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5; Joint SUMF ¶ 22, App. Ex. 5, Misener Dep. Tr. 80:21-81:15; Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22; Joint SUMF ¶ 23, App. Ex. 5, Misener Dep. Tr. 81:7-15.) The team held regular meetings and minutes were kept. (Joint SUMF ¶¶ 24, 25, App. Ex. 5, Misener Dep.

Tr. 79:2-4, 20-23.) [redacted] (Joint SUMF ¶ 40, App. Ex. 4, Kassab Dep. Tr. 66:24-68:9), [redacted] (Joint SUMF ¶ 45, App. Ex. 9, Davis Dep. Tr. 10:13-18), [redacted] (Joint SUMF ¶ 57, App. Ex. 6, Decheek Dep. Tr. 22:25-23:4; Joint SUMF ¶ 58, App. Ex. 6, Decheek Dep. Tr. 23:5-9). [redacted] (Joint SUMF ¶ 52, App. Ex. 7, Phillips Dep. Tr. 54:11-14; Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 51:12-15, 54:11-14) [redacted] (Joint SUMF ¶ 55, App. Ex. 7, Phillips Dep. Tr. 37:4-10; Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-8.) After the third anniversary of the Agreements, [redacted] (Bard SUMF ¶ 43, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056304; Bard SUMF ¶ 44, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056333.) Both before and after the third anniversary, he contacted 3DT to negotiate an sign a Non-Disclosure Agreement to allow the parties to communicate about the project. (Joint SUMF ¶ 88, App. Ex. 4, Kassab Dep. Ex. 6; Joint SUMF ¶ 90, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 91, App. Ex. 14, BAS-3DT 0034928-0034929; Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 96, App. Ex. 4, Kassab Dep. Ex. 7; Joint SUMF ¶ 97, App. Ex. 4, Kassab Dep. Ex. 7.) Most notably, [redacted] (Joint SUMF ¶ 98, App. Ex. 8, Zentgraf Dep. Ex. 2; Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2.) Without doubt, these efforts constitute

"at least some activity" and "some conscious exertion to accomplish the agreed goal" (3DT Br. 31, 32 (quoting *Holland Loader*, 313 F. Supp. 3d at 473)).

3DT now argues, in effect, that Bard should have [redacted] including Nautilus Delta which is now on the market, for three years. But that is not how any business, including Bard's business, operates, and it is not what the Development Agreement requires. More importantly, 3DT knew that at the time it negotiated the Development Agreement. The Development Agreement calls for [redacted] (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.) That is, the Agreement clearly allows [redacted] *See Commercial*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "commercial," in pertinent part, as "[o]f, relating to, or involving the ability of a product or business to make a profit."). Just as the Court or a law firm has many cases to work on, Bard has many medical devices in development. [redacted] (Joint SUMF ¶ 66, App. Ex. 5, Misener Dep. Tr. 72:1-4.) Indeed, Anthony Misener testified that [redacted] (Joint SUMF ¶ 67, App. Ex. 5, Misener Dep. Tr. 261:19-262:4.) He also testified that [redacted] (Bard SUMF ¶ 34, Mantell 3/26 Decl., Ex. C, Misener Dep. Tr. 210:6-16.) Quite simply, the fact that Bard did not [redacted] is by no means a breach of the parties' Agreement. Had Bard – or any other well-established medical device company for that matter – been asked to sign an agreement requiring as much, it surely would have refused. 3DT's interpretation is divorced from reality and must be rejected as a matter of law.

Further, contrary to 3DT's cherry-picked statements, the documentary evidence in the record (including emails that 3DT cites) establishes that [redacted][3] For example, on January 11, 2016, Ed Burnside stated that "[redacted]" (Gibson Decl. Ex. 10.) On February 9, 2016, Mr. Misener confirmed that "[redacted]" (Gibson Decl. Ex. 13.) As of June 8, 2016, the team was "[redacted]." (Mantell 4/16/2021 Decl. Ex. C, Decheek Dep. Tr. 80:12-17.) In addition, Mr. Misener [redacted] (Bard SUMF ¶ 43, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056304, ¶ 44, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056333.) Mr. Misener also finalized a new Non-Disclosure Agreement with Dr. Kassab less than two weeks prior to the third anniversary, (Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929), and afterwards, exchanged emails with Dr. Kassab on next steps. (Joint SUMF ¶¶ 96, 97, App. Ex. 4, Kassab Dep. Ex. 7.) And, as of November 14, 2016, as 3DT itself confirmed in its Statement of Undisputed Material Facts (*see* 3DT SUMF ¶ 39), [redacted]. (Gibson Dec. Ex. 8, Decheek Dep. Ex. 23.) 3DT claims that the [redacted], but the opposite is true. Indeed, 3DT does not, and cannot, claim that [redacted]. 3DT's contention that [redacted] is unfounded, and simply untrue.

