**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| 3DT HOLDINGS LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:17-cv-05463-LJL |
| BARD ACCESS SYSTEMS, INC., | ) | |
| Defendant. | ) | |

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF BARD ACCESS SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT .....................................................................................................................2

I. NO DISPUTE OF MATERIAL FACT EXISTS AND SUMMARY JUDGMENT FOR BARD IS APPROPRIATE ........................................................................2

A. [redacted] ..........................................................................2

B. [redacted] ..........................................................................4

C. [redacted] ..........................................................................7

D. The Opinions of 3DT's Expert, Mr. Waddell, Are Irrelevant to the Court's Analysis of the Contractual Standard Because He Cannot Create a Factual Dispute, His Opinions Are Based on False Assumptions, And He Has No Knowledge of Bard's Business. ..................................................................13

II. 3DT SHOULD BE EQUITABLY ESTOPPED FROM CLAIMING THAT QUESTIONS OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT FOR BARD BECAUSE IT MOVED FOR SUMMARY JUDGMENT CLAIMING SUCH FACTS WERE UNDISPUTED ..................................................................17

III. BARD IS ENTITLED TO SUMMARY JUDGMENT ON 3DT'S CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING ...............19

CONCLUSION ..............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Breezy Point Co-op., Inc. v. Cigna Prop. & Cas. Co.*,
868 F. Supp. 33 (E.D.N.Y. 1994) ....................14

*Cambridge Petrol. Holdings, Inc. v. Lukoil Americas Corp.*,
11 N.Y.S.3d 58 (N.Y. App. Div. 2015) ....................4

*CL-Alexanders Laing & Cruickshank v. Goldfeld*,
739 F. Supp. 158 (S.D.N.Y. 1990) ....................13, 14

*Gay v. Affourtit*,
76 F. Supp. 2d 517 (S.D.N.Y. 1999)....................7

*Gen. Motors Corp. v. Dealmaker, LLC*,
No. 07-CV-141, 2009 WL 1310616 (N.D.N.Y. May 8, 2009)....................5

*ICD Holdings S.A. v. Frankel*,
976 F.Supp. 234 (S.D.N.Y. 1997) ....................19

*Intelligent Digital Sys., LLC v. Beazley Ins. Co.*,
906 F. Supp. 2d 80 (E.D.N.Y. 2012) ....................17

*In re Ionosphere Clubs, Inc.*,
85 F.3d 992 (2d Cir. 1996)....................19

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
950 F. Supp. 2d 568 (S.D.N.Y. 2013)....................8

*Munn v. Hotchkiss Sch*.,
24 F. Supp. 3d 155 (S.D.N.Y. 2014)....................16

*Nasso v. Bio Reference Lab'ys, Inc*.,
892 F. Supp. 2d 439 (E.D.N.Y. 2012) ....................17, 19

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co*.,
86 N.Y.2d 685 (N.Y. 1995) ....................4

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc*.,
441 F. Supp. 3d 1 (S.D.N.Y. 2020) ....................8

*S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp*.,
4 N.Y.3d 272 (N.Y. 2005) ....................6

*In re Zyprexa*,
433 F. Supp. 2d 268 (E.D.N.Y. 2006) .....17

**Rules**

Fed. R. Evid. 702 .....13, 14

## PRELIMINARY STATEMENT

3DT's opposition is a striking example of baseless advocacy. It takes bold liberties with the facts and relevant legal standard in an attempt to somehow prevent a loss. In a tacit acknowledgement of its weak arguments in opposition to Bard's summary judgment motion (the same arguments it made in its motion), 3DT stunningly reverses course and now claims that multiple questions of fact preclude granting summary judgment for Bard. This is an admittedly shocking development, given the nature of this case. The parties' competing summary judgment motions are two sides of the same coin – if 3DT believed that there were disputes of material fact from the outset, it should not have moved for summary judgment in the first place. As a matter of fairness, and after countless hours of Bard's time and effort on these motions, 3DT should be equitably estopped from asserting this directly contradictory position.

Contrary to 3DT's arguments and its last-minute attempt to save its claims, however, no dispute of fact exists. The undisputed facts in the parties' Joint 56.1 Statement require judgment as a matter of law for Bard based upon the applicable contractual and legal standards. Bard undoubtedly complied with the Development Agreement's terms both by [redacted]. 3DT's attempts to have its expert contort the relevant contractual and legal standards must fail. 3DT similarly blurs the line between opinion and fact, improperly arguing that its expert's *opinions* create a dispute of *fact*. This cannot be.

