UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  2/10/2022
```

-----------------------------------------------------------------------X

3DT HOLDINGS LLC,                          :

                    Plaintiff,             :

                                           :
                                           :        17-cv-5463 (LJL)
          -v-                              :
                                           :        OPINION AND ORDER
                                           :
BARD ACCESS SYSTEMS INC.,                  :
                                           :
                    Defendant.             :
                                           :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff 3DT Holdings LLC ("Plaintiff" or "3DT") and Defendant Bard Access Systems Inc. ("Defendant" or "Bard") each cross-move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

For the following reasons, 3DT's motion for summary judgment is denied, and Bard's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

This case involves the sale and development of a technology for use in navigating, tracking, and confirming the location of the tip of a catheter during heart surgery. On the parties' cross-motions for summary judgment, the Court draws all reasonable inferences against the moving party. It grants summary judgment only if the facts that are not genuinely in dispute demonstrate the absence of a material issue and support entry of judgment as a matter of law.

Plaintiff 3DT is a limited liability company organized under the laws of the state of Delaware, with its principal place of business in San Diego, California. Dkt. No. 73 ¶ 1.[1] 3DT

---

[1] The sole member of 3DT is Dr. Ghassan Kassab who is a full-time resident and citizen of the state of California. *Id.* ¶ 1. The Court properly possesses diversity jurisdiction.

created an ███████████ technology" intended to ███████████████████
██████████████████████████████████████████████████ *id.* ¶ 3 (citing

Dkt. No. 73-1 at 2); this technology is referred to as the "Precisive Navigation Technology," *id.*

Defendant Bard is a corporation organized under the laws of the state of Utah, with its

principal place of business in Salt Lake City, Utah. *Id.* ¶ 2.

## I.    The Sale of the Precisive Navigation Technology from 3DT to Bard

In 2013, 3DT entered into a sale transaction pursuant to which it sold its Precisive

Navigation Technology to Bard for further development, regulatory approval, and sale. Dkt. No.

73 ¶¶ 4, 6–7. 3DT primarily vetted a total of four potential buyers, including Bard, that were

interested in acquiring the Precisive Navigation Technology. *Id.* ¶ 5. The transaction was

documented in three agreements executed by Bard and 3DT on August 29, 2013: An Asset

Purchase Agreement (the "Purchase Agreement"), Dkt. No. 73-1, a Design, Development and

Services Agreement (the "Development Agreement"), Dkt. No. 73-2, and a Statement of Work

("SOW"), Dkt. No. 73-3. Dkt. No. 73 ¶ 7. The Purchase Agreement, Development Agreement,

and SOW are referred to collectively as the "Purchase Documents." The language of the

Purchase Documents is critical to the disposition of this contract dispute.

### A.    The Purchase Agreement

The Purchase Agreement provided for 3DT to "sell, convey, assign, transfer and deliver"

to Bard "all right, title and interest" of 3DT, free and clear of all encumbrances, to "the product

incorporating the Precisive Navigation Technology . . . and all (x) prototypes thereof, (y) line

extensions, modifications, improvements, additions, successors thereto, and (z) replacements

therefor." Dkt. No. 73-1 § 2.01. The purchase price was ████████ to be paid in two

installments. *Id.* § 2.04. ████████████████████ was to be tendered to

3DT at the time of closing. *Id.* § 2.04(a). The remaining ████████ was due to "be paid by

Buyer [Bard] directly to Seller [3DT] (the "Full Milestone Payment"), either (1) upon receipt by [Bard] or its designee, assignee or transferee of its first 510(k) clearance from the FDA[2] to market and sell a medical device that incorporates the Precisive Navigation Technology in the Buyer Field," *id.* § 2.04(b); or (2) under some circumstances where it has ceased to provide commercially reasonable support to the development of the product.  Bard has not paid any of the Full Milestone Payment.  It also has not received FDA clearance to market and sell a medical device incorporating the Precisive Navigation Technology.  Whether Bard's obligation to pay the Full Milestone Payment was triggered is at the heart of this lawsuit.  Dkt. No. 1.  3DT claims that its right to the Full Milestone Payment was triggered, and it is entitled to the ███████ payment, while Bard claims that it has not breached the Purchase Agreement and that the condition precedent for the Full Milestone Payment has not occurred.

Section 2.04(b) of the Purchase Agreement defines Bard's obligations to support the development of the Precisive Navigation Technology and sets forth the circumstances under which, in the absence of FDA clearance, Bard is obligated to make the Full Milestone Payment. It states:

> [Bard] shall be obligated to support the development of the Precisive Navigation Technology as and to the extent contemplated by the Development Agreement; provided that [Bard] may elect, at any time and for any reason, to not continue to support the development of the Precisive Navigation Technology as and to the extent contemplated under the Development Agreement, without violation of the

---

[2] Under Section 510(k) of the Federal Food, Drug, and Cosmetic Act, device manufacturers must provide a premarket notification to FDA when they intend to introduce a device into commercial distribution for the first time. FDA, *510(k) Clearances*, https://www.fda.gov/medical-devices/device-approvals-denials-and-clearances/510k-clearances (last updated Aug. 31, 2021). This submission is called a 510(k) and is made "to demonstrate that the device to be marketed is as safe and effective, that is, substantially equivalent, to a legally marketed device."  FDA, *Premarket Notification 510(k)*, https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/premarket-notification-510k (last updated Mar. 13, 2020).  Once a submitter receives an order declaring a device to be substantially equivalent, the device can be marketed in the United States. *Id.*; *see also* Dkt. No. 73 ¶¶ 30–34.

> Development Agreement, if it provides at least thirty (30) days prior written notice
> thereof to [3DT] ("Notice of Discontinued Support") and pays to [3DT], not later
> than forth-five [sic] (45) days following the date of such Notice of Discontinued
> Support, the Full Milestone Payment.

Dkt. No. 73-1 § 2.04(b).

In short, Bard has the right at any time and for any reason to stop or suspend work on the

project but, if it does so, it ordinarily must pay 3DT the remaining ████ .

Section 4.05 of the Purchase Agreement states, in pertinent part, "Buyer will be the

lawful owner of, and have good, valid and marketable title to, the Acquired Assets, free and clear

of all Encumbrances." *Id.* § 4.05.

## B.     The Development Agreement

The Development Agreement, to which the Purchase Agreement refers, defines Bard's

obligation to support the development of the Precisive Navigation Technology.  It sets forth the

agreement of the parties with respect to "the design, development validation and testing of one or

more new Bard products in the Buyer Field that utilizes, incorporates, and/or employs the

Precisive Navigation Technology."  Dkt. No. 73 ¶ 13 (citing Dkt. No. 73-2 at 1).  The term of the

Development Agreement runs from "the Effective Date and, unless earlier terminated as

expressly provided herein, shall continue until the completion, expiration or termination

(pursuant to Section 9.2 below) of the Statement of Work."  *Id.* ¶ 16 (citing Dkt. No. 73-2 § 9.1).

