**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| 3DT Holdings LLC, | ) | |
| | ) | Civil Action No. 1-17-cv-05463-LJL-GWG |
| Plaintiff, | ) | |
| | ) | |
| Bard Access Systems Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**3DT HOLDINGS, LLC'S REPLY MEMORANDUM OF LAW**

**IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Table of Authorities** ........ 3
**I. Introduction** ........ 4
**II. Argument** ........**Error! Bookmark not defined.**
**a. Bard's Discontinuance of Development Constitutes a Breach of the Development Agreement and Bard Must Pay the Full Milestone Payment.** ........ 5
**i. Bard Misinterprets Section 2.1 of the Development Agreement** ........ 5
**ii. Bard Has Not Determined that Exploitation of a Bard Product Incorporating the Precisive Navigation Technology is No Longer Commercially Practicable.** ........ 8
**iii. Bard Has Not Determined that Modus II is Superior to Penske** ........ 10
**b. Bard Stopped Providing Commercially Reasonable Support to Penske Prior to August 29, 2016.** ........ 13
**III. Conclusion** ........ 20

# TABLE OF AUTHORITIES

## Cases

*Clarex Ltd. v. Natixis Securities Amercias LLC*, 2014 WL 4276481, at *11 (S.D.N.Y 2014.)...........10

*Galli v. Metz*, 973 F.2d 145, 149 (2nd Cir. 1992) ..........................................................................7

*Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2nd Cir. 2013)........7

*Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2nd Cir. 1988)..............................................7

*Holland Loader Company, LLC v. FLSmidth*, 313 F.Supp.3d 447, 469 (S.D.N.Y.2018)............ 14

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2nd Cir. 2005) .............9

*Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2nd Cir. 1985)...................................7

*Walden Federal Savings & Loan Ass'n v. The Slane Co., Ltd.*, 2011 U.S. Dist. Lexis 37010, at *2 (S.D.N.Y 2011) ......................................................................................................................10

## Other Authorities

COMMERCIAL, Black's Law Dictionary (11th ed. 2019)........................................................... 9

IMPRACTICABILITY, Black's Law Dictionary (11th ed. 2019) .............................................. 10

PRACTICABLE, Black's Law Dictionary (11th ed. 2019)........................................................... 9

## I. Introduction

Ignoring the irrelevant rhetoric of Defendant Bard Access System, Inc.'s ("Bard") opposition and focusing on the substance, it becomes clear that Bard has not – and cannot – overcome the clear and undisputed fact that it owes Plaintiff 3DT Holdings LLC ("3DT") the Full Milestone Payment of [redacted] plus prejudgment interest.

Bard admits it formally "shelved" Penske at some unidentified time. However, the Development Agreement expressly requires Bard to provide commercially reasonable resources unless it determines – after three (3) years – that "Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable due to…. the creation, development and/or commercial availability of a superior technology." (Dkt. No. 72 ¶ 14, Parties' Joint Statement of Facts and Joint Appendix [J.A.] Ex. 2). Bard never determined that Penske commercialization is no longer commercially practicable. Bard never even determined that Modus II was superior. (Dkt. No. 72, J.A. Ex. 5, Misener Dep. Tr. 200:8-202:24.)

In addition, Bard cannot overcome the overwhelming evidence that it stopped providing commercially reasonable resources to Penske prior to August 29, 2016. Despite its best efforts to disguise reality, Bard fails to present any <u>evidence</u> – only unsupported argument – that it provided commercially reasonable resources after January 2016. While Penske may have remained active on paper for just long enough for Bard to finalize routine paperwork and officially bury the Penske project, Bard ceased any effort to meet the goal of product development and actually shelved Penske and placed it on "life support" in January 2016-well before the 3 years was up.

## II. LEGAL ARGUMENT

### a. Bard's Discontinuance of Development Constitutes a Breach of the Development Agreement and Bard Must Pay the Full Milestone Payment.

Bard admits it discontinued its development of the Penske project. However, Bard argues that it was permitted to discontinue development under Section 2.1 of the Development Agreement simply because it determined that a superior technology (Modus II) existed. (Dkt. No. 92, Bard Opp. 3DT MSJ pp. 9-11.) Bard's position is flawed for numerous reasons. To start, Bard is clearly misinterpreting Section 2.1 of the Development Agreement. Second, Bard never determined that "Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable." Third, Bard never even determined that Modus II is superior to Penske under Section 2.1 of the Development Agreement.

