**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| 3DT Holdings LLC,<br><br>Plaintiff,<br><br>Bard Access Systems Inc.,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1-17-CV-5463-LJL-GWG<br><br>**Joint Rule 56.1 Statement of Facts** |

Plaintiff, 3DT Holdings, LLC, by counsel Delk McNally LLP, and Defendant, Bard Access Systems, Inc., by counsel McCarter & English, LLP, hereby submit this Joint Rule 56.1 Statement of Facts, which sets forth the facts that the parties agree are undisputed for purposes of summary judgment motion practice:

## I. Introduction

1. 3DT Holdings, LLC ("3DT") is a limited liability company organized under the law of the state of Delaware with its principal place of business located in San Diego, California. (Dkt. No. 46-1, ¶¶ 5-6). Dr. Ghassan Kassab ("Dr. Kassab") (Ex. 4, Kassab Dep. Tr. 7:25[1]) is the sole member of 3DT and is a full-time resident and citizen of the State of California. (Dkt. No. 46-1, ¶¶ 3-4).

2. Bard Access Systems, Inc. ("Bard") is a corporation organized under the laws of the State of Utah, with its principal place of business located in Salt Lake City, Utah. (Dkt. No. 1, ¶ 2; Dkt. No. 14 ¶ 2)

[1] Exhibits to the Joint Appendix of Exhibits in Support of Joint Rule 56.1 Statement of Facts are cited herein as "Ex.".

3. [redacted]

## II. August 2013 Acquisition of the Precisive Navigation Technology

4. In early 2013, 3DT first considered selling or licensing the Precisive Navigation Technology, for purposes of further development, regulatory approval and sale. (Ex. 4, Kassab Dep. Tr. 24:1-14, 37:1-13, 51:6-8; see also Ex. 2, Development Agreement Section 2.1.)

5. 3DT primarily vetted four potential buyers, including Bard, interested in acquiring the Precisive Navigation Technology. (Ex. 4, Kassab Dep. Tr. 51:20-52:6.)

6. Ultimately, 3DT chose to sell the Precisive Navigation Technology to Bard due to (i) Bard's commitment to getting the technology to the clinic; (ii) "what [Bard] was willing to commit to it in terms of resources," meaning how much Bard was willing to pay for and devote to the project (Ex. 4, Kassab Dep. Tr. 59:22-60:5), (iii) Bard's expertise in [redacted] (Id. at Kassab Dep. Tr. 60:23-61:1), and (iv) Bard's offer of a [redacted] upfront payment plus a potential [redacted] milestone payment, in contrast with another potential buyer's offer that did not front-load payment to 3DT (Id. at Kassab Dep. Tr. 61:2-21).

7. On August 29, 2013, 3DT and Bard executed various documents to formalize Bard's acquisition of the Precisive Navigation Technology, including ancillary documents memorializing 3DT's transfer of all intellectual property rights related to the Precisive Navigation Technology to Bard, and the following: (1) Asset Purchase Agreement ("Purchase Agreement") (Ex. 1); (2) Design, Development and Services Agreement ("Development Agreement") (Ex. 2); and (3) Statement of Work (Ex. 3).

### A. *Purchase Agreement*



ME1 35848725v.3

8. Section 2.01 of the Purchase Agreement (Ex. 1) provides, in relevant part, as follows:

> (a) Subject to the terms and conditions of this Agreement, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, assume and acquire from Seller all right, title and interest of Seller in and to the Acquired Assets, free and clear of all Encumbrances.
>
> (b) "Acquired Assets" means Seller and Seller Affiliate's right, title and interest in and to the following:
>
> (i) the product incorporating the Precisive Navigation Technology, a description and schematics of which, as such product exists in its current stage of development as of the Closing Date, are attached hereto as Schedule 2.01(b)(i) ("Product") and all (x) prototypes thereof, (y) line extensions, modifications, improvements, additions, successors thereto, and (z) replacements therefor, in each case, that are owned by or licensed to Seller or any Seller Affiliate at the Closing;

9. Section 2.04 of the Purchase Agreement (Ex. 1) provides for a potential total Purchase Price of [redacted] to be paid by Bard to 3DT. Section 2.04(a) of the Purchase Agreement required Bard to tender to 3DT [redacted] (less the amount of Standstill Payments previously paid) at the Closing.

10. Section 2.04(b) of the Purchase Agreement (Ex. 1) further provides that an additional [redacted] shall be paid by Buyer [Bard] directly to Seller [3DT] (the "Full Milestone Payment"), upon receipt by [Bard] or its designee, assignee or transferee of its first 510(k) clearance from the FDA to market and sell a medical device that incorporates the Precisive Navigation Technology in the Buyer Field[.]"[2]

---

[2] Section 1.01 of the Purchase Agreement (Ex. 1) defines "Buyer Field" as follows: "'Buyer Field' [redacted]



ME1 35848725v.3

11. Section 2.04(b) of the Purchase Agreement (Ex. 1) further states, "[Bard] shall be obligated to support the development of the Precisive Navigation Technology as and to the extent contemplated by the Development Agreement; provided that [Bard] may elect, at any time and for any reason, to not continue to support the development of the Precisive Navigation Technology as and to the extent contemplated under the Development Agreement, without violation of the Development Agreement, if it provides at least thirty (30) days prior written notice thereof to [3DT] ("Notice of Discontinued Support") and pays to [3DT], not later than forth-five [sic] (45) days following the date of such Notice of Discontinued Support, the Full Milestone Payment."

