**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| 3DT HOLDINGS LLC,<br><br>Plaintiff,<br><br>v.<br><br>BARD ACCESS SYSTEMS, INC.,<br><br>Defendant. | ) | Case No. 1:17-cv-05463-LJL |

**MEMORANDUM OF LAW IN SUPPORT OF**
**BARD ACCESS SYSTEMS, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

FACTUAL BACKGROUND ..... 3

I. Bard's August 2013 Acquisition of the Precisive Navigation Technology ..... 3

II. Governing Agreements ..... 5

A. Financial Terms ..... 5

B. Development Agreement and Bard's Release from Obligations ..... 6

C. Governing Law and Forum ..... 8

III. The Penske Project Team ..... 8

IV. Penske's Initial Stages ..... 10

V. The FDA Regulatory Process – Background on 510(k) Clearance ..... 12

VI. Developing a Next Generational Technology – Specific Development Efforts ..... 13

A. Animal Studies ..... 14

B. Bench Models ..... 15

C. Third-Party Vendors ..... 16

D. Prioritization of the [redacted] ..... 16

E. Identifying a Predicate Device for the FDA 510(k) Submission ..... 17

F. Penske Marketing / Commercialization Efforts – Clinician Usability Research ..... 20

VII. Modus II (2013-present) ..... 22

A. Technology and Timing ..... 22

B. Comparison of Modus II and Penske ..... 23

VIII. Ambergris (2015-2016) ..... 25

IX. Penske Concept Phase Continues ..... 26

X. Non-Disclosure Agreement ..... 31

XI. Penske Activities After the August 2016 Anniversary of the Parties' Agreement ........... 31

XII. The Parties' Letters ........................................ 33

LEGAL STANDARD ........................................ 36

ARGUMENT ........................................ 37

I. THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN BARD'S FAVOR BECAUSE BARD FULFILLED ITS OBLIGATIONS UNDER THE GOVERNING AGREEMENTS AS A MATTER OF LAW ........................................ 37

A. The Contractual Standard for Commercially Reasonable Development Efforts is Highly Deferential to Bard, Guided by Good Faith and Reasonable Business Judgment, Which Bard Satisfied as a Matter of Law .......... 38

B. Bard Provided Commercially Reasonable Personnel, Financial, and Other Support to Develop the Precisive Navigation Technology, as Determined by Bard, in Good Faith, Based Upon its Reasonable Business Judgment, For More than Three Years ........................................ 43

C. After the Third Anniversary and in Accord with the Development Agreement, Bard Exercised Its Good Faith Business Judgment to Focus on a Superior Technology. ........................................ 51

D. Bard Does Not Owe 3DT the Full Milestone Payment Because 510(k) Clearance Has Not Been Achieved ........................................ 53

E. Bard Does Not Owe 3DT the Full Milestone Payment Because the At-Will Discontinuance Provision Does Not Apply On These Facts ........................................ 54

II. BARD IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ........................................ 54

A. The Claim is Duplicative of its Breach of Contract Claim ........................................ 54

B. 3DT Impermissibly Seeks to Create New Contractual Rights and Contradict the Express Language of the Agreement ........................................ 55

CONCLUSION ........................................ 57



ME1 36118866v.5

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**


*Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*,
No. 03 Civ. 8259 (CSH), 2007 WL 1988150 (S.D.N.Y. July 9, 2007) ....................41

*Bryant v. Maffucci*,
923 F.2d 979 (2d Cir. 1991) ....................36

*Champagne v. United States*,
15 F. Supp. 3d 210 (N.D.N.Y. 2014) ....................54, 55

*Clalit Health Servs. v. Israel Humanitarian Found.*,
395 F. Supp. 2d 21 (S.D.N.Y. 2005) ....................56

*D'Amico v. City of New York*,
132 F.3d 145 (2d Cir. 1998) ....................36

*Fischer & Mandell LLP v. Citibank, N.A.*,
632 F.3d 793 (2d Cir. 2011) ....................37

*Holland Loader Co., LLC v. FLSmidth A/S*,
313 F. Supp. 3d 447 (S.D.N.Y. 2018) ....................39, 40, 47

*In Touch Concepts, Inc. v. Cellco P'ship*,
949 F. Supp. 2d 447 (S.D.N.Y. 2013) ....................55

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*,
655 F.3d 136 (2d Cir. 2011) ....................40

*Leigh Co. v. Bank of N.Y.*,
617 F. Supp. 147 (S.D.N.Y. 1985) ....................39

*M/A-COM Sec. Corp. v. Galesi*,
904 F.2d 134 (2d Cir. 1990) ....................40

*Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ....................36

*Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*,
No. 08 Civ. 4341 (RJS), 2009 WL 1054830 (S.D.N.Y. Apr. 17, 2009) ....................57

*Sekisui Am. Corp. v. Hart*,
15 F. Supp. 3d 359 (S.D.N.Y. 2014) ....................39, 45

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
441 F. Supp. 3d 1 (S.D.N.Y. 2020) ....................39, 41

**State Cases**

*Fesseha v. TD Waterhouse Inv. Servs., Inc.*,
761 N.Y.S.2d 22 (1st Dep't 2003) ....................55

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
87 A.D.3d 287 (1st Dep't 2011) ....................54, 55

*ProSource Tech., LLC v. Housing Trust Fund Corp.*,
No. 5972-14, 2015 WL 5797028 (N.Y. Sup. Ct. Albany Cty. Oct. 2, 2015) ....................40, 42, 47

*Slamow v. Delcol*,
584 N.Y.S.2d 424 (N.Y. 1992) ....................40

**Federal Statutes**

21 U.S.C. §§ 630(k), 360(n), 360c(f) (1) & 360c(i) (1) (A) ....................47

**Rules**

Fed. R. Civ. P. 56 ....................36

**Regulations**

21 C.F.R. § 807.92(a) (3) ....................47

**PRELIMINARY STATEMENT**

This action arises out of the sale of a technology intended to allow clinicians to locate the [redacted] Bard Access Systems, Inc. ("Bard"), a major medical device developer and manufacturer, purchased this technology, called the Precisive Navigation Technology (or Penske, its internal project name), from 3DT Holdings, LLC ("3DT") in 2013, with the hopes of incorporating it into a product that Bard could commercialize after securing Food and Drug Administration ("FDA") clearance. Indeed, Bard was eager to acquire this "next generational" and early stage technology, as reflected in its approximately [redacted] upfront payment to 3DT for the assets, beating out other potential purchasers in the process. What is more, upon Bard's receipt of an FDA 510(k) clearance for a product incorporating the Precisive Navigation Technology, Bard agreed to pay 3DT the Full Milestone Payment of an additional [redacted].

It is no surprise that Bard's bargained-for Development Agreement vested Bard with significant discretion to staff and support the project consistent with its own normal business practices, given the significant consideration Bard provided to close the deal and Bard's expertise as a major player in device development and commercialization—expertise 3DT does not have. In relevant part, the Development Agreement required that Bard provide "commercially reasonable personnel, financial, and other support to develop the Precisive Navigation Technology, <u>as determined by Bard, in good faith, based upon its reasonable business judgment</u>." "Commercially reasonable" performance under New York law is a low threshold, even in cases where the contract language does not provide a party with similar flexibility. Bard amply exceeded this standard by, among other things, quickly assembling a cross-functional team, hiring new engineers who worked on the project, [redacted], conducting numerous animal studies, endeavoring to develop bench models, conducting marketing and

usability research studies, and, critically, investing significant time and effort to determine a sound regulatory pathway to FDA clearance to allow Bard to market the device. The regulatory pathway [redacted] which is necessary to obtain FDA 510(k) clearance for a device like this. Unfortunately, as the project pushed forward, the technology simply did not function as Bard had hoped. At every turn, project team members encountered problems and roadblocks in development.

Despite these challenges, Bard performed work for three years after the date on which the deal documents were executed, *i.e.*, August 29, 2016, and continued to work on the Penske project after that date. As is typical at Bard, the pace of development ebbed and flowed. Logically, as Bard is in the business of developing, manufacturing and commercializing medical devices, it has multiple projects in its pipeline at all times and prioritizes each based on Bard's evolving business strategy. The same was true during this three-year period. 3DT's principal, Dr. Kassab, also acknowledged that product development is not a linear process. Moreover, Bard's allocation of resources among several ongoing projects was consistent with its contractual obligations, which incorporate significant discretion on Bard's part to determine the appropriate level of support, to be guided only by good faith and reasonable business judgment. A technology called Modus II, which had a similar function to the Precisive Navigation Technology and could be used with many of the same patient populations, was under development at the same time. Modus II was primarily [redacted]. Therefore, among other advantages, Modus II emerged as a technology that was closer to market realization. Indeed, the Development Agreement expressly provides for a scenario where, after the three-year anniversary, Bard can focus on the creation, development and/or commercial availability of superior technology. In light of the development

of Modus II and its advantages, Bard exercised its rights under this provision, which eliminated the need for the milestone payment unless and until Bard obtains 510(k) clearance from the FDA to market the device incorporating the 3DT technology.

The undisputed material facts demonstrate that Bard's conduct conformed with its contractual obligations, and 3DT's claims for breach of contract and the implied covenant of good faith and fair dealing fail as a matter of law. If anyone was (and is) highly incentivized to develop the technology, it was Bard. To date, Bard has not yet been able to obtain any return on its [redacted] investment. That is why Bard remains hopeful that a product incorporating the Precisive Navigation Technology may be brought to market at some point in the future.

## FACTUAL BACKGROUND

### I. Bard's August 2013 Acquisition of the Precisive Navigation Technology

[redacted] ("Precisive Navigation Technology"). (Joint 56.1 Statement ("Joint SUMF") ¶ 3 (ECF No. 73), App. Ex. 1, Purchase Agreement Recitals (ECF No. 73-1).) In early 2013, 3DT first considered selling or licensing the Precisive Navigation Technology for purposes of further development, regulatory approval and sale. (Joint SUMF ¶ 4, App. Ex.[1] 4, Kassab Dep. Tr. 24:1-14, 37:1-13, 51:6-8 (ECF No. 73-4); *see also* App. Ex. 2, Development Agreement Section 2.1 (ECF No. 73-2).) 3DT primarily vetted four potential buyers, including Bard, interested in acquiring the Precisive Navigation Technology. (Joint SUMF ¶ 5, App. Ex. 4, Kassab Dep. Tr. 51:20-52:6.)

Ultimately, 3DT chose to sell the Precisive Navigation Technology to Bard due to (i) Bard's commitment to getting the technology to the clinic; (ii) "what [Bard] was willing to commit to it in terms of resources," meaning how much Bard was willing to pay for and devote to

[1] Exhibits to the Joint Appendix of Exhibits in Support of Joint Rule 56.1 Statement of Facts are cited herein as "App. Ex.".

the project (Joint SUMF ¶ 6, App. Ex. 4, Kassab Dep. Tr. 59:22-60:5), (iii) Bard's expertise in navigation and tip location (*id.* at Kassab Dep. Tr. 60:23-61:1), and (iv) Bard's offer of a [redacted] upfront payment plus a potential [redacted] milestone payment, in contrast with another potential buyer's offer that did not front-load payment to 3DT (*id.* at Kassab Dep. Tr. 61:2-21).

Bard's financial commitment was both significant and immediate: the financial terms under which Bard purchased the Precisive Navigation Technology from 3DT front loaded approximately 85% of potential total payment to 3DT, with approximately [redacted] at the Closing. (Bard Local Rule 56.1 Statement ("Bard SUMF") ¶ 3, Joint SUMF ¶¶ 9-10, App. Ex. 1, Purchase Agreement, Section 2.04.) This upfront payment was a motivating factor in 3DT's selection of Bard as the winning bidder, even over another bidder whose potential total deal value was tens of millions of dollars greater than Bard's offer. Dr. Kassab, 3DT's sole member (Joint SUMF ¶ 1, App. Ex. 4, Kassab Dep. Tr. 7:25, ECF. No. 46-1, ¶¶ 3-4), stated that the package of another potential buyer, Teleflex, "was significantly larger than Bard, but Bard had more front than Teleflex did. … They [Teleflex] offered up to [redacted] plus a royalty stream, but they had broken that into tranches, you know, milestone payments, you know, five here, ten here, et cetera." (Bard SUMF ¶ 4, App. Ex. 4, Kassab Dep. Tr. 61:2-14.) Another buyer was interested in licensing the Precisive Navigation Technology; however, 3DT chose to sell the Precisive Navigation Technology outright to Bard. (Bard SUMF ¶ 5, App. Ex. 4, Kassab Dep. Tr. 60:6-9; *see also generally* Joint SUMF ¶ 7, App. Ex. 1, 2, 3.) However, he recognized that "Bard was extremely interested in getting the technology and making sure that -- you know, that they were the ones that acquired it" and Bard "suddenly in the eleventh hour" offered a [redacted] upfront payment with [redacted] "in the back." (Bard SUMF ¶ 4, App. Ex. 4, Kassab Dep. Tr. 61:16-20.) Dr. Kassab stated this deal structure "also weighed in on our decision." (Bard SUMF ¶ 4, App. Ex. 4, Kassab Dep. Tr. 61:20-21.)

