**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| 3DT HOLDINGS LLC,<br><br>Plaintiff,<br><br>v.<br><br>BARD ACCESS SYSTEMS, INC.,<br><br>Defendant. | ) | Case No. 1:17-cv-05463-LJL |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**3DT HOLDINGS LLC'S**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

UNDISPUTED FACTUAL BACKGROUND ..... 4

ARGUMENT ..... 7

I. IN COMPLIANCE WITH THE DEVELOPMENT AGREEMENT, BARD PROPERLY RELIED ON ITS GOOD FAITH, REASONABLE BUSINESS JUDGMENT TO DETERMINE THAT THE EXISTENCE OF A SUPERIOR TECHNOLOGY MADE CONTINUED DEVELOPMENT OF THE PRECISIVE NAVIGATION TECHNOLOGY NO LONGER COMMERCIALLY PRACTICABLE. ..... 7

A. After the Third Anniversary and in Accord with the Development Agreement, Bard Determined that Development of the Precisive Navigation Technology Was No Longer Commercially Practicable due to Superior Technology. ..... 9

1. The Existence of a Superior Technology Defines When Development is "No Longer Commercially Practicable" ..... 9

2. Bard Exercised Its Good Faith, Reasonable Business Judgment to Determine Whether A Superior Technology Exists and What Constitutes a Superior Technology ..... 11

B. Bard's Hope to Recoup a Return on Its Investment Has No Bearing on Bard's Good Faith, Reasonable Business Determination, that a Superior Technology Exists ..... 16

II. BARD DOES NOT OWE 3DT THE FULL MILESTONE PAYMENT BECAUSE THE CONDITIONS PRECEDENT HAVE NOT OCCURRED. ..... 17

A. 510(k) Clearance Has Not Been Achieved ..... 18

B. The At-Will Discontinuance Provision Does Not Apply ..... 18

III. BARD COMPLIED WITH ITS DEVELOPMENT OBLIGATIONS FOR MORE THAN THREE YEARS ..... 19

A. The Development Agreement Vests Bard With Discretion to Provide Commercially Reasonable Support to the Penske Project for Three Years, Guided By Good Faith and Reasonable Business Judgment ..... 19

B. Bard Provided Commercially Reasonable Personnel, Financial, and Other Support to Develop the Precisive Navigation Technology, as Determined by Bard, in Good Faith, Based Upon its Reasonable Business Judgment, For More than Three Years ....21

1. Bard, At a Minimum, Provided the Support Required By This Low Threshold ....21

2. Bard Exceeded the Development Agreement's Standards ....25

IV. THE OPINIONS OF 3DT'S EXPERT, MR. WADDELL, ARE IRRELEVANT TO THE COURT'S ANALYSIS OF THE CONTRACTUAL STANDARD BECAUSE IT IS BASED ON FALSE ASSUMPTIONS AND HE HAS NO KNOWLEDGE OF BARD'S BUSINESS. ....33

V. 3DT IS NOT ENTITLED TO PREJUDGMENT INTEREST ....37

CONCLUSION ....37

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*,
821 F.3d 297 (2d Cir. 2016)....17

*Breezy Point Co-op., Inc. v. Cigna Prop. & Cas. Co.*,
868 F. Supp. 33 (E.D.N.Y. 1994) ....33

*EMA Fin., LLC v. 5Barz Int'l, Inc.*,
No. 18-CV-4995 (VEC), 2019 WL 8503357 (S.D.N.Y. Sept. 18, 2019)....37

*Holland Loader Co., LLC v. FLSmidth A/S*,
313 F. Supp. 3d 447 (S.D.N.Y. 2018)....13, 20, 21, 23, 28, 33

*Int'l Bus. Machs. Corp. v. United Microelectronics Corp.*,
764 F. App'x 9 (2d Cir. 2019) ....18

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*,
655 F.3d 136 (2d Cir. 2011)....13

*M/A-COM Sec. Corp. v. Galesi*,
904 F.2d 134 (2d Cir. 1990)....13

*Munn v. Hotchkiss Sch.*,
24 F. Supp. 3d 155 (S.D.N.Y. 2014)....36

*In re Namenda Direct Purchaser Antitrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018)....35

*Sekisui Am. Corp. v. Hart*,
15 F. Supp. 3d 359 (S.D.N.Y.2014)....20, 26

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
441 F. Supp. 3d 1 (S.D.N.Y. 2020) ....20

## State Cases

*Cambridge Petrol. Holdings, Inc. v. Lukoil Americas Corp.*,
11 N.Y.S.3d 58 (N.Y. App. Div. 2015) ....12

*Ecoline, Inc. v. W.H. Peepels Co.*,
60 N.Y.S.3d 358 (N.Y. App. Div. 2017) ....37

*NML Cap. v. Republic of Argentina*,
17 N.Y.3d 250 (N.Y. 2011) ....37

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685 (N.Y. 1995) ....................12, 17, 18

*ProSource Tech., LLC v. Housing Trust Fund Corp.*, No. 5972-14, 2015 WL 5797028 (N.Y. Sup. Ct. Albany Cty. Oct. 2, 2015) ....................13, 29

*S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272 (N.Y. 2005) ....................12

**Federal Statutes**

21 U.S.C. § 360(k) ....................29

21 U.S.C. § 360(n) ....................29

21 U.S.C. § 360c ....................29

**Rules**

FED. R. EVID. 401 ....................35

FED. R. EVID. 702 ....................34

**Regulations**

21 C.F.R. § 807.92 ....................29

**PRELIMINARY STATEMENT**

3DT's motion for summary judgment is nothing more than a desperate attempt to squeeze even more money out of an almost eight-year old deal to fund its struggling business. 3DT cannot prevail in the face of both (1) unambiguous contractual language that provides Bard with significant discretion to develop the Penske project for three years consistent with Bard's own usual business practices, and, after that, to determine when certain enumerated events make development no longer commercially practicable, and (2) case law that establishes a low standard for commercial reasonableness, even where the contract does not provide the performing party with additional flexibility to determine its actions, as the contract at issue here does. To avoid these legal standards, which require judgment for Bard, 3DT distorts the operative contractual language, and even improperly attempts to introduce an expert to change the governing legal standard. 3DT's arguments fail as a matter of law.

As set forth herein and in its moving brief in support of its summary judgment motion, Bard properly invoked Section 2.1 of the Development Agreement when, after the third anniversary of the Effective Date, it determined, in good faith and exercising its reasonable business judgment, that Exploitation of a Bard Product incorporating the Precisive Navigation Technology was no longer commercially practicable "due to" – or "because of" -- "the creation, development and/or commercial availability of superior technology." 3DT incorrectly argues that Bard was required to make two separate determinations, but 3DT's interpretation is belied by the contractual language itself. The triggering events *define* the limited circumstances when development is no longer commercially practicable; their existence necessarily *means* that development of the Precisive Navigation Technology is no longer commercially practicable, and Bard rightfully discontinued development at that time with no payment owed to 3DT. Moreover, even if 3DT's tortured interpretation were accepted, Bard satisfied its obligation in its December

20, 2016 letter to 3DT, explicitly invoking and quoting the operative section of the Development Agreement. 3DT hangs its hat on the single fact that Bard hopes to one day recoup some portion of its [redacted] upfront investment in the Precisive Navigation Technology, but the Agreement expressly contemplates exactly that circumstance, and allows Bard to discontinue development anyway.

In addition, the terms of the Development Agreement logically provide Bard with the ability to use its good faith and reasonable business judgment to determine whether a "superior technology," or any other of the enumerated triggering events allowing Bard to discontinue development, exists. That is exactly what Bard did, and 3DT has no evidence demonstrating otherwise. Moreover, 3DT and Bard are sophisticated parties who were represented by counsel in this arms' length negotiation. 3DT cannot now attempt to change the contractual language, and its attempt to call Bard's good faith, sound business decision into question is misplaced. The undisputed evidence shows that after the three-year anniversary of the Development Agreement's Effective Date, Bard exercised its bargained-for discretion to determine Modus II was a "superior technology" that presented various advantages in design, regulatory pathway, usability, and lower costs. Accordingly, Bard rightfully discontinued its development of the Penske project.

Finally, unlike the cases 3DT relies on, which discuss industry standards for commercial reasonableness, these Agreements provide *Bard* with significant discretion – to provide commercially reasonable personnel, financial, and other support to develop "*as determined by Bard*, in good faith, based upon *its* reasonable business judgment." Throughout its brief, 3DT ignores this discretion, and attempts to convert the bargained-for contractual language into a self-serving standard that was neither bargained for nor agreed to. In reality, however, 3DT's apparent disappointment in the outcome of this project, and its expert's "opinion" as to how he may have done the project differently (which is riddled with baseless assumptions) are plainly irrelevant to

whether Bard has unequivocally exercised good faith and reasonable business judgment in carrying out its obligations under the Agreement.