[3] Tellingly, 3DT routinely omits context from the documents it cites, which, [redacted] is highly relevant and dispositive as to whether Bard [redacted] Bard clarifies the record in its Response to 3DT's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1.

**2.** *Bard* [redacted] – far more than the "some activity" required to meet the commercial reasonableness standard. Bard's work was performed by skilled team members across a variety of disciplines, whose dedication reflected the enormous financial commitment Bard made in acquiring the technology. Consistent with its normal business practices, within two weeks of the acquisition, Bard assembled a cross-functional team with on-the-job expertise and educational background in project management, research and design, marketing, and regulatory affairs – all of the major aspects of the development pathway. (*See* Joint SUMF ¶ 27, App. Ex. 5, Misener Dep. Tr. 43:5-20; 52:22-53:11; App. Ex. 7, Phillips Dep. Tr. 128:21-129:11; *see also* Joint SUMF paragraphs discussing the Penske team members, their specialties, education, and prior experience: Joint SUMF ¶ 21, App. Ex. 5, Misener Dep. Tr. 10:8-11:2; 11:15-12:23; 47:11-15; Joint SUMF ¶ 23, App. Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5; Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15; Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22; App. Ex. 8, Zentgraf Dep. Tr. 7:8-16; 8:4-5, 23-24; 10:22-25, 14:11-16; App. Ex. 5, Misener Dep. Tr. 81:7-15; 104:7-8.) Mr. Misener felt fortunate to have two additions to the R&D engineering team to help get the work done, particularly where it was atypical for him to obtain increased headcount during that time. (*See* App. Ex. 5, Misener Dep. Tr. at 85:8-21; 86:25-87:5.) The entire team met regularly on this project. (Joint SUMF ¶ 24, App. Ex. 5, Misener Dep. Tr. 79:2-4; Joint SUMF ¶ 24, App. Ex. 6, Decheek Dep. Tr. 27:12-18.) [redacted]

(Joint SUMF ¶ 47, App. Ex. 5, Misener Dep. Tr. 107:22-108:9; *id*. at Misener Dep. Tr. 241:17-20.)

These team members conducted broad-based efforts across multiple disciplines – [redacted] – in an attempt to develop a product that could be cleared and commercialized [redacted]

***1.*** [redacted] (Joint SUMF ¶ 105, App. Ex. 5, Misener Dep. Ex. 8 at 3) [redacted] (Joint SUMF ¶ 40, App. Ex. 5, Misener Dep. Tr. 245:18-20; App. Ex. 9, Davis Dep. Ex. 5). [redacted]. (Joint SUMF ¶ 43, App. Ex. 7, Phillips Dep. Tr. 63:5-6, 63:13-21; Joint SUMF ¶ 44, App. Ex. 5, Misener Dep. Tr. 116:20-24; Bard SUMF ¶ 18, Mantell 3/26 Decl., Ex. C, Misener Dep. Tr. 117:7-10.) [redacted] (Joint SUMF ¶ 45, App. Ex. 9, Davis Dep. Tr. 10:13-18.) [redacted] (Bard SUMF ¶ 20; App. Ex. 9, Davis Dep Tr. 18:20-21; Bard SUMF ¶ 20; App. Ex. 9, Davis Dep Tr. 19:12-22.) To be commercially reasonable, Bard's efforts need not be successful; they must exist. *See Sekisui Am. Corp.*, 15 F. Supp. 3d at 378, 381 (despite unsuccessful attempts to obtain clinical data, company's work was commercially reasonable as a matter of law, requiring dismissal).