The undisputed facts also demonstrate that Bard acted in good faith throughout the parties' contractual relationship. Setting aside that 3DT's claim for breach of the covenant of good faith and fair dealing is duplicative because [redacted], which bars this claim as a matter of law, 3DT's expert admits that he "had no knowledge of

[Bard] acting in an unfair or deceptive manner." Bard is entitled to summary judgment.

## ARGUMENT[1]

### I. NO DISPUTE OF MATERIAL FACT EXISTS AND SUMMARY JUDGMENT FOR BARD IS APPROPRIATE

3DT claims that various "questions of fact" preclude granting Bard's motion. (*See, e.g.*, 3DT Opp'n Br. at 34, 36, 46, 48, 49, 54-55.) Not so. There is no dispute of fact preventing the Court from granting Bard's motion – the parties merely disagree as to whether the undisputed facts constitute [redacted] required under the Development Agreement. That is a legal, not a factual, question. As set forth extensively in Bard's moving papers, Bard complied with Section 2.1 of the Development Agreement by [redacted] This Court can, and should, determine that Bard complied with the Development Agreement as a matter of law.

#### A. [redacted]

3DT incorrectly claims that Section 2.1 of the Development Agreement required Bard to make two separate [redacted][2] (3DT Opp'n Br. at

---

[1] In addition to the arguments set forth herein, Bard incorporates by reference and refers the Court to arguments set forth in its Memorandum of Law in Opposition to 3DT's Motion for Summary Judgment. (ECF No. 92 (under seal).)

[2] 3DT claims that the Development Agreement does not provide Bard with [redacted]



ME1 36309085v.3

30-35.) 3DT's interpretation is wrong for several reasons.

First, 3DT's exclusive reliance on the definition of [redacted] conveniently ignores the first word in the phrase -- [redacted] -- which describes any [redacted] here. Black's Law Dictionary defines "commercial," in pertinent part,[3] as "[o]f, relating to, or involving the ability of a product or business to make a profit." *Commercial*, BLACK'S LAW DICTIONARY (11th ed. 2019). 3DT's omission [redacted] is telling. Throughout its brief, 3DT conflates [redacted] It is wholly consistent for Bard [redacted] while also realizing that [redacted] at a given moment in time.

Second, 3DT ignores that the two phrases it attempts to separate are joined by the words "due to," which means "because of" or "as a result of." *Due to,* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/due%20to (last visited Apr. 23, 2021). Using that definition, the sentence would read:

> [redacted]

---

[redacted] (Opp'n Br. 33.) Yet, the Agreement permits Bard to do exactly that.

[3] For completeness, the balance of the definition of "commercial" is "1. Of, relating to, or involving the buying and selling of goods; mercantile <commercial advertising>. 2. Resulting or accruing from commerce or exchange <commercial gains>. 3. Employed in trade; engaged in commerce <commercial travelers>. 4. Manufactured for the markets; put up for trade <commercial products>. . . . 6. Produced and sold in large quantities <commercial cosmetics>. 7. Pejorative. More concerned with money than with quality <he sold out and became commercial>."

[redacted] the words "due to" make clear that [redacted] 3DT's two allegedly separate determinations are one and the same.[4]

**B.** [redacted]

Displeased with the deal it struck nearly seven years ago, 3DT attempts to rewrite the language of the Development Agreement to strip Bard of its good faith [redacted] 3DT "may not rewrite the terms of an agreement because, in hindsight, it dislikes its terms." *Cambridge Petrol. Holdings, Inc. v. Lukoil Americas Corp.*, 11 N.Y.S.3d 58, 59 (N.Y. App. Div. 2015). 3DT may not substitute Bard's judgment for its own in the face of a standard that bestows Bard the ability to [redacted] "If [3DT is] dissatisfied with the consequences of [its] agreement, **the time to say so [was] at the bargaining table**." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695 (N.Y. 1995) (third alteration in original) (emphasis added) (citations omitted).

As explained in Bard's opposition to 3DT's motion for summary judgment, Bard is given

---

[4] Moreover, contrary to 3DT's claim that Bard [redacted], Bard explicitly quoted and relied upon Section 2.1 of the Development Agreement in its December 20, 2016 letter, including [redacted]

[redacted]

(App. Ex. 16 (emphasis added).) 3DT's reading of Section 2.1 and the December 20, 2016 letter is simply wrong.

deference, [redacted], to determine whether any of the [redacted] For example, the [redacted] And "[g]iven the deference afforded to corporations that contractually reserve to themselves the discretion to make decisions based on their business judgment, attacks on the methodology used, or the conclusion reached, are generally of little significance." *Gen. Motors Corp. v. Dealmaker, LLC*, No. 07-CV-141, 2009 WL 1310616, at *4 (N.D.N.Y. May 8, 2009).