The language of Section 2.1 of the Development Agreement is critical to the resolution of

this dispute.  It provides:

> Bard has interest in designing, developing, validating, testing and commercializing
> a possible Bard Product using the Precisive Navigation Technology, and, through
> this Agreement, wishes to engage 3DT to perform Services (as defined herein) in
> support of that endeavor.  *Bard shall provide commercially reasonable personnel,*
> *financial and other support (as determined by Bard, in good faith, based upon its*
> *reasonable business judgment) with regard to the development of a Bard Product*
> *incorporating the Precisive Navigation Technology.*   Notwithstanding the
> foregoing, *following the third (3rd) anniversary of the Effective Date, if Bard*

*determines, in good faith, based upon its reasonable business judgment, that the Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable* due to (i) technological failure(s) of the Bard Product to perform to Bard-required specifications ███████████████████████

████████████████████████████████████ (ii) clinical failures, (iii) ineligibility for a 510(k) premarket notification application, or (iv) the creation, development and/or commercial availability of superior technology, *then Bard shall have no obligation to continue to support the development of a Bard Product incorporating the Precisive Navigation Technology or seek the 510(k) clearance or CE Mark, as contemplated by Section 2.04(b) of the Purchase Agreement.* For clarity, the Parties understand and agree that, following any such discontinuance of support by Bard, Bard shall have no obligation to pay the Full Milestone Payment (or any one-half portion thereof), unless, notwithstanding such discontinuance, Bard subsequently obtains the 510(k) clearance and/or the CE Mark trigging [sic] either the Full Milestone Payment (or any one-half portion thereof), as contemplated by Section 2.04(b) of the Purchase Agreement.

*Id.* ¶ 14 (emphasis added) (citing Dkt. No. 73-2 § 2.1).

The third anniversary of the "Effective Date" occurred on August 29, 2016. *Id.* ¶ 15.

## C.   The Statement of Work

The Statement of Work ("SOW")—to which the Development Agreement refers—was executed on the date of the acquisition and prior to Bard's development of the technology. *Id.*

¶ 18. It:

sets forth the tasks, responsibilities, budget and schedule for the fabrication and testing of a prototype, ███████████████████ for use with the Precisive Navigation Technology to allow for the ████████████████████████████████

████████████████████████████████████ This SOW also includes the deliverables which shall be provided by 3DT to Bard ("3DT Deliverables"), including data and final report showing in vivo (animal study) performance compared to design specifications. It is the intention of the Parties that the completion of the tasks and deliverables described in this SOW will be a collaborative effort that appropriately leverages the relative strengths and capabilities of the Parties.

*Id.* (citing Dkt. No. 73-3 § 1).

The Statement of Work contemplated "[t]he major tasks to be completed" as:

(1) "[d]esign and fabricate ███████████████  (2) "[d]esign and fabricate ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████   *Id.* ¶ 19 (citing Dkt. No. 73-3 § 2.1).

## II.     The Development of a Bard Product Incorporating the Precisive Navigation Technology

Upon purchasing the Precisive Navigation Technology, Bard took action to develop that technology for use in a Bard Product.  Bard established a project—internally referred to as "Penske"—to develop a product incorporating the technology.  Dkt. No. 73 ¶ 20.  Bard also assembled a cross-functional team, which contained at least five members, including two full-time engineers—Zach Davis and Brian Cieselwicz, both of whom were hired in 2013—and designated a leader for the project.  *Id.* ¶¶ 21–23.  The group of people working on Penske is referred to as the "Penske team," and they tried to meet weekly.  *Id.* ¶ 24.

Bard also initiated its four-stage process typical of the development of a new product: concept phase, feasibility, qualification, and launch, with regulatory approval sometimes placed in between feasibility and launch.  *Id.* ¶ 35.  In January 2015, Bard projected that the concept phase would be completed by July 2015, a 510(k) premarket submission to the Food and Drug Administration ("FDA") would be completed by May 2017, and a product would launch in May 2018.  *Id.* ¶ 36; Dkt. No. 92-1 ¶ 9.  A "Penske Project Executive Summary" dated July 10, 2015, reflects an anticipated timeline with a completed concept phase that month, feasibility to be determined by September 2015, qualification by March 2015, and product launch by October 2017.  Dkt. No. 73 ¶ 77; Dkt. No. 73-10, Ex. 4 at 3.

In its early months, the Penske project was on track to reach these milestones.  While in development, the Penske team conducted animal studies, performed work in connection with

bench models, engaged third-party vendors, pursued ███████████████████████████

██████████████████ applications, developed a regulatory strategy—including by researching

and identifying predicate devices—and conducted market and clinician research studies.  Dkt.

No. 73 ¶ 37.  The 3DT team performed an animal study to demonstrate that the technology

functioned as intended.  *Id.* ¶ 38.  Bard itself performed additional animal studies.  *Id.* ¶ 40.  The

overall results of ████████████████████████████████████████████████

████████████████████ *id.* ¶ 42, but other ██████████████████████████ *id.*

¶¶ 41, 43–44.

By July 21, 2015, the Penske team's regulatory specialist, in charge of preparing the

submission for approval to the FDA, had completed what he testified was a substantial draft of

the submission that he believed would permit Bard to move past the concept phase.  *Id.* ¶ 79.[3]

By September 4, 2015, the regulatory specialist believed that the regulatory strategy was built

and ready to be signed for purposes of concept review, and he believed that there was a final

document around September 10, 2015.  Dkt No. 92-1 ¶ 10.  However, although "the essence of

the regulatory strategy was built" "further work . . . still was necessary," and the team needed to

"gai[n] the approval from the rest of the regulatory organization ██████████████

---

[3] Payment of the Full Milestone Payment was tied to 510(k) clearance from the FDA.  To obtain
the FDA's permission to market a medical device incorporating Precisive Navigation
Technology pursuant to section 510(k) of the Food, Drug and Cosmetic Act, Bard was required
to submit testing and other documentation to the FDA demonstrating the device "to be
substantially equivalent to an existing product that has been approved or cleared by the FDA."
*Id.* ¶ 30.  In pursuit of 510(k) approval, Bard evaluated potential predicates ████████
████████████████████████████████████  *Id.* ¶ 32.  Bard's efforts would culminate in a
regulatory submission to obtain approval or clearance, the basis for which is a regulatory-
strategy document.  *Id.* ¶ 33.

████████████████████  *Id.*  As of October 2015, management had not yet approved the regulatory strategy.  Dkt. No. 73 ¶ 81.

In October 2015, the Penske research and development team members signed "Concept Design Review Meeting Minutes," which the project lead, Anthony Misener, testified is the form for the concept phase. Dkt. No. 72 ¶ 82; *see also* Dkt. No. 75-3 at 19.  A set of "Penske Integration Meeting Minutes," dated December 17, 2015, stated that the concept-design review was "'Complete,' the feasibility phase was scheduled to be completed by May 2016, a 510(k) submission was scheduled for January 2017, and a Penske product launch was projected for May 2018." Dkt. No. 92-1 ¶ 12.  A project status report for Penske dated January 25, 2016 moved the projected Penske feasibility completion to August 18, 2017 and the product launch to January 31, 2020, which was a delay of twenty months from the projected timeline made the previous December.  *Id.* ¶ 18.