#### i. Bard Misinterprets Section 2.1 of the Development Agreement

According to Bard, it was permitted to discontinue development by Section 2.1 of the Development Agreement simply because it determined that a superior technology (Modus II) existed. Bard misinterprets the clear intent of the parties as expressed by the plain language of the Development Agreement. Section 2.1 unambiguously provides as follows:

> Notwithstanding the foregoing, following the third (3rd) anniversary of the Effective Date, **if Bard determines, in good faith, based upon its reasonable business judgment, that the Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable due to** (i) technological failure(s) of the Bard Product to perform to Bard-required specifications ([redacted]), (ii) clinical failures, (iii) ineligibility for a 510(k) premarket notification application, or (iv) **the creation, development and/or commercial availability of superior technology**, then Bard shall have no obligation to continue to support the development of a Bard Product incorporating the Precisive Navigation Technology or seek the 510(k) clearance or CE Mark, as contemplated by Section 2.04(b) of the Purchase Agreement. (Dkt. No. 72 ¶ 14; J.A. Ex. 2) (emphasis added.)

The Development Agreement could not be clearer – to stop providing commercially reasonable resources to the development of Penske pursuant to Section 2.1, Bard must: (1) determine that "the Exploitation of a Bard product incorporating the Precisive Navigation Technology is no longer commercially practicable;" (2) and demonstrate that the Exploitation is no longer commercially practicable "due to…the creation, development and/or commercial availability of superior technology." (Dkt. No. 72 ¶ 14; J.A. Ex. 2.) (emphasis added.)

Bard argues 3DT's interpretation of the Development Agreement incorrectly requires two determinations. (Dkt. No. 92, Bard Opp. 3DT MSJ p. 9.) Specifically, Bard argues that Section 2.1 of the Development Agreement allows Bard to stop providing commercially reasonable support simply by determining that one of the stated bases in Section 2.1 exists. (Dkt. No. 92, Bard Opp. 3DT MSJ pp. 9-10.) In other words, Bard interprets the Development Agreement to mean that "development of a Bard product incorporating the Precisive Navigation Technology is no longer commercially practicable, *by definition*, if any of the aforementioned events occur." (Dkt. No. 92, Bard Opp. 3DT MSJ p. 10.)

In this case, Bard argues that the mere existence of a superior technology automatically deems the commercialization of Penske impracticable. In a flawed attempt to illustrate its improper argument, Bard supplants "due to" in Section 2.1 of the Development Agreement with the related phrases "because of" or "as a result of." This futile exercise, however, fails to support Bard's improper interpretation and, instead, simply reinforces 3DT's position – the plain language of the Development Agreement patently provides that even if Bard identifies a superior technology, Bard must make the determination that development of Penske is commercially impracticable.

When interpreting a contract under New York law, the "intention of the parties should control, and the best evidence of intent is the contract itself." *Gary Friedrich Enterprises, LLC v.*

*Marvel Characters, Inc.*, 716 F.3d 302, 313 (2nd Cir. 2013). "Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless…is not preferred and will be avoided if possible." *Galli v. Metz,* 973 F.2d 145, 149 (2nd Cir. 1992) quoting *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2nd Cir. 1988). "Rather, an interpretation that 'gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that lease a part unreasonable or of no effect.'" *Id.* citing *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2nd Cir. 1985).

Bard seeks to fundamentally alter the nature of the determination required under Section 2.1 from whether "Exploitation of a Bard product incorporating the Precisive Navigation Technology is no longer commercially practicable" to whether any of the four (4) circumstances/situations simply exist. Common sense dictates that the mere existence of a superior technology does not automatically render commercialization of a product no longer commercially practicable. Common sense also dictates that reasons exist beyond those enumerated that could render commercialization of a product no longer commercially practicable. By arguing that it merely must determine that a superior technology exists, Bard is asking this Court to render the plain language of Section 2.1 of the Development Agreement – "that the Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable due to" – completely meaningless. (Dkt. No. 72 ¶ 14; J.A. Ex. 2.)

If the parties intended to permit Bard to stop commercially reasonable development if it determined that one of the four (4) circumstances in Section 2.1 existed, the parties would have simply stated that Bard could discontinue development if, after three (3) years, it determines that one of the enumerated circumstances exists – without any mention of commercial practicability. But they didn't. The parties included the requirement that it be "no longer commercially

practicable" and expressly agreed that Bard could discontinue commercially reasonable development, after three years, only if it makes the express determination. (Dkt. No. 72 ¶ 14; J.A. Ex. 2.)