12. Section 4.05 of the Purchase Agreement (Ex. 1) states, in pertinent part, "Buyer will be the lawful owner of, and have good, valid and marketable title to, the Acquired Assets, free and clear of all Encumbrances[.]"

### B. *Development Agreement*

13. The Development Agreement sets forth the agreement of the parties with respect to "the design, development validation and testing of one or more new Bard products in the Buyer Field that utilizes, incorporates, and/or employs the Precisive Navigation Technology." (Ex. 2, Development Agreement Preamble.)

14. Section 2.1 of the Development Agreement (Ex. 2) provides:

> Bard has interest in designing, developing, validating, testing and commercializing a possible Bard Product using the Precisive Navigation Technology, and, through this Agreement, wishes to engage 3DT to perform Services (as defined herein) in support of that endeavor. Bard shall provide commercially reasonable personnel, financial and other support (as determined by Bard, in good faith, based upon its reasonable business judgment) with regard to the development of a Bard Product incorporating the Precisive Navigation Technology. Notwithstanding the foregoing, following the third (3rd) anniversary of the Effective Date, if

---

[redacted]

> Bard determines, in good faith, based upon its reasonable business judgment, that the Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable due to (i) technological failure(s) of the Bard Product to perform to Bard-required specifications [redacted], (ii) clinical failures, (iii) ineligibility for a 510(k) premarket notification application, or (iv) the creation, development and/or commercial availability of superior technology, then Bard shall have no obligation to continue to support the development of a Bard Product incorporating the Precisive Navigation Technology or seek the 510(k) clearance or CE Mark, as contemplated by Section 2.04(b) of the Purchase Agreement. For clarity, the Parties understand and agree that, following any such discontinuance of support by Bard, Bard shall have no obligation to pay the Full Milestone Payment (or any one-half portion thereof), unless, notwithstanding such discontinuance, Bard subsequently obtains the 510(k) clearance and/or the CE Mark trigging either the Full Milestone Payment (or any one-half portion thereof), as contemplated by Section 2.04(b) of the Purchase Agreement.

15. The "third (3rd) anniversary of the Effective Date" occurred on August 29, 2016.

16. Section 9.1 of the Development Agreement (Ex. 2) provides: "The term of this Agreement ("Term") shall begin on the Effective Date and, unless earlier terminated as expressly provided herein, shall continue until the completion, expiration or termination (pursuant to Section 9.2 below) of the Statement of Work."

17. Section 9.2 of the Development Agreement (Ex. 2) provides:

> (a) Upon any material breach of this Agreement by any Party, the non-breaching Party shall have the right to give notice of default in writing, stating in reasonable detail the nature of the claimed breach. If, within thirty (30) days from its receipt of such notice, the breaching Party shall not have cured any such material breach, the non-breaching Party may at its option terminate this Agreement by giving written notice of termination to the breaching Party.
>
> (b) Bard may terminate this Agreement for any reason upon thirty (30) days prior written notice to 3DT.

### C. *Statement of Work*

18. The Statement of Work (Ex. 3), executed on the date of the acquisition and prior to

Bard's development of the technology, "sets forth the tasks, responsibilities, budget and schedule [redacted]. This SOW also includes the deliverables which shall be provided by 3DT to Bard ("3DT Deliverables"), including data and final report showing in vivo (animal study) performance compared to design specifications. It is the intention of the Parties that the completion of the tasks and deliverables described in this SOW will be a collaborative effort that appropriately leverages the relative strengths and capabilities of the Parties." (Ex. 3, Statement of Work Section 1. General Description.)

19. At that time, the Statement of Work contemplated "[t]he major tasks to be completed" as: [redacted] (Ex. 3, Statement of Work Sections 2. Deliverable/Task/Responsible Parties and 2.1. Deliverables/Tasks.)

## III. <u>The Penske Project Team</u>

### A. ***Staffing***

20. Bard used the name "Penske" internally to refer to the Precisive Navigation Technology and the team dedicated to its development. (Ex. 5, Misener Dep. Tr. 43:21-44:7.)

21. Anthony Misener is the Research and Development Program Manager for the tip location and central ultrasound side of the Vascular Access Technologies Platform, and has been

a program manager for the tip location side of the platform since approximately 2010. (Id. at: Misener Dep. Tr. 10:8-11:2.) He has an engineering background and Bard initially hired him as a Senior Engineer. (Id. at Misener Dep. Tr. 11:15-12:23.) Bard assigned him to be the project leader for Penske. (Id. at Misener Dep. Tr. 47:11-15.)