This upfront payment proved particularly useful to 3DT to fund its operations. As of January 30, 2020, 3DT was not making any money and according to Dr. Kassab, had "been in the red for the past five or six years." (Bard SUMF ¶ 1, attached to the Declaration of Natalie H. Mantell, Esq., ("Mantell Decl.") as Ex. A, Kassab Dep. Tr. 22:21-23.) 3DT had been applying for research grants and using the money it received from Bard during the acquisition of the Precisive Navigation Technology to fund operations. (*Id*. at Kassab Dep. Tr. 22:21-23:17.) And, as of that same date, none of the technologies that 3DT has licensed or sold had ever been incorporated into a commercialized product. (Bard SUMF ¶ 2, Mantell Decl., Ex. A, Kassab Dep. Tr. 34:3-9.)

## II. Governing Agreements

On August 29, 2013, 3DT and Bard executed various agreements to formalize Bard's acquisition of the Precisive Navigation Technology, including ancillary documents memorializing 3DT's transfer of all intellectual property rights related to the Precisive Navigation Technology to Bard, and the following: (1) Asset Purchase Agreement ("Purchase Agreement") (Joint SUMF ¶ 7, App. Ex. 1); (2) Design, Development and Services Agreement ("Development Agreement") (*id*., App. Ex. 2); and (3) Statement of Work (*id*., App. Ex. 3 (ECF No. 73-3)). Indeed, the Purchase Agreement provided that Bard "shall purchase, assume and acquire from [3DT] all right, title and interest of [3DT] in and to" the Precisive Navigation Technology. (Joint SUMF ¶ 8, App. Ex. 1, Purchase Agreement, Section 2.01; *see also id*. ¶ 12, App. Ex. 1, Purchase Agreement, Section 4.05 ("Buyer will be the lawful owner of, and have good, valid and marketable title to, the Acquired Assets, free and clear of all Encumbrances[.]").

### A. Financial Terms

Bard acquired 3DT's right, title and interest in the Precisive Navigation Technology, free and clear of all encumbrances. (Joint SUMF ¶¶ 8, 12, App. Ex. 1, Purchase Agreement, Section 2.01, Section 4.05.) As for financial compensation, the Purchase Agreement memorialized Bard's

significant monetary commitment, providing for a potential total Purchase Price of [redacted] to be paid by Bard to 3DT, with [redacted] (less the amount of Standstill Payments previously paid) to be paid at the Closing. (Joint SUMF ¶ 9, App. Ex. 1, Purchase Agreement Section 2.04.) The Purchase Agreement also provided for a potential future payment, called the "Full Milestone Payment" – an additional [redacted] "upon receipt by [Bard] or its designee, assignee or transferee of its first 510(k) clearance from the FDA to market and sell a medical device that incorporates the Precisive Navigation Technology in the Buyer Field[.]"[2] (Joint SUMF ¶ 10, App. Ex. 1, Purchase Agreement Section 2.04(b).)

### B. Development Agreement and Bard's Release from Obligations

***Development Agreement***. The Development Agreement sets forth the agreement of the parties with respect to "the design, development validation and testing of one or more new Bard products in the Buyer Field that utilizes, incorporates, and/or employs the Precisive Navigation Technology." (Joint SUMF ¶ 13, App. Ex. 2, Development Agreement Preamble.) The Development Agreement explicitly acknowledged Bard's "interest in designing, developing, validating, testing and commercializing a possible Bard Product using the Precisive Navigation Technology." (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.)

Bard agreed to develop the Precisive Navigation Technology by "**provid[ing] commercially reasonable** personnel, financial and other support (**as determined by Bard, in good faith, based upon its reasonable business judgment**) with regard to the development of a

[2] Section 1.01 of the Purchase Agreement defines [redacted] as follows: [redacted]

(Joint SUMF ¶ 10 n.2, App. Ex. 1, Purchase Agreement Section 1.01.)

Bard Product incorporating the Precisive Navigation Technology. (*Id.* (emphasis added); *see also* App. Ex. 1, Purchase Agreement Section 2.04(b) ("[Bard] shall be obligated to support the development of the Precisive Navigation Technology as and to the extent contemplated by the Development Agreement.")

***Release from Development Agreement – Full Milestone Payment Not Required.*** In certain circumstances, Bard is relieved from development of the technology set forth above without any payment to 3DT. Section 2.1 of the Development Agreement provides:

> Notwithstanding the foregoing, following the third (3rd) anniversary of the Effective Date, **if Bard determines, in good faith, based upon its reasonable business judgment**, that the Exploitation of a Bard Product incorporating the Precisive Navigation Technology is **no longer commercially practicable due to** (i) technological failure(s) of the Bard Product to perform to Bard-required specifications [redacted], (ii) clinical failures, (iii) ineligibility for a 510(k) premarket notification application, or **(iv) the creation, development and/or commercial availability of superior technology, then Bard shall have no obligation to continue to support the development of a Bard Product incorporating the Precisive Navigation Technology** or seek the 510(k) clearance or CE Mark, as contemplated by Section 2.04(b) of the Purchase Agreement. **For clarity, the Parties understand and agree that, following any such discontinuance of support by Bard, Bard shall have no obligation to pay the Full Milestone Payment (or any one-half portion thereof), unless, notwithstanding such discontinuance, Bard subsequently obtains the 510(k) clearance** and/or the CE Mark trigging either the Full Milestone Payment (or any one-half portion thereof), as contemplated by Section 2.04(b) of the Purchase Agreement.

(Joint SUMF ¶ 14, App. Ex. 2, Development Agreement, Section 2.1.) Thus, the Development Agreement *explicitly contemplates* a situation where, after the third anniversary of the Effective Date of the Development Agreement, *i.e.*, August 29, 2016, Bard, in good faith based upon its reasonable business judgment, can cease development without payment of the Full Milestone

Payment to 3DT *and* Bard can later develop the Precisive Navigation Technology and obtain the 510(k) clearance, trigging payment of the Full Milestone Payment.

***Release from Development Obligations – Full Milestone Payment Required.*** Alternatively, Bard can be relieved of its development obligations under the Development Agreement at any time; however, payment of the Full Milestone Payment would be owed to 3DT. Bard can

> elect, at any time and for any reason, to not continue to support the development of the Precisive Navigation Technology as and to the extent contemplated under the Development Agreement, without violation of the Development Agreement, if it provides at least thirty (30) days prior written notice thereof to [3DT] ("Notice of Discontinued Support") and pays to [3DT], not later than forth-five [sic] (45) days following the date of such Notice of Discontinued Support, the Full Milestone Payment.

(Joint SUMF ¶ 11, App. Ex. 1, Purchase Agreement Section 2.04(b).) 3DT alleges that Bard breached this provision and payment is owed to 3DT (*see, e.g.*, Compl. ¶¶ 15, 22, 27, 33, ECF No. 1), but as demonstrated herein, the provision is not applicable here.

### C. Governing Law and Forum

Section 12.11 of the Development Agreement provides:

> 12.11 Governing Law and Venue. This Agreement will be construed in accordance with and governed by the laws of the State of New York. Any actions brought under this Agreement will be subject to the jurisdiction of the federal and state courts located in the State of New York, County of New York, or any federal court of competent jurisdiction in the Southern District of New York.

(Bard SUMF ¶ 11, App. Ex. 2, Development Agreement, Section 12.11).

## III. The Penske Project Team

Bard used the name "Penske" internally to refer to the Precisive Navigation Technology and the team dedicated to its development. (Joint SUMF ¶ 20, App. Ex. 5, Misener Dep. Tr. 43:21-44:7.) Bard assembled a cross-functional team to drive development efforts.

- At the helm was project leader Anthony Misener, the Research and Development Program Manager for the tip location and central ultrasound side of the Vascular Access Technologies Platform, who has been a program manager for the tip location side of the platform since approximately 2010. (Joint SUMF ¶ 21, App. Ex. 5, Misener Dep. Tr. 10:8-11:2; 47:11-15.) Mr. Misener has an engineering background, and Bard initially hired him as a Senior Engineer. (*Id*. at Misener Dep. Tr. 11:15-12:23.)
- Anthony Decheek was then a product manager in marketing with six years of prior experience as a contracts manager. Mr. Decheek holds an undergraduate degree in mechanical engineering and a Master's in Business Administration, and currently serves as Senior Marketing Manager at Bard. (Joint SUMF ¶ 23, App. Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5) Mr. Decheek was assigned to other projects in addition to Penske, which he said felt "pretty standard." (*Id*. at Decheek Dep. Tr. 20:12-23.)
- Chris Phillips, then a Regulatory Specialist II, was added to the team, having eight years of prior experience in the regulatory and quality fields. Mr. Phillips holds an undergraduate degree in biotechnology business management, a Master's degree in Health Sciences, focusing on regulatory affairs, and a Regulatory Affairs Certification and a Medical Device Auditor Certification through two industry groups. Currently, Mr. Phillips serves as a Senior Manager of Regulatory Affairs at Bard. (Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15) Mr. Phillips was assigned to four or five other projects in addition to Penske, which he stated was "our target." (Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 38:17-22.)
- In 2013, Bard hired two full-time engineers, Zach Davis and Brian Cieselwicz, who worked on the project. (Joint SUMF ¶ 22, App. Ex. 5, Misener Dep. Tr. 80:21-81:15.) Zach Davis is an R&D engineer with a background in electromagnetics and prior

experience at Bard as a Quality Engineer. Penske was his first engineering medical device development project. (Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22). Brian Cieselwicz was an R&D Engineer who has since left employment at Bard. (Joint SUMF ¶ 23, App. Ex. 5, Misener Dep. Tr. 81:7-15; 104:7-8.)

- Brad Zentgraf is an R&D engineer who was assigned to Penske in 2015, and had prior experience working on catheter products at Bard. Mr. Zentgraf holds undergraduate and Master's degrees in Bioengineering, and currently serves as Senior R&D Engineer at Bard. (Joint SUMF ¶ 23, App. Ex. 8, Zentgraf Dep. Tr. 7:8-16; 8:4-5, 23-24; 10:22-25, 14:11-16.)

"[T]he team members changed at various stages during the project based on other needs. … [For example, Anthony Misener knew they] had other members from some of [the] catheter groups as well. But they changed as well at various stages depending on business and other project needs." (Bard SUMF ¶ 12, Mantell Decl., Ex. C, Misener Dep. Tr. at 51:16-25.)

## IV. Penske's Initial Stages

The "entire team" tried to meet once per week. (Joint SUMF ¶ 24, App. Ex. 5, Misener Dep. Tr. 79:2-4.) Tony Decheek testified that the Penske integration meetings would occur "[m]aybe weekly." (Joint SUMF ¶ 24, App. Ex. 6, Decheek Dep. Tr. 27:12-18.) Mr. Misener was trying to keep the minutes for Penske cross-functional team meetings, and "for a lot of the full team meetings, … certainly generated minutes." (Joint SUMF ¶ 25, App. Ex. 5, Misener Dep. Tr. 79:20-23.)

When the team was established and the project scope was more defined, Mr. Misener was given a "tentative timetable" "because that's required as part of the due diligence" at Bard. (Joint SUMF ¶ 26, App. Ex. 5, Misener Dep. Tr. 89:16-22.) He explained that "it's expected that the team will try to better refine that timetable as we delve further into the project." (*Id*. at Misener

Dep. Tr. 89:22-24.) According to Mr. Misener, "the due diligence timeline is typically pretty loose in that they understand it's going to take longer than you understand. It's just the due diligence phase," but the timeline at that time was three (3) to three and a half (3 ½) years for the commercialization of a device incorporating the Precisive Navigation Technology. (*Id*. at Misener Dep. Tr. 89:25-90:8.) Dr. Kassab predicted a similar timeline of three years to develop and commercialize the technology, but his belief was founded on specific assumptions that: (A) the technology would get 510(k) clearance (explained below) and (B) [redacted]. (Bard SUMF ¶ 10, Mantell Decl., Ex. A, Kassab Dep. Tr. 80:16-81:7.)

The Bard Penske team's directive was to develop a Bard product incorporating the Precisive Navigation Technology, which was a "next generational" technology. (Joint SUMF ¶ 27, App. Ex. 5, Misener Dep. Tr. 43:5-20; 52:22-53:11; App. Ex. 7, Phillips Dep. Tr. 128:21-129:11.) At the time of the acquisition, and as reflected in the SOW, the parties contemplated a [redacted] for the Penske technology. (Joint SUMF ¶¶ 18-19, App. Ex. 3, Statement of Work Sections 1. General Description, 2. Deliverable/Task/Responsible Parties and 2.1. Deliverables/Tasks; Joint SUMF ¶ 28, App. Ex. 5, Misener Dep. Tr. 57:13-21; 58:22-25.) The potential application of the [redacted] (*id*. at Misener Dep. Tr. 57:13-21) and the potential applications of the [redacted] (Joint SUMF ¶ 29, App. Ex. 5, Misener Dep. Tr. 58:22-25.)

Bard's R&D group's design control process typically begins with the concept phase, followed by feasibility, qualification, and launch, and sometimes a 510(k) phase in between feasibility and launch. (Joint SUMF ¶ 35, App. Ex. 5, Misener Dep. Tr. 19:1-5, 17-24.) Penske Integration Meeting minutes dated January 7, 2015 state that the concept phase was planned to be

completed by July 2015. The 510(k) submission was planned to be completed by May 2017 with a product launch projected for May 2018. (Joint SUMF ¶ 36, App. Ex. 10, BAS 3DT 0021225.)