While 3DT nit-picks at Bard's efforts to develop the Precisive Navigation Technology, the law is clear that the bar for commercial reasonableness is low. Indeed, it merely requires that a party perform "*at least some activity*," and provide "*some conscious exertion* to accomplish the agreed goal." Here, the undisputed facts prove that Bard met that standard as a matter of law, and in fact went far beyond what is required. It is undisputed that Bard assembled a cross-functional team that held meetings and generated minutes, conducted numerous animal studies, worked to create a bench model, invested manpower researching predicate devices upon which a submission to the FDA would be based, prepared a lengthy regulatory plan, devoted significant time and effort to [redacted], conducted market research studies and attended physician conferences to obtain customer feedback, executed a Non-Disclosure Agreement with Dr. Kassab in the days leading up to the third anniversary, and requested a budget for the project through the end of 2016. These efforts continued until December 2016 – after the third anniversary of the Effective Date – when the Penske Concept Design Meeting Minutes were fully signed, and certainly satisfy the standard here. But this is merely an abbreviated version of the full story – Bard well exceeded the commercially reasonable efforts required, constructing a [redacted] development.

Bard fulfilled its contractual obligations in every respect, and the Court should deny 3DT's motion for summary judgment.

## UNDISPUTED FACTUAL BACKGROUND

Bard hereby incorporates its Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 filed in support of its Motion for Summary Judgment and the parties' Joint 56.1 Statement of Facts. For purposes of this Brief in Opposition to 3DT's Motion for Summary Judgment, Bard provides the following concise Undisputed Factual Background:

Bard staffed a cross-functional Penske team with a program manager as project leader (Joint Rule 56.1 Statement of Facts ("Joint SUMF") ¶¶ 20, 21 App. Ex. 5, Misener Dep. Tr. 10:8-11:2, 47:11-15), a regulatory specialist (Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15), an R&D engineer (Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22), and a product manager (Joint SUMF ¶ 23, App. Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5), and hired two full-time engineers who worked on the project (Joint SUMF ¶ 22, App. Ex. 5, Misener Dep. Tr. 80:21-81:15, Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22, Joint SUMF ¶ 23, App. Ex. 5, Misener Dep. Tr. 81:7-15). Anthony Misener began to hold regular Penske Integration Meetings, which were memorialized in meeting minutes. (Joint SUMF ¶¶ 24, 25 App. Ex. 5, Misener Dep. Tr. 79:2-4, 20-23.)

Bard conducted extensive, wide-ranging development activities. On the R&D front, Bard performed multiple animal studies, including for the [redacted]. (Joint SUMF ¶ 40, App. Ex. 4, Kassab Dep. Tr. 66:24-68:9.) After the animal studies, the R&D team analyzed the results. (*See, e.g.*, Joint SUMF ¶ 41, App. Ex. 9, Davis Dep. Tr. 40:5-8; Joint SUMF ¶ 42, App. Ex. 9, Davis Dep. Ex. 4; Joint SUMF ¶ 43, App. Ex. 7, Phillips Dep. Tr. 63:5-6, 63:13-21; Joint SUMF ¶ 44, App. Ex. 5, Misener Dep. Tr. 116:20-24.) The team also worked on a bench model that Bard could use to simulate the technology "on the bench rather than having to go do an animal study every time we wanted to gather data." (Joint SUMF ¶ 45, App. Ex. 9, Davis Dep. Tr. 10:13-18.)

The marketing team was tasked with evaluating clinician usability. Tony Decheek testified that "we would have conducted research studies," "whether it was quantitative, smaller one- or two-page studies and larger qualitative 30-page studies[, w]e would have done some of those[.]" (Joint SUMF ¶ 57, App. Ex. 6, Decheek Dep. Tr. 22:25-23:4.) The team also "attended some physician conferences" to obtain customer feedback. (Joint SUMF ¶ 58, App. Ex. 6, Decheek Dep. Tr. 23:5-9.)

Bard also expended significant time and effort developing a regulatory strategy to obtain FDA 510(k) clearance. Chris Phillips testified that he researched "a lot of the background," "the different potential predicates," "further background research" and "further research into the regulatory paths." (Joint SUMF ¶ 52, App. Ex. 7, Phillips Dep. Tr. 54:11-14.) In particular, he researched predicate devices, including those [redacted], to understand those technologies and to determine whether [redacted]. (Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 54:11-14.) [redacted] (*Id*. at Phillips Dep. Tr. 51:12-15.)

Chris Phillips also worked with his manager in developing the Penske regulatory strategy. (Joint SUMF ¶ 55, App. Ex. 7, Phillips Dep. Tr. 37:4-10.) From September 10, 2015 to January 25, 2016 and beyond, Chris Phillips had "fairly regular weekly meetings" and the "topic of Penske was discussed with some regularity" Phillips does not know the number of meetings, "but the topic of Penske and, how to close up the concept review, and how [to] get to a point where the regulatory [redacted] (Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-8.)

Notably, Bard negotiated and executed a Non-Disclosure Agreement with Dr. Kassab during the summer of 2016 and in the days leading up to the third anniversary of the Development

Agreement. On May 6, 2016, Anthony Misener emailed Dr. Kassab a draft of a nondisclosure agreement. (Joint SUMF ¶ 88, App. Ex. 4, Kassab Dep. Ex. 6.) On May 12, 2016, 3DT's counsel provided comments on the proposed nondisclosure agreement to Anthony Misner. On August 5, 2016, Anthony Misener emailed a revised draft of the NDA to Dr. Kassab. (Joint SUMF ¶ 90, App. Ex. 14, BAS-3DT 0034929.) On August 8, 2016, 3DT provided minor comments, and Anthony Misener responded that same day, stating, "[i]f Ghassan is ready to sign, then would you send me a scan of the signed complete document and I will get the fully executed document back to the two of you." (Joint SUMF ¶ 91, App. Ex. 14, BAS-3DT 0034928-0034929.) On August 19, 2016, Anthony Misener followed up with Dr. Kassab via email saying, "Just checking in. Let me know if you are the [sic] ok with this latest version of the NDA." (Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929.) Dr. Kassab executed the NDA that day. (*Id*. at BAS-3DT 0034929.)

Mr. Misener also requested a budget for Penske through the end of 2016. On July 18, 2016, Anthony Misener emailed Ashley Krogh, Sr. Financial Analyst, confirming the Penske project "is still active. However it has shifted in priorities with the team." (Bard's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Bard SUMF") ¶ 43, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056304.) On July 19, 2016, Ms. Krogh asked Mr. Misener for "the spend breakout for the [redacted] in 2017." (*Id.*) On July 20, 2016, Anthony Misener requested a budget for Penske, stating "I expect ~[redacted]/ month from August through December of this year." (Bard SUMF ¶ 44, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056333.)

The third anniversary of the parties' Agreement was August 29, 2016. (Joint SUMF ¶ 94; *see* App. Ex. 2, Development Agreement.) Now that the Non-Disclosure Agreement between Bard and Dr. Kassab had been executed, on September 19, 2016, Dr. Kassab emailed Anthony Misener asking "[s]hould we chat to outline next steps per earlier email?" (Joint SUMF ¶ 96, App. Ex. 4, Kassab Dep. Ex. 7.) On September 30, 2016, Anthony Misener responded to Dr. Kassab stating:

"I am working with my team to try to bring together some information from our past work to provide context to our questions. We are having a meeting next week to bring everything together and distill it down to the key issues. I can tell you that one thing that I would like to better understand is the lower level theory behind the experimental set-up and the assumptions made to simplify the approach." (Joint SUMF ¶ 97, App. Ex. 4, Kassab Dep. Ex. 7.)

The regulatory team signed off on the Concept Design Review Meeting Minutes in November 2016. (Joint SUMF ¶ 98, App. Ex. 8, Zentgraf Dep. Ex. 2.) The final signature on the Concept Design Review Minutes was obtained on December 8, 2016, months after the third anniversary of the Effective Date. (Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2)

## ARGUMENT[1]

### I. IN COMPLIANCE WITH THE DEVELOPMENT AGREEMENT, BARD PROPERLY RELIED ON ITS GOOD FAITH, REASONABLE BUSINESS JUDGMENT TO DETERMINE THAT THE EXISTENCE OF A SUPERIOR TECHNOLOGY MADE CONTINUED DEVELOPMENT OF THE PRECISIVE NAVIGATION TECHNOLOGY NO LONGER COMMERCIALLY PRACTICABLE.

In an apparent attempt to fund its "in the red" business, 3DT argues that Bard must pay the [redacted] Full Milestone Payment because Bard did not invoke Section 2.1 of the Development Agreement that permits Bard to discontinue development of the Precisive Navigation Technology with no payment due. 3DT is simply wrong, and its position is based upon a fundamental misunderstanding of the applicable contractual standards. Specifically, Section 2.1 of the Development Agreement provides:

> Notwithstanding the foregoing, following the third (3rd) anniversary of the Effective Date, **if Bard determines, in good faith, based upon its reasonable business judgment**, that the Exploitation of a Bard Product incorporating the Precisive Navigation Technology is **no longer commercially practicable**

[1] In addition to the arguments set forth herein, Bard incorporates by reference and refers the Court to arguments set forth in its Memorandum of Law in Support of its Motion for Summary Judgment. (ECF No. 78, 82 (under seal).)