During this time, Bard (a company that had been developing and manufacturing PICC devices for years) made the reasonable business decision to [redacted]

(*See* Bard SUMF ¶ 22, Mantell 3/26 Decl., Ex. E, Davis Dep. Tr. 67:6-9; Joint SUMF ¶ 48, App. Ex. 5, Misener Dep. Tr. 91:2-6; Joint SUMF ¶ 48, App. Ex. 9, Davis Dep. Ex. 3, BAS-3DT 0053803). Importantly, this decision was in line with the Parties' Agreement. The Purchase Agreement contemplates [redacted]. (Joint SUMF ¶ 10 n.2, App. Ex. 1, Purchase Agreement Section 1.01.) Under the circumstances, Bard's decision to [redacted].

Still, the team [redacted]. (Joint SUMF ¶ 49, App. Ex. 5, Misener Dep. Tr. 111:16-17; Joint SUMF ¶ 50, App. Ex. 5, Misener Dep. Tr. 111:3-7; *see also* Joint SUMF ¶ 51, App. Ex. 7, Phillips Dep. Tr. 64:22-23; Bard SUMF ¶ 21; App. Ex. 7, Phillips Dep. Tr. 64:9-13). [redacted] (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.)

***2.*** [redacted] (Joint SUMF ¶¶ 57, 58, App. Ex. 6, Decheek Dep. Tr. 22:25-23:9), [redacted]

[redacted] (Joint SUMF ¶ 61, App. Ex. 6, Decheek Dep. Tr. 24:11-20; Bard SUMF ¶ 28; Mantell 3/26 Decl., Ex. B, Phillips Dep. Tr. 88:7-25.) Those efforts likewise constituted [redacted]

***3.*** [redacted] No product – even if safe and effective in practice – can be brought to market without the FDA's blessing. (Joint SUMF ¶ 30, App. Ex. 7, Phillips Dep. Tr. 23:23-24:2, 24:11-12; *see generally* Joint SUMF ¶¶ 30-34.) [redacted] (Joint SUMF ¶ 55, App. Ex. 7, Phillips Dep. Tr. 37:4-10; Joint SUMF ¶ 56, App. Ex. 7, Phillips Dep. Tr. 127:13-20.) [redacted] (*See* Bard SUMF ¶ 26; App. Ex. 7, Phillips Dep. Tr. 126:21:127:12.) Such concern is commercially reasonable as a matter of law, [redacted] *See Holland Loader*, 313 F. Supp. 3d at 474 (no breach of contract where defendant turned down a business opportunity for which it could not meet deadlines while following internal process, as it "operated for 135 years and has a reputation in the global mining market that it seeks to uphold[,] requir[ing] that any product or system that it sells comply with its internal safety, design, and engineering specifications"). [redacted]

[redacted] That concern was reasonable and warranted. By no means was Bard acting "arbitrarily, irrationally or without reasonable basis," as required for 3DT to prevail on its breach of contract claim. *See ProSource Tech., LLC*, 2015 WL 5797028, at *12.

[redacted] (Bard SUMF ¶¶ 1, 2, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 34:3-9; 22:21-23:17.) [redacted] (Bard SUMF ¶ 2, Mantell 3/26 Decl. Ex. A, Kassab Dep. Tr. 34:3-9.)

Specifically, to obtain 510(k) clearance, federal statutes and FDA regulations require Bard to demonstrate that its new device is "substantially equivalent" to a legally marketed "predicate" device. 21 U.S.C. §§360(k), 360(n), 360c(f) (1) & 360c(i) (1) (A); 21 C.F.R. §807.92(a) (3). [redacted] (Bard SUMF ¶ 8, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 76:11-77:19, Bard SUMF ¶ 9, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 77:20-23, Bard SUMF ¶ 23, Mantell 3/26 Decl., Ex. B, Phillips Dep. Tr. 91:12-25) [redacted] (Bard SUMF ¶ 8, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 76:11-77:19; Bard SUMF ¶ 9, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 77:20-23.)

[redacted] (Joint SUMF ¶ 52, App. Ex. 7, Phillips Dep. Tr. 54:11-14; Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 54:11-14; Bard SUMF

¶ 27, App. Ex. 7, Phillips Dep. Tr. 54:15-22.) [redacted] (Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 51:12-15.) [redacted] (Bard SUMF ¶ 30, App. Ex. 7, Phillips Dep. Tr. 128:6-20.) [redacted] As both Bard and Dr. Kassab understood, if the FDA deemed the identified predicates inappropriate or the submission insufficient, the product would be subjected to a more stringent FDA review process, and costs would increase exponentially. (Bard SUMF ¶ 13, Mantell 3/26 Decl., Ex. B, Phillips Dep. Tr. 55:19-24; Bard SUMF ¶ 14, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 119:8-11.) [redacted] (Joint SUMF ¶ 81, App. Ex. 5, Misener Dep. Tr. 155:18-20; App. Ex. 7, Phillips Dep. Tr. 110:21-111:5; Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 110:21-111:5; *see also* Joint SUMF ¶ 81, App. Ex. 8, Zentgraf Dep. Ex. 2 ([redacted]).)