3DT also claims that Bard never decided "that [redacted]." (Opp'n Br. at 35 (emphasis added).) Its argument misses the mark. First, Bard is not required to make this determination. That Penske may be superior in certain respects, and [redacted] in others, is irrelevant. Bard need only determine that [redacted]

Further, despite 3DT's contention, (Opp'n Br. at 32), Bard need not [redacted] Requiring Bard to do so would impose an obligation where none exists, particularly where 3DT failed to negotiate the right to notice of any Bard decision. "In cases of contract interpretation, it is well settled that when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms," *S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 277 (N.Y. 2005) (citations omitted), and that this is "particularly important" where "the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length," *id*. That is exactly what happened here. The Development Agreement must be enforced as written.

In its moving brief, Bard set forth the numerous reasons why it [redacted] (Bard Moving Br. 51-53.) These features include [redacted] (Joint SUMF ¶ 69, App. Ex. 7, Phillips Dep. Tr. 123:16-20; Joint SUMF ¶ 70, App. Ex. 7, Phillips Dep. Tr. 21:21-22:9; *see* Bard SUMF ¶ 31; App. Ex. 7, Phillips Dep. Tr. 19:25-20:2; Joint SUMF ¶ 71, App. Ex. 5, Misener Dep. Tr. 200:8-25.) And as also discussed in Bard's moving papers, Dr. Kassab's testimony supports [redacted] (Bard SUMF ¶ 32, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 121:1-11; 124:3-8). The question of whether Bard [redacted] The *fact* that Bard determined that [redacted] to Penske in a variety of ways -- as Bard's 30(b)(6) witness, Anthony Misener, testified and its Vice President and General Manager wrote in his December 2016 letter to 3DT -- is not disputed. That 3DT may believe [redacted] is irrelevant, and does not create a dispute of fact,

because the Development Agreement [redacted] That is exactly what Bard did. 3DT cannot [redacted] *Gay v. Affourtit*, 76 F. Supp. 2d 517, 518 (S.D.N.Y. 1999) ("[T]o survive [a] motion for summary judgment, [the non-moving party] must offer evidence sufficient to suggest that a genuine issue of material fact exists.").

[redacted] Indeed, the Agreement makes this clear, as it expressly contemplates the situation in which [redacted]

The undisputed evidence proves that Bard did exactly what the Development Agreement required – [redacted] Accordingly, summary judgment for Bard is required.

**C.** [redacted]

As 3DT notes, "[a] Court's evaluation of a party's compliance with a 'commercially reasonable efforts' requirement does not involve a hindsight comparison of the party's actual conduct to what which could have been undertaken to produce a better result; a court should only evaluate whether the party's actual conduct was sufficient." (3DT Opp'n Br. at 37 (citing *Holland Loader*, 313 F. Supp. 3d at 472-73) (citing *Bear, Stearns Funding, Inc. v. Interface Grp. – Nevada, Inc.*, 2007 WL 1988150, at *22 (S.D.N.Y July 10, 2007)).) 3DT itself concedes that the standard for commercial reasonableness is not a demanding one: "At a minimum, though, a promise to use

commercially reasonable efforts requires that the promising party undertake **at least some activity**," and "requires at the very least **some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests**." (3DT Moving Br. 31, 32 (quoting *Holland Loader*, 313 F. Supp. 3d at 473) (emphases added).) Critically, "commercial[] reasonable[ness] . . . does not require a party to act against its own business interests, which it has a legal privilege to protect." *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568, 618 (S.D.N.Y. 2013) (internal quotations omitted).