It is at that point in time that the version of facts offered by each of 3DT and Bard differs. 3DT, drawing all inferences in its favor, argues that there was a relatively low level of work toward Penske undertaken by Bard in 2016, if there was much work at all, emphasizing that the regulatory team did not sign off on the Concept Design Review Meeting Minutes until November 2016—over a year after they were complete—and the final signature necessary to formally conclude the concept phase did not occur until December 8, 2016.  Dkt. No. 73 ¶¶ 98–99; *see also* Dkt. No. 92-1 ¶ 5; Dkt. No. 87-2 ¶ 45.  It notes that one of the engineers, Davis, testified that, at some point prior to January 25, 2016, he was "redirected . . . to work on some other business critical items" but also "had some tasks that [he] was working on for Penske as well during that time." Dkt. No. 73-10 at 9–10.  It also highlights that, on September 15, 2016, after the expiration of the three-year period following the "Effective Date" of the Development

Agreement, the project team leader stated in an email that Penske "ha[d] been put on life support" since at least February 2016, Dkt. No. 73 ¶ 95; *see also* Dkt. No. 73-6 at 261, and stated that the team would "not really be working on Penske as a team until Q3 next year" at which point it would "continue the [c]oncept [p]hase from where the team left off," Dkt. No. 73 ¶ 95. Over the spring of 2016, the team leader wrote in another email that Penske "ha[d] been pushed out to 2017." *Id.* ¶¶ 86–87. 3DT also argues that Bard cannot point to anything specific that was done on the Penske project in the approximate eight-month period from December 2015/January 2016 to August 2016.

Bard argues that the facts, construed favorably to it, demonstrate that work continued on the project. Penske's project leader testified that, from March 1, 2016 to September 1, 2016, Penske was moving forward, including by continued investigation on animal studies and work on the regulatory strategy. *Id.* ¶ 85. While the team was moving forward on some items, "[i]t was definitely slowly compared to what [he's] used to . . . when [he] can dedicate a full team to it." *Id.* Bard notes that the project team leader explained his email about "life support" by stating that there was a delay due to his resources "hav[ing] been diverted in part due to another project," not that work on the project was stopped altogether. Dkt. No. 73-6 at 262. It also argues that work was done to consider whether to approve the concept and to sign the Concept Design Review Meeting Minutes.

On December 6, 2016, after the expiration of the three-year period, 3DT sent a letter to Bard's president, asking about the status of the project and requesting that he identify the financial resources and personnel that had been dedicated to developing the Precisive Navigation Technology. Dkt. No. 73 ¶ 102. Bard's Vice President and General Manager responded two

weeks later saying, among other things, that "Bard is currently focusing its attention on the development of an alternative, superior technology." *Id.* ¶ 103.

## III.    The Parties' Competing Theories

3DT argues that Bard never devoted commercially reasonable resources to Penske. It submits an expert report in support of that argument. It also argues that after December 2015, Bard essentially suspended or froze Penske—an act that 3DT claims was commercially unreasonable. It identifies testimony from the project leader that Bard "push[ed] pause" on Penske after concept review was complete. Dkt. No. 73 ¶ 100. It also identifies the numerous emails and communications starting in the early January 2016 time frame in which Bard executives stated that Bard: was "pushing a shift from Penske to" a different project and "has been especially sensitive to spending on that front," Dkt. No. 92-1 ¶ 14; would "slow development" on Penske, *id.* ¶ 16; moved the "majority of resources" from Bard to another project, *id.* ¶ 19; and had chosen to "suspend" certain work on Penske, *id.* ¶ 20. It notes that the various Bard employees who testified to work performed prior to January 2016 on the Penske project could not identify work performed on Penske after that date other than in conclusory terms or other than obtaining signatures on the Concept Design Review Meeting Minutes.

In 3DT's telling, Bard's actions from January 2016 onward reflected a commercially unreasonable decision to stall what otherwise would have been a promising project offering substantial public-health benefits in favor of two alternative products. Bard started working on one of those products, Modus II, as of May 2015 as one of the "two horses in the race," Dkt. No. 87-2 ¶ 29; Dkt. No. 73-7 at 43, and had completed due diligence on the other, Project Ambegris, by January 2016, Dkt. No. 92-1 ¶ 13.

Bard characterizes the facts differently. It does not dispute that in January 2016, it made a decision to divert some resources from Penske to Project Ambegris, but it claims that it never

stopped work on Penske.  Typically, research and development employees of Bard are assigned to work on at least two projects, if not more.  Dkt. No. 92-1 ¶ 3.  Bard points to testimony from the Penske team's project lead that "resources being 'diverted in part to another project . . . happens all the time,'" Dkt. No. 92 at 23 (citing Dkt. No. 73 ¶ 67), and that "Penske or any other project" that Bard works on "certainly had surges of activity and then lulls in activity," *id.* (citing Dkt. No. 82-4 at 210).

It argues that ████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████  *Id.* at 26. There were also challenges from a regulatory-approval perspective.  Bard had a strong reputation before the FDA and an interest in maintaining that reputation.  The pathway to FDA approval for Penske was more complicated ████████████████ than that of other products ████████████████████████████.  *Id.* at 30.  It would take time and care for Bard to conclude that Penske was ready for submission to the FDA—time and care it was reasonable for Bard to take.  By December 2016, Bard had become focused on Modus II which it believed was an alternative, superior technology with an easier pathway to regulatory approval.  Dkt. No. 73 ¶¶ 62, 69–72; Dkt. No. 92 at 15.

## PROCEDURAL HISTORY

3DT filed its complaint on July 18, 2017, bringing claims against Bard for breach of contract and breach of the covenant of good faith and fair dealing.  Dkt. No. 1.  On March 26, 2021, 3DT and Bard each moved for summary judgment.  Dkt. Nos. 75, 77.  The parties filed opposition memoranda to the other side's motion for summary judgment on April 16, 2021.  Dkt. Nos. 86–88.  On April 23, 2021, each side filed a reply memorandum of law.  Dkt. Nos. 94–96, 98.

**LEGAL STANDARD**

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to" the non-moving party, *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  It may not rely on "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted), or "on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and by demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  If "the party opposing

summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment shall be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9–10 (2d Cir. 1983).

Where each party moves for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## DISCUSSION

### I.      Breach of Contract Claim

Under New York law "there are four elements to a breach of contract claim: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Mancuso v. L'Oreal USA, Inc.*, 2021 WL 1240328, at *3 (S.D.N.Y. Apr. 2, 2021) (quoting *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011)); *see also Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). Moreover, "[w]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations." *Willsey v. Gjuraj*, 885 N.Y.S.2d 528, 530 (2d Dep't 2009) (internal quotation marks and citation omitted); *see also Beach v. HSBC Bank USA, N.A.*, 2018 WL 3996931, at *6 (S.D.N.Y. Aug. 21, 2018) (internal quotation marks and citation omitted) (same).