The Development Agreement could not be clearer – Bard may stop development <u>if</u> Bard: (1) determines that "the Exploitation of a Bard product incorporating the Precisive Navigation Technology <u>is no longer commercially practicable;</u>" **AND** (2) demonstrates that the commercial impracticability is "<u>due to</u>…the creation, development and/or commercial availability of superior technology." (Dkt. No. 72 ¶ 14; J.A. Ex. 2.) The overarching determination that Bard must reach is that incorporation of the technology into a Bard Product is "no longer commercially practicable." If Bard makes such a determination, it may discontinue commercially reasonable development if the lack of commercial practicability is "due to," because of, or the result of four (4) limited circumstances. This is the only interpretation that makes sense, gives meaning and effect to all words and phrases in the Agreement, and is supported by the clear and unambiguous language of Section 2.1 of the Development Agreement.

**ii. Bard Has Not Determined that Exploitation of a Bard Product Incorporating the Precisive Navigation Technology is No Longer Commercially Practicable.**

The evidence undisputedly demonstrates that Bard <u>never</u> determined that "Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable" for any reason – let alone one of the reasons enumerated in the Development Agreement. Misener – Bard's 30(b)(6) representative– testified that Bard has never stopped having the intent to get Penske to the marketplace. (Dkt. Nos. 75-76, Declaration of Daniel Gibson [Gibson Dec.] Ex. 2, Misener Dep. Tr. 162:14-21.) Misener informed Bard's expert that Penske was "an important one for Bard to have in their portfolio" and "was a potentially viable solution

to projects or challenges that they were continuing to have with projects." (Dkt. Nos. 75-76, Gibson Dec. Ex. 22, Haas Dep. Tr. 53:21-54:3.) Phillips – Bard's regulatory 30(b)(6) representative – was asked whether he still believed it to be feasible that Penske can be brought to market in a Bard device, and he responded, "I still believe that." (Dkt. Nos. 75-76, Gibson Dec. Ex. 5, Phillips Dep. Tr. 106:3-7.) And Decheek answered "Yes" when asked whether it is still Bard's hope that it can integrate the Penske technology into a Bard project and have it commercialized. (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Tr. 105:3-8.)

This evidence clearly demonstrates that Bard has not made the required determination that "Exploitation of a Bard Product incorporating the Precisive Navigation technology is no longer commercially practicable." (Dkt. No. 72 ¶ 14; J.A. Ex. 2.) Bard does not dispute this evidence. Rather, Bard argues that this evidence is nothing more than an irrelevant expression of Bard's hope to recoup a return on its investment. (Dkt. No. 92, Bard Opp. 3DT MSJ p. 9.) Once again, Bard is asking this Court to disregard the plain meaning of the Development Agreement.

"In interpreting a contract under New York law, words and phrases…should be given their plain meaning." *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2nd Cir. 2005) (citation omitted). The term "practicable" is defined as "reasonably capable of being accomplished; feasible in a particular situation." PRACTICABLE, Black's Law Dictionary (11th ed. 2019). The term "commercially" includes "relating to or involving the ability of a product or business to make a profit." COMMERCIAL, Black's Law Dictionary (11th ed. 2019).

"Commercial impracticability" is defined as the occurrence of a contingency whose nonoccurrence was an assumption in the contract, as a result of which one party cannot perform. IMPRACTICABILITY, Black's Law Dictionary (11th ed. 2019) (emphasis added.) Under New York law, the defense of commercial impracticability "is treated as a type of impossibility and

construed in the same restricted manner." *Clarex Ltd. v. Natixis Securities Amercias LLC*, 2014 WL 4276481, at *11 (S.D.N.Y Aug. 29, 2014.) "Under New York law, impossibility is a defense to a contract 'only when…performance [is rendered] objectively impossible…by an unanticipated event…" *Id.* see also *Walden Federal Savings & Loan Ass'n v. The Slane Co., Ltd.*, 2011 U.S. Dist. Lexis 37010, at *2 (S.D.N.Y 2011) (rejecting commercial impracticability defense because "New York courts refuse to excuse performance where difficulty is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy.")