22. In 2013, Bard hired two full-time engineers, Zach Davis and Brian Cieselwicz. (Ex. 5, Misener Dep. Tr. 80:21-81:15.)

23. Bard assembled a cross-functional team including the following key members:

a. Anthony Decheek, then a product manager in marketing with six years of prior experience as a contracts manager. Mr. Decheek holds an undergraduate degree in mechanical engineering and a Master's in Business Administration, and currently serves as Senior Marketing Manager at Bard. (Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5) Mr. Decheek was assigned to other projects in addition to Penske, which he said felt "pretty standard." (Id. at Decheek Dep. Tr. 20:12-23.);

b. Chris Phillips, then a Regulatory Specialist II, with eight years of prior experience in the regulatory and quality fields. Mr. Phillips holds an undergraduate degree in biotechnology business management, a Master's degree in Health Sciences, focusing on regulatory affairs, and a Regulatory Affairs Certification and a Medical Device Auditor Certification through two industry groups. Currently, Mr. Phillips serves as a Senior Manager of Regulatory Affairs at Bard. (Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15) Mr. Phillips was assigned to four or five other projects in addition to Penske, which he stated was "our target." (Ex. 7, Phillips Dep.

Tr. 38:17-22.);

c. Zach Davis, an R&D engineer with a background in electromagnetics and prior experience at Bard as a Quality Engineer. Penske was his first engineering medical device development project. (Ex. 9, Davis Dep. Tr. 7:2-3, 18-22);

d. Brian Cieselwicz was an R&D Engineer who has since left employment at Bard. (Ex. 5, Misener Dep. Tr. 81:7-15; 104:7-8); and

e. Brad Zentgraf, an R&D engineer assigned to Penske in 2015, who had prior experience working on catheter products at Bard. Mr. Zentgraf holds undergraduate and Master's degrees in Bioengineering, and currently serves as Senior R&D Engineer at Bard. (Ex. 8, Zentgraf Dep. Tr. 7:8-16; 8:4-5, 23-24; 10:22-25, 14:11-16).

**B. *Initial Stages***

24. The "entire team" tried to meet once per week. (Ex. 5, Misener Dep. Tr. 79:2-4.) Tony Decheek testified that the Penske integration meetings would occur "[m]aybe weekly." (Ex. 6, Decheek Dep. Tr. 27:12-18.)

25. Anthony Misener stated, "for a lot of the full team meetings, I certainly generated minutes when we tried to get, you know, the entire cross-functional team together" and "I was trying to keep minutes for Penske." (Ex. 5, Misener Dep. Tr. 79:20-23.)

26. When the team was established and the project scope was more defined, Anthony Misener was given a "tentative timetable" "because that's required as part of the due diligence" at Bard. (Ex. 5, Misener Dep. Tr. 89:16-22.) He explained that "it's expected that the team will try to better refine that timetable as we delve further into the project." (Id. at Misener Dep. Tr. 89:22-

24.) During his deposition, when asked if he recalled the timetable that he was given at the outset of the project, Anthony Misener stated, "I'd be guessing a little bit here because the due diligence timeline is typically pretty loose in that they understand it's going to take longer than you understand. It's just the due diligence phase," but the timeline at that time was three (3) to three and a half (3 ½) years for the commercialization of a device incorporating the Precisive Navigation Technology. (Id. at Misener Dep. Tr. 89:25-90:8.)

27. The Bard Penske team's directive was to develop a Bard product incorporating the Precisive Navigation Technology, which was a "next generational" technology. (Id. at Misener Dep. Tr. 43:5-20; 52:22-53:11; Ex. 7, Phillips Dep. Tr. 128:21-129:11.)

28. At the time of the acquisition, and as reflected in the SOW, the parties contemplated [redacted] for the Penske technology.

29. Anthony Misener testified, "At a high level, we were looking at [redacted] (Ex. 5, Misener Dep. Tr. 57:6-8.) He stated that the potential application on the [redacted] (id. at Misener Dep. Tr. 57:13-21) and the potential applications on the [redacted], [redacted] (id. at Misener Dep. Tr. 58:22-25).

## IV. The FDA Regulatory Process

30. To obtain the FDA's permission to market a medical device incorporating the Penske technology pursuant to section 510(k) of the Food, Drug and Cosmetic Act, Bard had to submit testing and other documentation to the FDA demonstrating that device "to be substantially equivalent to an existing product that has been approved or cleared by the FDA[.]" (Ex. 7, Phillips

Dep. Tr. 23:23-24:2, 24:11-12.)

31. Chris Phillips, the regulatory team member primarily responsible for the Penske regulatory efforts, explained that "Clearance [through the FDA's 510(k) process] means that the device is seen in the FDA's eyes to be equivalent to something else, to a predicate model that exists" on the market. (Ex. 7, Phillips Dep. Tr. 30:9-21.)

32. As a part of this process, Bard "review[s] potential predicates in greater detail, to review the different challenges associated with the device to understand the technology on a more intimate level, and to figure out what the different challenges are going to be as we approach a regulatory body." (Ex. 7, Phillips Dep. Tr. 23:8-13.)

33. These efforts culminate in "a regulatory submission [to] get … through an approval or clearance." (Ex. 7, Phillips Dep. Tr. 23:14-15.) "[T]he main document … used to put that together is the regulatory strategy document, or the RACA," which Bard sometimes refers to as the RSD as well. (Id. at Phillips Dep. Tr. 23:16-18.)