## V. The FDA Regulatory Process – Background on 510(k) Clearance

To obtain the FDA's permission to market a medical device incorporating the Penske technology pursuant to section 510(k) of the Food, Drug and Cosmetic Act, Bard had to submit testing and other documentation to the FDA demonstrating that device "to be substantially equivalent to an existing product that has been approved or cleared by the FDA[.]" (Joint SUMF ¶ 30, App. Ex. 7, Phillips Dep. Tr. 23:23-24:2, 24:11-12.) "Clearance [through the FDA's 510(k) process] means that the device is seen in the FDA's eyes to be equivalent to something else, to a predicate model that exists" on the market. (Joint SUMF ¶ 31, App. Ex. 7, Phillips Dep. Tr. 30:9-21.) As a part of this process, Bard "review[s] potential predicates in greater detail, to review the different challenges associated with the device to understand the technology on a more intimate level, and to figure out what the different challenges are going to be as we approach a regulatory body." (Joint SUMF ¶ 32, App. Ex. 7, Phillips Dep. Tr. 23:8-13.) These efforts culminate in "a regulatory submission [to] get … through an approval or clearance." (Joint SUMF ¶ 33, App. Ex. 7, Phillips Dep. Tr. 23:14-15.) "[T]he main document … used to put that together is the regulatory strategy document, or the RACA," which Bard sometimes refers to as the RSD as well. (*Id*. at Phillips Dep. Tr. 23:16-18.) At the time the parties entered into the Agreements, they contemplated that the Bard device incorporating the Precisive Navigation Technology would obtain FDA 510(k) clearance. (Joint SUMF ¶ 10, App. Ex. 1, Purchase Agreement Section 2.04(b) (providing for Full Milestone Payment "upon receipt . . . of its first 510(k) clearance from the FDA")).

Other FDA clearance or approval pathways exist – like the premarket approval (or PMA) process and de novo review – which depend, in part, on the risk posed by a device and its equivalence to previous devices already approved: "high-risk device[] approvals … can be sought

through what is called a premarket approval, PMA process. For devices that may not really be high risk but for which a predicate doesn't exist, there's another process called the de novo submission. The FDA allows that. [A de novo submission is] essentially, quite similar in terms of content to a PMA in terms of cost to submit. It is more similar to a PMA than a 510(k). But it allows you to take a medium-risk product for which there is no good comparatives on the market allowed by FDA at that time and to get a designation of that product in the future, would be a Class II product for which a 510(k) pathway is possible." (Joint SUMF ¶ 34, App. Ex. 7, Phillips Dep. Tr. 25:3-16.)

The cost of seeking the FDA's blessing outside of the standard 510(k) process is significant. As Chris Phillips observed, "if you get kicked into a more challenging review process, the costs can increase by . . . a factor of ten." (Bard SUMF ¶ 13, Mantell Decl., Ex. B, Phillips Dep. Tr. 55:19-24.) Similarly, Dr. Kassab acknowledged that a de novo 510(k) application would require more work, and more work would mean more money. (Bard SUMF ¶ 14, Mantell Decl., Ex. A, Kassab Dep. Tr. 119:8-11.)

## VI. Developing a Next Generational Technology – Specific Development Efforts

The Precisive Navigation Technology was a nascent technology at the time of the acquisition: "this project was different from most that [Bard] acquired, in that … we called it a paper … acquisition[,] [an] acqui[sition of] intellectual property and some lab equipment that was made into a prototype but nothing ever close to commercialization." (Bard SUMF ¶ 15, Mantell Decl., Ex. D, Decheek Dep. Tr. 26:12-18.) Mr. Decheek believed that "it was not as far along as other projects, so that was definitely a hurdle under development," meaning that the team started earlier in Penske's development process than in other Bard projects. (Bard SUMF ¶ 16, Mantell Decl., Ex. D, Decheek Dep. Tr. 26:18-24.)

To develop the technology, the Penske team conducted animal studies, performed work in connection with bench models, engaged third-party vendors, pursued CVC and PICC applications, developed a regulatory strategy, including by researching and identifying predicate devices, and conducted market and clinician usability research studies. (Joint SUMF ¶ 37, *see* citations to the record that follow in sections below.)

**A. Animal Studies**

Dr. Kassab noted that the [redacted] (Joint SUMF ¶ 39, App. Ex. 4, Kassab Dep. Tr. 66:24-68:9.)

During due diligence, Dr. Kassab and two others on the 3DT team went to Bard for an animal study with the purpose of "demonstrat[ing] the technology functioned as intended." (Joint SUMF ¶ 38, App. Ex. 4, Kassab Dep. Tr. 83:2-3.) At that time, the study was performed "using the prototypes that [3DT] developed." (*Id.* at Kassab Dep. Tr. 83:4-7.)

Bard performed additional animal studies, including for the [redacted] applications. (Joint SUMF ¶ 40, App. Ex. 5, Misener Dep. Tr. 245:18-20; App. Ex. 9, Davis Dep. Ex. 5.) While at least one animal study performed on June 24, 2015 yielded [redacted] (Joint SUMF ¶ 42, App. Ex. 9, Davis Dep. Ex. 4), the animal studies produced [redacted] – [redacted] (Joint SUMF ¶ 41, App. Ex. 9, Davis Dep. Tr. 40:5-8.) Indeed, the animal study results were [redacted]

[redacted] (Joint SUMF ¶ 43, App. Ex. 7, Phillips Dep. Tr. 63:5-6, 63:13-21.) Indeed, Mr. Davis observed, "I have put down more pigs than I care to acknowledge. But I mean, I don't know the exact number, but it feels like at least 20 of [the studies]. … I know that multiple times, usually about once a month, we were going up there to – to do animal studies. And then we'd get the data, bring it back, digest the data, try to filter it through other digital algorithms to try to discern what that identifying characteristics of the CAJ was." (Bard SUMF ¶ 17, Mantell Decl., Ex. E, Davis Dep. Tr. 41:10-22.)

In fact, Mr. Misener noted, [redacted] (Joint SUMF ¶ 44, App. Ex. 5, Misener Dep. Tr. 116:20-24.) [redacted] (Bard SUMF ¶ 18, Mantell Decl., Ex. C, Misener Dep. Tr. 117:7-10.) When asked if 3DT was able to help with determining the reason for these [redacted], Mr. Misener stated that he "started to try and get ahold of Ghassan" and "[w]e started getting -- tried to get NDAs in place, which always takes a long time any time we get an NDA in place. And that I remember by the time we started having conversations, we ended up – I started hearing about litigation." (Bard SUMF ¶ 19, Mantell Decl., Ex. C, Misener Dep. Tr. 117:13-118:2.)

**B. Bench Models**

In addition, Mr. Davis was working on a bench model that Bard could use to simulate the technology "on the bench rather than having to go do an animal study every time we wanted to gather data." (Joint SUMF ¶ 45, App. Ex. 9, Davis Dep. Tr. 10:13-18.) He noted that Bard had the bench model that 3DT provided at the time of the acquisition, which "functioned but didn't

really give us any data that we could correlate to a living patient." (Joint SUMF ¶ 46, App. Ex. 9, Davis Dep. Tr. 19:22-24.) Mr. Davis described his efforts: "I've developed multiple bench models [redacted] (Bard SUMF ¶ 20; App Ex. 9, Davis Dep Tr. 18:20-21.) He explained that, "We went to Home Depot and bought [redacted] and all the stuff we need to try to create a [redacted] We looked into buying [redacted]. We looked into a [redacted]. All kinds of options that we were trying to pursue. And we tried a few – we -- we tried some of them out, and [redacted] (Bard SUMF ¶ 20; App. Ex. 9, Davis Dep Tr. 19:12-21.)

**C. Third-Party Vendors**

Bard also engaged third-party vendors to assist in developing a Bard product to incorporate the Precisive Navigation Technology. These vendors included one with "whom they had a good working relationship" to assist in developing the [redacted] for the [redacted] application and the [redacted] for the [redacted] application, (Joint SUMF ¶ 47, App. Ex. 5, Misener Dep. Tr. 107:22-108:9), and another, [redacted], to assist with the [redacted] (*id.* at Misener Dep. Tr. 241:17-20).

**D. Prioritization of the [redacted]**

The focus of the Penske project shifted [redacted] (Joint SUMF ¶ 48, App. Ex. 5, Misener Dep. Tr. 91:2-6.) On February 23, 2015, Anthony Misener wrote to members of the team, "I received word from on high that we are putting the [redacted] of the Penske project on hold. Meaning that all focus should be placed on the [redacted] and pushing down this road as quickly as possible." (Joint SUMF ¶ 48, App. Ex. 9, Davis Dep. Ex. 3, BAS-3DT 0053803.)

For the [redacted], Bard was trying to start by to modifying its [redacted] (Joint SUMF ¶ 49, App. Ex. 5, Misener Dep. Tr. 108:25-109:4.) The type of [redacted] selected impacted

the [redacted] of the Penske [redacted] because [redacted] (*Id.* at Misener Dep. Tr. 111:16-17.) [redacted] "experimenting with [redacted] (Joint SUMF ¶ 50, App. Ex. 5, Misener Dep. Tr. 111:3-7.) Mr. Phillips echoed Mr. Misener's observations: [redacted] (Joint SUMF ¶ 51, App. Ex. 7, Phillips Dep. Tr. 64:22-23.) Mr. Phillips reported that [redacted] (Bard SUMF ¶ 21; App. Ex. 7, Philips Dep. Tr. 64:8-13.)

Mr. Davis testified that they "assumed that – that the [redacted] would actually be an easier solution" but [redacted] (Bard SUMF ¶ 22, Mantell Decl., Ex. E, Davis Dep. Tr. 67:6-9.) When asked why not, Zach Davis responded, "If we knew the answer to that, I don't think we'd be here today." (*Id.* at Davis Dep. Tr. 67:10-12.)

### E. Identifying a Predicate Device for the FDA 510(k) Submission

***Beginning Stages***. Dr. Kassab confirmed that 3DT did not [redacted] – 3DT's own regulatory discussions were akin to a [redacted] and it would have needed to bring in a regulatory consultant. (Bard SUMF ¶ 8, Mantell Decl., Ex. A, Kassab Dep. Tr. 76:11-77:19.) Dr. Kassab expected that when Bard purchased the PNT from 3DT that it would need to do its own regulatory evaluation before making a submission to the FDA. (Bard SUMF ¶ 9, Mantell Decl., Ex. A, Kassab Dep. Tr. 77:20-23.)

And that is what Bard did. Mr. Phillips, who spearheaded the regulatory efforts, researched "a lot of the background," "the different potential predicates," "further background research" and "further research into the regulatory paths." (Joint SUMF ¶ 52, App. Ex. 7, Phillips Dep. Tr.

54:11-14.) In particular, he researched predicate devices to identify appropriate predicates for Penske. (Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 54:11-14.) The idea was to have a [redacted] (*Id*. at Phillips Dep. Tr. 51:12-15.)

In addition, Mr. Phillips described changes "in 2014-2015 time frame in the regulatory [redacted] The FDA had just issued a guidance, a final guidance document that was operable at that time period, that informed how you claim substantial equivalents [sic] and whether a product can be substantially equivalent to something." (Bard SUMF ¶ 27; App. Ex. 7, Phillips Dep. Tr. 54:15-22.)

[redacted]. By July 10, 2015, Mr. Phillips had identified a predicate device for Penske, but [redacted] He "had a reasonable belief that [redacted] could be a predicate [redacted] (Joint SUMF ¶ 54, App. Ex. 7, Phillips Dep. Tr. 72:7-15; *id*. at. Ex. 4.)

Mr. Philips provided additional information about [redacted]

[redacted] (Bard SUMF ¶ 23, Mantell Decl., Ex. B, Phillips Dep. Tr. 91:12-25.) He further observed that [redacted]" (Bard SUMF ¶ 24; App. Ex. 7, Phillips Dep. Tr. 51:21-24.)

***Bard's Reputation with the FDA***. Mr. Phillips reported to Kerrie Hamblin, his manager and then a senior manager of regulatory affairs, in developing the Penske regulatory strategy. (Joint SUMF ¶ 55, App. Ex. 7, Phillips Dep. Tr. 37:4-10.) Mr. Phillips explained that "discussions with Kerrie were around [redacted] and pursuing a project like this and pursuing a strategy that was a [redacted] And whether we could be [redacted] (Joint SUMF ¶ 56, App. Ex. 7, Phillips Dep. Tr. 127:13-20.) He stated, [redacted] Bard Access Systems had never brought a submission to the FDA that had resulted in an NS[E] designation[3] … every submission that we brought the to [sic] FDA had resulted in a ruling of substantial equivalence. And that was something that Bard Access Systems prided itself on, and the regulatory group specifically prided itself on having that record and on making sure the FDA understood that when Bard Access Systems brought something to FDA, it was something that would be considered complete and something that would be considered realistic." (Bard SUMF ¶ 26; Mantell Decl. Ex. B, Phillips Dep. Tr. 126:21-25, App. Ex. 7, Phillips Dep. Tr. 127:1-12.)

[3]An NSE designation is a ruling by the FDA that the device is not substantially equivalent. (Bard SUMF ¶ 26 n.3, App. Ex. 7, Phillips Dep. Tr. 30:18-19.)