> **<u>due to</u>** (i) technological failure(s) of the Bard Product to perform to Bard-required specifications [redacted], (ii) clinical failures, (iii) ineligibility for a 510(k) premarket notification application, or **<u>(iv) the creation, development and/or commercial availability of superior technology, then Bard shall have no obligation to continue to support the development of a Bard Product incorporating the Precisive Navigation Technology</u>** or seek the 510(k) clearance or CE Mark, as contemplated by Section 2.04(b) of the Purchase Agreement. **<u>For clarity, the Parties understand and agree that, following any such discontinuance of support by Bard, Bard shall have no obligation to pay the Full Milestone Payment (or any one-half portion thereof), unless, notwithstanding such discontinuance, Bard subsequently obtains the 510(k) clearance</u>** and/or the CE Mark trigging either the Full Milestone Payment (or any one-half portion thereof), as contemplated by Section 2.04(b) of the Purchase Agreement.

(Joint SUMF ¶ 14, App. Ex. 2, Development Agreement, Section 2.1.)

As demonstrated herein, Bard properly exercised its discretion under the Development Agreement to determine that development is no longer commercially practicable. First, Bard is only required to determine that one of the stated bases in Section 2.1 exists – that is the essence of the commercial practicability determination. Contrary to 3DT's claim, Bard's hope to one day recoup some of its [redacted] investment has no bearing on this determination. Second, as reflected by the language of the operative contractual provision, this determination is subjective – *Bard*, not 3DT, has the ability and the discretion to determine whether a "superior technology" exists and what constitutes a "superior technology." Bard properly exercised its discretion, in its good faith, reasonable business judgment, and determined that development of a product incorporating the Precisive Navigation Technology was no longer commercially practicable due to the existence of Modus II, a superior technology. No payment to 3DT was or is required, and this Court should deny 3DT's motion.

### A. After the Third Anniversary and in Accord with the Development Agreement, Bard Determined that Development of the Precisive Navigation Technology Was No Longer Commercially Practicable due to Superior Technology.

#### 1. *The Existence of a Superior Technology Defines When Development is "No Longer Commercially Practicable"*

3DT incorrectly reads Section 2.1 of the Development Agreement to require Bard to make two determinations to avoid paying the Full Milestone Payment to 3DT: (1) that the development of a Bard Product incorporating the Precisive Navigation Technology was no longer commercially practicable, and that determination is (2) due to any of the circumstances listed within Section 2.1's romanettes – "(i) technological failure(s) of the Bard Product to perform to Bard-required specifications [redacted], (ii) clinical failures, (iii) ineligibility for a 510(k) premarket notification application, or (iv) the creation, development and/or commercial availability of superior technology." (3DT Br. at 25, 28.) 3DT's interpretation is wrong for several reasons.

First, 3DT ignores that the two phrases it attempts to separate are joined by the words "due to," which means "because of" or "as a result of." *Due to,* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/due%20to (last visited Apr. 15, 2021). Using that definition, the sentence would read:

> . . . if Bard determines, in good faith, based upon its reasonable business judgment, that the Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable **["because of"** or **"as a result of"]** . . . the creation, development and/or commercial availability of superior technology, then Bard shall have no obligation to continue to support the development of a Bard Product incorporating the Precisive Navigation Technology.

Thus, each romanette defines when the development of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable. The words "due to" make clear

that the creation, development and/or commercial availability of a superior technology ***means*** that the development of the Precisive Navigation Technology is no longer commercially practicable. 3DT's two separate determinations are one and the same.

This interpretation is the only one that makes sense. Recognizing the risk that the Penske project could encounter hurdles during development, particularly in light of the early stage, nascent technology Bard acquired (Bard SUMF ¶ 15, Mantell 3/26 Decl. Ex. D, Decheek Dep. Tr. 26:12-18), Bard and 3DT agreed that Bard need not pursue development after three years under certain circumstances. As 3DT notes, an agreement must be enforced according to its plain meaning. (3DT Br. 24.) The occurrence of any of these defined events, as determined by Bard, in its good faith, reasonable business judgment, justifies discontinuing development. Accordingly, development of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable, *by definition*, if any of the aforementioned events occur.

3DT's position is based in part on tortured readings of Bard's December 20, 2016 and February 21, 2017 letters to 3DT, in which Bard first informed 3DT of its determination and explained the resources it dedicated to the Penske project. 3DT's reading of these letters illustrates its illogical position. 3DT claims that Bard did not state in either letter that Exploitation of a Bard Product incorporating the Precisive Navigation Technology was no longer commercially practicable. (3DT Br. 29.) However, in its December 20, 2016 letter, Bard explicitly quoted and relied upon Section 2.1 of the Development Agreement, including by citing to that very language:

> Separately, I can confirm that Bard is currently focusing its attention on the development of an alternative, superior technology. As you may recall, Section 2.1 of the Development Agreement provides that after August 29, 2016, Bard is not obligated to continue to support the Development of the Precisive Navigation Technology if it determines, in good faith, based upon its reasonable business judgment, that the exploitation of such technology is **no longer commercially practicable due to, among other things, the creation development and/or commercial availability of superior technology**.

(App. Ex. 16 (emphasis added).) 3DT's contention is without merit.

Moreover, 3DT has no basis to challenge the words Bard used to communicate its determination, when it had no right to notice of the determination *at all*. Attempting to rewrite the agreement that it negotiated and signed, 3DT baldly asserts, without any support, that "[i]f Bard had made that specific determination [that development was no longer commercially practicable] it would have expressly informed 3DT of that decision and would not still consider the technology as having great value." (3DT Br. 30.) But the Development Agreement does not require Bard to inform 3DT of its determination. If 3DT wanted notice of such a determination, then it should have negotiated for that right.

**2.** *Bard Exercised Its Good Faith, Reasonable Business Judgment to Determine Whether A Superior Technology Exists and What Constitutes a Superior Technology*

Bard – not 3DT – is the entity that determines whether any of the four events in Section 2.1 has occurred. The Agreement clearly states, "following the third (3rd) anniversary of the Effective Date, **if Bard determines**, in good faith, based upon its reasonable business judgment…" that development is no longer commercially practicable due to any of the four triggering events, then it need not continue to pursue the venture to its detriment. That is exactly what Bard did.

The triggering events themselves are also deferential to Bard, guided by good faith and Bard's reasonable business judgment. For example, the existence of "technological failure(s) of the Bard Product to perform to *Bard-required* specifications" clearly depend on what Bard's specifications are. The term "clinical failures" is broad and so too subject to Bard's determination of when such failures exist. "[T]he creation, development and/or commercial availability of superior technology" is similarly a subjective assessment.

The Development Agreement logically allows Bard to make the determination as to whether such superior technology exists. This discretion makes sense in light of the [redacted]



ME1 36281579v.4

in upfront consideration Bard provided to 3DT, and because Bard purchased the Precisive Navigation Technology outright. Moreover, Bard, as the owner of this technology, negotiated for and obtained significant control over its development within the bounds of the contract. This is logical, because one company could deem a technology to be "superior" while another may not, because any determination will be informed by factors like the other products in a company's portfolio and in development, development costs, the company's business needs and opportunities for growth, its technical expertise, and market demand. Here, 3DT agreed at an arm's length that Bard would make this determination. "If [3DT is] dissatisfied with the consequences of [its] agreement, **the time to say so [was] at the bargaining table**." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co*., 86 N.Y.2d 685, 695 (N.Y. 1995) (third alteration in original) (emphasis added) (citations omitted). 3DT "may not rewrite the terms of an agreement because, in hindsight, it dislikes its terms." *Cambridge Petrol. Holdings, Inc. v. Lukoil Americas Corp*., 11 N.Y.S.3d 58, 59 (N.Y. App. Div. 2015).

Further, contrary to 3DT's contentions, Bard need not prove to 3DT that a technology is superior – its good faith belief that it is superior is sufficient. Requiring Bard to offer any such proof would rewrite the terms of the Development Agreement. "In cases of contract interpretation, it is well settled that when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms," *S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp*., 4 N.Y.3d 272, 277 (N.Y. 2005) (citations omitted), and that this is "particularly important" where "the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length," *id*. Here, two sophisticated parties negotiated and entered into the agreements at issue: 3DT is a self-described "innovation engine that looks for unmet needs in the medical community and develops technologies and solutions" (3DT Br. 4) and Bard is a market leader in the medical device manufacturing space. Both were represented by counsel in the

negotiation of this arm's-length transaction. The Development Agreement must be enforced as written. Thus, Bard's good faith business determination, based on its reasonable business judgment, that Modus II is a superior technology is enough. 3DT does not get to insert itself into that determination, even if Bard bases its decision on its own business concerns. Indeed, good faith "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 46 (N.Y. 1972), *cert. denied*, 409 U.S. 875 (1972)) (internal quotation marks omitted); *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 471 (S.D.N.Y. 2018) (citation omitted) ("A good faith standard has been held to apply when a contractual provision leaves implementation decisions to the discretion of the promisor."); *see also Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 146 (2d Cir. 2011) (citations omitted) ("In any number of contexts, reasonable discretion is commonly understood to allow a decision maker to choose from a broad range of choices not conflicting with law or reason."); *see also ProSource Tech., LLC v. Housing Trust Fund Corp.*, No. 5972-14, 2015 WL 5797028, at *12 (N.Y. Sup. Ct. Albany Cty. Oct. 2, 2015) (contract requiring "exercise of 'reasonable discretion' [is] an express promise that [a party] will not act arbitrarily, irrationally or without reasonable basis").