As with any new product, Bard's regulatory strategy for Penske was memorialized in document called a [redacted]

[redacted] (Bard SUMF ¶ 25, App. Ex. 7, Phillips Dep. Tr. 128:24-129:11.) [redacted] (Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-8.) [redacted] (Bard SUMF ¶ 38, Mantell 3/26 Decl., Ex. C, Misener Dep. Tr. 156:22-157:6; Bard SUMF ¶ 39, Mantell 3/26 Decl., Ex. C, Misener Dep. Tr. 157:13-19; Bard SUMF ¶ 40, Mantell 3/26 Decl., Ex. C, Misener Dep. Tr. 157:20-158:4.; Bard SUMF ¶ 41, Mantell 3/26 Decl., Ex. B, Phillips Dep. Tr. 121:9-15.) [redacted] (Joint SUMF ¶ 85, App. Ex. 5, Misener Dep. Tr. 276:21-277:16; Joint SUMF ¶ 86, App. Ex. 7, Phillips Dep. Ex. 17.)

*4.* [redacted] (Joint SUMF ¶ 98, App. Ex. 8, Zentgraf Dep. Ex. 2; Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2.) Further, Bard worked to negotiate and sign a new NDA with Dr. Kassab to allow him to assist. (Joint SUMF ¶ 88, App. Ex. 4, Kassab Dep. Ex. 6; Joint SUMF ¶ 89, App. Ex. 13, 3DT Prod. 0000101-0000103; Joint SUMF ¶ 90, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 91, App. Ex. 14, BAS-3DT 0034928-0034929.) E-mail exchanges between the two took place just weeks before, days prior, and well after the third anniversary, [redacted] (Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 93, App. Ex.

14, BAS-3DT 0034928; Joint SUMF ¶ 96, App. Ex. 4, Kassab Dep. Ex. 7; Joint SUMF ¶ 97, App. Ex. 4, Kassab Dep. Ex. 7.)

[redacted] (Bard SUMF ¶ 44, Ex. F, BAS-3DT 0056333; Joint SUMF ¶ 95, App. Ex. 5, Misener Dep. Tr. 261:19-262:4 (e-mail indicating [redacted])

[redacted] (Joint SUMF ¶¶ 102-08, App. Ex. 15, December 6, 2016 3DT Letter, App. Ex. 16, December 20, 2016 Bard Letter, App. Ex. 5, Misener Dep. Ex. 8, App. Ex. 17, May 10, 2017 3DT Letter, App. Ex. 18. May 19, 2017 Bard Letter.) These letters revealed [redacted] (Joint SUMF ¶ 104, App. Ex. 16, December 20, 2016 Bard Letter), [redacted]. As Bard noted in its February 21, 2017 letter to 3DT, Bard [redacted]

[redacted] (Joint SUMF ¶ 105, App. Ex. 5, Misener Dep. Ex. 8 at 2-4.) These efforts easily exceeded [redacted] the Development Agreement and governing law.

## IV. THE OPINIONS OF 3DT'S EXPERT, MR. WADDELL, ARE IRRELEVANT TO THE COURT'S ANALYSIS OF THE CONTRACTUAL STANDARD BECAUSE IT IS BASED ON FALSE ASSUMPTIONS AND HE HAS NO KNOWLEDGE OF BARD'S BUSINESS.

3DT's reliance upon the opinions of its expert, Mr. Waddell, is improper. Contrary to 3DT's assertion, Mr. Waddell does not set the standard for commercial reasonableness; the Agreements governing the parties' relationship, and the law, do. Indeed, "an expert is prohibited from offering his opinion as to the legal obligations of parties under a contract." *Breezy Point Co-op., Inc. v. Cigna Prop. & Cas. Co.*, 868 F. Supp. 33, 36 (E.D.N.Y. 1994) (citing *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 508 (2d Cir.), *cert. denied*, 434 U.S. 861 (1977)). Mr. Waddell's invention of his own legal standard for commercial reasonableness – [redacted] (Waddell Aff. ¶ 21, Ex. C at 1) – is not permitted.