Because "[t]he standard for satisfying commercial reasonability under New York law is a fairly lenient one," *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020), Bard's substantial investment of time and resources certainly satisfied this standard. For example, in *Sekisui Am. Corp. v. Hart*, the court determined a party could not recover on its counterclaim for breach of contract for failure to provide commercially reasonable efforts to market a breast cancer diagnostic assay and to take actions to obtain FDA approval. 15 F. Supp. 3d 359, 362, 370, 381 (S.D.N.Y. 2014). Even under a contractual standard unqualified by [redacted] the *Sekisui* court held that "considerable efforts" to obtain FDA clearance via the 510(k) process were taken. *Id*. at 381. Such efforts included "re-creating files" of data and traveling to Germany in unsuccessful attempts to obtain clinical data, until the company concluded that it would need new clinical studies performed in the United States costing $3.2 million and taking more than three years. *Id*. at 377, 381. Certainly, Bard performed more work on the Penske project than in *Sekisui*, given that *Sekisui* involved a 510(k) submission already made and under FDA review, and [redacted]

The contractual standard [redacted] and provides [redacted]

[redacted] (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1) (emphasis added); *see also* App. Ex. 1, Purchase Agreement Section 2.04(b).) Bard's conduct easily met, and exceeded, this contractual threshold.[5]

For example, Bard assembled a cross-functional team consisting of a program leader at the helm, multiple engineers, a regulatory specialist focused on FDA clearance, and a marketing product manager. (Joint SUMF ¶¶ 20, 21 App. Ex. 5, Misener Dep. Tr. 10:8-11:2, 47:11-15; Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15; Joint SUMF ¶ 23, App. Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5; Joint SUMF ¶ 22, App. Ex. 5, Misener Dep. Tr. 80:21-81:15; Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22; Joint SUMF ¶ 23, App. Ex. 5, Misener Dep. Tr. 81:7-15.) The team held regular meetings and minutes were kept. (Joint SUMF ¶¶ 24, 25, App. Ex. 5, Misener Dep. Tr. 79:2-4, 20-23.) [redacted] (Joint SUMF ¶ 40, App. Ex. 5, Misener Dep. Tr. 245:18-20; App. Ex. 9 Davis Dep. Ex. 5), [redacted] (Joint SUMF ¶ 45, App. Ex. 9, Davis Dep. Tr. 10:13-18), [redacted] (Joint SUMF ¶ 57, App. Ex. 6, Decheek Dep. Tr. 22:25-23:4; Joint SUMF ¶ 58, App. Ex. 6, Decheek Dep. Tr. 23:5-9). [redacted] (Joint SUMF ¶ 52, App. Ex. 7, Phillips Dep. Tr. 54:11-14; Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 51:12-15, 54:11-14) [redacted] (Joint SUMF ¶ 55, App. Ex. 7,

[5] Bard discussed its extensive efforts at length in its opposition to 3DT's motion for summary judgment but highlights here even the most basic efforts, which are undisputed, that satisfy this standard.

Phillips Dep. Tr. 37:4-10; Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-8.) After the third anniversary of the Agreements, [redacted] (Bard SUMF ¶ 43, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056304; Bard SUMF ¶ 44, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056333.) Both before and after the third anniversary, he contacted 3DT to negotiate an sign a Non-Disclosure Agreement to allow the parties to communicate about the project. (Joint SUMF ¶ 88, App. Ex. 4, Kassab Dep. Ex. 6; Joint SUMF ¶ 90, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 91, App. Ex. 14, BAS-3DT 0034928-0034929; Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 96, App. Ex. 4, Kassab Dep. Ex. 7; Joint SUMF ¶ 97, App. Ex. 4, Kassab Dep. Ex. 7.) Most notably, [redacted] (Joint SUMF ¶ 98, App. Ex. 8, Zentgraf Dep. Ex. 2; Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2.) Without doubt, these efforts constitute "at least some activity" and "some conscious exertion to accomplish the agreed goal." *Holland Loader*, 313 F. Supp. 3d at 473.

The Development Agreement calls for [redacted] (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.) That is, the Agreement clearly allows [redacted] *See Commercial*, BLACK'S LAW DICTIONARY (11th ed. 2019). Just as the Court or a law firm has many cases to work on, Bard has many medical devices in development. [redacted] (Joint SUMF ¶ 66, App. Ex. 5, Misener Dep. Tr. 72:1-4.) Indeed, Anthony Misener testified that [redacted] (Joint SUMF ¶ 67, App. Ex. 5, Misener Dep. Tr. 261:19-262:4.)

He also testified that [redacted] (Bard SUMF ¶ 34, Mantell 3/26 Decl., Ex. C, Misener Dep. Tr. 210:6-16.)