Further, "[i]t is well settled that a contract must be read as a whole to give effect and meaning to every term . . . .  Indeed, a contract should be interpreted in a way that reconciles all of its provisions, if possible." *N.Y. State Thruway Auth. v. KTA-Tator Eng'g Servs., P.C.*, 913 N.Y.S.2d 438, 440 (4th Dep't 2010) (internal quotation marks and citations omitted) (alterations

adopted); *see also Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.*, 2002 WL 1203836, at *7 (S.D.N.Y. June 4, 2002) ("[U]nder New York law . . . a court must interpret a contract so as to give effect to all of its clauses and to avoid an interpretation that leaves part of a contract meaningless."); Restatement (Second) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms [of an agreement] is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."). "In interpreting a contract, courts 'should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.'" *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 469 (S.D.N.Y. 2018) (quoting *MBIA Ins. Corp. v. Patriarch Partners VII*, LLC, 842 F. Supp. 2d 682, 704 (S.D.N.Y. 2012)), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (summary order).

Both Bard and 3DT argue that they are entitled to summary judgment on 3DT's breach-of-contract claim.  3DT contends that, under the Purchase Documents, Bard could only avoid paying 3DT the Full Milestone Payment if it made a determination after August 29, 2016, that continued development on Penske was not commercially practicable.  According to 3DT, until both the three-year period from August 2013 had expired and Bard had made this determination, Bard was still obligated to provide commercially reasonable efforts to developing Penske.  In 3DT's view, if Bard believed that development of a product incorporating the Precisive Navigation Technology was not commercially practicable for one of the reasons stated in the Development Agreement, it still would have to devote commercially reasonable support to the project or else elect to provide Notice of Discontinued Support and tender the Full Milestone Payment to end its support obligations.  3DT contends that because Bard either (1) ceased

providing the commercially reasonable support prior to August 29, 2016 or (2) even after August 29, 2016, did not resume providing commercially reasonable support and never determined that developing the Precisive Navigation Technology was no longer commercially practicable, Bard is obligated to pay 3DT the Full Milestone Payment.

Bard, in contrast, argues that the actions that it took were commercially reasonable as a matter of law and of undisputed fact.  It argues that it was not required always to devote the same level of support to the Penske project, that it continued to devote work to the project, and that "where, as here, the material facts are undisputed, the Court may decide as a matter of law that [Bard's] actions were commercially reasonable."  Dkt. No. 82 at 39 (alteration adopted) (quoting *Leigh Co. v. Bank of N.Y.*, 617 F. Supp. 147, 153 (S.D.N.Y. 1985) (citations omitted)).  It also argues that after August 2016, it made the necessary determination, relieving it of the obligation to provide commercially reasonable support.

## A.    "Commercially Reasonable" and Bard's Discretion

The operative contractual provisions appear in Section 2.04(b) of the Purchase Agreement and Section 2.1 of the Development Agreement.  Under Section 2.04(b), Bard has the option at any time and for any reason to relieve itself of the obligation to provide the support required by the Development Agreement, but it must provide 30-days' notice and make the remaining ███████ payment.  Under Section 2.1 of the Development Agreement, unless Bard makes the ███████ payment, it is required to "provide commercially reasonable personnel, financial and other support (as determined by Bard, in good faith, based upon its reasonable business judgment) with regard to the development of a Bard Product incorporating the Precisive Navigation Technology."  Dkt. No. 73-2 § 2.1.  Section 2.1 also provides that:

> following the third (3rd) anniversary of the Effective Date, if Bard determines, in good faith, based upon its reasonable business judgment, that the Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer

commercially practicable due to (i) technological failure(s) of the Bard Product to perform to Bard-required specifications ███████████████████████████

████████████████████████ (ii) clinical failures, (iii) ineligibility for a 510(k) premarket notification application, or (iv) the creation, development and/or commercial availability of superior technology, then Bard shall have no obligation to continue to support the development of a Bard Product incorporating the Precisive Navigation Technology or seek the 510(k) clearance or CE Mark, as contemplated by Section 2.04(b) of the Purchase Agreement.

*Id.*

The language of the Development Agreement, read as a whole, bespeaks compromise, though it is far from a model of clarity. Portions of the Development Agreement set forth an objective standard for Bard's conduct. An obligation to act in a "commercially reasonable" fashion is judged by an objective standard. *See Hollander Loader*, 313 F. Supp. 3d at 471; *MBIA Ins. Co.*, 842 F. Supp. 2d at 704. Where the contract itself does not define what efforts are "commercially reasonable," the standard requires the court to examine the practices of the particular industry. *Hollander Loader*, 313 F. Supp. 3d at 472. It also requires consideration of "the financial resources, business expertise, and practices of [the defendant]." *Lemond Cycling Inc. v. PTI Holding, Inc.*, 2005 WL 102969, at *5 (D. Minn. Jan. 14, 2005). Here what was required to be commercially reasonable was the support for the development of a product containing the Precisive Navigation Technology. The term "commercially reasonable" in the Development Agreement modifies "personnel, financial and other support." Dkt. No. 73-2 § 2.1. By the plain language of the contract, then, Bard was obligated to dedicate a "commercially reasonable" number of persons to Penske and also to provide financial and other support that was commercially reasonable.

"The standard for satisfying commercial reasonability under New York law is a fairly lenient one," *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020), but a business which engages in no effort cannot be found to have engaged in

commercially reasonable efforts.  *Cf. SATCOM Int'l Grp. PLC v. ORBCOMM Int'l Partners, L.P.*, 2000 WL 729110, at *20 (S.D.N.Y. June 6, 2000).  The standard does not require the promisor to disregard or act against its own business interests.  *Hollander Loader*, 313 F. Supp. 3d at 472.  "[C]ompliance with a 'commercially reasonable efforts' clause requires at the very least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business efforts."  *Id.* at 473.

At the same time, however, there is language in the Development Agreement that relieves Bard of having to comply with a purely objective industry standard of commercial reasonableness and that is directed to Bard's judgment regarding commercial reasonableness.  In particular, the requirement that Bard provide "commercially reasonable personnel, financial and other support" to Penske is further qualified by the parenthetical language following "personnel, financial and other support" that this shall be "as determined by Bard, in good faith, based upon its reasonable business judgment."  Dkt. No. 73-2 §2.1.  By utilizing this language, the contract left the determination of whether the support (personnel, financial, or otherwise) Bard provided was commercially reasonable in the first instance to Bard acting in good faith and "based upon its reasonable business judgment."  *Id.*; *cf.* Dkt. No. 76 at 31 ("While the Development Agreement gives Bard some discretion to determine the limits of commercial reasonableness, that discretion has its limits.  At a minimum, Bard must act in good faith and use its reasonable business judgment.").[4]

---

[4] The Court rejects 3DT's argument, made for the first time at oral argument, that the parenthetical modifies only "other support" and not each item in the full clause including personnel support and financial support.  According to that argument, the level of personnel support and financial support Bard was obligated to provide would be judged by the purely objective industry standard, while the level and type of other support would be subject to Bard's reasonable business judgment.  Although the parties could have written the Development Agreement to so define Bard's obligations, they did not.  The rule of the last antecedent, which

The contracts bespeak a negotiation process where each side demanded concessions of the other resulting in an agreement that does not fit neatly into any defined legal categories.  The Development Agreement requires Bard, for at least three years, to provide "commercially reasonable . . . support" for "the development of a Bard Product incorporating the Precisive Navigation Technology," but leaves the determination of what is "commercially reasonable" to Bard.  Dkt. No. 73-2 § 2.1.  At the same time, the business judgment standard it incorporates is not unqualified, Bard's decision must not only be "in good faith" but also "reasonable."