The plain meaning of the words and legal treatment of commercial impracticability lead to the conclusion that Bard could only discontinue development if it determined that commercializing a product incorporating the Precisive Navigation technology was no longer capable of being accomplished. The testimony of Bard's development team is in direct conflict with such a determination. (Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Tr. 162:14-21; Ex. 5, Phillips Dep. Tr. 106:3-7; Decheek Dep. Tr. 105:3-8; Ex. 22, Haas Dep. Tr. 53:21-54:3)) If Bard had determined that "Exploitation of a Bard Product incorporating the Precisive Navigation" was no longer able to be accomplished, Bard would no longer have an intent to commercialize or see value in the technology. Simply put, the undisputed evidence demonstrates that Bard has not made the required determination and its admitted discontinuance of development of Penske is not justified by Section 2.1 of the Development Agreement.

**iii. Bard Has Not Determined that Modus II is Superior to Penske**

Even if this Court were to accept Bard's improper interpretation of the Development Agreement and conclude that Bard could stop development of Penske merely by determining the existence of a superior technology, 3DT is still entitled to judgment as a matter of law. The undisputed evidence demonstrates that Bard has not determined that Modus II is superior to

Penske, that the existence of Modus II renders commercialization of Penske no longer commercially practicable or that Modus II had anything to do with Bard shelving Penske.

Most importantly, Misener – Bard's 30(b)(6) representative – could not testify that Modus II was superior to Penske. Misener was directly asked whether Modus II is superior to Penske, and Misener responded: "My opinion is that its multifactorial superiority. So it depends on your definition of superior…" (Dkt. No. 72, J.A. Ex. 5, Misener Dep. Tr. 200:8-15.)

Misener went on to testify that Modus II has superiority to Penske in certain aspects [redacted] (Dkt. No. 72 ¶ 71, J.A. Ex. 5, Misener Dep. Tr. 200:8-19.) Misener further noted that, [redacted] (Id. at Misener Dep. Tr. 200:20-22.) Finally, Misener stated that [redacted] (Id. at Misener Dep. Tr. 200:22-25.)

However, Misener also noted numerous aspects in which Penske is superior to Modus II [redacted] (Dkt. No. 72 ¶ 72, J.A. Ex. 5, Misener Dep. Tr. 201:20-202:24.) Misener testified that both [redacted]. (Dkt. Nos. 86-87, Declaration of Daniel Gibson in Opposition to Summary Judgment [Gibson Opp. Dec.] Ex. 4,

Misener Dep. Tr. 205:14-206:18.)

While Misener testifies that there were aspects of Penske that were superior and aspects of Modus II that were superior, it is undisputed that the decision was never made that Modus II was superior to Penske as a whole. (Dkt. No. 72, J.A. Ex. 5, Misener Dep. Tr. 200:8-202:24.) In addition, the alleged advantages of Modus II – its [redacted] – have no impact on the practicability of commercializing Penske – which further highlights the flaw in Bard's claim that superiority automatically equates to commercial impracticability.

Penske resources were shifted to Ambergris in January 2016 – not to Modus II. A member of Bard's management team felt that both projects could continue to be developed simultaneously. (Dkt. No. 72 ¶ 68.) Importantly, Misener was asked whether there was a point where a determination was made to progress one of the projects (Modus II) as opposed to the other (Penske), to which he responded: "Not really. We continued to push each one forward, you know, as we could given where it was at." (Dkt. No. 72, J.A. Ex. 5, Misener Dep. Tr. 209:21-210:3.) Misener stated that he does not remember being directed to pause either Modus II or Penske and can't think of a formal decision to pause Penske. (Id. at Misener Dep. Tr. 210:11-211:8.) Finally, Decheek does not recall if Bard ever made the decision to narrow down to one project between Penske and Modus II. (Dkt. Nos. 86-87, Gibson Opp. Dec. Ex. 3, Decheek Dep. Tr. 44:18-22.)

In reality, the decision to shelve Penske had nothing to do with Modus II and/or its impact on the commercial practicability of commercializing Penske. Misener – as the project manager – cannot even tell us that a formal decision to stop development was made – let alone why it was made. Bard's attempted reliance on Section 2.1 of the Development Agreement to justify its improper discontinuance of development of Penske fails and 3DT is entitled to judgment as a

matter of law.