34. Chris Phillips also testified that different FDA approval processes exist, depending, in part, on the risk posed by a device and its equivalence to previous devices already approved. "[H]igh-risk device[] approvals … can be sought through what is called a premarket approval, PMA process. For devices that may not really be high risk but for which a predicate doesn't exist, there's another process called the de novo submission. The FDA allows that. It's, essentially, quite similar in terms of content to a PMA in terms of cost to submit. It is more similar to a PMA than a 510(k). But it allows you to take a medium-risk product for which there is no good comparatives on the market allowed by FDA at that time and to get a designation of that product in the future, would be a Class II product for which a 510(k) pathway is possible." (Ex. 7, Phillips Dep. Tr. 25:3-16.)

**V. Overview of Bard's Design Control Process**

35. Anthony Misener testified that Bard's R&D group's design control process typically begins with the concept phase, followed by feasibility, qualification, and launch, and sometimes a 510(k) phase in between feasibility and launch. (Ex. 5, Misener Dep. Tr. 19:1-5, 17-24.)

36. Penske Integration Meeting minutes dated January 7, 2015 state that the concept phase was planned to be completed by July 2015. The 510(k) submission was planned to be completed by May 2017 with a product launch projected for May 2018. (Ex. 10, BAS-3DT 0021225.)

**VI. Penske Development Efforts**

37. As discussed below, the Penske team conducted animal studies, performed work in connection with bench models, engaged third-party vendors, pursued [redacted], developed a regulatory strategy, including by researching and identifying predicate devices, and conducted market and clinician usability research studies.

**A. *Animal Studies***

38. During due diligence, Dr. Kassab and two others on the 3DT team went to Bard for an animal study with the purpose of "demonstrat[ing] the technology functioned as intended." (Ex. 4, Kassab Dep. Tr. 83:2-3.) At that time, the study was performed "using the prototypes that [3DT] developed." (Id. at Kassab Dep. Tr. 83:4-7.)

39. Dr. Kassab testified that the prototype stylet provided by 3DT "would need to have [redacted]

prototype provided by 3DT needed to be developed further in terms of [redacted] because 3DT was focused on the [redacted]. (Ex. 4, Kassab Dep. Tr. 66:24-68:9.)

40. Bard performed additional animal studies, [redacted]. (Ex. 5, Misener Dep. Tr. 245:18-20; Ex. 9, Davis Dep. Ex. 5.)

41. Zach Davis testified that [redacted] (Ex. 9, Davis Dep. Tr. 40:5-8.)

42. The overall results of an animal study performed on June 24, 2015 were deemed [redacted] and labeled [redacted] (Ex. 9, Davis Dep. Ex. 4.)

43. Chris Phillips testified that certain animal study results were [redacted] Phillips further testified [redacted] (Ex. 7, Phillips Dep. Tr. 63:5-6, 63:13-21.)

44. Anthony Misener testified, [redacted] (Ex. 5, Misener Dep. Tr. 116:20-24.)

**B. *Bench Models***

45. In addition, Zach Davis testified that he was working on a bench model that Bard could use to simulate the technology "on the bench rather than having to go do an animal study every time we wanted to gather data." (Ex. 9, Davis Dep. Tr. 10:13-18.)

46. Zach Davis testified that Bard had the bench model that 3DT provided at the time

of the acquisition, which "functioned but didn't really give us any data that we could correlate to a living patient." (Ex. 9, Davis Dep. Tr. 19:22-24.)

**C. *Third-Party Vendors***

47. Bard also engaged third-party vendors to assist in developing a Bard product to incorporate the Precisive Navigation Technology. These vendors included one with "whom they had a good working relationship" to assist in developing the [redacted] and the [redacted], (Ex. 5, Misener Dep. Tr. 107:22-108:9), and another, [redacted] (id. at Misener Dep. Tr. 241:17-20).

**D. [redacted]**

48. The focus of the Penske project shifted "[redacted] (Ex. 5, Misener Dep. Tr. 91:2-6.) On February 23, 2015, Anthony Misener wrote to members of the team, "I received word from on high that we are putting the [redacted] of the Penske project on hold. Meaning that all focus should be placed on the [redacted] and pushing down this road as quickly as possible." (Ex. 9, Davis Dep. Ex. 3, BAS-3DT 0053803.)

49. For the [redacted], Bard was trying to start by to modifying its [redacted]. (Ex. 5, Misener Dep. Tr. 108:25-109:4.) [redacted] (Id. at Misener Dep. Tr. 111:16-17.)

50. Anthony Misener testified that R&D was [redacted] (Ex. 5, Misener Dep. Tr. 111:3-7.)

51. [redacted] (Ex. 7, Phillips Dep. Tr. 64:22-23.)

E. ***Identifying a Predicate Device for the FDA 510(k) Submission***

52. Chris Phillips testified that he researched "a lot of the background," "the different potential predicates," "further background research" and "further research into the regulatory paths." (Ex. 7, Phillips Dep. Tr. 54:11-14.)