Mr. Phillips is not aware of any other projects he has worked on with Bard where it has taken over a year to get the regulatory team to sign off on a strategy. (Bard SUMF ¶ 25, Mantell Decl., Ex. B, Phillips Dep. Tr. 131:15-19.) That the technology was next-generational affected the development timeline: Mr. Phillips testified, "I agree that [if the technology were not next-generational] it wouldn't have taken so much time as this did. It still would have taken a moment. There were always discussions for future advancements, to make sure that they were fully established and thought out. But this one, because it was next generational and different than what we owned, did take more." (Bard SUMF ¶ 25; App. Ex. 7, Phillips Dep. Tr. 128:24-129:11.)

**F. Penske Marketing / Commercialization Efforts – Clinician Usability Research**

Dr. Kassab knew when he sold the Precisive Navigation Technology to Bard in 2013 that Bard indicated it wanted to add certain features to improve the technology's usability and desirability to physicians. (Bard SUMF ¶ 6, Mantell Decl., Ex. A, Kassab Dep. Tr. 70:3-10.) For example, he expected Bard to further reduce the [redacted] during its development: [redacted] (Bard SUMF ¶ 7, Mantell Decl., Ex. A, Kassab Dep. Tr. 69:18-70:2.)

According to Mr. Decheek, the team was focused on "the user interface. So because it [redacted]. So from an implementation and commercialization standpoint, that was something that we were focused on, how was it actually going to look to the customer and how are they actually going to use it." (Joint SUMF ¶ 59, App. Ex. 6, Decheek Dep. Tr. 21:10-19.)

Mr. Decheek testified to Bard's efforts: "we would have conducted research studies," "whether it was quantitative, smaller one- or two-page studies and larger qualitative 30-page studies[, w]e would have done some of those[.]" (Joint SUMF ¶ 57, App. Ex. 6, Decheek Dep. Tr. 22:25-23:4.) He "believe[d they] attended some physician conferences because this is going to be, initially a different user group with [redacted]. So emergency physicians, ICU and anesthetists." (Joint SUMF ¶ 58, App. Ex. 6, Decheek Dep. Tr. 23:5-9.)

As to whether customers raised any concerns or potential roadblocks during Bard's endeavors, Mr. Decheek indicated, [redacted] (Joint SUMF ¶ 60, App. Ex. 6, Decheek Dep. Tr. 23:14-19.) [redacted] (*Id.* at Decheek Dep. Tr. 23:20-24.) Mr. Decheek did not recall any specific actions taken by Bard to address those concerns, but testified that "We always just, as our internal team, tried to push forward and have different concepts to iterate and try to prove upon. So while it was a hurdle, I don't think we thought it was an unachievable hurdle, but it was still a hurdle nonetheless." (Joint SUMF ¶ 61, App. Ex. 6, Decheek Dep. Tr. 24:11-20.)

Mr. Phillips provided additional insight into [redacted] "There were fundamental questions [redacted] (Bard SUMF ¶ 28, Mantell Decl., Ex. B, Phillips Dep. Tr. 88:7-25.)

## VII. Modus II (2013-present)

### A. Technology and Timing

In December 2016 and February 2017, Bard stated in letters to 3DT that it was focusing its attention on a technology it maintains is an alternative, superior technology. (Joint SUMF ¶ 62, App. Ex. 16, Ex. 5, Misener Dep. Ex. 8 at 4). Following the commencement of litigation, and upon entry of a Protective Order, Bard identified Modus II as the technology referenced in the letters.

"Both [Penske and Modus II] were intended to [redacted] (Joint SUMF ¶ 63, App. Ex. 7, Phillips Dep. Tr. 20:17-21:1.) Mr. Phillips, who worked on both projects, observed that [redacted] (Joint SUMF ¶ 64, App. Ex. 7, Phillips Dep. Tr. 18:18-23, 19:3-8.)

Modus II development activities started in late 2013 / early 2014. (Joint SUMF ¶ 65, App. Ex. 5, Misener Dep. Tr. 74:16-22; Ex. 11, BAS-3DT 0059430; Ex. 12, BAS-3DT 0061106.) Bard always tried to have multiple projects in the pipeline at the same time, and Modus II was in the pipeline at the same time as Penske. (Joint SUMF ¶ 66, App. Ex. 5, Misener Dep. Tr. 72:1-4.) Certain members of Bard leadership believed both Modus II and Penske had the potential to be developed. (Joint SUMF ¶ 68, App. Ex. 6, Decheek Dep. Tr. 43:11-16; Decheek Dep. Ex. 4 (reporting that during a May 2015 Franchise Review Meeting, "Rob [Fredericks, current Vice President and General Manager of the company, (App. Ex. 5, Misener Dep. Tr. 286:18-23)] brought up a point – why not both?").

In Mr. Misener's experience, resources being "diverted in part due to another project … happens all the time." (Joint SUMF ¶ 67, App. Ex. 5, Misener Dep. Tr. 261:19-262:4.) Mr. Decheek testified that "all projects compete for resources." (Bard SUMF ¶ 33; App. Ex. 6, Decheek Dep. Tr. 43:5-9.) As between Modus II and Penske, Mr. Decheek stated did not know if the projects were competing for resources, but he thinks they were "[k]eeping two horses in the race to have best chance of success." (Bard SUMF ¶ 33; App. Ex. 6, Decheek Dep. Tr. 43:11-16.) Indeed, in a May 7, 2015 email from Mr. Decheek to Mr. Misener, Mr. Decheek stated, "We presented Modus II and Penske as 'two horses in the race[.]'" (Bard SUMF ¶ 29; App. Ex. 6, Decheek Dep. Ex. 4, BAS-3DT 0058898.) Mr. Misener stated, "we haven't really paused the Modus II project. But it's certainly been on a – it's certainly had surges of activity and then lulls in activity. And I would say the same for Penske or any other project that we work on." (Bard SUMF ¶ 34, Mantell Decl., Ex. C, Misener Dep. Tr. 210:6-16.)

**B. Comparison of Modus II and Penske**

Dr. Kassab acknowledged that determining whether one product is superior to the other "could be" a [redacted] (Bard SUMF ¶ 32, Mantell Decl., Ex. A, Kassab Dep. Tr. 121:1-4), noting that if a device [redacted] (*id*. at Kassab Dep. Tr. 121:5-11), and it "could [also] be" [redacted] (*id*. at Kassab Dep. Tr. 124:3-8).

With respect to regulatory pathway, Mr. Phillips testified that, [redacted] (Joint SUMF ¶ 69, App. Ex. 7, Phillips Dep. Tr. 123:16-20.) Mr. Phillips elaborated that [redacted]

[redacted] (Joint SUMF ¶ 70, App. Ex. 7, Phillips Dep. Tr. 21:10-20.) [redacted] (*Id.* at Phillips Dep. Tr. 21:21-22:9.)

In a similar vein, Mr. Phillips explained, [redacted] (Bard SUMF ¶ 30; App. Ex. 7, Phillips Dep. Tr. 128:6-20.)

Mr. Phillips explained additional benefits of Modus II as a result of it being based on [redacted]

[redacted] (Bard SUMF ¶ 31; App. Ex. 7, Phillips Dep. Tr. 19:11-20:2.)

From an R&D perspective, Mr. Misener testified that Modus II has superiority to Penske in certain aspects including its [redacted] (Joint SUMF ¶ 71, App. Ex. 5, Misener Dep. Tr. 200:8-19.) In addition, "the Modus II [redacted] which meant the R&D efforts "started . . . in a feasibility phase." (*Id*. at Misener Dep. Tr. 208:20-22.) Mr. Misener also testified that [redacted] (*Id*. at Misener Dep. Tr. 200:22-25.)

Mr. Misener further testified that there are aspects in which Penske is superior to Modus II including: [redacted] (Joint SUMF ¶ 72, App. Ex. 5, Misener Dep. Tr. 201:20-202:24.)

## VIII. Ambergris (2015-2016)

From the end of 2015 to January 2016, Bard began the process of acquiring another unrelated technology, Nautilus Delta, a project it referred to as "Ambergris." (Joint SUMF ¶ 73, App. Ex. 5, Misener Dep. Tr. 217:9-10; App. Ex. 6, Decheek Dep. Ex. 12 (January 2016 BAS Marketing Monthly Report stating that Ambergris "Due Diligence completed").)

In January 2016, Zach Davis was "redirected to not forget about Penske, but to work on some other business critical items too" (Joint SUMF ¶ 74, App. Ex. 9, Davis Dep. Tr. 9:20-10:5)

"with emphasis being put on the Nautilus Delta project that had popped up." (*Id*. at Davis Dep. Tr. 17:19-23.) Brad Zentgraf does not recall Anthony Misener ever telling him that the Penske project was put on hold --"I don't remember him saying those specific words. You know, he let me know that I needed to focus my time to Ambergris and the Nautilus Delta projects, but it was my expectation that I would be told to work on something else at a later date." (Joint SUMF ¶ 75, App. Ex. 8, Zentgraf Dep. Tr. 34:14-20.)

On January 25, 2016, Misener sent an email stating that in the PSR tomorrow, which is a monthly project review with the Management Board (Joint SUMF ¶ 76, App. Ex. 5, Misener Dep. Tr. 230:15-16), consisting of "the VP and general manager in Salt Lake and then the vice presidents of quality, regulatory, research and development and marketing and sales" (*id*. at Misener Dep. Tr. at 23:14-17), he would report "the significant delay to Penske…. completely due to the anticipated Ambergris project" (*id*. at Misener Dep. Ex. 3).

## IX. Penske Concept Phase Continues

According to a BAS Penske Project Executive Summary dated July 10, 2015, the anticipated development timeline for Bard as of that date was as follows:

- Concept Phase – July 2015
  - Concept phase defined by Bard as fluid, non-design control, look for plan on testing, low sample size of design iterations.
- Feasibility– September 2015
  - Feasibility phase defined by Bard as larger sample size to verify Qual will pass. Define design control and establish pre-DV
- Qual – March 2016
  - Qual phase defined by Bard as DV and process validations
- Product launch without claims – March 2016
  - Product launch with Penske claims – October 2017

(Joint SUMF ¶ 77, App. Ex. 7, Phillips Dep. Ex. 4, BAS-3DT 0040344.) Dr. Kassab agrees that development and commercialization is not a linear process, with one step happening one right after another, but rather one where multiple different facets of the project happen at once. In responding to that deposition question, Dr. Kassab stated, "I would say lots of things going on, yeah." (Bard

SUMF ¶ 35, Mantell Decl., Ex. A, Kassab Dep. Tr. at 44:24-45:5.) Bard followed this common practice. Indeed, as described herein, the Penske team worked on various aspects of the project at the same time.

At least one Penske concept design review meeting was held in July 2015, and another was held in October 2015. (Joint SUMF ¶ 78, App. Ex. 7, Phillips Dep. Tr. 78:3-6; 78:19-22; App. Ex. 9, Davis Dep. Tr. 110:8-19.)

By July 21, 2015, Mr. Phillips "had completed what I believed at that point in time to be the draft of the [regulatory strategy document, or] RACA" and "believed entering into it that it was a substantial draft that would allow us to move past concept[.]" (Joint SUMF ¶ 79, App. Ex. 7, Phillips Dep. Tr. 78:7:18; App. Ex. 7, Phillips Dep. Ex. 7, BAS-3DT 0046505.) The RACA often had to be "very significantly complete" before a project exited the concept phase. (Joint SUMF ¶ 80, App. Ex. 7, Phillips Dep. Tr. 26:6-10; 27:1-9, 34:9-13). The regulatory team did not want to close the concept phase of the Penske project until a regulatory strategy was settled, and management had not approved the regulatory strategy as of October 2015. (Joint SUMF ¶ 81, App. Ex. 5, Misener Dep. Tr. 155:18-20; App. Ex. 7, Phillips Dep. Tr. 110:21-111:5.) Kerrie Hamblin "needed to make sure that she was [redacted] with the regulatory strategy" "before she was willing to sign off on the concept design review meeting minutes." (Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 110:21-111:5.)

As reflected in a September 4, 2015 email, Mr. Phillips stated that "I believed that the [RACA] could be signed, but there was further work that still was necessary." (Bard SUMF ¶ 42, Mantell Decl., Ex. B, Phillips Dep. Tr. 90:10-17.) As of September 4, 2015, he testified that "[f]urther testing was going to be needed to prove anything out. I believe the essence of the regulatory strategy was built, but the rest of that element is buy-off, and that is the element that still remained, gaining the approval from the rest of the regulatory organization to pursue a strategy

[redacted] (Bard SUMF ¶ 42, Mantell Decl., Ex. B, Phillips Dep. Tr. 90:22-91:8.) He "believ[ed] there was a final document" around September 10, 2015 "but there was never a signed – to my knowledge, there wasn't a signed document at that point." (Bard SUMF ¶ 42, Mantell Decl., Ex. B, Phillips Dep. Tr. 97:19-21.)

From September 10, 2015 to January 25, 2016 and beyond, Mr. Phillips had "fairly regular weekly meetings" and the "topic of Penske was discussed with some regularity." (Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-3.) Phillips does not know the number of meetings, "but the topic of Penske and, how to close up the concept review, and how [to] get to a point where the [redacted] discussion." (*Id.* at Phillips Dep. Tr. 101:4-8.) In light of this work, all of the Penske cross-functional team members, except for Chris Phillips, signed the Concept Design Review Meeting Minutes in October 2015. (Joint SUMF ¶ 82, App. Ex. 8, Zentgraf Dep. Ex. 2.)