The contractual standard also incorporates principles from the business judgment rule arising in the corporate governance context, "[t]he judicial presumption that in making business decisions not involving direct self-interest or self-dealing, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest." *Business-Judgment Rule*, BLACK'S LAW DICTIONARY (11th ed. 2019). Here, the deferential

standard permits actions consistent with this rule, *i.e.*, those made on an informed basis, in good faith, and are in the honest belief that their actions are in the corporation's best interest.

3DT cannot meet its burden of proving that Bard acted in bad faith, contrary to law, or inconsistent with decisions that could be made pursuant to the business judgment rule. In fact, even 3DT's expert testified that he has no information about Bard "acting in an unfair or deceptive manner," because there is none. (Mantell 4/16/2021 Decl., Ex. J, Waddell Dep. Tr. 93:7-12.) On the contrary, Bard had good faith, reasonable business reasons for believing Modus II to be superior to Penske in several ways – based on Modus II's design, [redacted] Not only could Modus II [redacted] (*see* Bard SUMF ¶ 31; App. Ex. 7, Philips Dep. Tr. 19:11-20:2), many other reasons led to Bard's commercially reasonable belief that Modus II was superior to Penske in December 2016. In addition, Modus II was essentially a [redacted]. (Joint SUMF ¶ 69, App. Ex. 7, Phillips Dep. Tr. 123:16-20; Joint SUMF ¶ 70, App. Ex. 7, Phillips Dep. Tr. 21:21-22:9). [redacted] (*See* Bard SUMF ¶ 31; App. Ex. 7, Phillips Dep. Tr. 19:25-20:2; Joint SUMF ¶ 71, App. Ex. 5, Misener Dep. Tr. 200:22-25.) This stands in stark contrast to the Penske conceptualized [redacted]

In addition, from an R&D perspective, Modus II, [redacted]. (Joint SUMF ¶ 71, App. Ex. 5, Misener Dep. Tr. 200:8-19.) In

addition, because Modus II's algorithm had already been developed, the R&D work began in the feasibility phase. (*Id*. at Misener Dep. Tr. 208:20-22.) Accordingly, on December 20, 2016 – and twelve days after the final signature on the Concept Design Review Minutes was obtained on December 8, 2016 (Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2) – Rob Fredericks, Vice President & General Manager at Bard, informed 3DT that "Bard is currently focusing its attention on the development of an alternative, superior technology." (Joint SUMF ¶ 103, App. Ex. 16, December 20, 2016 Bard Letter.) Bard's February 2017 letter echoed Modus II's advantages, that it was expected to be [redacted] than a product incorporating the Precisive Navigation Technology. (Joint SUMF ¶ 106, App. Ex. 5, Misener Dep. Ex. 8 at 4.) This decision was more than reasonable, given Modus II's demonstrated advantages.

Dr. Kassab's testimony supports the reasonableness of Bard's good faith decision. He agreed that determining whether one product is superior to the other "could be" a multifactorial analysis (Bard SUMF ¶ 32, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 121:1-4), noting that a [redacted] (*id.* at Kassab Dep. Tr. 121:5-11), and it [redacted] (*id.* at Kassab Dep. Tr. 124:3-8). In large part, these same considerations weighed [redacted] 3DT has no evidence to claim that Bard did anything other than make an informed, good faith, reasoned business decision to pursue a superior technology. Its summary judgment motion should be denied.

**B. Bard's Hope to Recoup a Return on Its Investment Has No Bearing on Bard's Good Faith, Reasonable Business Determination, that a Superior Technology Exists**

In an attempt to distract the Court from the salient analysis governed by the contractual language, 3DT makes much of Penske team members' testimony that they continue to believe that Penske could one day be incorporated in a Bard device and commercialized. (3DT's Br. 27, 29.) 3DT highlights that testimony to argue that Bard never determined that the development of the Precisive Navigation Technology was "no longer commercially practicable," but 3DT's position again misunderstands the determination that the Development Agreement allows Bard to make.

First, as discussed above, the only relevant determination is Bard's good faith determination, in exercise of its reasonable business judgment, that a superior technology (or another basis enumerated in Section 2.1) exists. Whether Bard hopes to develop the Precisive Navigation Technology at some future time has nothing to do with whether a superior technology existed in 2016 that allowed Bard to discontinue further development of the Penske technology at that time. Indeed, the Agreement itself makes this clear, as it expressly contemplates the situation in which Bard would discontinue development of the Precisive Navigation Technology after the three-year anniversary without paying the Full Milestone Payment, which would only be due to 3DT if at some future date Bard obtained 510(k) clearance for a Bard product incorporating the technology. Thus, Bard's hope to commercialize the Precisive Navigation technology in the future is immaterial to the Court's analysis and 3DT's reliance on this testimony is misplaced.

Second, 3DT's reliance on the definition of "practicable" conveniently and improperly ignores the first word in the phrase -- "commercially" -- which describes any practicability determination here. Black's Law Dictionary defines "commercial," in pertinent part,[2] as "[o]f,

[2] For completeness, the balance of the definition of "commercial" is "1. Of, relating to, or involving the buying and selling of goods; mercantile <commercial advertising>. 2. Resulting or accruing from commerce or exchange <commercial gains>. 3. Employed in trade; engaged in commerce <commercial travelers>. 4. Manufactured for the

relating to, or involving the ability of a product or business to make a profit." *Commercial*, BLACK'S LAW DICTIONARY (11th ed. 2019). 3DT's omission of "commercially" is telling. Throughout its brief, 3DT conflates feasibility with commercial practicability, but just because it is possible to continue development of the Precisive Navigation Technology does not mean that it is a sound business practice for Bard to do so.

Section 2.1 allows Bard to determine, by exercising good faith, reasonable business judgment, what projects and/or devices had the ability to "make a profit" and drive its business forward. This level of discretion makes sense, given that 3DT has no knowledge or insight into the other technologies under development that may present superior options for Bard's business. The undisputed evidence proves that Bard did exactly what the Development Agreement required – it acted in good faith, and exercised its sound business judgment to determine that a superior technology justified discontinuing development of Penske after more than three years. Accordingly, summary judgment for Bard is required.

## II. BARD DOES NOT OWE 3DT THE FULL MILESTONE PAYMENT BECAUSE THE CONDITIONS PRECEDENT HAVE NOT OCCURRED.

Simply put, Bard does not owe 3DT any additional money at this time. Neither of the conditions precedent to payment of the Full Milestone Payment – obtaining FDA 510(k) clearance, or discontinuing development without Bard making a determination in good faith, based upon its reasonable business judgment, that a superior technology exists – has occurred. "Under New York law . . . a condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (quoting *Oppenheimer*, 86 N.Y.2d at 690). "'Most conditions precedent describe acts or events

markets; put up for trade <commercial products>. . . . 6. Produced and sold in large quantities <commercial cosmetics>. 7. Pejorative. More concerned with money than with quality <he sold out and became commercial>."

which must occur before a party is obliged to perform a promise made pursuant to an existing contract.'" *Int'l Bus. Machs. Corp. v. United Microelectronics Corp.*, 764 F. App'x 9, 12 (2d Cir. 2019) (quoting *Oppenheimer*, 86 N.Y.2d at 690)). As set forth more fully below, it is undisputed that neither of these conditions precedent to payment has occurred. Thus, the Full Milestone Payment is not due, and 3DT's breach of contract claim fails as a matter of law.

**A. 510(k) Clearance Has Not Been Achieved**

The Purchase Agreement provides for the Full Milestone Payment of an additional [redacted] to 3DT, on top of the [redacted] 3DT has already received, triggered by Bard's receipt of the "first 510(k) clearance from the FDA to market and sell a medical device that incorporates the Precisive Navigation Technology in the Buyer Field[.]" (Joint SUMF ¶ 10, App. Ex. 1, Purchase Agreement Section 2.04(b).) Bard could and did decide to discontinue Penske development activities on an enumerated contractual basis, and at some later date, may develop and commercialize via 510(k) clearance a product incorporating the Precisive Navigation Technology. Then, and only then, 3DT will have a right to payment. Bard intends to make good on its promise and pay 3DT the Full Milestone Payment if that payment becomes due in the future.

**B. The At-Will Discontinuance Provision Does Not Apply**

As discussed extensively above, Bard availed itself of the provision in the Development Agreement permitting it to discontinue development after the third anniversary without the Full Milestone Payment becoming due. Although there is also a provision in the Purchase Agreement that would have permitted Bard to halt development at any time and without cause (provided it make the Full Milestone Payment), that provision simply does not apply here. (Joint SUMF ¶ 11, App. Ex. 1, Purchase Agreement Section 2.04(b).) Bard's concerted efforts to develop the Precisive Navigation Technology for more than three years, and its reasoned business decision to pursue a superior technology at that time, fit squarely within the parameters of Section 2.1 of the

Development Agreement. Therefore, Bard is relieved of its obligation to pay 3DT any additional money.

## III. BARD COMPLIED WITH ITS DEVELOPMENT OBLIGATIONS FOR MORE THAN THREE YEARS

As set forth extensively in Bard's Memorandum of Law in Support of its Motion for Summary Judgment, Bard complied with Section 2.1 of the Development Agreement by providing commercially reasonable personnel, financial, and other support to develop the Precisive Navigation Technology, as determined by Bard, in good faith, based upon its reasonable business judgment for more than three years.