To find some way to rely on its expert's "opinions," 3DT relies on *Holland Loader* for the proposition that the contractual standard requires [redacted]. (3DT Br. 31 (quoting *Holland Loader*, 313 F. Supp. 3d at 469).) [redacted] the agreement in that case contained an objective commercial reasonableness standard which would require input regarding industry standards. Indeed, the provision at issue in *Holland Loader* provides, "[d]uring the Earnout Period, Buyer shall use commercially reasonable efforts to actively promote the sale of Products and to further develop new products that substantially incorporate the Acquired Assets." *Holland Loader*, 313 F. Supp. 3d at 456. Here, [redacted]

[redacted] *See*, *supra*, Point I. There is no question Bard's actions meet, and exceed, that standard.

Moreover, as set forth in detail below, Mr. Waddell's opinions are untethered to the agreed upon contractual standard, which [redacted] and therefore do not and cannot defeat summary judgment for Bard based on the contractual language at issue in this case.[4,5] That standard necessarily [redacted] But Mr. Waddell admits that he knows practically nothing about Bard's business:

> Q Based upon what you know about Bard, was there anything inconsistent with the development of this product as compared to the development of other products at the company?
>
> A I am not familiar with their development strategies for other products. I can only comment on this one. So I don't have a comparison, so I don't know how to answer that question.
>
> Q **So you have no opinion one way or another as to whether or not the work that was done on this project was consistent with how Bard ordinarily conducts its business?**
>
> A **Yeah. I don't know how they ordinarily conduct their business, so I don't have a way to tell you that.** All I can tell you about is my opinions on how they conducted this particular project.

---

[4] 3DT claims that both parties retained experts "to opine on the sufficiency of Bard's development resources in light of development standards in the medical device industry." (3DT Br. 32.) However, that characterization is only partially accurate – 3DT's expert misguidedly opined as to [redacted], while Bard's expert, Mr. Haas, issued a report tailored to the contractual standard after, among other things, conducting an interview of Anthony Misener to obtain [redacted]. (Mantell 4/16/2021 Decl., Ex. K, Haas Report.)

[5] Should the Court deny both parties' summary judgment motions, Bard reserves its right to challenge Mr. Waddell's opinions for failure to meet the standards for admissibility set forth in FED. R. EVID. 702, *Daubert*, and other relevant case law.

(Mantell 4/16/2021 Decl., Ex. J, Waddell Dep. Tr. 91:10-25. (emphases added)). Mr. Waddell also admitted that he: (i) had no way to determine whether or not the activities related to the development of this product were different than the activities related to the development of other products "because [he] ha[d] no knowledge of how their other products' activities are performed," (*id*. at 93:13-18), (ii) "ha[d] no idea" whether the title of "systems engineer" existed at Bard (*id*. at 98:2-4), (iii) did not "believe that [he] kn[e]w of any of the processes that they were required to follow" in connection with the matter (*id*. at 80:12-17), and (iv) did not "know what their regulatory strategy was" so he had no criticisms of it (*id*. at 81:2-5).

Mr. Waddell wrote similarly revealing information in his report that:

- "This plan was *developed before being provided access to the 79 Bard documents* and was developed to contrast with the Penske project without bias from knowledge of actual project dates." (Waddell Aff., Ex. B at 3.)
- "*Without knowing the specific disposable configurations to be used*, there was an assumption made that Bard would have sufficient disposable expertise." (*Id*.)
- "The Waddell Development Plan *was developed based upon the methodology employed by the Waddell Group* when developing project development plans as a Project Manager." (*Id*.)
- "This development *assumed* that Bard would need one iteration (2 tries) for each of the disposable items, and 2 iterations of the electronics / software." (*Id*. at 4.)

Thus, Mr. Waddell's statements are irrelevant to the Court's analysis of the contractual language, and amount to no more than improper net opinion. *See* FED. R. EVID. 401; *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 171 (S.D.N.Y. 2018) (quoting *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 281-82 (S.D.N.Y. 2011)) ("But simply saying, 'They could do it in 2015, so they could have done it in 2012,' without any analysis of the market and corporate conditions that might have impacted the generics' ability to launch generic Namenda in 2012, is a conclusion tethered to nothing whatever. This Court must exclude 'unsupport[ed] speculation cloaked as expertise.'").