Relatedly, 3DT argues – in the face of contrary documentary evidence in the record and without citation – that "a question of fact remains as to whether Bard's decision to stop development of Penske was even related to [redacted][.]" (Opp'n Br. at 34.) 3DT claims [redacted] caused a slowdown in the Penske project, which Bard does not deny. (*Id.*) The undisputed testimony of Bard's witnesses, and even the emails on which 3DT relies, make clear that this "lull" to develop [redacted] was temporary and the team would continue Penske development when this "urgent" project was complete. *See, e.g.*, Gibson Decl. Exs. 10, 13, 15. Further, 3DT cannot reasonably question Bard's good faith reasonable *business judgment*, which the Development Agreement expressly allows Bard to exercise, to temporarily prioritize [redacted] given that it is now commercialized and "making a profit" for Bard. Quite simply, the fact that Bard did not [redacted] is by no means a breach of the parties' Agreement. Had Bard – or any other well-established medical device company for that matter – been asked to sign an agreement requiring as much, it surely would have refused. 3DT's interpretation of commercial reasonableness ignores the applicable contractual standard and defies reality, and must be rejected as a matter of law.

Further, the documentary evidence in the record (including emails that 3DT cites) establishes that [redacted] For example, on January 11, 2016, Ed Burnside stated that "[redacted]" (Gibson Decl. Ex. 10.) On February 9, 2016, Mr. Misener confirmed that "[redacted]" (Gibson Decl. Ex. 13.) As of June 8, 2016, the team was "[redacted]" (Mantell 4/16/2021 Decl. Ex. C, Decheek Dep. Tr. 80:12-17.) In addition, Mr. Misener

[redacted] (Bard SUMF ¶ 43, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056304, ¶ 44, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056333.) Mr. Misener also finalized a new Non-Disclosure Agreement with Dr. Kassab less than two weeks prior to the third anniversary, (Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929), and afterwards, exchanged emails with Dr. Kassab on next steps. (Joint SUMF ¶¶ 96, 97, App. Ex. 4, Kassab Dep. Ex. 7.) And, as of November 14, 2016, as 3DT itself confirmed in its Statement of Undisputed Material Facts (*see* 3DT SUMF ¶ 39), [redacted]. (Gibson Dec. Ex. 8, Decheek Dep. Ex. 23.) 3DT claims that the [redacted], but the opposite is true. Indeed, 3DT does not, and cannot, claim that [redacted]. 3DT's contention that [redacted] is unfounded, and simply untrue.

Even the most artful lawyer argument cannot create a dispute of fact that will defeat summary judgment. The facts are the facts. Tellingly, 3DT routinely omits context, which, under the governing contractual standard, is highly relevant to whether Bard exercised its discretion in good faith based on its reasonable business judgment. Bard refers the Court to its fulsome Response to 3DT's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, and calls out 3DT's most egregious inaccuracies, particularly with respect to Bard's 2016 activities, here:

- Obtaining [redacted] (Opp'n Br. at 40) was not insignificant – [redacted] moved the project forward, which is exactly what is required to [redacted]. Undisputed record evidence proves that this was not a minor task: "[redacted]." (App. Ex. 9, Davis Dep. Tr. 20:22-21:7.)

- Bard's [redacted] efforts were significant, not merely having "a few discussions" (Opp'n Br. at 40, 49) or "occasionally discussing the [redacted] strategy" (*id.* at 43). The undisputed facts

demonstrate that Mr. Phillips and his supervisor held regular meetings over the course of months to discuss [redacted]. (Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-8.)

- Reliance on [redacted] (*see, e.g.*, Opp'n Br. at 38, 39, 41) cannot be used to dispute Bard's efforts on the whole, as their contents were limited to [redacted] activities. For example, Mr. Decheek testified that [redacted] (Gibson Dec. Ex. 8, Decheek Dep. Ex. 12) – the same language that repeats in the [redacted] (Gibson Dec. Ex. 8, Decheek Dep. Ex. 13; Gibson Dec. Ex. 12) – [redacted]" (Mantell 4/16/2021 Decl., Ex. C, Decheek Dep. Tr. 79:2-6 (emphasis added).)

- 3DT incorrectly claims that "Bard does not identify another development project that experienced [redacted]" (Opp'n Br. at 41.) Aside from the fact that Bard has no obligation to identify [redacted] to 3DT, who is a competitor, the undisputed facts prove that [redacted] *itself* is *still* [redacted] even though it was acquired at about the same time as Penske and [redacted]. Product development takes time.

- The undisputed facts demonstrate that Bard did not [redacted], (Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2.), not in January 2016 as 3DT posits, (Opp'n Br. at 42).

- Overall, 3DT uses lawyer arguments, not facts, to attempt to dispute what was necessary to commercialize this product, which is unsurprising because – lacking any firsthand experience – it does not know how to do so. Simply [redacted] and obtain FDA §510(k) clearance. The undisputed *evidence* demonstrates that more is required, including a viable predicate (or two), material selection, and laboratory testing to demonstrate safety and effectiveness of a [redacted] for human use.