### B.    The Purchase Documents Generally

Reading the Purchase Documents as a whole, the Court finds that there are at least several respects in which the agreements are clear and unambiguous.  First, and as previously mentioned, Bard was required to "support the development of a Bard Product incorporating the Precisive Navigation Technology" and to seek 510(k) clearance, even if Bard had some discretion regarding the level of that support.  *Id.*; *see also* Dkt. No. 73-1 at § 2.04(b).  To read the Development Agreement otherwise would make hash of the second sentence of Section 2.1, which leaves Bard to answer (within limits) the question of what is commercially reasonable but does not allow Bard to choose not to provide support at all.  It also would undermine the third sentence of that Section which gives Bard the right—on certain conditions and only after "the (3rd) anniversary of the Effective Date"—to discontinue its efforts to incorporate the Precisive

---

3DT seems to invoke, provides that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows."  *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).  Here, however, there is not a series of nouns preceding the parenthetical but a single antecedent; each of "personnel," "financial," and "other" is used as an adjective to modify "support."  To read the Development Agreement otherwise would leave the adjective "financial" without any object it modifies and would place the word "and" in the wrong location in the phrase.  *Cf. Lockhart v. United States*, 577 U.S. 347, 352 (2016) (applying rule of the last antecedent where "the varied syntax of each item in [a] list makes it hard for the reader to carry the final modifying clause across all three").

Navigation Technology into a Bard Product and to seek 510(k) clearance.  Bard's ███████
upfront payment may have given it a financial stake in the success of the Precisive Navigation
Technology, but that interest alone did not provide all the bargained-for insurance for 3DT that
Bard would take the steps necessary to develop Penske in a manner that would allow 3DT to
obtain the Full Milestone Payment.  The Development Agreement imposed contractual
obligations—obligations separate from any independent financial incentive—on Bard to support
the development of Precisive Navigation Technology and to obtain 510(k) clearance.

Second, however, the Purchase Documents do not specify what level of support is
necessary to qualify as support that Bard could determine "reasonably" and "in good faith" was
commercially reasonable.  It is clear from the Purchase Documents that Bard could not simply
decide months before August 2016 to stop any support of Precisive Navigation Technology for
no reason other than because the presence of another product rendered continued development of
a product with the Precisive Navigation Technology commercially impracticable.  Reading the
Development Agreement to give Bard such license would render illusory 3DT's bargained-for
assurance that Bard would have to wait until August 2016 to make such a determination and that,
until that date, it would have to provide support for the development of a product.  At the same
time, however, it cannot be that Bard was required to always provide the identical level of
support for Precisive Navigation Technology for no reason other than that it previously provided
that level of support.  Such an approach would be inconsistent with the deference the Purchase
Documents give Bard in terms of developing a Bard product that incorporated the technology.

Thus, at least prior to the expiration of the three-year period on August 29, 2016, Bard
could not simply stop support of Precisive Navigation Technology because of a judgment that
another superior technology was available.  The Development Agreement provides that, *after* the

expiration of the three-year period, Bard could stop support of the technology based on a

judgment (that was reasonable and in good faith) that development of the Precisive Navigation

Technology was no longer commercially practicable due to the creation, development and/or

commercial availability of a superior technology.  By negative implication, Bard could not make

that judgment and cease the continuation of support within the three-year period without

consequences.  To read the Purchase Documents otherwise would give no meaning to the second

clause of Section 2.04(b) of the Purchase Agreement, which gives Bard the right "to not continue

to support the development of the Precisive Navigation Technology as and to the extent

contemplated under the Development Agreement, without violation of the Development

Agreement" but only if (1) "it provides at least thirty (30) days prior written notice thereof to

[3DT] ('Notice of Discontinued Support')" and (2) it pays 3DT the Full Milestone Payment.  A

party seeking to avoid the Full Milestone Payment could simply cease support and then delay

issuance of the Notice until after August 2016.  That clearly was not in the contemplation of the

parties and would defeat their agreement.

Third, after the three-year period, and without having to provide a formal "Notice of

Discontinued Support," Bard could cease entirely to support the development of Precisive

Navigation Technology and could do so without paying the Full Milestone Payment.  It could

only do so, however, if it determines "in good faith" and "based upon its reasonable business

judgment that" the "Exploitation[5] of a Bard Product incorporating the Precisive Navigation

---

[5] Exploitation is defined broadly under the Purchase Agreement.  It states:

> "Exploit" or "Exploitation" means, with respect to any product, invention,
> intellectual property, asset or property, to disclose, make, have made, manufacture,
> have manufactured, practice (and have practiced) any method or process, produce,
> import, use, operate, research, design, develop, perform animal, clinical or other
> testing, perform quality assurance testing, commercialize, revise, repair, register,
> maintain, modify, enhance, upgrade, copy or have copied, prepare derivative

Technology [wa]s no longer commercially practicable due to . . . the creation, development and/or commercial availability of superior technology" or the other factors set forth in Section 2.1.  Dkt. No. 73-2 § 2.1.  Until Bard reached that judgment, it was required to continue to support Precisive Navigation Technology.

The conclusion that Bard need not serve a formal Notice of Discontinued Support follows from the language of Section 2.04(b) of the Purchase Agreement.  It permits Bard to cease the support of the development of Precisive Navigation Technology "as and to the extent contemplated under the Development Agreement," if a Notice of Discontinued Support is provided.  It follows that, if support would not otherwise be provided under the Development Agreement—for example, because Bard elected to end its obligations through a determination of commercial impracticability—then no formal Notice need be provided.  To read the Agreement otherwise would tack an additional thirty days, as provided for in Section 2.04(b), onto the three-year period of development to which Bard committed.

C.     **Entitlement to Summary Judgment**

"[T]he determination of commercial reasonableness is usually a factual determination best made by the trier of fact."  *Leigh Co.*, 617 F. Supp. at 153.  Where the material facts are undisputed, a court may decide that a party's actions were commercially reasonable as a matter of law.  *Id.*

Here, there are genuine questions of fact that preclude a grant of summary judgment for either party.

---

works*, seek regulatory concurrences or approvals,* package, label, improve, formulate, export, transport, distribute, promote, market, advertise, sell, have sold, offer for sale or license such product, invention, intellectual property, asset or property, or to have another Person do any of the same.

Dkt. No. 73-1 §1.01 (emphasis added).