**b. Bard Stopped Providing Commercially Reasonable Support to Penske Prior to August 29, 2016.**

Bard breached the Development Agreement when it stopped providing commercially reasonable resources prior to August 29, 2016 without payment of the Full Milestone Payment. The Development Agreement requires Bard to provide commercially reasonable resources for a minimum of three (3) years, unless Bard elects to not continue to support the development of the Precisive Navigation Technology by providing 3DT with a Notice of Discontinued Support and paying the Full Milestone Payment. (Dkt. No. 72, J.A. Ex. 1 § 2.04(b).) Bard's internal documents demonstrate that it stopped providing commercially reasonable resources in January 2016.

Bard does not dispute that it was required to provide commercially reasonable resources for a period of at least three (3) years. Nor does Bard dispute the content of the internal documents that demonstrate that it stopped providing commercially reasonable resources in January 2016. Instead, Bard argues that the statements in internal documents should not be taken at face value and/or are not material because the Development Agreement provided Bard with significant discretion in determining what constituted commercially reasonable support. Bard's arguments wholly lack merit.

While Bard spends a great deal of time asserting it was accorded discretion in the Development Agreement and taking issue with Tom Waddell's expert testimony as to the core development standards in the medical device industry, its contentions are ultimately irrelevant to the issue of whether Bard stopped providing commercially reasonable resources prior to August 29, 2016. Rather, as Bard correctly notes, the issue is whether Bard's efforts "at the very least" constitute "some conscious exertion to accomplish the agreed goal, but something less than a

degree of efforts that jeopardizes one's business interests." *Holland Loader Company, LLC v. FLSmidth*, 313 F.Supp.3d 447, 469 (S.D.N.Y.2018).

The evidence is clear that the Bard's development efforts from January 2016 to August 29, 2016 do not constitute a "conscious exertion to accomplish the agreed goal" – commercialization of a product incorporating the Precisive Navigation Technology. Bard asks this Court to disregard the overwhelming evidence of its own documents by characterizing it as "cherry-picked statements" that constitutes nit-picking of its development efforts (Dkt. No. 92, Bard Opp. 3DT MSJ pp. 3, 24), downplaying certain statements and citing to its business practices that result in "lulls" in development activity in all projects.

While Bard tries to limit Davis' representation to a specific "vendor's persistent salesman" that Penske was suspended (Dkt. No. 92, Bard Opp. 3DT MSJ p. 21), argues that the shift of the "majority of resources" applies only to Decheek's marketing efforts (Dkt. No. 92-1, Bard Resp. 3DT SUMF ¶ 19), or highlight conclusory statements that Penske remained "active," the statements in these internal documents <u>taken as a whole</u> demonstrate that conscious exertion of development efforts to reach commercialization stopped in January 2016. It is disingenuous to characterize these statements as "nit-picking." It is illogical to argue that these statements are "not material." (See Dkt. No. 92-1, Bard Resp. 3DT SUMF ¶¶ 14, 16-25, 27-39.) The statements in Bard's internal documents demonstrate that all resources were diverted to other projects and it was a project that was not even worthy of being mentioned in status reports – well before August 29, 2016.

In January 2016, Penske was put on "life support" and third-party vendors were being told the project was suspended. (Dkt. No. 72, J.A. Ex. 5, Misener Dep. Ex. 7; Dkt. Nos. 75-76, Gibson Dec. Ex. 2, Misener Dep. Ex. 5.) By February employees were hearing that Penske was "more or

less cancelled." (Dkt. Nos. 75-76, Gibson Dec. Ex. 13, February 9, 2016 Email between Misener and Cleverly.) By March Bard was prevented from allocating any current and future resources to Penske and bard was unsure "when things can start up again." (Dkt. Nos. 75-76, Gibson Dec. Ex. 15, March 8, 2016 Email between Zentgraf and Tino.) Something cannot start up again unless it was stopped.

During the first quarter of 2016, Penske was being officially reported as "active" but with a "majority of resources" shifted to Ambergris." (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Ex.'s 12, 13; Gibson Dec. Ex. 12, March 2016 Marketing Monthly Report.) In April, there was no update on Penske development and its project timelines were delayed 4 to 5 years. (Dkt. Nos. 75-76, Gibson Dec. Ex. 16, April 2016 Marketing Monthly Report, Ex. 8, Decheek Dep. Tr. pp. 72:20-73:11, Decheek Dep. Ex. 15.) Penske never returned to the Marketing Monthly Reports thereafter, which – according to Bard – means that Decheek was not working on anything and the R&D team was not providing him with an update (unlike the other projects listed on the reports). (Dkt. No. 92-1, Bard Resp. 3DT SUMF ¶¶ 29-30, 33, 37.)