53. In particular, he researched predicate devices to identify appropriate predicates for Penske. (Ex. 7, Phillips Dep. Tr. 54:11-14.) [redacted] (Id. at Phillips Dep. Tr. 51:12-15)

54. By July 10, 2015, Chris Phillips had identified a predicate device for Penske, but [redacted] (Ex. 7, Phillips Dep. Tr. 72:7-15; id. at. Ex. 4.)

55. Chris Phillips reported to Kerrie Hamblin, his manager and then a senior manager of regulatory affairs, in developing the Penske regulatory strategy. (Ex. 7, Phillips Dep. Tr. 37:4-10.)

56. Chris Phillips testified "[D]iscussions with Kerrie were around preserving the [redacted] was a little bit more risk taking than some of the other strategies that Bard Access Systems had taken in the past. And whether we could be comfortable as an organization doing that, given the

reputation that we were trying to keep with the agency." (Ex. 7, Phillips Dep. Tr. 127:13-20.)

**F. Penske Marketing / Commercialization Efforts – Clinician Usability Research**

57. Tony Decheek testified that "we would have conducted research studies," "whether it was quantitative, smaller one- or two-page studies and larger qualitative 30-page studies[, w]e would have done some of those[.]" (Ex. 6, Decheek Dep. Tr. 22:25-23:4.)

58. He then testified, "What exactly we did, I don't recall, but we have been – oh, I believe we attended some physician conferences because this is going to be, initially a different user group with [redacted] So emergency physicians, ICU and anesthetists." (Ex. 6, Decheek Dep. Tr. 23:5-9.)

59. Tony Decheek testified, [redacted] So from an implementation and commercialization standpoint, that was something that we were focused on, how was it actually going to look to the customer and how are they actually going to use it." (Ex. 6, Decheek Dep. Tr. 21:10-19.)

60. When asked whether customers raised any concerns or potential roadblocks during Bard's research efforts, Tony Decheek responded, "We had developed some conceptualized user interfaces, and I -- if I remember correctly, those [redacted] (Ex. 6, Decheek Dep. Tr. 23:14-19.) Those interfaces were [redacted] (Id. at Decheek Dep. Tr. 23:20-24.)

61. Decheek did not recall any specific actions taken by Bard to address those concerns, but testified that "We always just, as our internal team, tried to push forward and have different

concepts to iterate and try to prove upon. So while it was a hurdle, I don't think we thought it was an unachievable hurdle, but it was still a hurdle nonetheless." (Ex. 6, Decheek Dep. Tr. 24:11-20.)

## VII. Modus II (2013-present)

### A. *Technology and Timing*

62. In December 2016 and February 2017, Bard stated in letters to 3DT that it was focusing its attention on a technology it maintains is an alternative, superior technology. (Rob Fredericks' letters.) Following the commencement of litigation, and upon entry of a Protective Order, Bard identified Modus II as the technology referenced in the letters.

63. "Both [Penske and Modus II] were intended [redacted] (Ex. 7, Phillips Dep. Tr. 20:17-21:1.)

64. Chris Phillips, who worked on both Penske and Modus II, testified that "Modus II [redacted] (Ex. 7, Phillips Dep. Tr. 18:18-23, 19:3-8.)

65. Modus II development activities started in late 2013 / early 2014. (Ex. 5, Misener Dep. Tr. 74:16-22; Ex. 11, BAS-3DT 0059430; Ex. 12, BAS-3DT 0061106.)

66. Bard always tried to have multiple projects in the pipeline at the same time and Modus II was in the pipeline at the same time as Penske. (Ex. 5, Misener Dep. Tr. 72:1-4.)

67. Misener testified that resources being "diverted in part due to another project … happens all the time." (Ex. 5, Misener Dep. Tr. 261:19-262:4.)

68. Certain members of Bard leadership believed both Modus II and Penske had the potential to be developed. (Ex. 6, Decheek Dep. Tr. 43:11-16; Decheek Dep. Ex. 4 (reporting that

during a May 2015 Franchise Review Meeting, Rob [Fredericks, current Vice President and General Manager of the company, (Ex. 5, Misener Dep. Tr. 286:18-23)] brought up a point – why not both?")

**B.** ***Comparison of Modus II and Penske***

69. With respect to regulatory pathway, Chris Phillips testified that, [redacted] (Ex. 7, Phillips Dep. Tr. 123:16-20.)

70. Chris Phillips testified that [redacted] (Ex. 7, Phillips Dep. Tr. 21:10-20.) While not the only difference between Modus II and Penske, [redacted] (Id. at Phillips Dep. Tr. 21:21-22:9.)

71. From an R&D perspective, Anthony Misener testified that Modus II has superiority to Penske in certain aspects including its [redacted] (Ex. 5, Misener Dep. Tr. 200:8-19.) In addition, [redacted] had been developed," which meant the R&D efforts "started . . . in a feasibility phase." (Id. at Misener Dep. Tr. 208:20-22.) Anthony Misener also testified that [redacted] (Id. at Misener Dep. Tr. 200:22-25.)

72. Anthony Misener further testified that there are aspects in which Penske is superior

[redacted] (Ex. 5, Misener Dep. Tr. 201:20-202:24.)