The December 2015 Monthly Marketing Report stated that the projected timeline for the submission of a 510(k) application for Penske was Quarter 3 of 2017, and the projected launch of a [redacted] incorporating Penske was Quarter 1 2018. (Joint SUMF ¶ 83, App. Ex. 6, Decheek Dep. Ex. 11.)

Mr. Davis testified that after January 25, 2016 "our concept design review, and those meeting minutes, which I was responsible for procuring all the signatures and getting all the approval from the cross-functional team members, including management board, it was my job at that time to close that out and get that -- get that all signed out." (Joint SUMF ¶ 84, App. Ex. 9, Davis Dep. Tr. 18:2-20:21.) This is the only work that Mr. Davis can recall after January 25, 2016. (*Id.*) But getting the Concept Design Meeting Minutes signed was not simply chasing the team for signatures. Zach Davis explained the process as follows: "How meeting minutes work for a design review, all of the cross functions attend and they all give us actions, things that they're

concerned about. There were multiple actions that came out of the concept review that we did, and then as the R&D lead, it's my job to satisfy all of those actions and bring all -- evidence or whatever the -- the person that made the request, to bring the information to them to mitigate their concerns and gain their signature." (*Id*. at Davis Dep. Tr. 20:22-21:7.)

While the Penske concept meeting minutes were routing, Mr. Misener stated "the project could move forward on various other avenues. So we weren't waiting for the minutes to get done. We -- R&D moves on to feasibility related activities while the minutes are being signed. We don't hold off on those things. So we continue to look at technical concepts, we continue to push in terms of risks and all of those things. So it didn't stall out the project as a whole. It only stalled out the minutes." (Bard SUMF ¶ 38, Mantell Decl., Ex. C, Misener Dep. Tr. 156:22-157:6.) In his view, "we moved on as soon as we felt from an R&D standpoint we were -- the concepts were sufficient, and we moved into what we would consider feasibility. But it's kind of a fluid thing. It's not like we have to get a blessing from the management board of, okay, now you can move into feasibility." (Bard SUMF ¶ 39, Mantell Decl., Ex. C, Misener Dep. Tr. 157:13-19.) [Attorneys' Eyes Only Portion]. The stage gate is "a gate in that we have to go through each gate before we can commercialize. But the project -- … The development is definitely more of a flow." (Bard SUMF ¶ 40, Mantell Decl., Ex. C, Misener Dep. Tr. 157:20-158:4.) Mr. Phillips stated similarly. "In design control systems like this one and others that I'm familiar with, the phase gates are not true locks. There are some, such as being able to market a product, that are a true locked [sic]. You can't proceed until certain things are accomplished.· But with a project like this and in the phase that it's in, there can be advancements while meeting minutes are routing." (Bard SUMF ¶ 41, Mantell Decl., Ex. B, Philips Dep. Tr. 121:9-15.)

Mr. Misener testified that other work was performed from March 1, 2016 to September 1, 2016, "I know the investigation continued on the animal study results, and I know we were looking

at the solutions that we had talked about previously. I know we finalized -- well, I don't know if we finalized before September, but we certainly pushed the regulatory piece to conclusion, the regulatory strategy to conclusion. So I mean at least items like that were certainly moving forward. It was definitely slowly compared to what I'm used to, yes. I mean compared to what I'm used to when I can dedicate a full team to it." (Joint SUMF ¶ 85, App. Ex. 5, Misener Dep. Tr. 276:21-277:16.) Indeed, on March 11, 2016, Mr. Misener asked Kerrie Hamblin and Mr. Phillips via email "if we could push to close out the Penske Concept Design Review Meeting Minutes. It has been on hold pending an RSD per your request. At this stage we will be asking the reviewers to sign on a document that they looked at last on September 1st, more than 6 months ago. I know we are close, but given Penske's low priority I don't see it getting done soon. Can we move this forward?" (Joint SUMF ¶ 86, App. Ex. 7, Phillips Dep. Ex. 17.)

On April 26, 2016, Ashley Krogh, a Senior Financial Analyst at Bard, emailed Mr. Misener copying Daniel Read, asking, "Can you please update us on the Penske PICC project? Will you be submitting an AFE for this[?] If so when do you project you will spend on this? Let us know if this project is cancelled or pushed out to 2017." (Joint SUMF ¶ 87, App. Ex. 5, Misener Dep. Ex. 2, BAS-3DT 0056218.) On April 26, 2016, Mr. Misener responded, "[t]his project has been pushed out to 2017." (*Id.*) On July 18, 2016, Mr. Misener emailed Ms. Krogh confirming that the Penske project "is still active. However it has shifted in priorities with the team." (Bard SUMF ¶ 43, Mantell Decl., Ex. F, BAS-3DT 0056304.) On July 19, 2016, Ms. Krogh asked Mr. Misener for [redacted] (Bard SUMF ¶ 43, Mantell Decl., Ex. F, BAS-3DT 0056304.) The following day, Mr. Misener requested an external expenditure budget for Penske of [redacted] from August through December of this year." (Bard SUMF ¶ 44, Mantell Decl., Ex. F, BAS-3DT 0056333.)

**X. Non-Disclosure Agreement**

One of the things that Mr. Misener did to [redacted] was to reach out to Dr. Kassab. (Bard SUMF ¶ 19, Mantell Decl., Ex. C, Misener Dep. Tr. 117:1-118:2.) However, Mr. Misener's team could not have had meaningful discussions with Dr. Kassab without entering into a non-disclosure agreement. On May 6, 2016, Anthony Misener emailed Dr. Kassab a draft of a nondisclosure agreement. (Joint SUMF ¶ 88, App. Ex. 4, Kassab Dep. Ex. 6.) On May 12, 2016, 3DT's counsel provided comments on the proposed nondisclosure agreement to Anthony Misner. On May 17, 2016, 3DT's counsel followed up on her comments and, on May 20, 2016, Anthony Misener said he would review and get back with her. (Joint SUMF ¶ 89, App. Ex. 13, 3DT Prod. 0000101-0000103.) On August 5, 2016, Anthony Misener emailed a revised draft of the NDA to Dr. Kassab based upon the comments from 3DT's counsel. Anthony Misener apologized for being "completely side-tracked by other priorities." (Joint SUMF ¶ 90, App. Ex. 14, BAS-3DT 0034929.) On August 8, 2016, 3DT provided minor comments, and Anthony Misener responded that same day, stating, "[i]f Ghassan is ready to sign, then would you send me a scan of the signed complete document and I will get the fully executed document back to the two of you." (Joint SUMF ¶ 91, App. Ex. 14, BAS-3DT 0034928-0034929.) On August 19, 2016, Anthony Misener followed up with Dr. Kassab via email saying, "Just checking in. Let me know if you are the [sic] ok with this latest version of the NDA." (Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929.) Dr. Kassab executed the NDA that day. (*Id.* at BAS-3DT 0034929.) On August 23, 2016, Anthony Misener emailed Dr. Kassab the fully executed NDA. (Joint SUMF ¶ 93, App. Ex. 14, BAS-3DT 0034928.)

**XI. Penske Activities After the August 2016 Anniversary of the Parties' Agreement**

The third anniversary of the parties' Development Agreement was August 29, 2016. (Joint SUMF ¶ 94; *see also* App. Ex. 2.)

On September 15, 2016, Mr. Misener sent an email to a colleague, Luke Tedesco, copying Shayne Messerly and Mr. Decheek, "updat[ing] the Penske schedule to reflect my best estimate to reality. This project has been put on life support ever since Nautilus Delta came into the picture (even before DD was done)." (Joint SUMF ¶ 95, App. Ex. 5, Misener Dep. Ex. 7.) In that same email, Mr. Misener further noted, "the scope was completely changed [redacted] from the initial acquisition scope [redacted] prior to Nautilus Delta. As such, Concept starts forever ago, but we will not really be working on Penske as a team until Q3 next year. At that point we will continue the Concept Phase from where the team left off." (*Id.*) Mr. Misener testified that "saying the project has been put on life support" means "that there's been a delay. That my resources have been – you know, have been diverted in part due to another project, which happens all the time." (Joint SUMF ¶ 95, App. Ex. 5, Misener Dep. Tr. 261:19-262:4.)

On September 19, 2016, Dr. Kassab emailed Mr. Misener asking "[s]hould we chat to outline next steps per earlier email?" (Joint SUMF ¶ 96, App. Ex. 4, Kassab Dep. Ex. 7.) On September 30, 2016, Anthony Misener responded to Dr. Kassab stating: "I am working with my team to try to bring together some information from our past work to provide context to our questions. We are having a meeting next week to bring everything together and distill it down to the key issues. I can tell you that one thing that I would like to better understand is the lower level theory behind the experimental set -up and the assumptions made to simplify the approach." (Joint SUMF ¶ 97, App. Ex. 4, Kassab Dep. Ex. 7.)

The regulatory team signed off on the Concept Design Review Meeting Minutes in November 2016. (Joint SUMF ¶ 98, App. Ex. 8, Zentgraf Dep. Ex. 2.) The final signature on the Concept Design Review Minutes was obtained on December 8, 2016. (Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2.) These signatures were obtained months after the third anniversary of the

parties' execution of the Development Agreement. (Joint SUMF ¶¶ 98-99, Ex. 8, Zentgraf Dep. Ex. 2.)

Anthony Misener testified that "at that time we pushed pause on this one, you know sometime after the concept review was completed. But it's something that we … still see great advantages in." (Joint SUMF ¶ 100, App. Ex. 5, Misener Dep. Tr. 161:2-5.) In this context, pushing pause after the concept review was completed meant "that that phase gate at least offers a point of reference for when teams come back to pick things up and move forward, it makes it easier to pick up and move forward. So that's a good practice in terms of, you know, being able to take things forward. So you know you have a document that kind of points you to where everything is so that you can, you know, pick up where you've paused and keep moving." (Joint SUMF ¶ 100, App. Ex. 5, Misener Dep. Tr. 161:6-16.)

Bard has never determined that a Bard product incorporating the Precisive Navigation Technology could never be brought to market and hopes to bring such a product to market in the future. (Joint SUMF ¶ 101, App. Ex. 5, Misener Dep. Tr. 162:14-21; App. Ex. 6, Decheek Dep. Tr. 105:3-8; App. Ex. 7, Phillips Dep. Tr. 106:3-7.)

## XII. The Parties' Letters

On December 6, 2016, over three months after the third anniversary of the Development Agreement, 3DT sent Bard the first in a series of letters exchanged by the parties regarding Penske development efforts and the obligations under the agreements. (Joint SUMF ¶¶ 102-08, App. Ex. 15, December 6, 2016 3DT Letter, App. Ex. 16, December 20, 2016 Bard Letter, App. Ex. 5, Misener Dep. Ex. 8, App. Ex. 17, May 10, 2017 3DT Letter, App. Ex. 18. May 19, 2017 Bard Letter.) In this December 6, 2016 letter to Bard's President, John P. Groetelaars, 3DT inquired about the status of the project and requested that Mr. Groetelaars "please identify what financial resources have been spent over the past three years and which personnel have been dedicated" to

the development of the Precisive Navigation Technology. (Joint SUMF ¶ 102, App. Ex. 15, December 6, 2016 3DT Letter.)

On December 20, 2016, Rob Fredericks, Vice President & General Manager at Bard, responded by letter stating, among other things, "While I am not aware of any obligation under the August 29, 2013 transaction agreements to report Bard's progress to 3DT regarding the development of the Precisive Navigation Technology, I do appreciate the spirit of your request for information. As such, we will identify the financial and personnel resources expended by Bard to develop the Precisive Navigation Technology and send that information to you at a later date, as you requested." The letter further stated, "Bard is currently focusing its attention on the development of an alternative, superior technology." (Joint SUMF ¶ 103, App. Ex. 16, December 20, 2016 Bard Letter.)

In the December 20, 2016 letter, Mr. Fredericks wrote, "We very much appreciate that you chose Bard to commercialize the Precisive Navigation Technology and like you are disappointed, as our up-front investment to purchase this technology significantly [redacted] exceeds the potential milestone. Bard has had much more at stake from the outset, not to mention the appreciable financial and other resources we have spent in our development efforts over the last few years. Please expect to receive additional correspondence from us, as noted above." (Joint SUMF ¶ 104, App. Ex. 16, December 20, 2016 Bard Letter.)

In a February 21, 2017 letter, Bard wrote that it prepared "a brief overview of the resources expended by it in connection with the development of the Precisive Navigation Technology for use in the below-listed applications" and noted "[t]his summary is not all-inclusive, and figures and dates in this overview are approximations[.]" (Joint SUMF ¶ 105, App. Ex. 5, Misener Dep. Ex. 8 at 1.) Fredericks wrote in the letter that Bard conducted integration meetings, established a development team with representatives from various departments, conducted more than 100 one-

on-one interviews with clinicians and evaluated more than 650 market research surveys, formulated design inputs and requirements based on the marketing inputs, established relationships with key vendors, researched numerous potential predicate devices, conducted 13 animal studies, and incurred significant expenses in the form of [redacted] gross wages for full-time R&D team members and [redacted] in out of pocket expenses that do not include the wages for personnel working on the project. (*Id*. at 2-4.)