### A. The Development Agreement Vests Bard With Discretion to Provide Commercially Reasonable Support to the Penske Project for Three Years, Guided By Good Faith and Reasonable Business Judgment

3DT misinterprets the relevant contractual language and the governing law related to commercial reasonableness. Here, the contractual standard provides Bard with significant discretion to develop the Precisive Navigation Technology by "provid[ing] commercially reasonable personnel, financial and other support (**as determined by Bard**, in good faith, based upon its reasonable business judgment) with regard to the development of a Bard Product incorporating the Precisive Navigation Technology." (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1) (emphasis added); *see also* App. Ex. 1, Purchase Agreement Section 2.04(b) ("[Bard] shall be obligated to **support the development of the Precisive Navigation Technology as and to the extent contemplated by the Development Agreement**.") Bard did exactly that.

3DT rests its argument on the fact that New York case law does not precisely define what activities constitute "commercially reasonable efforts," (3DT Br. 31), but the case law *does* define a minimum satisfactory threshold – which Bard clearly met and exceeded here – and the standard in the Development Agreement vests Bard with discretion to determine what such efforts are.

While Bard must make its determination in good faith and based upon its reasonable business judgment, 3DT itself concedes that the standard for commercial reasonableness is not a demanding one: "At a minimum, though, a promise to use commercially reasonable efforts requires that the promising party undertake **at least some activity**," and "requires at the very least **some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests**." (3DT Br. 31, 32 (quoting *Holland Loader*, 313 F. Supp. 3d at 473) (emphases added).)

Because "[t]he standard for satisfying commercial reasonability under New York law is a fairly lenient one," *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020), Bard's substantial investment of time and resources certainly satisfied this standard. For example, in *Sekisui Am. Corp. v. Hart*, the court determined a party could not recover on its counterclaim for breach of contract for failure to provide commercially reasonable efforts to market a breast cancer diagnostic assay and to take actions to obtain FDA approval. 15 F. Supp. 3d 359, 362, 370, 381 (S.D.N.Y. 2014). Even under a contractual standard unqualified by deference to a party's judgment (like the one here), the *Sekisui* court held that "considerable efforts" to obtain FDA clearance via the 510(k) process were taken. *Id*. at 381. Such efforts included "re-creating files" of data and traveling to Germany in unsuccessful attempts to obtain clinical data, until the company concluded that it would need new clinical studies performed in the United States costing $3.2 million and taking more than three years. *Id*. at 377, 381. Certainly, Bard performed more work on the Penske project than in *Sekisui*, given that *Sekisui* involved a 510(k) submission already made and under FDA review, and Penske needed to be developed from the ground up.

### B. Bard Provided Commercially Reasonable Personnel, Financial, and Other Support to Develop the Precisive Navigation Technology, as Determined by Bard, in Good Faith, Based Upon its Reasonable Business Judgment, For More than Three Years

#### 1. *Bard, At a Minimum, Provided the Support Required By This Low Threshold*

As discussed above, the case law involving "commercially reasonable efforts" clauses that do not involve a party's discretion sets forth a low standard of required minimum efforts. The standard of commercial reasonableness is further relaxed in this case because Bard had the ability to determine the level of support it provided to the Penske project, in good faith and based upon its own reasonable business judgment. Bard's conduct easily met this standard. 3DT focuses on minutiae in its summary judgment motion, misconstruing the record in an attempt to paint a favorable picture of the factual narrative, leaning heavily on, for example, emails between Penske team members and a vendor's persistent salesman who was trying to drum up business. Any attempt at distraction should fail. This case boils down to whether Bard took "some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes [its] business interests." (3DT Br. 31, 32 (quoting *Holland Loader*, 313 F. Supp. 3d at 473).) Bard easily exceeded this threshold.

Bard assembled a cross-functional team consisting of a program leader at the helm, multiple engineers, a regulatory specialist focused on FDA clearance, and a marketing product manager. (Joint SUMF ¶¶ 20, 21 App. Ex. 5, Misener Dep. Tr. 10:8-11:2, 47:11-15; Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15; Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22; Joint SUMF ¶ 23, App. Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5; Joint SUMF ¶ 22, App. Ex. 5, Misener Dep. Tr. 80:21-81:15; Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22; Joint SUMF ¶ 23, App. Ex. 5, Misener Dep. Tr. 81:7-15.) The team held regular meetings and minutes were kept. (Joint SUMF ¶¶ 24, 25, App. Ex. 5, Misener Dep.

Tr. 79:2-4, 20-23.) Bard performed multiple animal studies, including for the [redacted] applications (Joint SUMF ¶ 40, App. Ex. 4, Kassab Dep. Tr. 66:24-68:9), attempted to create a bench model from which they could obtain data in lieu of animal studies (Joint SUMF ¶ 45, App. Ex. 9, Davis Dep. Tr. 10:13-18), conducted market research studies, including smaller quantitative and larger qualitative studies, and attended physician conferences to obtain customer feedback (Joint SUMF ¶ 57, App. Ex. 6, Decheek Dep. Tr. 22:25-23:4; Joint SUMF ¶ 58, App. Ex. 6, Decheek Dep. Tr. 23:5-9). Importantly, the Bard team member responsible for the regulatory component spent a significant amount of time researching predicate devices upon which to base a 510(k) submission (Joint SUMF ¶ 52, App. Ex. 7, Phillips Dep. Tr. 54:11-14; Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 51:12-15, 54:11-14) and had regular meetings with his supervisor about obtaining internal regulatory buy-in and the FDA's permission to market the device. (Joint SUMF ¶ 55, App. Ex. 7, Phillips Dep. Tr. 37:4-10; Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-8.) After the third anniversary of the Agreements, the program leader requested a budget for external expenditures through the end of 2016, and confirmed that the project was still active. (Bard SUMF ¶ 43, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056304; Bard SUMF ¶ 44, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056333.) Both before and after the third anniversary, he contacted 3DT to negotiate an sign a Non-Disclosure Agreement to allow the parties to communicate about the project. (Joint SUMF ¶ 88, App. Ex. 4, Kassab Dep. Ex. 6; Joint SUMF ¶ 90, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 91, App. Ex. 14, BAS-3DT 0034928-0034929; Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 96, App. Ex. 4, Kassab Dep. Ex. 7; Joint SUMF ¶ 97, App. Ex. 4, Kassab Dep. Ex. 7.) Most notably, the efforts to finalize the Concept Design Review Meeting Minutes continued; the regulatory team signed off in November 2016, and the final signature was obtained on December 8, 2016. (Joint SUMF ¶ 98, App. Ex. 8, Zentgraf Dep. Ex. 2; Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2.) Without doubt, these efforts constitute

"at least some activity" and "some conscious exertion to accomplish the agreed goal" (3DT Br. 31, 32 (quoting *Holland Loader*, 313 F. Supp. 3d at 473)).

3DT now argues, in effect, that Bard should have prioritized Penske over every other development project that came its way (irrespective of its prospects), including Nautilus Delta which is now on the market, for three years. But that is not how any business, including Bard's business, operates, and it is not what the Development Agreement requires. More importantly, 3DT knew that at the time it negotiated the Development Agreement. The Development Agreement calls for "commercially reasonable" support, *i.e.*, "some conscious exertion," "as determined by Bard, in good faith, based upon its reasonable business judgment." (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.) That is, the Agreement clearly allows Bard to adjust its resources as needed to "make a profit." *See Commercial*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "commercial," in pertinent part, as "[o]f, relating to, or involving the ability of a product or business to make a profit."). Just as the Court or a law firm has many cases to work on, Bard has many medical devices in development. Bard always tried to have multiple projects in the pipeline at the same time. (Joint SUMF ¶ 66, App. Ex. 5, Misener Dep. Tr. 72:1-4.) Indeed, Anthony Misener testified that resources being "diverted in part due to another project … happens all the time." (Joint SUMF ¶ 67, App. Ex. 5, Misener Dep. Tr. 261:19-262:4.) He also testified that "Penske or any other project that we work on" "certainly had surges of activity and then lulls in activity." (Bard SUMF ¶ 34, Mantell 3/26 Decl., Ex. C, Misener Dep. Tr. 210:6-16.) Quite simply, the fact that Bard did not continuously prioritize the Penske project over all else for three years is by no means a breach of the parties' Agreement. Had Bard – or any other well-established medical device company for that matter – been asked to sign an agreement requiring as much, it surely would have refused. 3DT's interpretation is divorced from reality and must be rejected as a matter of law.