Even more striking, Mr. Waddell's testimony does not support 3DT's position that Bard [redacted]. In response to a question asking whether he had an opinion as to "[redacted]" of the Precisive Navigation Technology (92:1-4), Mr. Waddell testified that "**<u>I have no knowledge of [Bard] acting in an unfair or deceptive manner.</u>** I just don't know. I have no way of being able to determine that." (93:7-12.) Mr. Waddell does not and cannot assert, and 3DT has no basis to claim, that [redacted] On the contrary, Bard's efforts here are fully consistent with its efforts to develop hundreds of medical devices that it has successfully brought to market. 3DT's claims are without merit, and its complaint should be dismissed.

Far more troubling, though, are Mr. Waddell's assumptions on which his purported opinions are based. By way of example, the *first* assumption in his report is: "3DT's Precisive Navigation Technology is safe and effective." (Waddell Aff., Ex. B at 4.) That could not be farther from the truth, as the FDA is the only entity that would make that determination upon review and analysis of substantial data. Moreover, there are no facts in the record on which this "assumption" is based. *See Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 203 (S.D.N.Y. 2014) (expert testimony stricken for lack of "sufficient basis in facts or data" and noting "[d]etermining the factual basis for an expert's opinion and the soundness of an expert's methodology falls within the 'gatekeeping' function of district judges"). 3DT has no evidence to demonstrate that the FDA determined (or would have determined) that the Precisive Navigation Technology was adequately proven to be safe or effective. On the contrary, [redacted] (Joint SUMF ¶ 40, App. Ex. 4, Kassab Dep. Tr. 66:24-68:9; Joint SUMF ¶ 41, App. Ex. 9, Davis Dep. Tr. 40:5-8;

Joint SUMF ¶ 42, App. Ex. 9, Davis Dep. Ex. 4; Joint SUMF ¶ 43, App. Ex. 7, Phillips Dep. Tr. 63:5-6, 63:13-21; Joint SUMF ¶ 44, App. Ex. 5, Misener Dep. Tr. 116:20-24.) This fundamental, incorrect assumption undermines the basis for Mr. Waddell's opinions, particularly those related to [redacted] The Court should disregard Mr. Waddell's "opinions."

## V. 3DT IS NOT ENTITLED TO PREJUDGMENT INTEREST

3DT improperly claims it is entitled to pre-judgment interest. Under New York law, an award of prejudgment interest is only warranted where a party *prevails* in a breach-of-contract action. *NML Cap. v. Republic of Argentina*, 17 N.Y.3d 250, 258 (N.Y. 2011) (citing N.Y. C.P.L.R. 5001) (emphasis added); *see, e.g.*, *EMA Fin., LLC v. 5Barz Int'l, Inc.*, No. 18-CV-4995 (VEC), 2019 WL 8503357, at *10 (S.D.N.Y. Sept. 18, 2019) (granting summary judgment on the plaintiff's breach-of-contract claim and awarding prejudgment interest on that basis); *Ecoline, Inc. v. W.H. Peepels Co.*, 60 N.Y.S.3d 358, 359 (N.Y. App. Div. 2017) (affirming the trial court's order granting summary judgment favoring the plaintiff in a breach-of-contract matter, and affirming generally the trial court's assessment of prejudgment interest (though enlarging the amount awarded)). As outlined at length in this Memorandum of Law, and in the Memorandum of Law in Support of Bard's Motion for Summary Judgment, 3DT is not entitled to prejudgment interest because it cannot prevail on its breach of contract claim as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendant Bard Access Systems, Inc. respectfully requests that this Court deny Plaintiff 3DT Holdings, LLC's Motion for Summary Judgment on its breach of contract claim.

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

By: *<u>/s/ Natalie</u>* <u>H. Mantell</u>
Natalie H. Mantell

Natalie H. Mantell
Meghan McSkimming
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
Facsimile: (973) 624-7070
nmantell@mccarter.com
mmcskimming@mccarter.com

*Attorneys for Defendant*
*Bard Access Systems, Inc.*

Dated: April 16, 2021