The Court should put aside 3DT's lawyer argument and hone in on the undisputed evidence, which requires summary judgment for Bard.

**D. The Opinions of 3DT's Expert, Mr. Waddell, Are Irrelevant to the Court's Analysis of the Contractual Standard Because He Cannot Create a Factual Dispute, His Opinions Are Based on False Assumptions, And He Has No Knowledge of Bard's Business.**

As a threshold matter, under the Federal Rules of Civil Procedure, 3DT's expert offered opinions, not facts. Fed. R. Evid. 702. The facts are what they are – an expert cannot rewrite history to serve a party's interests, and expert *opinions* cannot create a dispute of *fact*. *CL-*

*Alexanders Laing & Cruickshank v. Goldfeld*, 739 F. Supp. 158, 164 (S.D.N.Y. 1990) (quoting *In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 187, 193 (2d Cir. 1987)), *cert. denied*, 487 U.S. 1234 (1988)) ("A particular set of facts 'cannot be established by mere speculation or idiosyncratic opinion, even if th[e] opinion [about the facts] is held by one who qualifies as an expert under Fed. R. Evid. 702.'" (alterations in original)). But that is exactly what 3DT tries to do here. (Opp'n Br. at 46 (stating Mr. Waddell's opinions "create a question of fact as to whether Bard [redacted]").) This Court should reject 3DT's meritless, and outrageous, change of course to defeat summary judgment.

Moreover, 3DT's attempt to use their expert to craft their own favorable legal standard and then opine that Bard did not satisfy that standard, is improper. Mr. Waddell does not set the standard for commercial reasonableness – the Agreements governing the parties' relationship, and the law, do. *See Breezy Point Co-op., Inc. v. Cigna Prop. & Cas. Co.*, 868 F. Supp. 33, 36 (E.D.N.Y. 1994) (citing *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 508 (2d Cir.), *cert. denied*, 434 U.S. 861 (1977)). Mr. Waddell's invention of his own legal standard – [redacted] (Waddell Aff. ¶ 21, Ex. C at 1) – is not permitted.

3DT relies on *Holland Loader* for the proposition that the contractual standard requires [redacted] (*See* 3DT Moving Br. at 31 (quoting *Holland Loader*, 313 F. Supp. 3d at 469).) [redacted] the agreement in that case contained an objective commercial reasonableness standard which would require input regarding industry standards. Here, [redacted]

[redacted] *See*, *supra*, Point I.A.-C. There is no question Bard's actions meet, and exceed, that standard.

Moreover, Mr. Waddell's opinions are untethered to the contractual standard, which [redacted] and therefore do not and cannot defeat summary judgment for Bard based on the contractual language at issue in this case.[6] That standard necessarily [redacted] But Mr. Waddell admits that he knows practically nothing about Bard's business:

> Q Based upon what you know about Bard, was there anything inconsistent with the development of this product as compared to the development of other products at the company?
>
> A I am not familiar with their development strategies for other products. I can only comment on this one. So I don't have a comparison, so I don't know how to answer that question.
>
> Q **So you have no opinion one way or another as to whether or not the work that was done on this project was consistent with how Bard ordinarily conducts its business?**
>
> A **Yeah. I don't know how they ordinarily conduct their business, so I don't have a way to tell you that.** All I can tell you about is my opinions on how they conducted this particular project.

(Mantell 4/16/2021 Decl., Ex. J, Waddell Dep. Tr. 91:10-25. (emphases added)). Mr. Waddell also admitted that he: (i) had no way to determine whether or not the activities related to the development of this product were different than the activities related to the development of other products "because [he] ha[d] no knowledge of how their other products' activities are performed,"

[6] 3DT claims that both parties retained experts "to opine on the sufficiency of Bard's development resources in light of development standards in the medical device industry." (3DT Moving Br. at 32.) However, that characterization is only partially accurate – 3DT's expert misguidedly opined as to [redacted], while Bard's expert, Mr. Haas, issued a report tailored to [redacted] after, among other things, conducting an interview of Anthony Misener to obtain [redacted] (Mantell 4/16/2021 Decl., Ex. K, Haas Report.)

(*id*. at 93:13-18), (ii) "ha[d] no idea" whether the title of "systems engineer" existed at Bard (*id*. at 98:2-4), (iii) did not "believe that [he] kn[e]w of any of the processes that they were required to follow" in connection with the matter (*id*. at 80:12-17), and (iv) did not "know what their regulatory strategy was" so he had no criticisms of it (*id*. at 81:2-5).