### 1.   "Commercially Reasonable Support"

3DT's first theory is that Bard breached the second sentence of Section 2.1 of the Development Agreement and therefore did not provide the support "as and to the extent contemplated by the Development Agreement" under Section 2.04(b) of the Purchase Agreement because it ceased providing commercially reasonable support sometime around December 2015 or January 2016 until at least and beyond August 2016.  3DT asserts that this breach triggers its entitlement to the Full Milestone Payment.  Genuine issues of material fact preclude summary judgment on this theory.  The questions of fact include but are not limited to: (1) whether Bard provided any support for Precisive Navigation Technology during the eight-month period from January 2016 to August 2016; and (2) if it provided support, was the level of support based upon a determination by Bard of commercial reasonableness or some other factor; and (3) if it was based on a determination by Bard, was that determination reasonable and made in good faith.[6]

Viewed in the light most favorable to 3DT, the evidence could support a reasonable conclusion that Bard stopped providing commercially reasonable resources to the ███████ ████ application of Penske in March of 2015 and to the remaining components of Penske in January of 2016.  Dkt. No. 76 at 33.  The evidence, again construed favorably to 3DT, suggests

---

[6] 3DT also suggests that Bard never provided commercially reasonable resources to Penske but appears to concede that the Court could not find this as a matter of law.  *See* Dkt. No. 76 at 32–33 ("To start, it should be noted that [3DT's expert] opines that Bard never provided commercially reasonable resources . . . .  However, the question of whether Bard *stopped* providing commercially reasonable resources prior to August 29, 2016 can be determined as a matter of law . . . ." (emphasis added)); *id.* at 40 ("The earliest ascertainable date that Bard stopped providing commercially reasonable support is January 25, 2016 . . . ."); *but see* Dkt. No. 87 at 43 ("[A] question of fact exists as to whether Bard ever provided commercially reasonable resources to the development of Penske.").  Bard argues that there is no genuine dispute that it provided commercially reasonable support at least up until January 2016.  Bard, however, does not seek summary judgment solely as to the period up until January 2016 nor does it suggest that the Court should parse the three-year period to determine when its support was commercially reasonable and when it was not.  Accordingly, the Court will not further consider the level of support for the period prior to December 2015.

that starting, at the latest, in January of 2016 and continuing until well after the expiration of the

three-year period, Bard stopped work on Penske.  As late as December 17, 2015, Bard's meeting

minutes reflect that it believed it could make a 510(k) submission in January 2017 and launch a

product domestically in May 2018.  Dkt. No. 76-1 at ECF p. 84.  However, in 3DT's telling, in

January of 2016, and after Bard diverted resources, that timeline and any support Bard provided

to Penske dramatically changed.  Penske's team lead, Misener, explained—in response to what

appears to be an email regarding external-vendor work for Penske—that Bard would not be

spending any money on Penske for the next several months:  "Ed [Burnside, Bard VP] is pushing

a shift from Penske to Project A for the time being and he has been especially sensitive to

spending on that front.  Management has cinched the belt for Q1 spending so even if we had a

number we couldn't spend it this *quarter*."  *Id.* at ECF p. 134 (emphasis added).  That same day,

Misener wrote in an email that "[a]ssuming Ambergris goes through this will dramatically

change the development of Penske (due to resource loading)," to which Ed Burnside replied

"[g]o ahead with the assumption that Ambergris goes through and we slow development but

continue Penske."  *Id.* at ECF p. 136.  A couple of weeks later, Misener wrote that he would be

"reporting the significant delay to Penske that is reflected in our timeline" and that "[t]his is

completely due to the anticipated Ambergris project."  Dkt. No. 73-6, Ex. 3.  In February 2016,

Misener wrote, in response to a question regarding whether the project was "more or less

cancelled," that "[t]he project is moving forward, but at a very slow burn."  Dkt. No. 76-1 at ECF

p. 146.  In March 2016, an engineer on the Penske team sent an email explaining that "[a]ll

activities for this project have currently been put on hold in order to focus all team efforts to

meet a new, higher priority project with a relatively quick turnaround" adding only that Misener

"assure[d] [him] that resource allocation on our part will be reevaluated in Q2 at which point we

can better say when things can start up again." *Id.* at ECF pp. 162–63.  In April 2016, in
response to a question by a Bard financial analyst regarding whether "the project is cancelled or
pushed out to 2017," Meisner replied that "the project has been pushed out to 2017."  Dkt. No.
73-6, Ex. 2.

On September 15, 2016, Misener stated in an email that Penske "ha[d] been put on life
support" since January or February 2016, Dkt. No. 73 ¶ 95; *see also* Dkt. No. 73-6 at 261, which
he later testified to mean that there was a delay due to his resources "hav[ing] been diverted in
part due to another project," Dkt. No. 73-6 at 262.  Engineers assigned to Penske testified that
they were told to focus their time and energy on other projects in the beginning of 2016, Dkt. No.
73 ¶¶ 74–75, and they could recall minimal or no work on Penske performed after February
2016, Dkt. No. 76-1 at ECF pp. 33–34, 152.  Although there is some evidence that the project
was not stopped entirely (e.g., that it was still on a "slow burn"), a jury could well reject those
characterizations as pretextual and conclude that there was nothing done on the project for many
months.  If that is so, then the fact that Bard had a financial interest in the commercialization of
Penske would be insufficient to exculpate it.  The Purchase Agreement and the Development
Agreement were structured not only to create a financial incentive for Bard to obtain the
requisite FDA clearance but to create a financial penalty for Bard if Bard ceased the
commercially reasonable efforts (as defined in good faith and reasonably by Bard) to obtain that
clearance.[7]

---

[7] Bard relies on *Sekisui America Corp. v. Hart*, 15 F. Supp. 3d 359 (S.D.N.Y. 2014), but the case
does not support it.  There, the court dismissed a counterclaim against the plaintiff—for breach
of a contractual obligation to take "commercially reasonable efforts to market and sell" a
product—because defendant failed to plead how Sekisui deviated from a "commercially
reasonable efforts" standard.  *Id.* at 381.  In this case, by contrast, 3DT has offered evidence of
how Bard's conduct deviated from that which was commercially reasonable.  Nor does *InspiRx,
Inc. v. Lupin Atlantis Holdings SA*, 2021 WL 3604850 (S.D.N.Y. Aug. 12, 2021), weigh in favor

At the same time, however, there is evidence, construed favorably to Bard, that supports that it met the "highly deferential" contractual standard of commercial reasonableness, guided by good faith and reasonable business judgment because it engaged in more than just "some activity" in advancing Penske.  Dkt. No. 82 at 43.

For example, there were communications by Bard in the latter half of 2016 that suggests that work on Penske was ongoing and, more importantly, that work was continuing between January 2016 and August 2016.  On July 20, 2016, Misener confirmed that the Penske project was still active, requested an expenditure budget through the end of 2016, and noted that further work was planned for 2017.  Dkt. No. 73 ¶ 95.  One of Penske's engineers, Davis, testified that he was "never told to stop work" on Penske but "to continue working but do multiple . . . projects at the same time."  Dkt. No. 76-1 at ECF p. 149.  He also testified that he was working on developing a bench model to test Penske technology, but couldn't "say if the bench models that we developed or not were before or after" January 25, 2016, suggesting that Bard may have been continuing to develop a bench model during the months before August 2016.  *Id.* at ECF p. 150.  There also is evidence that the animal studies—███████████████████████

████████████——███████████████████████████████

███████████████████████  *See* Dkt. No. 73 ¶¶ 41–44.  Construed favorably

---

of granting Bard summary judgment.  In that case, the court found that the defendant "demonstrated an absence of material facts as to the reasonableness of its efforts" and was entitled to summary judgment where, among other things, it ceased marketing a product before the end of a termination period, cut its sales force, and cut its marketing budget for the products at issue.  *Id.* at *10, 14.  In that case, the contract expressly defined "commercially reasonable efforts" in a manner that gave broad discretion to the defendant and expressly recognized that the "level of efforts required to meet" the standard "may change over time" if there were changes to the status or characteristics of the products at issue.  *Id.* at *2.  Significantly, the contract's definition of "commercially reasonable efforts" also allowed the defendant to take into account "the competitiveness of alternative products in the marketplace."  *Id.*

to Bard, the evidence would support that Penske was like "any other project" that Bard works on in that it "had surges of activity and then lulls in activity." Dkt. No. 82-4 at 210.