Misener himself said in April 2016 that the project had been pushed out to 2017, (Dkt. No. 72, J.A. Ex. 5, Misener Dep. Ex. 2), and in July 2016 said that Bard was "fully **resourced** with the projects that jumped in line ahead of Penske" and that "Penske had been put on hold pending completion of a few projects." (Dkt. Nos. 75-76, Gibson Dec. Ex. 20, July 27, 2016 Poliac Engineer Resources Email) (emphasis added.) Thus, it is not surprising that the July 2016 email accompanying the Bard project priority list described Penske as "(frozen)." (Dkt. Nos. 75-76, Gibson Dec. Ex. 19, July 25, 2016 Roeca Email.) The documents demonstrate more than a "lull" in development – this is a clear stoppage of conscious development activity that never resumed.

Characterizing a project as pushed out, on hold and frozen because Bard was fully resourced with other projects is fundamentally inconsistent with the notion of providing commercially reasonable resources. Yet Bard is asking this Court to determine that these statements are not material. Instead, Bard wants this Court to applaud the lackluster development efforts it generically describes and focus on alleged development hurdles in an effort to disguise its complete lack of conscious exertion of effort toward the goal of commercializing Penske in 2016. Once you sift through Bard's grandiose narrative of its alleged development efforts, it becomes clear that Bard has not – and cannot – demonstrate that it provided commercially reasonable resources to Penske in 2016.

In fact, review of each area of development that Bard identifies in opposition to summary judgment clearly demonstrates that Bard stopped providing commercially reasonable resources prior to August 29, 2016.

- <u>Animal Studies</u>: [redacted]. (Dkt. No. 92, Bard Opp. 3DT MSJ p. 26.) Bard's [redacted]." (Dkt. No. 72, J.A. Ex. 9, Davis Dep. Ex.'s 4 and 5.) Bard claims another [redacted]" (Dkt. No. 92-1, Bard Resp. 3DT SUMF ¶ 11.) There is no evidence of any [redacted].
- <u>Bench Model</u>: Bard cites to its efforts to [redacted]. (Dkt. No. 92, Bard Opp. 3DT MSJ p. 26). Davis testified that he was working [redacted]

[redacted] – the only item he recalls working on after January 25, 2016 is routing the Concept Design Review Meeting Minutes. (Dkt. No. 72, J.A. Ex. 9, Davis Dep. Tr. 10:13-18, 18:10-20:21.) There is no evidence of [redacted].

- Marketing Efforts and Challenges: Bard relies upon [redacted]. (Dkt. No. 92, Bard Opp. 3DT MSJ pp. 27-28.) To start, [redacted]. (Dkt. No. 72 ¶ 61, J.A. Ex. 6, Decheek Dep. Tr. 24:11-20.) More importantly, Bard does not come forward with any evidence of marketing activities occurring in 2016. According to Bard, Decheek – the sole marketing team member by 2016 – was the "resources" that shifted to Ambergris as referenced in the January, February and March 2016 Marketing Monthly Reports. (Dkt. No. 92-1, Bard Resp. 3DT SUMF ¶ 19). There was no update on the April Marketing Monthly Report, and Penske was excluded from the reports thereafter. (Dkt. Nos. 75-76, Gibson Dec. Ex. 8, Decheek Dep. Ex. 20, Ex. 16, April 2016 Marketing Monthly Report; Gibson Dec. Ex. 17, May 2016 Marketing Monthly Report; Gibson Dec. Ex. 21, August 2016 Marketing Monthly Report.) Bard admits that the lack of report means no marketing activities were occurring. (Dkt. No. 92-1, Bard Resp. 3DT SUMF ¶¶ 29-30, 33, 37.) There is no evidence of marketing efforts in 2016.