## VIII. Ambergris (2015-2016)

73. From the end of 2015 to January 2016, Bard began the process of acquiring another unrelated technology, Nautilus Delta, a project it referred to as "Ambergris." (Ex. 5, Misener Dep. Tr. 217:9-10; Ex. 6, Decheek Dep. Ex. 12 (January 2016 BAS Marketing Monthly Report stating that Ambergris "Due Diligence completed").)

74. In January 2016, Zach Davis was "redirected to not forget about Penske, but to work on some other business critical items too" (Ex. 9, Davis Dep. Tr. 9:20-10:5) "with emphasis being put on the Nautilus Delta project that had popped up." (Id. at Davis Dep. Tr. 17:19-23.)

75. Brad Zentgraf does not recall Anthony Misener ever telling him that the Penske project was put on hold --"I don't remember him saying those specific words. You know, he let me know that I needed to focus my time to Ambergris and the Nautilus Delta projects, but it was my expectation that I would be told to work on something else at a later date." (Ex. 8, Zentgraf Dep. Tr. 34:14-20.)

76. On January 25, 2016, Misener sent an email stating that in the PSR tomorrow, which is a monthly project review with the Management Board (Ex. 5, Misener Dep. Tr. 230:15-16), consisting of "the VP and general manager in Salt Lake and then the vice presidents of quality, regulatory, research and development and marketing and sales" (Id. at Misener Dep. Tr. at 23:14-

17), he would report “the significant delay to Penske…. completely due to the anticipated Ambergris project.” (Id. at Misener Dep. Ex. 3.)

## IX. Penske Concept Phase Continues

77. According to a BAS Penske Project Executive Summary dated July 10, 2015, the anticipated development timeline for Bard as of that date was as follows:

- “Concept Phase – July 2015
  - Concept phase defined by Bard as fluid, non-design control, look for plan on testing, low sample size of design iterations.
- Feasibility– September 2015
  - Feasibility phase defined by Bard as larger sample size to verify Qual will pass. Define design control and establish pre-DV
- Qual – March 2016
  - Qual phase defined by Bard as DV and process validations
- Product launch without claims – March 2016
- Product launch with Penske claims – October 2017”

(Ex. 7, Phillips Dep. Ex. 4, BAS-3DT 0040344.)

78. At least one Penske concept design review meeting was held in July 2015, and another was held in October 2015. (Ex. 7, Phillips Dep. Tr. 78:3-6; 78:19-22; Ex. 9, Davis Dep. Tr. 110:8-19.)

79. By July 21, 2015, Chris Phillips “had completed what I believed at that point in time to be the draft of the [regulatory strategy document, or] RACA” and “believed entering into it that it was a substantial draft that would allow us to move past concept[.]” (Ex. 7, Phillips Dep. Tr. 78:7:18; Ex. 7, Phillips Dep. Ex. 7, BAS-3DT 0046505.)

80. Chris Phillips testified the RACA often had to be "very significantly complete" before a project exited the concept phase. (Ex. 7, Phillips Dep. Tr. 26:6-10; 27:1-9, 34:9-13).

81. The regulatory team did not want to close the concept phase of the Penske project until a regulatory strategy was settled, and management had not approved the regulatory strategy as of October 2015. (Ex. 5, Misener Dep. Tr. 155:18-20; Ex. 7, Phillips Dep. Tr. 110:21-111:5.) [redacted] (Ex. 7, Phillips Dep. Tr. 110:21-111:5.) From September 10, 2015 to January 25, 2016 and beyond, Chris Phillips had "fairly regular weekly meetings" and the "topic of Penske was discussed with some regularity." Phillips does not know the number of meetings, "but the topic of Penske and, how to close up the concept review, and how [to] get to a point where [redacted] was an ongoing discussion." (Id. at Phillips Dep. Tr. 101:1-8.)

82. All of the Penske cross-functional team members, except for Chris Phillips, signed the Concept Design Review Meeting Minutes in October 2015. (Ex. 8, Zentgraf Dep. Ex. 2.)

83. The December 2015 Monthly Marketing Report stated that the projected timeline for the submission of a 510(k) application for Penske was Quarter 3 of 2017, and the projected launch of a [redacted] incorporating Penske was Quarter 1 2018. (Ex. 6, Decheek Dep. Ex. 11.)

84. Zach Davis testified that after January 25, 2016 "our concept design review, and those meeting minutes, which I was responsible for procuring all the signatures and getting all the approval from the cross-functional team members, including management board, it was my job at

that time to close that out and get that -- get that all signed out."[3] … This is the only work that Zach Davis can recall after January 25, 2016. (Ex. 9, Davis Dep. Tr. 18:2-20:21.)

85. Anthony Misener testified that from March 1, 2016 to September 1, 2016, "I know the investigation continued on the animal study results, and I know we were looking at the solutions that we had talked about previously. I know we finalized -- well, I don't know if we finalized before September, but we certainly pushed the regulatory piece to conclusion, the regulatory strategy to conclusion. So I mean at least items like that were certainly moving forward. It was definitely slowly compared to what I'm used to, yes. I mean compared to what I'm used to when I can dedicate a full team to it." (Ex. 5, Misener Dep. Tr. 276:21-277:16.)