With respect to the alleged alternative, superior technology, Rob Fredericks wrote that "[t]his technology is based upon [redacted] that we believe will enable [redacted] (Joint SUMF ¶ 106, App. Ex. 5, Misener Dep. Ex. 8 at 4.)

On May 10, 2017, 3DT's counsel wrote to Bard claiming that Bard "has not provided any … notice of discontinuation [pursuant to Section 2.04(b) of the Purchase Agreement]; however, based on correspondence solicited by 3DT from Bard, it appears that Bard admits it has stopped supporting the Precisive Navigation Technology. It is unclear when this decision was made." (Joint SUMF ¶ 107, App. Ex. 17, May 10, 2017 3DT Letter.) The letter further requests that Bard confirm by May 19, 2017 that it "(i) will honor its obligations under the [Purchase Agreement] and [Development Agreement] by paying, within thirty (30) days of this letter, the Full Milestone Payment in consideration of its decision to discontinue support of the Precisive Navigation Technology or (ii) will provide, in accordance with Section 6.02 of the [Purchase Agreement] and Section 12.10 of the [Development Agreement], information necessary to ascertain the basis for

Bard's assertion that it has identified a technology that is superior to the Precisive Navigation Technology." (*Id.*)

Bard responded on May 19, 2017, by stating the following to 3DT in a letter: "Bard has honored and will continue to honor its obligations to 3DT under the referenced agreements. At this time, the Full Milestone Payment to which you refer under the [Purchase Agreement] is not due and owing, for reasons we have explained in our prior correspondence with 3DT. Lastly, Bard is not obligated to provide any internal data or business information, confidential or otherwise, to you or 3DT as you request." (Joint SUMF ¶ 108, App. Ex. 18, May 19, 2017 Bard Letter.)

**LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). After "the movant has established a prima facie case demonstrating the absence of a genuine issue of material fact," the "nonmoving party must come forward with enough evidence to support a jury verdict in its favor" to defeat grant of summary judgment. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). Critically, the party opposing the motion may "not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). In addition, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ." *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## ARGUMENT

### I. THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN BARD'S FAVOR BECAUSE BARD FULFILLED ITS OBLIGATIONS UNDER THE GOVERNING AGREEMENTS AS A MATTER OF LAW

Under New York law, to prevail on its breach of contract claim, 3DT must prove (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages. *Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (citations omitted). Bard does not dispute the existence of valid contracts between the parties. Rather, the undisputed material facts demonstrate that Bard did not breach its contractual obligations to 3DT. Thus, 3DT cannot sustain its burden on that element and its claim fails as a matter of law. To the contrary, Bard expended more than three years' worth of time, money, and effort trying to develop a product incorporating the Precisive Navigation Technology, more than satisfying the contractual obligation to "provide commercially reasonable personnel, financial and other support (**as determined by Bard, in good faith, based upon its reasonable business judgment**) with regard to the development of a Bard Product incorporating the Precisive Navigation Technology." (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1 (emphasis added).) This standard of commercial reasonableness is highly deferential to Bard, limited only by the duty to act in good faith and exercise reasonable business judgment. That low standard has clearly been exceeded here.

In addition, the Development Agreement vested Bard with the unilateral right to cease development after those three years "in good faith, based upon its reasonable business judgment," if, among other things, "technological failure(s) of the Bard Product to perform to Bard-required specifications" occurred, or it decided to focus on "the creation, development and/or commercial availability of superior technology" for a period of time. (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.) That is exactly what it did. The undisputed material facts

demonstrate that Bard satisfied the applicable deferential standard of commercial reasonableness as a matter of law, and after three years of efforts, properly exercised its contractual right to cease development of the Penske project at that time.

Further, the Development Agreement expressly contemplates the circumstances present in this case -- after the third anniversary of the Effective Date of the Development Agreement, Bard, and Bard alone, could decide to cease Penske development activities for any one of the enumerated contractual bases, and at some later date, continue to develop a product incorporating 3DT's technology. The Agreement makes clear that if and when Bard obtains 510(k) clearance for that product, the Full Milestone Payment would then be due. (*See* Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1) Because that condition precedent to payment has not occurred, no portion of the [redacted] Full Milestone Payment is yet due and owing to 3DT. Finally, because Bard appropriately invoked its above-described right to cease development, the discontinuation provision in the Purchase Agreement triggering a Full Milestone Payment does not apply. Based on the foregoing and following, summary judgment in favor of Bard is just.

### A. The Contractual Standard for Commercially Reasonable Development Efforts is Highly Deferential to Bard, Guided by Good Faith and Reasonable Business Judgment, Which Bard Satisfied as a Matter of Law

The Agreements incorporate several legal standards, all of which provided Bard with significant discretion to determine what constituted "commercially reasonable personnel, financial and other support" to develop the Precisive Navigation Technology. While principles of commercial reasonableness, good faith and reasonable business judgment guided its efforts, Bard was well within its contractual rights to determine the personnel devoted to the Penske project, their responsibilities, and their development activities, to be consistent with its own usual business practices. That is exactly what Bard did.

Notably, "where[, as here,] the material facts are undisputed, the Court may decide as a matter of law that [Bard's] actions were commercially reasonable." *Leigh Co. v. Bank of N.Y.*, 617 F. Supp. 147, 153 (S.D.N.Y. 1985) (citations omitted). "The standard for satisfying commercial reasonability under New York law is a fairly lenient one[.]" *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020). A party to a contract requiring commercial reasonableness must show "'some conscious exertion to accomplish the agreed goal.'" *Id*. (quoting *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 473 (S.D.N.Y. 2018)). Where "[a]t a minimum, . . . a promise to use commercially reasonable efforts requires that the promising party undertake at least *some* activity," Bard's substantial investment of time and resources certainly satisfied this standard. *Holland Loader*, 313 F. Supp. 3d at 473 (citing *SATCOM Int'l Grp., PLC v. ORBCOMM Int'l Partners, L.P.*, No. 98CIV.9095(DLC), 2000 WL 729110, at *20 (S.D.N.Y. June 6, 2000)) (emphasis added). For example, in *Sekisui Am. Corp. v. Hart*, the court determined a party could not recover on its counterclaim for breach of contract for failure to provide commercially reasonable efforts to market a breast cancer diagnostic assay and to take actions to obtain FDA approval. 15 F. Supp. 3d 359, 362, 370, 381 (S.D.N.Y. 2014). Even under a contractual standard unqualified by deference to a party's judgment (like the one here), the *Sekisui* court held that "considerable efforts" to obtain FDA clearance via the 510(k) process were taken. *Id*. at 381. Such efforts included "re-creating files" of data and traveling to Germany in unsuccessful attempts to obtain clinical data, until the company concluded that it would need new clinical studies performed in the United States costing $3.2 million and taking more than three years. *Id*. at 379, 381. Certainly, Bard performed more work on the Penske project than in *Sekisui*, given that *Sekisui* involved a 510(k) submission already made and under FDA review, and Penske needed to be developed from the ground up.

Moreover, the standard embodied in the Development Agreement is even more lenient than many of the contractual standards discussed in case law because the plain language of the Agreement explicitly provides Bard *with discretion* to determine the commercially reasonable staffing and support of the Penske project. "In any number of contexts, reasonable discretion is commonly understood to allow a decision maker to choose from a broad range of choices not conflicting with law or reason." *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 146 (2d Cir. 2011) (citations omitted); *see also ProSource Tech., LLC v. Housing Trust Fund Corp.*, No. 5972-14, 2015 WL 5797028, at *12 (N.Y. Sup. Ct. Albany Cty. Oct. 2, 2015) (contract requiring "exercise of 'reasonable discretion' [is] an express promise that [a party] will not act arbitrarily, irrationally or without reasonable basis"). Indeed, "[a] good faith standard has been held to apply when a contractual provision leaves implementation decisions to the discretion of the promisor." *Holland Loader*, 313 F. Supp. 3d at 471 (citation omitted); *see also Slamow v. Delcol*, 584 N.Y.S.2d 424, 425 (N.Y. 1992) ("The best evidence of what parties to a written agreement intend is what they say in their writing."). Good faith, however, "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 46 (1972)) (internal quotation marks omitted).

The contractual standard also incorporates principles from the business judgment rule arising in the corporate governance context. The "business-judgment rule" is "[t]he judicial presumption that in making business decisions not involving direct self-interest or self-dealing, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest." Business-Judgment Rule, Black's Law Dictionary (11th ed. 2019). Here, the deferential standard permits actions consistent with this rule, *i.e.*, those made on

an informed basis, in good faith, and are in the honest belief that their actions are in the corporation's best interest. Bard's conduct undoubtedly conformed with this standard, particularly where commercial reasonableness is judged by Bard from its perspective, necessarily encompassing a view of its business as a large medical device company with numerous products on the market and in the development pipeline. The Penske project did not exist in a vacuum.

Guided by its expertise in developing hundreds of medical devices, Bard agreed to—and did—exercise such good faith, reasonable business judgment in determining the commercially reasonable resources to dedicate to development, even in the face of significant hurdles in every major aspect of the project. As described in more detail below, for years, and even continuing beyond the three-year anniversary of the parties' Agreements, Bard undertook efforts to develop this technology. 3DT can point to no evidence of bad faith, because there is none. On the contrary, the evidence demonstrates that Bard tried time and again to find a way to incorporate the Precisive Navigation Technology into a Bard product. This makes sense, because Bard paid a hefty sum of [redacted] to purchase the rights to do so. Without question, it is in Bard's best interest to bring a product incorporating this technology to market.

An evaluation of Bard's conduct "does not involve a hindsight comparison of the party's actual conduct to that which could have been undertaken to produce a better result; *a court should evaluate only whether the party's actual conduct was sufficient*." *Frieze Events, Inc.*, 441 F. Supp. 3d at 3 (citation and internal quotations omitted) (emphasis added); *Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, No. 03 Civ. 8259 (CSH), 2007 WL 1988150, at *22 (S.D.N.Y. July 9, 2007) ("[a] violation of the good faith duty to . . . use commercially reasonable efforts to obtain the best price – cannot be established simply by observing, in hindsight, that [a party] could have done something differently that would have produced a better result" and plaintiff exercised "commercially reasonable efforts"). Bard's efforts were plainly sufficient here, and indeed 3DT

has presented no evidence that Bard could have obtained a better result with greater effort. The record reflects that the technology unfortunately did not work as the parties had hoped.

Moreover, the undisputed material facts establish that Bard did exactly what it always does to develop medical devices. Bard always tried to have multiple projects in the pipeline at the same time, and this was no exception. (Joint SUMF ¶ 65, App. Ex. 5, Misener Dep. Tr. 74:16-22; App. Ex. 11, BAS-3DT 0059430; App. Ex. 12, BAS-3DT 0061106; Joint SUMF ¶ 66, App. Ex. 5, Misener Dep. Tr. 72:1-4.) Mr. Decheek described this business strategy more colloquially as "[k]eeping two horses in the race to have best chance of success." (Bard SUMF ¶ 33; App. Ex. 6, Decheek Dep. Tr. 43:11-16; *see also* Bard SUMF ¶ 29; App. Ex. 6, Decheek Dep. Ex. 4, BAS-3DT 0058898.) Thus, it was typical for Bard's employees to work on multiple projects at once. Mr. Decheek testified that "all projects compete for resources." (Bard SUMF ¶ 33; App. Ex. 6, Decheek Dep. Tr. 43:5-9.) In Mr. Misener's experience at Bard, resources being "diverted in part due to another project … ***happens all the time***." (Joint SUMF ¶ 67, App. Ex. 5, Misener Dep. Tr. 261:19-262:4 (emphasis added).) In addition, every project Mr. Misener works on, including Penske and Modus II, has "surges of activity and then lulls in activity." (Joint SUMF ¶ 34, Mantell Decl., Ex. C, Misener Dep. Tr. 210:12-16.) Having multiple products in the pipeline, shifting priorities depending on management's business strategy, and having ebbs and flows in every project is simply the way Bard does business, and the Agreements provided Bard with discretion to conduct business as usual. There is nothing "arbitrary, irrational, or without reasonable basis" about this business practice. *See ProSource Tech., LLC*, 2015 WL 5797028, at *12. On the contrary, it helps Bard remain competitive in an innovative and ever-advancing field. Neither the law nor the Development Agreement, which defines commercial reasonableness "as determined by Bard," permit 3DT to second-guess Bard's sound business practices. Accordingly, this Court

should hold that Bard meets the lenient, deferential standards of commercial reasonableness, good faith, and reasonable business judgment as a matter of law, and grant summary judgment for Bard.

### B. Bard Provided Commercially Reasonable Personnel, Financial, and Other Support to Develop the Precisive Navigation Technology, as Determined by Bard, in Good Faith, Based Upon its Reasonable Business Judgment, For More than Three Years

As noted above, the Development Agreement provides Bard with significant discretion in how to staff and support the Penske project. Bard undertook significant efforts in good faith, described in this section, to develop the Penske technology. These efforts, described in more detail below, easily exceeded the low threshold for commercial reasonableness, particularly because the contractual standard is defined by **<u>Bard's own determination</u>** of what commercial reasonableness means, within the bounds of good faith and reasonable business judgment. Accordingly, Bard respectfully requests that this Court grant its motion for summary judgment.