Further, contrary to 3DT's cherry-picked statements, the documentary evidence in the record (including emails that 3DT cites) establishes that the Penske project was ongoing throughout 2016.[3] For example, on January 11, 2016, Ed Burnside stated that "we slow development but continue Penske." (Gibson Decl. Ex. 10.) On February 9, 2016, Mr. Misener confirmed that "[t]he project is moving forward[.]" (Gibson Decl. Ex. 13.) As of June 8, 2016, the team was "still keeping [Penske] alive and keeping it in [their] thoughts." (Mantell 4/16/2021 Decl. Ex. C, Decheek Dep. Tr. 80:12-17.) In addition, Mr. Misener requested budget for the Penske project through the end of that calendar year. (Bard SUMF ¶ 43, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056304, ¶ 44, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056333.) Mr. Misener also finalized a new Non-Disclosure Agreement with Dr. Kassab less than two weeks prior to the third anniversary, (Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929), and afterwards, exchanged emails with Dr. Kassab on next steps. (Joint SUMF ¶¶ 96, 97, App. Ex. 4, Kassab Dep. Ex. 7.) And, as of November 14, 2016, as 3DT itself confirmed in its Statement of Undisputed Material Facts (*see* 3DT SUMF ¶ 39), the team was still performing work on the project. (Gibson Dec. Ex. 8, Decheek Dep. Ex. 23.) 3DT claims that the estimated percentages of time each team member devoted to Penske during 2016 evidences that the project stopped, but the opposite is true. Indeed, 3DT does not, and cannot, claim that any of the team members spent 0% of their time on Penske during 2016. 3DT's contention that the Penske project stopped in January 2016 is unfounded, and simply untrue.

[3] Tellingly, 3DT routinely omits context from the documents it cites, which, under the governing contractual standard, is highly relevant and dispositive as to whether Bard exercised its discretion in good faith based on its reasonable business judgment. Bard clarifies the record in its Response to 3DT's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1.

### 2. *Bard Exceeded the Development Agreement's Standards*

From August 29, 2013 through at least December 2016 when the final team member approved the meeting minutes signaling the official close of the concept phase of development, Bard made considerable efforts to develop a product incorporating the next-generational Precisive Navigation Technology – far more than the "some activity" required to meet the commercial reasonableness standard. Bard's work was performed by skilled team members across a variety of disciplines, whose dedication reflected the enormous financial commitment Bard made in acquiring the technology. Consistent with its normal business practices, within two weeks of the acquisition, Bard assembled a cross-functional team with on-the-job expertise and educational background in project management, research and design, marketing, and regulatory affairs – all of the major aspects of the development pathway. (*See* Joint SUMF ¶ 27, App. Ex. 5, Misener Dep. Tr. 43:5-20; 52:22-53:11; App. Ex. 7, Phillips Dep. Tr. 128:21-129:11; *see also* Joint SUMF paragraphs discussing the Penske team members, their specialties, education, and prior experience: Joint SUMF ¶ 21, App. Ex. 5, Misener Dep. Tr. 10:8-11:2; 11:15-12:23; 47:11-15; Joint SUMF ¶ 23, App. Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5; Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15; Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22; App. Ex. 8, Zentgraf Dep. Tr. 7:8-16; 8:4-5, 23-24; 10:22-25, 14:11-16; App. Ex. 5, Misener Dep. Tr. 81:7-15; 104:7-8.) Mr. Misener felt fortunate to have two additions to the R&D engineering team to help get the work done, particularly where it was atypical for him to obtain increased headcount during that time. (*See* App. Ex. 5, Misener Dep. Tr. at 85:8-21; 86:25-87:5.) The entire team met regularly on this project. (Joint SUMF ¶ 24, App. Ex. 5, Misener Dep. Tr. 79:2-4; Joint SUMF ¶ 24, App. Ex. 6, Decheek Dep. Tr. 27:12-18.) Bard also engaged outside consultants and partners to assist with certain aspects of the project if it required specific expertise.

(Joint SUMF ¶ 47, App. Ex. 5, Misener Dep. Tr. 107:22-108:9; *id*. at Misener Dep. Tr. 241:17-20.)

These team members conducted broad-based efforts across multiple disciplines – R&D, marketing, and regulatory work – in an attempt to develop a product that could be cleared and commercialized and, ultimately, yield a return on the company's [redacted] investment.

***1. R&D Efforts and Challenges***: With respect to its R&D efforts, Bard conducted approximately thirteen animal studies (Joint SUMF ¶ 105, App. Ex. 5, Misener Dep. Ex. 8 at 3) and involving not one, but [redacted] applications of the technology (Joint SUMF ¶ 40, App. Ex. 5, Misener Dep. Tr. 245:18-20; App. Ex. 9, Davis Dep. Ex. 5). [redacted], many of those animal studies provided [redacted] results. (Joint SUMF ¶ 43, App. Ex. 7, Phillips Dep. Tr. 63:5-6, 63:13-21; Joint SUMF ¶ 44, App. Ex. 5, Misener Dep. Tr. 116:20-24; Bard SUMF ¶ 18, Mantell 3/26 Decl., Ex. C, Misener Dep. Tr. 117:7-10.) Undeterred, and dedicated to capitalizing on its [redacted] investment in a promising, next-generational technology, the team focused on developing a bench model that they could use to gather data instead. (Joint SUMF ¶ 45, App. Ex. 9, Davis Dep. Tr. 10:13-18.) Yet, despite continued research and exploration of a variety of potential bench model designs, those efforts [redacted] (Bard SUMF ¶ 20; App. Ex. 9, Davis Dep Tr. 18:20-21; Bard SUMF ¶ 20; App. Ex. 9, Davis Dep Tr. 19:12-22.) To be commercially reasonable, Bard's efforts need not be successful; they must exist. *See Sekisui Am. Corp.*, 15 F. Supp. 3d at 378, 381 (despite unsuccessful attempts to obtain clinical data, company's work was commercially reasonable as a matter of law, requiring dismissal).

During this time, Bard (a company that had been developing and manufacturing PICC devices for years) made the reasonable business decision to narrow its focus to the [redacted] as opposed to trying to develop both a [redacted] application simultaneously.



ME1 36281579v.4

(*See* Bard SUMF ¶ 22, Mantell 3/26 Decl., Ex. E, Davis Dep. Tr. 67:6-9; Joint SUMF ¶ 48, App. Ex. 5, Misener Dep. Tr. 91:2-6; Joint SUMF ¶ 48, App. Ex. 9, Davis Dep. Ex. 3, BAS-3DT 0053803). Importantly, this decision was in line with the Parties' Agreement. The Purchase Agreement contemplates development of "a Bard Product" in the "Buyer Field," which, by definition, encompasses a product incorporating either the [redacted] (Joint SUMF ¶ 10 n.2, App. Ex. 1, Purchase Agreement Section 1.01.) Under the circumstances, Bard's decision to focus on an implementation that it believed would be clinically and commercially successful was clearly driven by its good faith and commercial reasonableness.

Still, the team [redacted] (Joint SUMF ¶ 49, App. Ex. 5, Misener Dep. Tr. 111:16-17; Joint SUMF ¶ 50, App. Ex. 5, Misener Dep. Tr. 111:3-7; *see also* Joint SUMF ¶ 51, App. Ex. 7, Phillips Dep. Tr. 64:22-23; Bard SUMF ¶ 21; App. Ex. 7, Phillips Dep. Tr. 64:9-13). Bard tried a wide variety of approaches to get the Precisive Navigation Technology to function as was contemplated by the parties – and as defined in the Purchase Agreement itself – when Bard decided to pay 3DT [redacted] in 2013. But no matter what Bard did, they could not develop a safe and effective product incorporating the Precisive Navigation Technology. These "technological failures," which were no doubt as disappointing to Bard as to 3DT, permitted Bard to avoid payment of the Full Milestone Payment as set forth in the Development Agreement. (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.)

***2. Marketing Efforts and Challenges***: Of course, obtaining clinician approval and positive feedback is also necessary to the marketing and sale of a medical device – without an eager customer base that believes the product is usable, the product simply will not sell. In this regard, the team engaged in marketing activities such as research studies and physician conferences (Joint SUMF ¶¶ 57, 58, App. Ex. 6, Decheek Dep. Tr. 22:25-23:9), in order to identify,

[redacted] (Joint SUMF ¶ 61, App. Ex. 6, Decheek Dep. Tr. 24:11-20; Bard SUMF ¶ 28; Mantell 3/26 Decl., Ex. B, Phillips Dep. Tr. 88:7-25.) Those efforts likewise constituted good faith, commercially reasonable efforts to develop a product incorporating the Precisive Navigation Technology consistent with Bard's own business judgment.

***3. Regulatory Efforts and Challenges***: Finally, determining a regulatory pathway was imperative. No product – even if safe and effective in practice – can be brought to market without the FDA's blessing. (Joint SUMF ¶ 30, App. Ex. 7, Phillips Dep. Tr. 23:23-24:2, 24:11-12; *see generally* Joint SUMF ¶¶ 30-34.) Because seeking FDA clearance was a prerequisite to commercialization, it was perfectly reasonable for Bard to spend the time it did to formulate a strategy for obtaining such clearance – and one that would not negatively impact Bard's many other business endeavors. An overarching consideration that transcended all aspects of Bard's business as a medical device developer motivated Bard's regulatory process. The team was concerned with preserving Bard's stellar reputation with the FDA, particularly in light of a [redacted] (Joint SUMF ¶ 55, App. Ex. 7, Phillips Dep. Tr. 37:4-10; Joint SUMF ¶ 56, App. Ex. 7, Phillips Dep. Tr. 127:13-20.) [redacted] (*See* Bard SUMF ¶ 26; App. Ex. 7, Phillips Dep. Tr. 126:21:127:12.) Such concern is commercially reasonable as a matter of law, even without regard to the deferential standard that applies under the Agreements at issue here. *See Holland Loader*, 313 F. Supp. 3d at 474 (no breach of contract where defendant turned down a business opportunity for which it could not meet deadlines while following internal process, as it "operated for 135 years and has a reputation in the global mining market that it seeks to uphold[,] requir[ing] that any product or system that it sells comply with its internal safety, design, and engineering specifications"). Bard wanted to commercialize the Precisive

Navigational Technology while also maintaining credibility with a regulator—credibility that is core to its entire business. That concern was reasonable and warranted. By no means was Bard acting "arbitrarily, irrationally or without reasonable basis," as required for 3DT to prevail on its breach of contract claim. *See ProSource Tech., LLC*, 2015 WL 5797028, at *12.