Mr. Waddell wrote similarly revealing information in his report that:

- "This plan was *developed before being provided access to the 79 Bard documents* and was developed to contrast with the Penske project without bias from knowledge of actual project dates." (Waddell Aff., Ex. B at 3 (emphasis added).)
- "*Without knowing the specific disposable configurations to be used*, there was an assumption made that Bard would have sufficient disposable expertise." (*Id*. (emphasis added).)
- "The Waddell Development Plan *was developed based upon the methodology employed by the Waddell Group* when developing project development plans as a Project Manager." (*Id*. (emphasis added).)
- "This development *assumed* that Bard would need one iteration (2 tries) for each of the disposable items, and 2 iterations of the electronics / software." (*Id*. at 4 (emphasis added).)

Far more troubling, though, are Mr. Waddell's assumptions on which his purported opinions are based. By way of example, the *first* assumption in his report, unsupported by any cited facts, is: "3DT's Precisive Navigation Technology is safe and effective." (Waddell Aff., Ex. B at 4.) The FDA is the only entity that can make that determination upon review and analysis of substantial data. And [redacted]. (Joint SUMF ¶ 40, App. Ex. 5, Misener Dep. Tr. 245:18-20; Joint SUMF ¶ 41, App. Ex. 9, Davis Dep. Tr. 40:5-8; Joint SUMF ¶ 42, App. Ex. 9, Davis Dep. Ex. 4; Joint SUMF ¶ 43, App. Ex. 7, Phillips Dep. Tr. 63:5-6, 13-21; Joint SUMF ¶ 44, App. Ex. 5, Misener Dep. Tr. 116:20-24.) *See Munn v. Hotchkiss Sch*., 24 F. Supp. 3d 155, 203 (S.D.N.Y. 2014) (expert testimony stricken for lack of "sufficient basis in facts or data"; "[d]etermining the factual basis for an expert's opinion and the soundness of an expert's

methodology falls within the 'gatekeeping' function of district judges"). For these reasons, the Court should disregard Mr. Waddell's "opinions" and the purported questions of "fact" they create.

## II. 3DT SHOULD BE EQUITABLY ESTOPPED FROM CLAIMING THAT QUESTIONS OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT FOR BARD BECAUSE IT MOVED FOR SUMMARY JUDGMENT CLAIMING SUCH FACTS WERE UNDISPUTED

After moving for summary judgment on the same issues as Bard, 3DT now claims that "questions of fact" exist that preclude grant of Bard's motion. This Court should equitably estop 3DT from talking out of both sides of its mouth. "The doctrine of equitable estoppel precludes a party at law and in equity from denying or asserting the contrary of any material fact which he has induced another to believe and to act on a particular manner." *Intelligent Digital Sys., LLC v. Beazley Ins. Co.*, 906 F. Supp. 2d 80, 94 (E.D.N.Y. 2012). In other words, "[i]n a broad sense, equitable estoppel is [a] bar that prevents one from asserting a claim or right that contradicts what one has said or done before or what has been legally established as true." *In re Zyprexa*, 433 F. Supp. 2d 268, 272 (E.D.N.Y. 2006) (citation omitted)); *see also Nasso v. Bio Reference Lab'ys, Inc*., 892 F. Supp. 2d 439, 449 (E.D.N.Y. 2012) ("'Estoppel' generally means that one party in a dispute should not be permitted to reap any benefit from its own misrepresentations." (citation omitted)). Indeed, "[e]quitable estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result." *Nasso*, 892 F. Supp. 2d at 449 (citation omitted).

Here, 3DT represented to the Court – and to Bard – on multiple occasions that this matter is ripe for summary judgment, which necessarily requires that there be no genuine dispute of material fact. More specifically, in 3DT's December 23, 2020 Letter to the Court, it stated, "the undisputed facts demonstrate that Bard breached its development obligations by [redacted]" and that "[f]or this reason alone, 3DT is entitled to summary judgment." (ECF No. 61 at 2). Later, in its moving brief, 3DT recognized



ME1 36309085v.3

that the standard for summary judgment requires it to demonstrate that "there is 'no genuine dispute as to any material fact,'" (ECF No 75-1 at 22 (quoting *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F. Supp. 2d 596, 601 (S.D.N.Y. 2012)), which 3DT argued that it met (*see e.g.*, *id*. at 41).