Because, on the record before the Court, a reasonable jury could find for either party on the question of whether Bard acted commercially reasonably, as determined in good faith and in its reasonable business judgment, summary judgment is not appropriate on 3DT's first breach-of-contract theory.

### 2.    Determination of "No Longer Commercially Practicable"

Pursuant to the Development Agreement, Bard could cease development of a Bard product incorporating the Precising Navigation Technology after August 2016 if it determined, in good faith based on its reasonable business judgment, that it was no longer commercially practicable to do so. There are four broad reasons that Bard could make a finding of "no longer commercially practicable," one of which is "the creation, development and/or commercial availability of superior technology." Dkt. No. 73-2 § 2.1.

3DT argues that Bard never made the "no longer commercially practicable" determination and that, even after it sent letters to 3DT in December 2016 and February 2017 stating that Bard was "focusing its attention of an alternative, superior technology," Dkt. No. 73-15; Dkt. No. 73-6, Ex. 8 at 4, later identified as Modus II, Dkt. No. 73 ¶ 62, it still had an obligation to continue to use commercially reasonable efforts to develop the product. By contrast, Bard argues that it made a good-faith, reasonable business determination "that the Exploitation of a Bard Product incorporating the Precisive Navigation Technology [wa]s no longer commercially practicable," Dkt. No. 73-2 § 2.1, relieving it of any continuing obligations to 3DT except for the obligation to make a Full Milestone Payment if Bard obtained FDA (or a European equivalent) clearance for a product. The issue affects when Bard's obligation to provide commercially reasonable support would have ceased.

The undisputed evidence does support Bard's claim that at least as early as February 2017, if not earlier, Bard made a determination that exploitation of a Bard product incorporating the Precisive Navigation Technology was no longer commercially practicable.  In a letter sent to 3DT in December 2016, Bard explained that it was "currently focusing its attention on the development of an alternative, superior technology."  Dkt. No. 73-15 at 1.  It also reminded 3DT that, under Section 2.1 of the Development Agreement, Bard is no longer obligated "to continue to support the development of the Precisive Navigation Technology if it determines, in good faith, based upon its reasonable business judgment, that the exploitation of such technology is no longer commercially practicable due to, among other things, the creation, development and/or commercial availability of superior technology."  *Id.*  In a letter sent in February 2017, Bard wrote that "as previously mentioned," it was "focusing its attention on the development of an alternative, superior technology" and provided additional detail regarding why it believed it was a superior technology.  Dkt. No. 73-6, Ex. 8 at 4.

3DT argues that it is entitled to summary judgment, notwithstanding evidence suggesting that Modus II was a superior technology, because "[t]he decision was never made that Modus II was superior to Penske as a whole" and the requisite determination of "no longer commercially practicable" was not made.  Dkt. No. 87 at 35.  This argument is belied by Bard's multiple letters to 3DT explaining that it was focusing on a "superior" technology.  Although Bard was not required to tell 3DT that it made a determination that the development of Penske was no longer commercially practicable due to a superior technology, Bard did make that disclosure.  No reasonable jury could conclude that, at least as of the date of these letters, Bard had not made a determination of commercial impracticability.

3DT draws the Court's attention to Bard's admission that it "remains hopeful that a product incorporating the Precisive Navigation Technology may be brought to market at some point in the future." Dkt. No. 87 at 33–34 (quoting Dkt. No. 82 at 3). Indeed, the parties agree that "Bard has never determined that a Bard product incorporating the Precisive Navigation Technology could never be brought to market and hopes to bring such a product to market in the future." Dkt. 73 ¶ 101. 3DT also points to Phillips' testimony that he "still believe[s]" it would be feasible for Penske to be brought to market in a Bard product. Dkt. No. 76-1 at ECF p. 72. 3DT asserts that this shows that Bard has not made a determination that developing Penske is no longer commercially practicable or no longer commercially practicable specifically due to Modus II. Dkt. No. 87 at 34.

Contrary to 3DT's suggestion, however, the Development Agreement does not force Bard to decide that continued development of a product will *never* be commercially practicable in order for it to exercise its right—after the expiration of the three-year period—to decide that development is not *presently* commercially practicable. Section 2.1 of the Development Agreement speaks in the present tense—Bard can exercise the right not to provide commercially reasonable support (under specified circumstances) if exploitation of a product "is no longer commercially practicable." Dkt. No. 73-2 § 2.1. What is commercially practicable may well change over time. Bard purchased the intellectual property for Precisive Navigation Technology. It was not required to forego the possibility of exploiting its rights in that property at some point in the future after the exploitation became commercially practicable in order to relieve itself in the present of providing commercially reasonable support to a commercially impracticable project. It simply would be required to pay 3DT the Full Milestone Payment if, notwithstanding

its discontinuance of support, it "subsequently obtain[ed] the 510(k) clearance and/or the CE

Mark trigging [sic] . . . the Full Milestone Payment." *Id.*

3DT is entitled to a jury trial on this issue for a different reason. Although the

Development Agreement leaves to Bard's "reasonable business judgment" exercised "in good

faith" the determination whether the exploitation of Penske was commercially practicable, it

specifies that such judgment can be exercised only in one of four narrow and carefully tailored

circumstances: (i) where the Bard Product fails to perform to Bard-required specifications; (ii)

where there are clinical failures; (iii) where a product incorporating Precisive Navigation

Technology is not eligible for a 510(k) premarket application; and (iv) "the creation,

development and/or commercial availability of superior technology." *Id.* Thus, while Bard's

business judgment that development of Penske was not commercially practicable at the time may

have been reasonable and made in good faith, it would not relieve Bard of the obligation to either

provide support or make the remaining ███████ payment if one of the four events that

triggered Bard's right to make that judgment had not occurred.   That reading of the Purchase

Documents makes sense. *See BP Air Conditioning Corp. v. One Beacon Ins. Grp.*, 871 N.E.2d

1128, 1133 (N.Y. 2007) ("[T]he reasonable expectation and purpose of the ordinary business

person when making an ordinary business contract will be considered in construing a contract."

(internal quotation marks and citation omitted) (alteration adopted)); *Two Guys From Harrison-*

*N.Y., Inc. v. S.F.R. Realty Assocs.*, 472 N.E.2d 315, 318 ("In construing a contract, one of a

court's goals is to avoid an interpretation that would leave contractual clauses meaningless.");

*Muzak Corp. v. Hotel Taft Corp.*, 113 N.E.2d 688, 690 (N.Y. 1956) ("The rules of construction

of contracts require us to adopt an interpretation [in] which . . . no provision of a contract [is] left

without force and effect."). The obligation to provide commercially reasonable support (as

qualified by Bard's good-faith business judgment) continued past the three-year period.  A reading that left it entirely to Bard's discretion to determine both that continued development was not commercially practicable and that the conditions under which Bard could exercise that business judgment were present would render 3DT's continuing right to commercially reasonable support illusory.