- Regulatory Strategy: Bard discusses *ad nauseum* its regulatory strategy and the challenge of preserving "Bard's stellar reputation with the FDA." (Dkt. No. 28, Bard Opp. 3DT MSJ pp. 28-31.) Tellingly, Bard simply glosses over the fact that the proposed regulatory strategy was completed in September 2015, was the subject of a few discussions that maybe amounted to 5% of Phillips time in 2016 and remained substantively unchanged upon its approval 14 months later. (Dkt. Nos. 75-76 Gibson Dec. Ex. 5, Phillips Dep. Tr. 101:1-8, 101:14-102:6, 114:5-9.) Phillips himself – Bard's 30(b)(6) regulatory representative – refused to characterize the regulatory activities after September 2015 as "work" because he only recalls have some discussions with his supervisor. (Dkt. Nos. 86-87, Gibson Opp. Dec. Ex. 1, Phillips Dep. Tr. 100:5:16.) The regulatory strategy essentially collected dust on his supervisor's desk for 14 months – including most of 2016.

Bard's only evidence of its 2016 development efforts is limited to: (1) Misener's testimony that feasibility activities moved forward while waiting on regulatory approval; (2) Misener's vague reference to animal study investigations; (3) the signing of the Concept Design Review Meeting Minutes; (4) the negotiation of an NDA with 3DT; (5) emails expressing an intent to move forward with development; and (6) Misener's confirmation that the project was still "active" and requesting an expenditure budget through the end of 2016.

Misener's testimony, however, fails to identify specific development activity. The signing of the Concept Design Review Meeting Minutes fails to constitute development activity since nothing substantively changed since October 2015 when the last concept design review meeting was held. Classifying the project as active, keeping the project in your thoughts, expressing an intention to engage in development in the future, taking 6 months to execute a basic NDA and

vaguely requesting assistance from the creator of the technology (without ever actually asking for assistance) is not the same as actually providing commercially reasonable personnel, financial and other support.

3DT is not required to demonstrate that Penske was moved to the abandoned project list to establish that commercially reasonable resources were discontinued. If keeping Penske "active" on lists was all that was required, the entire Development Agreement would be meaningless. The Court must analyze Bard's conduct – not the project's "formal" classification: (1) Bard's internal documents demonstrating that in 2016 work was on-hold, pushed back, suspended or frozen because Bard was fully resourced with other projects which placed Penske on life-support, (2) no evidence of animal studies after January 14, 2016; (3) no evidence of [redacted] after January 2016, (4) no evidence of any marketing activities in 2016, (5) outside vendors being informed that work was suspended in January 2016, (6) exclusion of Penske on status reports to management, (7) employees asking whether the Penske was cancelled, and (8) reported 4 to 5 year delays.

This evidence demonstrates that while Penske may have been active on paper in 2016, it was not active in practice. Bard officially classified the project as active for just long enough to get past August 29, 2016 and only completed housekeeping items to appease management's formalistic desire to officially close out the concept phase. In practice, however, no meaningful development occurred, and Penske did not move any closer to commercialization throughout 2016. Bard simply did not consciously exert effort to reach the goal of commercialization after Penske was put on life support in January 2016. Rather, Bard stopped development "as and to the extent contemplated by the Development Agreement" prior to August 29, 2016 and, therefore, owed 3DT the Full Milestone Payment.

## III. Conclusion

3DT has established that there is no genuine issue of fact that (1) Bard failed to determine that Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable; and (2) Bard stopped providing commercially reasonable resources to the development of Penske prior to August 29, 2016. Either circumstance undisputedly requires Bard to tender 3DT the Full Milestone Payment.

Bard's opposition is based upon a flawed interpretation of the Development Agreement and fails to create an issue of fact as to whether it determined that Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable due to the existence of Modus II. In addition, Bard failed to come forward with evidence to refute the fact that it did not consciously exert development effort toward the goal of commercializing Penske between January 2016 and August 29, 2016.

In short, 3DT's Motion for Summary Judgment should be granted and 3DT should be awarded a judgment against Bard in the amount of the Full Milestone Payment [redacted] plus statutory prejudgment interest at the rate of 9% per annum from April 6, 2016 to the date judgment is entered, and such other relief as the Court deems just and proper.

Respectfully Submitted,

*/s/ Daniel J. Gibson*
Daniel J. Gibson (admitted *pro hac vice)*
Michael T. McNally (admitted *pro hac vice)*
DELK McNALLY, LLP
211 South Walnut Street
Muncie, Indiana 47305
gibson@delkmcnally.com
mcnally@delkmcnally.com
*Attorneys for Plaintiff*

*/s/ Deanna Koestel*
Deanna Koestel, Esq.
PASHMAN STEIN WALDER & HAYDEN
Court Plaza South
21 Main Street, Suite 200
Hackensack, NJ 07601
*Attorneys for Plaintiff*