86. On March 11, 2016, Anthony Misener asked Kerrie Hamblin and Chris Phillips via email "if we could push to close out the Penske Concept Design Review Meeting Minutes. It has been on hold pending an RSD per your request. At this stage we will be asking the reviewers to sign on a document that they looked at last on September 1st, more than 6 months ago. I know we are close, but given Penske's low priority I don't see it getting done soon. Can we move this forward?" (Ex. 7, Phillips Dep. Ex. 17.)

87. On April 26, 2016, Ashley Krogh, a Senior Financial Analyst at Bard, emailed Anthony Misener copying Daniel Read, asking, "Can you please update us on the Penske PICC project? Will you be submitting an AFE for this[?] If so when do you project you will spend on this? Let us know if this project is cancelled or pushed out to 2017." On April 26, 2016, Anthony

[3] Zach Davis explained the process for finalizing the Concept Design Meeting Minutes as follows: "How meeting minutes work for a design review, all of the cross functions attend and they all give us actions, things that they're concerned about. There were multiple actions that came out of the concept review that we did, and then as the R&D lead, it's my job to satisfy all of those actions and bring all -- evidence or whatever the -- the person that made the request, to bring the information to them to mitigate their concerns and gain their signature." (Ex. 9, Davis Dep. Tr. 20:22-21:7.)

Misener responded, "[t]his project has been pushed out to 2017." (Ex. 5, Misener Dep. Ex. 2, BAS-3DT 0056218.)

## X. Non-Disclosure Agreement

88. On May 6, 2016, Anthony Misener emailed Dr. Kassab a draft of a nondisclosure agreement. (Ex. 4, Kassab Dep. Ex. 6.)

89. On May 12, 2016, 3DT's counsel provided comments on the proposed nondisclosure agreement to Anthony Misner. On May 17, 2016, 3DT's counsel followed up on her comments and, on May 20, 2016, Anthony Misener said he would review and get back with her. (Ex. 13, 3DT Prod. 0000101-0000103.)

90. On August 5, 2016, Anthony Misener emailed a revised draft of the NDA to Dr. Kassab based upon the comments from 3DT's counsel. Anthony Misener apologized for being "completely side-tracked by other priorities." (Ex. 14, BAS-3DT 0034929.)

91. On August 8, 2016, 3DT provided minor comments, and Anthony Misener responded that same day, stating, "[i]f Ghassan is ready to sign, then would you send me a scan of the signed complete document and I will get the fully executed document back to the two of you." (Ex. 14, BAS-3DT 0034928-0034929.)

92. On August 19, 2016, Anthony Misener followed up with Dr. Kassab via email saying, "Just checking in. Let me know if you are the [sic] ok with this latest version of the NDA." (Ex. 14, BAS-3DT 0034929.) Dr. Kassab executed the NDA that day. (Id. at BAS-3DT 0034929.)

93. On August 23, 2016, Anthony Misener emailed Dr. Kassab the fully executed NDA. (Ex. 14, BAS-3DT 0034928.)

## XI. Penske Activities After the August 2016 Anniversary of the Parties' Agreement

94. The third anniversary of the parties' Agreement was August 29, 2016.

95. On September 15, 2016, Anthony Misener sent an email to a colleague, Luke Tedesco, copying Shayne Messerly and Tony Decheek, "updat[ing] the Penske schedule to reflect my best estimate to reality. This project has been put on life support ever since Nautilus Delta came into the picture (even before DD was done)." In that same email, Anthony Misener further noted, [redacted] As such, Concept starts forever ago, but we will not really be working on Penske as a team until Q3 next year. At that point we will continue the Concept Phase from where the team left off." (Ex. 5, Misener Dep. Ex. 7.) Anthony Misener testified that "saying the project has been put on life support" means "that there's been a delay. That my resources have been – you know, have been diverted in part due to another project, which happens all the time." (Ex. 5, Misener Dep. Tr. 261:19-262:4.)

96. On September 19, 2016, Dr. Kassab emailed Anthony Misener asking "[s]hould we chat to outline next steps per earlier email?" (Ex. 4, Kassab Dep. Ex. 7.)

97. On September 30, 2016, Anthony Misener responded to Dr. Kassab stating: "I am working with my team to try to bring together some information from our past work to provide context to our questions. We are having a meeting next week to bring everything together and distill it down to the key issues. I can tell you that one thing that I would like to better understand is the lower level theory behind the experimental set -up and the assumptions made to simplify the approach." (Ex. 4, Kassab Dep. Ex. 7.)

98. The regulatory team signed off on the Concept Design Review Meeting Minutes in November 2016. (Ex. 8, Zentgraf Dep. Ex. 2.)

99. The final signature on the Concept Design Review Minutes was obtained on December 8, 2016. (Ex. 8, Zentgraf Dep. Ex. 2)

100. Anthony Misener testified that "at that time we pushed pause on this one, you know sometime after the concept review was completed. But it's something that we, yeah, still see great advantages in." (Ex. 5, Misener Dep. Tr. 161:2-5.) In this context, pushing pause after the concept review was completed meant "that that phase gate at least offers a point of reference for when teams come back to pick things up and move forward, it makes it easier to pick up and move forward. So that's a good practice in terms of, you know, being able to take things forward. So you know you have a document that kind of points you to where everything is so that you can, you know, pick up where you've paused and keep moving." (Ex. 5, Misener Dep. Tr. 161:6-16.)