From August 29, 2013 through at least December 2016 when the final team member approved the meeting minutes signaling the official close of the concept phase of development, Bard made considerable efforts to develop a product incorporating the next-generational Precisive Navigation Technology – *far more* than the "*some* activity" required to meet the commercial reasonableness standard. Bard's work was performed by skilled team members across a variety of disciplines, whose dedication reflected the enormous financial commitment Bard made in acquiring the technology. Consistent with its normal business practices, within two weeks of the acquisition, Bard assembled a cross-functional team with on-the-job expertise and educational background in project management, research and design, marketing, and regulatory affairs – all of the major aspects of the development pathway. (*See* Joint SUMF ¶ 27, App. Ex. 5, Misener Dep. Tr. 43:5-20; 52:22-53:11; App. Ex. 7, Phillips Dep. Tr. 128:21-129:11; *see also* Joint SUMF paragraphs discussing the Penske team members, their specialties, education, and prior experience: Joint SUMF ¶ 21, App. Ex. 5, Misener Dep. Tr. 10:8-11:2; 11:15-12:23; 47:11-15;

Joint SUMF ¶ 23, App. Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5; Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15; Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22; App. Ex. 8, Zentgraf Dep. Tr. 7:8-16; 8:4-5, 23-24; 10:22-25, 14:11-16; App. Ex. 5, Misener Dep. Tr. 81:7-15; 104:7-8.) Mr. Misener felt fortunate to have two additions to the R&D engineering team to help get the work done, particularly where it was atypical for him to obtain increased headcount during that time. (*See* App. Ex. 5, Misener Dep. Tr. at 85:8-21; 86:25-87:5.) The entire team met regularly on this project. (Joint SUMF ¶ 24, App. Ex. 5, Misener Dep. Tr. 79:2-4; Joint SUMF ¶ 24, App. Ex. 6, Decheek Dep. Tr. 27:12-18.) Bard also engaged outside consultants and partners to assist with certain aspects of the project if it required specific expertise. (Joint SUMF ¶ 47, App. Ex. 5, Misener Dep. Tr. 107:22-108:9; *id*. at Misener Dep. Tr. 241:17-20.)

As described in detail above, these team members conducted broad-based efforts across multiple disciplines – R&D, marketing, and regulatory work – in an attempt to develop a product that could be cleared and commercialized and, ultimately, yield a return on the company's [redacted] investment.

***1. R&D Efforts and Challenges***: With respect to its R&D efforts, Bard conducted approximately thirteen animal studies (Joint SUMF ¶ 105, App. Ex. 5, Misener Dep. Ex. 8 at 3) and i[redacted] (Joint SUMF ¶ 40, App. Ex. 5, Misener Dep. Tr. 245:18-20; App. Ex. 9, Davis Dep. Ex. 5). Unfortunately, many of those animal studies provided [redacted] results. (Joint SUMF ¶ 43, App. Ex. 7, Phillips Dep. Tr. 63:5-6, 63:13-21; Joint SUMF ¶ 44, App. Ex. 5, Misener Dep. Tr. 116:20-24; Bard SUMF ¶ 18, Mantell Decl., Ex. C, Misener Dep. Tr. 117:7-10.) Undeterred, and dedicated to capitalizing on its [redacted] investment in a promising, next-generational technology, the team focused on developing a bench model that they could use to

gather data instead. (Joint SUMF ¶ 45, App. Ex. 9, Davis Dep. Tr. 10:13-18.) Yet, despite continued research and exploration of a variety of potential bench model designs, those efforts [redacted] (Bard SUMF ¶ 20; App. Ex. 9, Davis Dep Tr. 18:20-21; Bard SUMF ¶ 20; App. Ex. 9, Davis Dep Tr. 19:12-22.) To be commercially reasonable, Bard's efforts need not be successful; they must exist. *See Sekisui Am. Corp.*, 15 F. Supp. 3d at 378, 381 (despite unsuccessful attempts to obtain clinical data, company's work was commercially reasonable as a matter of law, requiring dismissal).

During this time, Bard (a company that had been developing and manufacturing [redacted] devices for years) made the reasonable business decision to narrow its focus to the [redacted] application, as opposed to trying to develop both a [redacted] application simultaneously. (*See* Bard SUMF ¶ 22, Mantell Decl., Ex. E, Davis Dep. Tr. 67:6-9; Joint SUMF ¶ 48, App. Ex. 5, Misener Dep. Tr. 91:2-6; Joint SUMF ¶ 48, App. Ex. 9, Davis Dep. Ex. 3, BAS-3DT 0053803). Importantly, this decision was in line with the Parties' Agreement. The Purchase Agreement contemplates development of "a Bard Product" in the "Buyer Field," which, by definition, encompasses a product incorporating either the [redacted] application. (Joint SUMF ¶ 9, App. Ex. 1, Purchase Agreement Section 1.01.) Under the circumstances, Bard's decision to focus on an implementation that it believed would be clinically and commercially successful was clearly driven by its good faith and commercial reasonableness.

Still, the team ran into [redacted] with the [redacted] as well. (Joint SUMF ¶ 49, App. Ex. 5, Misener Dep. Tr. 111:16-17; Joint SUMF ¶ 50, App. Ex. 5, Misener Dep. Tr. 111:3-7; *see also* Joint SUMF ¶ 51, App. Ex. 7, Phillips Dep. Tr. 64:22-23; Bard SUMF ¶ 21; App. Ex. 7, Phillips Dep. Tr. 64:9-13). Bard tried a wide variety of approaches to get the Precisive Navigation Technology to function as was contemplated by the parties – and as defined in the Purchase Agreement itself – when Bard decided to pay 3DT [redacted] in 2013. But no

matter what Bard did, they could not develop a safe and effective product incorporating the Precisive Navigation Technology. These "technological failures," which were no doubt as disappointing to Bard as to 3DT, permitted Bard to avoid payment of the Full Milestone Payment as set forth in the Development Agreement. (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.)

***2. Marketing Efforts and Challenges***: Of course, obtaining clinician approval and positive feedback is also necessary to the marketing and sale of a medical device – without an eager customer base that believes the product is usable, the product simply will not sell. In this regard, the team engaged in marketing activities such as research studies and physician conferences (Joint SUMF ¶¶ 57, 58, App. Ex. 6, Decheek Dep. Tr. 22:25-23:9), in order to identify, [redacted] (Joint SUMF ¶ 61, App. Ex. 6, Decheek Dep. Tr. 24:11-20; Bard SUMF ¶ 28; Mantell Decl., Ex. B, Phillips Dep. Tr. 88:7-25.) Those efforts likewise constituted good faith, commercially reasonable efforts to develop a product incorporating the Precisive Navigation Technology consistent with Bard's own business judgment.

***3. Regulatory Efforts and Challenges***: Finally, determining a regulatory pathway was imperative. No product – even if safe and effective in practice – can be brought to market without the FDA's blessing. (Joint SUMF ¶ 30, App. Ex. 7, Phillips Dep. Tr. 23:23-24:2, 24:11-12; *see generally* Joint SUMF ¶¶ 30-34.) Because seeking FDA clearance was a prerequisite to commercialization, it was perfectly reasonable for Bard to spend the time it did to formulate a strategy for obtaining such clearance – and one that would not negatively impact Bard's many other business endeavors. An overarching consideration that transcended all aspects of Bard's business as a medical device developer motivated Bard's regulatory process. The team was concerned with preserving Bard's stellar reputation with the FDA, particularly in light of a

[redacted] (Joint SUMF ¶ 55, App. Ex. 7, Phillips Dep. Tr. 37:4-10; Joint SUMF ¶ 56, App. Ex. 7, Phillips Dep. Tr. 127:13-20.) [redacted] (*See* Bard SUMF ¶ 26; App. Ex. 7, Phillips Dep. Tr. 126:21:127:12.) Such concern is commercially reasonable as a matter of law, even without regard to the deferential standard that applies under the Agreements at issue here. *See Holland Loader*, 313 F. Supp. 3d at 474 (no breach of contract where defendant turned down a business opportunity for which it could not meet deadlines while following internal process, as it "operated for 135 years and has a reputation in the global mining market that it seeks to uphold[,] requir[ing] that any product or system that it sells comply with its internal safety, design, and engineering specifications"). Bard wanted to commercialize the Precisive Navigational Technology while also maintaining credibility with a regulator—credibility that is core to its entire business. That concern was reasonable and warranted. By no means was Bard acting "arbitrarily, irrationally or without reasonable basis," as required for 3DT to prevail on its breach of contract claim. *See ProSource Tech., LLC,* 2015 WL 5797028, at *12.

What is more, under the Parties' Agreement, FDA 510(k) clearance triggers the Full Milestone Payment to 3DT. Thus, it is untenable for 3DT to fault Bard for its diligence and measured approach to the regulatory aspect of the project when its receipt of [redacted] ultimately hinges on Bard's success, and given that 3DT does not have regulatory expertise. (Bard SUMF ¶¶ 1, 2, Mantell Decl., Ex. A, Kassab Dep. Tr. 34:3-9; 22:21-23:17.) Indeed, none of the technologies that 3DT has licensed or sold has ever been incorporated into a commercialized product. (Bard SUMF ¶ 2, Mantell. Decl. Ex. A, Kassab Dep. Tr. 34:3-9.)

Specifically, to obtain 510(k) clearance, federal statutes and FDA regulations require Bard to demonstrate that its new device is "substantially equivalent" to a legally marketed "predicate" device. 21 U.S.C. §§630(k), 360(n), 360c(f) (1) & 360c(i) (1) (A); 21 C.F.R. §807.92(a) (3).

[redacted] (Bard SUMF ¶ 8, Mantell Decl., Ex. A, Kassab Dep. Tr. 76:11-77:19, Bard SUMF ¶ 9, Mantell Decl., Ex. A, Kassab Dep. Tr. 77:20-23, Bard SUMF ¶ 23, Mantell Decl., Ex. B, Phillips Dep. Tr. 91:12-25) and [redacted] (Bard SUMF ¶ 8, Mantell Decl., Ex. A, Kassab Dep. Tr. 76:11-77:19; Bard SUMF ¶ 9, Mantell Decl., Ex. A, Kassab Dep. Tr. 77:20-23.)

[redacted] Mr. Phillips performed significant research to identify predicate devices for the 510(k) submission. (Joint SUMF ¶ 52, App. Ex. 7, Phillips Dep. Tr. 54:11-14; Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 54:11-14; Bard SUMF ¶ 27, App. Ex. 7, Phillips Dep. Tr. 54:15-22.) Based on that research, he determined that the best course of action would be to [redacted]. (Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 51:12-15.) Mr. Phillips' proposed [redacted]. (Bard SUMF ¶ 30, App. Ex. 7, Phillips Dep. Tr. 128:6-20.) [redacted] As both Bard and Dr. Kassab understood, if the FDA deemed the identified predicates inappropriate or the submission insufficient, the product would be subjected to a more stringent FDA review process, and costs would increase exponentially. (Bard SUMF ¶ 13, Mantell Decl., Ex. B, Phillips Dep. Tr. 55:19-24; Bard SUMF ¶ 14, Mantell Decl., Ex. A, Kassab Dep. Tr. 119:8-11.) In short, under the circumstances, determining a 510(k) pathway for the Precisive Navigation Technology was a [redacted]

[redacted] For that reason, the regulatory team decided that the concept phase of development should not be closed unless and until a defined regulatory strategy was approved. (Joint SUMF ¶ 81, App. Ex. 5, Misener Dep. Tr. 155:18-20; App. Ex. 7, Phillips Dep. Tr. 110:21-111:5; Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 110:21-111:5; *see also* Joint SUMF ¶ 81, App. Ex. 8, Zentgraf Dep. Ex. 2 (Concept Design Review Meeting Minutes executed by others, other than regulatory, in October 2015).)

As with any new product, Bard's regulatory strategy for Penske was memorialized in document called a "RACA." As reflected in deposition testimony and documents produced in discovery, that document was revised several times and there were ongoing discussions about its contents. (Bard SUMF ¶ 25, App. Ex. 7, Phillips Dep. Tr. 128:24-129:11.) Indeed, from October 2015 through January 2016, Mr. Phillips and his then-supervisor, Ms. Hamblin, discussed Penske in fairly regular weekly meetings. (Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-8.) Notably, Bard did not allow its ongoing regulatory efforts to prevent other aspects of the project from continuing. The team pushed forward into feasibility activities, including by looking at technical concepts and risks, while the regulatory strategy was formalized and the Concept Design Meeting Minutes were routed for signature. (Bard SUMF ¶ 38, Mantell Decl., Ex. C, Misener Dep. Tr. 156:22-157:6; Bard SUMF ¶ 39, Mantell Decl., Ex. C, Misener Dep. Tr. 157:13-19; Bard SUMF ¶ 40, Mantell Decl., Ex. C, Misener Dep. Tr. 157:20-158:4.; Bard SUMF ¶ 41, Mantell Decl., Ex. B, Phillips Dep. Tr. 121:9-15.) Work on the aforementioned animal studies and other solutions was done during March 1, 2016 to September 1, 2016 – *after* the third anniversary of the Agreements in August 2016. (Joint SUMF ¶ 85, App. Ex. 5, Misener Dep. Tr. 276:21-277:16; Joint SUMF ¶ 86, App. Ex. 7, Phillips Dep. Ex. 17.)