What is more, under the Parties' Agreement, FDA 510(k) clearance triggers the Full Milestone Payment to 3DT. Thus, it is untenable for 3DT to fault Bard for its diligence and measured approach to the regulatory aspect of the project when its receipt of [redacted] ultimately hinges on Bard's success, and given that 3DT does not have regulatory expertise. (Bard SUMF ¶¶ 1, 2, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 34:3-9; 22:21-23:17.) Indeed, none of the technologies that 3DT has licensed or sold has ever been incorporated into a commercialized product. (Bard SUMF ¶ 2, Mantell 3/26 Decl. Ex. A, Kassab Dep. Tr. 34:3-9.)

Specifically, to obtain 510(k) clearance, federal statutes and FDA regulations require Bard to demonstrate that its new device is "substantially equivalent" to a legally marketed "predicate" device. 21 U.S.C. §§360(k), 360(n), 360c(f) (1) & 360c(i) (1) (A); 21 C.F.R. §807.92(a) (3). Because the technology was next-generational [redacted] (Bard SUMF ¶ 8, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 76:11-77:19, Bard SUMF ¶ 9, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 77:20-23, Bard SUMF ¶ 23, Mantell 3/26 Decl., Ex. B, Phillips Dep. Tr. 91:12-25) and Bard had to start from square one (Bard SUMF ¶ 8, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 76:11-77:19; Bard SUMF ¶ 9, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 77:20-23.)

To try and [redacted], Mr. Phillips performed significant research to identify predicate devices for the 510(k) submission. (Joint SUMF ¶ 52, App. Ex. 7, Phillips Dep. Tr. 54:11-14; Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 54:11-14; Bard SUMF

¶ 27, App. Ex. 7, Phillips Dep. Tr. 54:15-22.) Based on that research, he determined that the best course of action would be to make [redacted] (Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 51:12-15.) Mr. Phillips' proposed [redacted] (Bard SUMF ¶ 30, App. Ex. 7, Phillips Dep. Tr. 128:6-20.) [redacted] As both Bard and Dr. Kassab understood, if the FDA deemed the identified predicates inappropriate or the submission insufficient, the product would be subjected to a more stringent FDA review process, and costs would increase exponentially. (Bard SUMF ¶ 13, Mantell 3/26 Decl., Ex. B, Phillips Dep. Tr. 55:19-24; Bard SUMF ¶ 14, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 119:8-11.) In short, under the circumstances, determining a 510(k) pathway for the Precisive Navigation Technology was a high-stakes venture. For that reason, the regulatory team decided that the concept phase of [redacted] (Joint SUMF ¶ 81, App. Ex. 5, Misener Dep. Tr. 155:18-20; App. Ex. 7, Phillips Dep. Tr. 110:21-111:5; Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 110:21-111:5; *see also* Joint SUMF ¶ 81, App. Ex. 8, Zentgraf Dep. Ex. 2 (Concept Design Review Meeting Minutes executed by others, other than regulatory, in October 2015).)

As with any new product, Bard's regulatory strategy for Penske was memorialized in document called a "RACA." As reflected in deposition testimony and documents produced in discovery, that document was revised several times and there were ongoing discussions about its

contents. (Bard SUMF ¶ 25, App. Ex. 7, Phillips Dep. Tr. 128:24-129:11.) Indeed, from October 2015 through January 2016, Mr. Phillips and his then-supervisor, Ms. Hamblin, discussed Penske in fairly regular weekly meetings. (Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-8.) Notably, Bard did not allow its ongoing regulatory efforts to prevent other aspects of the project from continuing. The team pushed forward into feasibility activities, including by looking at technical concepts and risks, while the regulatory strategy was formalized and the Concept Design Meeting Minutes were routed for signature. (Bard SUMF ¶ 38, Mantell 3/26 Decl., Ex. C, Misener Dep. Tr. 156:22-157:6; Bard SUMF ¶ 39, Mantell 3/26 Decl., Ex. C, Misener Dep. Tr. 157:13-19; Bard SUMF ¶ 40, Mantell 3/26 Decl., Ex. C, Misener Dep. Tr. 157:20-158:4.; Bard SUMF ¶ 41, Mantell 3/26 Decl., Ex. B, Phillips Dep. Tr. 121:9-15.) Work on the aforementioned animal studies and other solutions was done during March 1, 2016 to September 1, 2016 – after the third anniversary of the Agreements in August 2016. (Joint SUMF ¶ 85, App. Ex. 5, Misener Dep. Tr. 276:21-277:16; Joint SUMF ¶ 86, App. Ex. 7, Phillips Dep. Ex. 17.)

***4. Efforts After the Third Anniversary of the Parties' Agreements and Ultimate Discontinuance of the Project***: Bard's efforts continued after the third anniversary. Most notably, months after the third anniversary, on December 8, 2016, the team signed off on the Concept Design Review Meeting Minutes. (Joint SUMF ¶ 98, App. Ex. 8, Zentgraf Dep. Ex. 2; Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2.) Further, Bard worked to negotiate and sign a new NDA with Dr. Kassab to allow him to assist. (Joint SUMF ¶ 88, App. Ex. 4, Kassab Dep. Ex. 6; Joint SUMF ¶ 89, App. Ex. 13, 3DT Prod. 0000101-0000103; Joint SUMF ¶ 90, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 91, App. Ex. 14, BAS-3DT 0034928-0034929.) E-mail exchanges between the two took place just weeks before, days prior, and well after the third anniversary, evidencing a clear intent to push forward with development and get to the root of problems the team was facing. (Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 93, App. Ex.

14, BAS-3DT 0034928; Joint SUMF ¶ 96, App. Ex. 4, Kassab Dep. Ex. 7; Joint SUMF ¶ 97, App. Ex. 4, Kassab Dep. Ex. 7.)

3DT can point to nothing in the record indicating that, prior to the third anniversary of the Development Agreement, team members were instructed that the project had been abandoned or permanently shelved. To the contrary, on July 20, 2016, Mr. Misener expressly confirmed that the Penske project was still active, requested an expenditure budget through the end of 2016, and further work was planned for 2017. (Bard SUMF ¶ 44, Ex. F, BAS-3DT 0056333; Joint SUMF ¶ 95, App. Ex. 5, Misener Dep. Tr. 261:19-262:4 (e-mail indicating intent to continue work on Penske in "Q3 next year.")

On December 6, 2016, almost to the day the Concept Design Meeting Minutes were signed, 3DT notified Bard – for the very first time – of its potential concern regarding Bard's performance over the past three years, in the first of a series of letters exchanged regarding Penske. (Joint SUMF ¶¶ 102-08, App. Ex. 15, December 6, 2016 3DT Letter, App. Ex. 16, December 20, 2016 Bard Letter, App. Ex. 5, Misener Dep. Ex. 8, App. Ex. 17, May 10, 2017 3DT Letter, App. Ex. 18. May 19, 2017 Bard Letter.) These letters revealed Bard's desire to commercialize the technology, particularly where its upfront investment was six times greater than the potential Full Milestone Payment that might be paid to 3DT, (Joint SUMF ¶ 104, App. Ex. 16, December 20, 2016 Bard Letter), and succinctly provide an overview of Bard's efforts. As Bard noted in its February 21, 2017 letter to 3DT, Bard conducted integration meetings, established a development team with representatives from various departments, conducted more than 100 one-on-one interviews with clinicians and evaluated more than 650 market research surveys, formulated design inputs and requirements based on the marketing inputs, established relationships with key vendors, researched numerous potential predicate devices, conducted 13 animal studies, and incurred significant expenses in the form of [redacted] gross wages for full-time R&D team members and

[redacted] in out of pocket expenses that do not include the wages for personnel working on the project. (Joint SUMF ¶ 105, App. Ex. 5, Misener Dep. Ex. 8 at 2-4.) These efforts easily exceeded the standard of commercial reasonableness required by the Development Agreement and governing law.

## IV. THE OPINIONS OF 3DT'S EXPERT, MR. WADDELL, ARE IRRELEVANT TO THE COURT'S ANALYSIS OF THE CONTRACTUAL STANDARD BECAUSE IT IS BASED ON FALSE ASSUMPTIONS AND HE HAS NO KNOWLEDGE OF BARD'S BUSINESS.

3DT's reliance upon the opinions of its expert, Mr. Waddell, is improper. Contrary to 3DT's assertion, Mr. Waddell does not set the standard for commercial reasonableness; the Agreements governing the parties' relationship, and the law, do. Indeed, "an expert is prohibited from offering his opinion as to the legal obligations of parties under a contract." *Breezy Point Co-op., Inc. v. Cigna Prop. & Cas. Co.*, 868 F. Supp. 33, 36 (E.D.N.Y. 1994) (citing *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 508 (2d Cir.), *cert. denied*, 434 U.S. 861 (1977)). Mr. Waddell's invention of his own legal standard for commercial reasonableness – "the effort and resources that a company with the size and resources of Bard would (and should) devote to successfully develop a product incorporating the Precisive Navigation Technology within a reasonable period of time" (Waddell Aff. ¶ 21, Ex. C at 1) – is not permitted.