Yet, 3DT outrageously included an entire Legal Argument section in its opposition to Bard's motion for summary judgment that claimed precisely the opposite: "A Question of Fact Exists as to Whether Bard Ever [redacted]." (Opp'n Br. at 43). For example, in the body of the brief, 3DT claimed that the following questions of fact exist:

- "whether Bard's [redacted] (*id*. at 34);
- "whether Bard provided [redacted]" (*id*. at 36) and "whether Bard ever [redacted]" (*id*. at 49);
- based on 3DT's expert's opinions, "whether Bard ever [redacted]" (*id*. at 46);
- "the existence and nature of the alleged [redacted] (*id*. at 48); and
- whether Bard breached the duty of good faith and fair dealing (*id*. at 54-55).

From the outset, Bard relied on 3DT's assertions that this matter was ripe for summary judgment, setting a joint briefing schedule to file competing summary judgment motions on the same core issues, and allocating significant resources to prepare and file the Joint Statement of Undisputed Material Facts, its own motion for summary judgment, and its opposition to 3DT's motion. 3DT cannot now – after Bard has spent countless hours and thousands of dollars – outrageously argue that there exist material "question[s] of fact" that preclude summary judgment. If 3DT truly stands by those assertions, it should withdraw its motion to prevent the Court from expending finite judicial resources on 3DT's filing. To ensure that 3DT will "not be permitted to

reap any benefit from its own misrepresentations," the Court should collaterally estop 3DT from setting forth any and all arguments asserting the existence of disputed material facts and give no consideration to same. *Nasso*, 892 F. Supp. 2d at 449. Utilization of equitable estoppel here will undoubtedly serve to prevent an "injustice [that] would otherwise result." *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996) (citations omitted).

## III. BARD IS ENTITLED TO SUMMARY JUDGMENT ON 3DT'S CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

3DT claims that Bard's "lack of transparency" and failure to inform it of problems with Penske was a breach of the covenant of good faith and fair dealing. (Opp'n Br. at 50-51.) But this argument does not make sense. 3DT ignores that the Development Agreement explicitly requires Bard to act in good faith. Because the contract requires good faith, no independent cause of action exists. *See ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y. 1997). Moreover, the duty of good faith and fair dealing does not require Bard to [redacted], which it does every day. 3DT sold this technology outright to Bard, a world-class medical device manufacturer who has brought countless products to market. CVC and PICC product development is the lifeblood of Bard's business – it did not require 3DT's assistance. If it had, it stands to reason that Bard would have aggressively pursued assistance with its efforts to commercialize a [redacted] technology.

3DT also claims that the Non-Disclosure Agreement ("NDA") Anthony Misener sent to Dr. Kassab was "unnecessary" due to the SOW. (Opp'n Br. at 22, 40.) To be clear, while Dr. Kassab may have thought that the NDA between Bard and Dr. Kassab was unnecessary, he is mistaken. The SOW does not contain a [redacted] provision (*see generally* App. Ex. 3), or a provision for [redacted] (*id.* at Section 5.1). Tellingly, none of the emails related to the NDA itself, which included Dr. Kassab's attorney, ever claimed that the NDA was "unnecessary"

at that time. Moreover, given the development work Bard had done in the three years since the Agreements were signed, it certainly needed an NDA to protect its intellectual property from a competitor. The Court should reject 3DT's argument.

Even more striking, Mr. Waddell's testimony does not support 3DT's position that Bard [redacted] In response to a question asking whether he had an opinion as to "[redacted]" of the Precisive Navigation Technology (92:1-4), Mr. Waddell testified that "**I have no knowledge of [Bard] acting in an unfair or deceptive manner** . . . I just don't know. I have no way of being able to determine that." (93:7-12.) Mr. Waddell does not and cannot assert, and 3DT has no basis to claim, that [redacted] On the contrary, Bard's efforts here are fully consistent with its efforts to develop hundreds of medical devices that it has successfully brought to market.

Summary judgment for Bard should be granted.

## CONCLUSION

For the foregoing reasons, Defendant Bard Access Systems, Inc. respectfully requests that this Court grant Bard Access Systems, Inc.'s Motion for Summary Judgment.

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

By: *<u>/s/ Natalie</u>* <u>H. Mantell</u>
Natalie H. Mantell

Natalie H. Mantell
Meghan McSkimming
nmantell@mccarter.com
mmcskimming@mccarter.com

*Attorneys for Defendant*
*Bard Access Systems, Inc.*

Dated: April 23, 2021