The only triggering event Bard has identified is what it claims to be the "creation [and] development . . . of superior technology."  Dkt. No. 73-2 §2.1.  It does not claim clinical failures or ineligibility for a 510(k) application.  But while Bard points to extensive evidence that would support a judgment that Modus II was superior technology, there is more than a "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  Bard has offered evidence that while Penske and Modus II are similar—██████████████████████ ████████████████████████████████████████████—there are "some significant benefits" associated with Modus II.  Dkt. No. 73-8 at 19; Dkt. No. 73 ¶ 63.  One such benefit was ████████████████████████████████ ███████████████████████████████████████, Dkt. No. 73-8 at 21–22; *see also* Dkt. No. 73 ¶¶ 69–70, ████████████████████████████████ ██████████████████████████████████ Dkt. No. 73 ¶¶ 53–56.  However, when asked if Modus II was a superior technology to Penske, Bard's expert Misener did not provide an unqualified "yes" answer; indeed, he did not provide a "yes" answer at all.  He testified that "it depends on [the] definition of superior" and explained that Modus II was superior in some ways and Penske was superior in other ways.  Dkt. No. 73-6 at 200.  Misener highlighted ████████████████████████████████████████████████ ████████████████████████████████████████ *Id.* at 200–01.

However, he also testified that Penske was superior to Modus II in ███████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████  *Id.* at 202.  At

deposition, he provided no reason that would compel a finding that the respects as to which

Modus II was superior to Penske outweighed the respects as to which Penske was superior to

Modus II or that, on balance, Modus II—and not Penske—was the superior technology.

Drawing every inference in favor of the non-moving party, the Court cannot say that a

reasonable jury would be unable to find that Penske remained at the time the superior technology

and that, as a result, Bard was required to continue to provide it commercially reasonable

support.

## II.     Breach of the Covenant of Good Faith and Fair Dealing

3DT alleges that Bard breached the covenant of good faith and fair dealing in performing

its contractual obligations by, among other things, "failing to keep 3DT informed about its

actions to support and develop the Precisive Navigation Technology" and associated products

and "failing and refusing to provide to 3DT the information necessary to ascertain the validity of

Bard's assertion that it has allegedly identified a technology that is superior to the Precisive

Navigation Technology."  Dkt. No. 1 ¶¶ 39–40.  Bard moves for summary judgment on this

claim, arguing that it is duplicative of 3DT's breach-of-contract claim and would impermissibly

create an independent contractual right.  According to Bard, it is entitled to summary judgment

for either reason.

3DT responds that its claim is not duplicative of its breach of contract claim because it is

based on Bard's lack of transparency and limited communications with 3DT for a portion of their

contractual relationship rather than Bard's allegedly contract-breaching conduct.  It further

asserts that "[w]hile Bard may not have been contractually required to provide details of the

development progress, it does have a duty to deal open and honestly with 3DT."  Dkt. No. 87 at 53–54.

"Under New York law, 'implicit in every contract is a covenant of good faith and fair dealing which encompasses any promises that a reasonable promisee would understand to be included.'" *Vista Outdoor Inc. v. Reeves Family Trust*, 725 F. App'x 17, 21 (2d Cir. 2018) (summary order) (quoting *N.Y. Univ. v. Continental Ins. Co.*, 662 N.E.2d 763, 769 (N.Y. 1995)). "Pursuant to this principle, 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014) (quoting *Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008)).  "Accordingly, the duty of good faith and fair dealing is violated when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under the agreement."  *Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, 2009 WL 1054830, at *5 (S.D.N.Y. April 17, 2009) (Sullivan, J.) (internal quotation marks and citations omitted).

Importantly, the duty of good faith and fair dealing "cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 306 (S.D.N.Y. 1998); *see also Higgs v. Columbia Univ.*, 2009 WL 77880, *12 (S.D.N.Y. Jan. 6, 2009) ("[T]he implied covenant of good faith and fair dealing cannot be used to add to a party's substantive obligations or to contradict express terms of the agreement.").  Where the implied covenant of good faith and fair dealing does not require the defendant to take the action that plaintiff complains has not been taken, summary judgment in favor of the defendant is appropriate.  *See, e.g., Oscar de la Renta, Ltd.*, 2009 WL 1054830, at *6.

Neither the Purchase Agreement nor the Development Agreement requires Bard to keep 3DT apprised of its actions in developing the technology that it purchased from 3DT.  Nor do they require Bard to provide 3DT with information—information that the Court suspects would be proprietary—regarding superior technologies in development.  The Purchase Agreement assigned to Bard "all right, title and interest of [3DT] in and to" the Precisive Navigation Technology.  Dkt. No. 73-1 § 2.01(a).  It contains a provision entitled "Sharing of Data," which gives Bard the right to have reasonable access to information regarding the purchased technology but imposes no obligation on Bard to share information with 3DT.  *Id.* § 6.11.  By the Development Agreement, Bard engaged 3DT to perform services in support of "designing, developing, validating, testing, and commercializing a possible Bard Product using the Precisive Navigation Technology."  Dkt. No. 73-2 § 2.1.  The Development Agreement requires 3DT to provide Bard with written status reports on at least a monthly basis and information regarding inventions that it "conceives, creates, or reduces to practice" at any time during the term of the agreement, but it does not impose reciprocal obligations on Bard.  *Id.* §§ 4.1, 7.2.

3DT does not explain why the information it complains it was denied was necessary for it to realize its "right to receive the benefits under the agreement."  *Oscar de la Renta, Ltd.*, 2009 WL 1054830, at *5.  Nor does it explain why "a reasonable promisee would understand [Bard's disclosure obligations] to be included" in the contract, *Vista Outdoor Inc.*, 725 F. App'x at 21 (internal quotation marks and citation omitted), particularly in light of express disclosure obligations going the other way.  The contracts between Bard and 3DT in no way imply an obligation that Bard—the purchaser and independent developer of a technology— make periodic reports or provide non-public information to the original producer of that technology.  Interpreting the implied covenant of good faith and fair dealing to impose any obligation on

behalf of Bard to do so would be akin to imposing an independent obligation that goes beyond the scope of the contracts governing the relationship between Bard and 3DT.  The Court declines to create such an obligation, and Bard is entitled to summary judgment on this count.[8]

## CONCLUSION

3DT's motion for summary judgment is DENIED.  Bard's motion for summary judgment is GRANTED in part and DENIED in part.

The Clerk of Court is respectfully directed to close Dkt. Nos. 75 and 77.

SO ORDERED.

Dated: February 10, 2022
      New York, New York

                                                           LEWIS J. LIMAN
                                        United States District Judge

---

[8] Because the Court concludes that summary judgment in favor of Bard is appropriate on 3DT's claim for breach of the covenant of good faith and fair dealing, it need not consider Bard's alternative argument that such a claim cannot lie because the conduct giving rise to a breach of the covenant is the same conduct giving rise to the breach-of-contract claim.