101. Bard has never determined that a Bard product incorporating the Precisive Navigation Technology could never be brought to market and hopes to bring such a product to market in the future. (Ex. 5, Misener Dep. Tr. 162:14-21; Ex. 6, Decheek Dep. Tr. 105:3-8; Ex. 7, Phillips Dep. Tr. 106:3-7.)

## XII. The Parties' Letters

102. On December 6, 2016, 3DT sent a letter to Bard's President, John P. Groetelaars, inquiring about the status of the project and requesting that Mr. Groetelaars "please identify what financial resources have been spent over the past three years and which personnel have been dedicated" to the development of the Precisive Navigation Technology. (Ex. 15, December 6, 2016 3DT Letter.)

103. On December 20, 2016, Rob Fredericks, Vice President & General Manager at Bard, responded by letter stating, among other things, "While I am not aware of any obligation under the August 29, 2013 transaction agreements to report Bard's progress to 3DT regarding the development of the Precisive Navigation Technology, I do appreciate the spirit of your request for information. As such, we will identify the financial and personnel resources expended by Bard to

develop the Precisive Navigation Technology and send that information to you at a later date, as you requested." The letter further stated, "Bard is currently focusing its attention on the development of an alternative, superior technology." (Ex. 16, December 20, 2016 Bard Letter.)

104. In the December 20, 2016 letter Mr. Fredericks wrote, "We very much appreciate that you chose Bard to commercialize the Precisive Navigation Technology and like you are disappointed, as our up-front investment to purchase this technology significantly [redacted] exceeds the potential milestone. Bard has had much more at stake from the outset, not to mention the appreciable financial and other resources we have spent in our development efforts over the last few years. Please expect to receive additional correspondence from us, as noted above." (Ex. 16, December 20, 2016 Bard Letter.)

105. In a February 21, 2017 letter, Bard wrote that it prepared "a brief overview of the resources expended by it in connection with the development of the Precisive Navigation Technology for use in the below-listed applications" and noted "[t]his summary is not all-inclusive, and figures and dates in this overview are approximations[.]" (Ex. 5, Misener Dep. Ex. 8 at 1.) Fredericks wrote in the letter that Bard conducted integration meetings, established a development team with representatives from various departments, conducted more than 100 one-on-one interviews with clinicians and evaluated more than 650 market research surveys, formulated design inputs and requirements based on the marketing inputs, established relationships with key vendors, researched numerous potential predicate devices, conducted 13 animal studies, and incurred significant expenses in the form of [redacted] gross wages for full-time R&D team members and [redacted] in out of pocket expenses that do not include the wages for personnel working on the project. (*Id*. at 2-4.)

106. With respect to the alleged alternative, superior technology, Rob Fredericks wrote

that [redacted] Importantly, we expect this technology will be backwards compatible with our customer's current Bard product solution, and, compared to the Precisive Navigation Technology, it will be simpler to use, will not require new or additional capital and will likely be delivered at a lower cost." (Ex. 5, Misener Dep. Ex. 8 at 4.)

107. On May 10, 2017, 3DT's counsel wrote to Bard claiming that Bard "has not provided any … notice of discontinuation [pursuant to Section 2.04(b) of the Purchase Agreement]; however, based on correspondence solicited by 3DT from Bard, it appears that Bard admits it has stopped supporting the Precisive Navigation Technology. It is unclear when this decision was made." (Ex. 17, May 10, 2017 3DT Letter.) The letter further requests that Bard confirm by May 19, 2017 that it "(i) will honor its obligations under the [Purchase Agreement] and [Development Agreement] by paying, within thirty (30) days of this letter, the Full Milestone Payment in consideration of its decision to discontinue support of the Precisive Navigation Technology or (ii) will provide, in accordance with Section 6.02 of the [Purchase Agreement] and Section 12.10 of the [Development Agreement], information necessary to ascertain the basis for Bard's assertion that it has identified a technology that is superior to the Precisive Navigation Technology." (*Id.*)

108. Bard responded on May 19, 2017, by stating the following to 3DT in a letter: "Bard has honored and will continue to honor its obligations to 3DT under the referenced agreements. At this time, the Full Milestone Payment to which you refer under the [Purchase Agreement] is not due and owing, for reasons we have explained in our prior correspondence with 3DT. Lastly, Bard is not obligated to provide any internal data or business information, confidential or otherwise, to you or 3DT as you request." (Ex. 18, May 19, 2017 Bard Letter.)

/s/ Daniel J. Gibson
Daniel J. Gibson
Michael T. McNally
DELK McNALLY LLP
mcnally@delkmcnally.com
delk@delkmcnally.com
211 S. Walnut Street
Muncie, IN 47304

/s/ Natalie H. Mantell
Natalie H. Mantell
Meghan McSkimming
McCARTER & ENGLISH, LLP
nmantell@mccarter.com
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

Dated: March 10, 2021