***4. Efforts After the Third Anniversary of the Parties' Agreements***: Bard's efforts continued after the third anniversary. Most notably, months after the third anniversary, on

December 8, 2016, the team signed off on the Concept Design Review Meeting Minutes. (Joint SUMF ¶ 98, App. Ex. 8, Zentgraf Dep. Ex. 2; Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2.) Further, Bard worked to negotiate and sign a new NDA with Dr. Kassab to allow him to assist. (Joint SUMF ¶ 88, App. Ex. 4, Kassab Dep. Ex. 6; Joint SUMF ¶ 89, App. Ex. 13, 3DT Prod. 0000101-0000103; Joint SUMF ¶ 90, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 91, App. Ex. 14, BAS-3DT 0034928-0034929.) E-mail exchanges between the two took place just weeks before, days prior, and well after the third anniversary, evidencing a clear intent to push forward with development and get to the root of problems the team was facing. (Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 93, App. Ex. 14, BAS-3DT 0034928; Joint SUMF ¶ 96, App. Ex. 4, Kassab Dep. Ex. 7; Joint SUMF ¶ 97, App. Ex. 4, Kassab Dep. Ex. 7.)

3DT can point to nothing in the record indicating that, prior to the third anniversary of the Development Agreement, team members were instructed that the project had been abandoned or permanently shelved. To the contrary, on July 20, 2016, Mr. Misener expressly confirmed that the Penske project was still active, requested an expenditure budget through the end of 2016, and further work was planned for 2017. (Bard SUMF ¶ 44, Ex. F, BAS-3DT 0056333; Joint SUMF ¶ 95, App. Ex. 5, Misener Dep. Tr. 261:19-262:4 (e-mail indicating intent to continue work on Penske in "Q3 next year.")

On December 6, 2016, almost to the day the Concept Design Meeting Minutes were signed, 3DT notified Bard – for the very first time – of its potential concern regarding Bard's performance over the past three years, in the first of a series of letters exchanged regarding Penske. (Joint SUMF ¶¶ 102-08, App. Ex. 15, December 6, 2016 3DT Letter, App. Ex. 16, December 20, 2016 Bard Letter, App. Ex. 5, Misener Dep. Ex. 8, App. Ex. 17, May 10, 2017 3DT Letter, App. Ex. 18. May 19, 2017 Bard Letter.) These letters revealed Bard's desire to commercialize the technology, particularly where its upfront investment was six times greater than the potential Full

Milestone Payment that might be paid to 3DT, (Joint SUMF ¶ 104, App. Ex. 16, December 20, 2016 Bard Letter), and succinctly provide an overview of Bard's efforts.

### C. After the Third Anniversary and in Accord with the Development Agreement, Bard Exercised Its Good Faith Business Judgment to Focus on a Superior Technology.

Ultimately, Bard decided to focus its efforts on Modus II, which it believes to be superior for a number of reasons related to its [redacted] Importantly, the Development Agreement vested Bard, and Bard alone, with the determination of whether superior technology existed. (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.) Specifically, the provision states, in relevant part:

> Notwithstanding the foregoing, following the third (3rd) anniversary of the Effective Date, **<u>if Bard determines</u>**, in good faith, based upon its reasonable business judgment, that the Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable due to (i) technological failure(s) of the Bard Product to perform to Bard-required specifications [redacted] (ii) clinical failures, (iii) ineligibility for a 510(k) premarket notification application, or **<u>(iv) the creation, development and/or commercial availability of superior technology, then Bard shall have no obligation to continue to support the development of a Bard Product incorporating the Precisive Navigation Technology</u>** or seek the 510(k) clearance or CE Mark, as contemplated by Section 2.04(b) of the Purchase Agreement. . . .

(*Id.*) As demonstrated herein, this determination was made in good faith, consistent with Bard's reasonable business judgment.

While Modus II, like Penske, could potentially allow for [redacted] (Bard SUMF ¶ 31; App. Ex. 7, Philips Dep. Tr. 19:11-20:2), many other reasons led to Bard's commercially reasonable belief that Modus II was superior to Penske at that point in time. In

addition, Modus II was essentially a [redacted]. Joint SUMF ¶ 69, App. Ex. 7, Phillips Dep. Tr. 123:16-20; Joint SUMF ¶ 70, App. Ex. 7, Phillips Dep. Tr. 21:21-22:9). Moreover, because Bard had gone through the [redacted] (Joint SUMF ¶ 70, App. Ex. 7, Phillips Dep. Tr. 21:10-20), which would necessarily rely on a [redacted]. Modus II was also more [redacted]. (Bard SUMF ¶ 31; App. Ex. 7, Phillips Dep. Tr. 19:25-20:2; Joint SUMF ¶ 71, App. Ex. 5, Misener Dep. Tr. 200:22-25.) [redacted]

From an R&D perspective, Modus II, as [redacted]. (Joint SUMF ¶ 71, App. Ex. 5, Misener Dep. Tr. 200:8-19.) In addition, because Modus II's [redacted] the R&D work began in the feasibility phase. (*Id*. at Misener Dep. Tr. 208:20-22.) Accordingly, on December 20, 2016 – and twelve days after the final signature on the Concept Design Review Minutes was obtained on December 8, 2016 (Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2) – Rob Fredericks, Vice President & General Manager at Bard, informed 3DT that "Bard is currently focusing its attention on the development of an alternative, superior technology." (Joint SUMF ¶ 103, App. Ex. 16, December 20, 2016 Bard Letter.) Bard's February 2017 letter echoed Modus II's advantages, that it was expected to be [redacted] (Joint

SUMF ¶ 106, App. Ex. 5, Misener Dep. Ex. 8 at 4.) This decision was more than reasonable, given Modus II's demonstrated advantages.

Dr. Kassab's testimony supports the reasonableness of Bard's decision. He conceded that determining whether one product is superior to the other "could be" a multifactorial analysis (Bard SUMF ¶ 32, Mantell Decl., Ex. A, Kassab Dep. Tr. 121:1-4), noting that a device that has an [redacted] (*id.* at Kassab Dep. Tr. 121:5-11), [redacted] (*id.* at Kassab Dep. Tr. 124:3-8). In large [redacted]

### D. Bard Does Not Owe 3DT the Full Milestone Payment Because 510(k) Clearance Has Not Been Achieved

The Purchase Agreement provides for the Full Milestone Payment of an additional [redacted] to 3DT, on top of the [redacted] 3DT has already received, triggered by Bard's receipt of the "first 510(k) clearance from the FDA to market and sell a medical device that incorporates the Precisive Navigation Technology in the Buyer Field[.]" (Joint SUMF ¶ 10, App. Ex. 1, Purchase Agreement Section 2.04(b).) Clearly, despite the Penske team's significant efforts, no 510(k) clearance has yet been obtained. Therefore, this potential payment is not due and owing to 3DT. Instead, the Development Agreement expressly contemplated this situation. The Development Agreement allows Bard to rightfully halt its development efforts as explained above, but safeguards 3DT's right to receive the Full Milestone Payment if Bard obtains 501(k) clearance after future efforts. (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.) It states, in pertinent part:

> For clarity, the Parties understand and agree that, following any such discontinuance of support by Bard, **Bard shall have no obligation to pay the Full Milestone Payment** (or any one-half portion thereof), **unless**, **notwithstanding such discontinuance**, **Bard subsequently obtains the 510(k) clearance** and/or the CE Mark

> **trigging either the Full Milestone Payment** (or any one-half portion thereof), as contemplated by Section 2.04(b) of the Purchase Agreement.

(*Id.*) Bard intends to make good on its promise and pay 3DT the Full Milestone Payment if that payment becomes due in the future.

### E. Bard Does Not Owe 3DT the Full Milestone Payment Because the At-Will Discontinuance Provision Does Not Apply On These Facts

As discussed extensively above, Bard availed itself of the provision in the Development Agreement permitting it to cease development after the third anniversary without the Full Milestone Payment becoming due. While there is also a provision in the Purchase Agreement allowing Bard to halt development at any time and for any reason (provided it make the Full Milestone Payment), that provision simply does not apply here. (Joint SUMF ¶ 11, App. Ex. 1, Purchase Agreement Section 2.04(b).) For all the reasons stated above, this at-will discontinuance provision simply does not apply to these facts. Bard's concerted efforts to develop the Precisive Navigation Technology for more than three years, and its reasoned decision to pursue a superior technology at that time, fit squarely within the parameters of Section 2.1 of the Development Agreement. Therefore, Bard is relieved of its obligation to pay 3DT any additional money.

## II. BARD IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### A. The Claim is Duplicative of its Breach of Contract Claim

New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when it is based on the same facts as the breach of contract[.]" *Champagne v. United States*, 15 F. Supp. 3d 210, 221 (N.D.N.Y. 2014) (quoting *Washington v. Kellwood Co*., No. 05 CIV. 10034 (DAB), 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009) (internal quotations omitted). For example, in *MBIA Ins. Corp. v. Countrywide Home Loans, Inc*., the First Department held that a "cause of action for breach of the implied duty of

good faith and fair dealing should have been dismissed in its entirety" because "[t]he allegation that defendant exercised its discretion in bad faith merely restate[d] the contract-based claims[.]" 87 A.D.3d 287, 297 (1st Dep't 2011). This is essentially what 3DT claims here. 3DT alleges "that it "initially … received occasional requests for assistance with the project from Bard" (Compl. ¶ 17), but that "[p]rior to August 29, 2016, Bard stopped requesting assistance from 3DT, and provided no information regarding its efforts to advance the Precisive Navigation Technology, commercialize the Products, and obtain FDA approval for the Products," (*id*. ¶ 19) "in order to avoid payment of the Full Milestone Payment" (*id*. ¶ 22).

Here, the Development Agreement expressly requires Bard to act in good faith. Therefore, any claim of an implied duty of good faith is duplicative of the breach of contract claim. This Court should dismiss this claim as a matter of law.

**B. 3DT Impermissibly Seeks to Create New Contractual Rights and Contradict the Express Language of the Agreement**

Moreover, a plaintiff cannot prevail on a claim for breach of the implied covenant of good faith and fair dealing unless: "(1) defendant must owe plaintiff a duty to act in good faith and conduct fair dealing; (2) defendant must breach that duty; and (3) the breach of duty must proximately cause plaintiff's damages." *Champagne*, 15 F. Supp. 3d at 221 (citation omitted). "The implied 'covenant [of good faith and fair dealing] embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 466 (S.D.N.Y. 2013) (subsequent history omitted) (citing 5*11 W. 232nd Owners Corp. v. Jennifer Realty Co*., 98 N.Y.2d 144, 153 (N.Y. 2002)).

The scope of this implied covenant has limits, however. It "cannot be construed so broadly as effectively … to create independent contractual rights." *Fesseha v. TD Waterhouse Inv. Servs., Inc.*, 761 N.Y.S.2d 22, 23 (1st Dep't 2003) (citations omitted). Further, conduct expressly

sanctioned by the contract cannot form the basis for an alleged breach. *See, e.g.*, *Clalit Health Servs. v. Israel Humanitarian Found.*, 395 F. Supp. 2d 21, 23 (S.D.N.Y. 2005) (citing 23 Richard A. Lord, Williston on Contracts § 63:22 (4th ed. 2004) ("There can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged[.]")).

The Development Agreement governs the agreement of the parties with respect to "the design, development, validation and testing of one or more new Bard products in the Buyer Field that utilizes, incorporates, and/or employs the Precisive Navigation Technology." (Joint SUMF ¶ 13, App. Ex. 2, Development Agreement Preamble.) This language neither requires Bard to keep 3DT informed about its Penske development activities and actions to obtain FDA approval prior to the third anniversary, (Compl. ¶ 39), nor requires Bard to "provide to 3DT the information necessary to ascertain the validity of Bard's assertion that it had allegedly identified a technology that is superior to the Precisive Navigation Technology" (*id*. at 40). Indeed, as explained above, the Agreements vest Bard with the sole determination of what constitutes "the creation, development or commercial availability of superior technology." Bard was under no obligation to provide such information to 3DT under the governing agreements, and any refusal to do so could not, and did not, deprive 3DT of the fruits of the contract, *i.e.*, payment of the Full Milestone Payment either upon 510(k) clearance or upon Bard's determination to discontinue development at any time. The language of the Development Agreement expressly defers to Bard's good faith, reasonable business judgment with respect to the manner in which it staffed and operated the Penske project and in its determination of the existence of a superior technology. (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.) The implied covenant "does not operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly

bargained-for benefits." *Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, No. 08 Civ. 4341 (RJS), 2009 WL 1054830, at *5 (S.D.N.Y. Apr. 17, 2009). The Development Agreement's bargained-for terms expressly vested Bard with such discretion, without input from 3DT. This also makes sense, because Bard had substantial experience in bringing a medical device to market, whereas 3DT had none. Similarly, even if Bard had a duty to keep 3DT informed or otherwise provide information to 3DT about the Penske project, 3DT cannot demonstrate damages flowing from any breach because any purported lack of information was not the cause of, and is wholly unrelated to, 3DT's purported harm.

**CONCLUSION**

For the foregoing reasons, Defendant Bard Access Systems, Inc. respectfully requests that this Court grant its Motion for Summary Judgment on all claims in the Complaint.

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

By: /s/ *Natalie* H. Mantell
Natalie H. Mantell

Natalie H. Mantell
Meghan McSkimming
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
Facsimile: (973) 624-7070
nmantell@mccarter.com
mmcskimming@mccarter.com

*Attorneys for Defendant*
*Bard Access Systems, Inc.*

Dated: March 26, 2021