To find some way to rely on its expert's "opinions," 3DT relies on *Holland Loader* for the proposition that the contractual standard requires input from experts as to industry standards. (3DT Br. 31 (quoting *Holland Loader*, 313 F. Supp. 3d at 469).) Unlike the Agreements at issue here, however, the agreement in that case contained an objective commercial reasonableness standard which would require input regarding industry standards. Indeed, the provision at issue in *Holland Loader* provides, "[d]uring the Earnout Period, Buyer shall use commercially reasonable efforts to actively promote the sale of Products and to further develop new products that substantially incorporate the Acquired Assets." *Holland Loader*, 313 F. Supp. 3d at 456. Here, the commercial

reasonableness determination under the Agreements is "**as determined by Bard**," within the bounds of its good faith, consistent with informed decisions it could make pursuant to the business judgment rule (*i.e.* those made with the honest belief that they are being made in Bard's own best interest). *See*, *supra*, Point I. There is no question Bard's actions meet, and exceed, that standard.

Moreover, as set forth in detail below, Mr. Waddell's opinions are untethered to the agreed upon contractual standard, which provide deference to Bard's good faith determination based on Bard's reasonable business judgment, and therefore do not and cannot defeat summary judgment for Bard based on the contractual language at issue in this case.[4,5] That standard necessarily allows Bard to determine how to develop this technology consistent with Bard's regular business practices for successfully developing, obtaining FDA clearance, and commercializing hundreds of medical devices. But Mr. Waddell admits that he knows practically nothing about Bard's business:

> Q Based upon what you know about Bard, was there anything inconsistent with the development of this product as compared to the development of other products at the company?
>
> A I am not familiar with their development strategies for other products. I can only comment on this one. So I don't have a comparison, so I don't know how to answer that question.
>
> Q **So you have no opinion one way or another as to whether or not the work that was done on this project was consistent with how Bard ordinarily conducts its business?**
>
> A **Yeah. I don't know how they ordinarily conduct their business, so I don't have a way to tell you that.** All I can tell you about is my opinions on how they conducted this particular project.

---

[4] 3DT claims that both parties retained experts "to opine on the sufficiency of Bard's development resources in light of development standards in the medical device industry." (3DT Br. 32.) However, that characterization is only partially accurate – 3DT's expert misguidedly opined as to industry standards, while Bard's expert, Mr. Haas, issued a report tailored to the contractual standard after, among other things, conducting an interview of Anthony Misener to obtain insight into Bard's process and perspective. (Mantell 4/16/2021 Decl., Ex. K, Haas Report.)

[5] Should the Court deny both parties' summary judgment motions, Bard reserves its right to challenge Mr. Waddell's opinions for failure to meet the standards for admissibility set forth in FED. R. EVID. 702, *Daubert*, and other relevant case law.

(Mantell 4/16/2021 Decl., Ex. J, Waddell Dep. Tr. 91:10-25. (emphases added)). Mr. Waddell also admitted that he: (i) had no way to determine whether or not the activities related to the development of this product were different than the activities related to the development of other products "because [he] ha[d] no knowledge of how their other products' activities are performed," (*id*. at 93:13-18), (ii) "ha[d] no idea" whether the title of "systems engineer" existed at Bard (*id*. at 98:2-4), (iii) did not "believe that [he] kn[e]w of any of the processes that they were required to follow" in connection with the matter (*id*. at 80:12-17), and (iv) did not "know what their regulatory strategy was" so he had no criticisms of it (*id*. at 81:2-5).

Mr. Waddell wrote similarly revealing information in his report that:

- "This plan was *developed before being provided access to the 79 Bard documents* and was developed to contrast with the Penske project without bias from knowledge of actual project dates." (Waddell Aff., Ex. B at 3.)

- "*Without knowing the specific disposable configurations to be used*, there was an assumption made that Bard would have sufficient disposable expertise." (*Id*.)

- "The Waddell Development Plan *was developed based upon the methodology employed by the Waddell Group* when developing project development plans as a Project Manager." (*Id*.)

- "This development *assumed* that Bard would need one iteration (2 tries) for each of the disposable items, and 2 iterations of the electronics / software." (*Id*. at 4.)

Thus, Mr. Waddell's statements are irrelevant to the Court's analysis of the contractual language, and amount to no more than improper net opinion. *See* FED. R. EVID. 401; *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 171 (S.D.N.Y. 2018) (quoting *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 281-82 (S.D.N.Y. 2011)) ("But simply saying, 'They could do it in 2015, so they could have done it in 2012,' without any analysis of the market and corporate conditions that might have impacted the generics' ability to launch generic Namenda in 2012, is a conclusion tethered to nothing whatever. This Court must exclude 'unsupport[ed] speculation cloaked as expertise.'").

Even more striking, Mr. Waddell's testimony does not support 3DT's position that Bard failed to exercise good faith in its performance. In response to a question asking whether he had an opinion as to "whether Bard acted in bad faith in connection with exercising its business judgment in connection with the development" of the Precisive Navigation Technology (92:1-4), Mr. Waddell testified that "**I have no knowledge of [Bard] acting in an unfair or deceptive manner.** I just don't know. I have no way of being able to determine that." (93:7-12.) Mr. Waddell does not and cannot assert, and 3DT has no basis to claim, that Bard failed act in good faith based upon its reasonable business judgment, in developing the Precisive Navigation Technology. On the contrary, Bard's efforts here are fully consistent with its efforts to develop hundreds of medical devices that it has successfully brought to market. 3DT's claims are without merit, and its complaint should be dismissed.

Far more troubling, though, are Mr. Waddell's assumptions on which his purported opinions are based. By way of example, the *first* assumption in his report is: "3DT's Precisive Navigation Technology is safe and effective." (Waddell Aff., Ex. B at 4.) That could not be farther from the truth, as the FDA is the only entity that would make that determination upon review and analysis of substantial data. Moreover, there are no facts in the record on which this "assumption" is based. *See Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 203 (S.D.N.Y. 2014) (expert testimony stricken for lack of "sufficient basis in facts or data" and noting "[d]etermining the factual basis for an expert's opinion and the soundness of an expert's methodology falls within the 'gatekeeping' function of district judges"). 3DT has no evidence to demonstrate that the FDA determined (or would have determined) that the Precisive Navigation Technology was adequately proven to be safe or effective. On the contrary, certain of Bard's numerous animal studies yielded [redacted]. (Joint SUMF ¶ 40, App. Ex. 4, Kassab Dep. Tr. 66:24-68:9; Joint SUMF ¶ 41, App. Ex. 9, Davis Dep. Tr. 40:5-8;

Joint SUMF ¶ 42, App. Ex. 9, Davis Dep. Ex. 4; Joint SUMF ¶ 43, App. Ex. 7, Phillips Dep. Tr. 63:5-6, 63:13-21; Joint SUMF ¶ 44, App. Ex. 5, Misener Dep. Tr. 116:20-24.) This fundamental, incorrect assumption undermines the basis for Mr. Waddell's opinions, particularly those related to how long development should take, or what is needed to commercialize this technology. The Court should disregard Mr. Waddell's "opinions."

## V. 3DT IS NOT ENTITLED TO PREJUDGMENT INTEREST

3DT improperly claims it is entitled to pre-judgment interest. Under New York law, an award of prejudgment interest is only warranted where a party *prevails* in a breach-of-contract action. *NML Cap. v. Republic of Argentina*, 17 N.Y.3d 250, 258 (N.Y. 2011) (citing N.Y. C.P.L.R. 5001) (emphasis added); *see, e.g.*, *EMA Fin., LLC v. 5Barz Int'l, Inc.*, No. 18-CV-4995 (VEC), 2019 WL 8503357, at *10 (S.D.N.Y. Sept. 18, 2019) (granting summary judgment on the plaintiff's breach-of-contract claim and awarding prejudgment interest on that basis); *Ecoline, Inc. v. W.H. Peepels Co.*, 60 N.Y.S.3d 358, 359 (N.Y. App. Div. 2017) (affirming the trial court's order granting summary judgment favoring the plaintiff in a breach-of-contract matter, and affirming generally the trial court's assessment of prejudgment interest (though enlarging the amount awarded)). As outlined at length in this Memorandum of Law, and in the Memorandum of Law in Support of Bard's Motion for Summary Judgment, 3DT is not entitled to prejudgment interest because it cannot prevail on its breach of contract claim as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendant Bard Access Systems, Inc. respectfully requests that this Court deny Plaintiff 3DT Holdings, LLC's Motion for Summary Judgment on its breach of contract claim.

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

By: *<u>/s/ Natalie</u>* <u>H. Mantell</u>
Natalie H. Mantell

Natalie H. Mantell
Meghan McSkimming
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
Facsimile: (973) 624-7070
nmantell@mccarter.com
mmcskimming@mccarter.com

*Attorneys for Defendant*
*Bard Access Systems, Inc.*

Dated: April 16, 2021