**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| 3DT HOLDINGS LLC,<br><br>Plaintiff,<br><br>v.<br><br>BARD ACCESS SYSTEMS, INC.,<br><br>Defendant. | ) | Case No. 1:17-cv-05463-LJL |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF BARD ACCESS SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT .......... 1

ARGUMENT .......... 2

I. NO DISPUTE OF MATERIAL FACT EXISTS AND SUMMARY JUDGMENT FOR BARD IS APPROPRIATE .......... 2

A. Bard's Good Faith, Reasonable Business Determination That a Superior Technology Exists Means Development is "No Longer Commercially Practicable" .......... 2

B. Bard Exercised Its Good Faith, Reasonable Business Judgment in Determining What Constituted a Superior Technology and That a Superior Technology Existed After August 29, 2016 .......... 4

C. The Undisputed Facts Demonstrate that Bard Provided Commercially Reasonable Resources to the Penske Project For More than Three Years .......... 7

D. The Opinions of 3DT's Expert, Mr. Waddell, Are Irrelevant to the Court's Analysis of the Contractual Standard Because He Cannot Create a Factual Dispute, His Opinions Are Based on False Assumptions, And He Has No Knowledge of Bard's Business. .......... 13

II. 3DT SHOULD BE EQUITABLY ESTOPPED FROM CLAIMING THAT QUESTIONS OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT FOR BARD BECAUSE IT MOVED FOR SUMMARY JUDGMENT CLAIMING SUCH FACTS WERE UNDISPUTED .......... 17

III. BARD IS ENTITLED TO SUMMARY JUDGMENT ON 3DT'S CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING .......... 19

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Breezy Point Co-op., Inc. v. Cigna Prop. & Cas. Co.*,
868 F. Supp. 33 (E.D.N.Y. 1994) ....................14

*Cambridge Petrol. Holdings, Inc. v. Lukoil Americas Corp.*,
11 N.Y.S.3d 58 (N.Y. App. Div. 2015) ....................4

*CL-Alexanders Laing & Cruickshank v. Goldfeld*,
739 F. Supp. 158 (S.D.N.Y. 1990) ....................13, 14

*Gay v. Affourtit*,
76 F. Supp. 2d 517 (S.D.N.Y. 1999)....................7

*Gen. Motors Corp. v. Dealmaker, LLC*,
No. 07-CV-141, 2009 WL 1310616 (N.D.N.Y. May 8, 2009)....................5

*ICD Holdings S.A. v. Frankel*,
976 F.Supp. 234 (S.D.N.Y. 1997) ....................19

*Intelligent Digital Sys., LLC v. Beazley Ins. Co.*,
906 F. Supp. 2d 80 (E.D.N.Y. 2012) ....................17

*In re Ionosphere Clubs, Inc.*,
85 F.3d 992 (2d Cir. 1996)....................19

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
950 F. Supp. 2d 568 (S.D.N.Y. 2013)....................8

*Munn v. Hotchkiss Sch.*,
24 F. Supp. 3d 155 (S.D.N.Y. 2014)....................16

*Nasso v. Bio Reference Lab'ys, Inc.*,
892 F. Supp. 2d 439 (E.D.N.Y. 2012) ....................17, 19

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
86 N.Y.2d 685 (N.Y. 1995) ....................4

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
441 F. Supp. 3d 1 (S.D.N.Y. 2020) ....................8

*S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*,
4 N.Y.3d 272 (N.Y. 2005) ....................6

*In re Zyprexa*,
433 F. Supp. 2d 268 (E.D.N.Y. 2006) ....................................................................................17

**Rules**

Fed. R. Evid. 702 ....................................................................................................................13, 14

## PRELIMINARY STATEMENT

3DT's opposition is a striking example of baseless advocacy. It takes bold liberties with the facts and relevant legal standard in an attempt to somehow prevent a loss. In a tacit acknowledgement of its weak arguments in opposition to Bard's summary judgment motion (the same arguments it made in its motion), 3DT stunningly reverses course and now claims that multiple questions of fact preclude granting summary judgment for Bard. This is an admittedly shocking development, given the nature of this case. The parties' competing summary judgment motions are two sides of the same coin – if 3DT believed that there were disputes of material fact from the outset, it should not have moved for summary judgment in the first place. As a matter of fairness, and after countless hours of Bard's time and effort on these motions, 3DT should be equitably estopped from asserting this directly contradictory position.

Contrary to 3DT's arguments and its last-minute attempt to save its claims, however, no dispute of fact exists. The undisputed facts in the parties' Joint 56.1 Statement require judgment as a matter of law for Bard based upon the applicable contractual and legal standards. Bard undoubtedly complied with the Development Agreement's terms both by using its good faith and reasonable business judgment to provide commercially reasonable personnel, financial, and other support to the Penske project and by ultimately determining that a "superior technology" existed, warranting a discontinuation of development. 3DT's attempts to have its expert contort the relevant contractual and legal standards must fail. 3DT similarly blurs the line between opinion and fact, improperly arguing that its expert's *opinions* create a dispute of *fact*. This cannot be.

The undisputed facts also demonstrate that Bard acted in good faith throughout the parties' contractual relationship. Setting aside that 3DT's claim for breach of the covenant of good faith and fair dealing is duplicative because the express contractual terms require Bard to act in good faith, which bars this claim as a matter of law, 3DT's expert admits that he "had no knowledge of

[Bard] acting in an unfair or deceptive manner." Bard is entitled to summary judgment.

## ARGUMENT[1]

### I. NO DISPUTE OF MATERIAL FACT EXISTS AND SUMMARY JUDGMENT FOR BARD IS APPROPRIATE

3DT claims that various "questions of fact" preclude granting Bard's motion. (*See, e.g.*, 3DT Opp'n Br. at 34, 36, 46, 48, 49, 54-55.) Not so. There is no dispute of fact preventing the Court from granting Bard's motion – the parties merely disagree as to whether the undisputed facts constitute the commercially reasonable support required under the Development Agreement. That is a legal, not a factual, question. As set forth extensively in Bard's moving papers, Bard complied with Section 2.1 of the Development Agreement by providing commercially reasonable personnel, financial, and other support to develop the Precisive Navigation Technology, as determined by Bard, in good faith, based upon its reasonable business judgment for more than three years, and after those three years, determining that the Exploitation of a Bard Product incorporating the Precisive Navigation Technology was no longer commercially practicable due to the creation, development and/or commercial availability of superior technology – Modus II. This Court can, and should, determine that Bard complied with the Development Agreement as a matter of law.

#### A. Bard's Good Faith, Reasonable Business Determination That a Superior Technology Exists Means Development is "No Longer Commercially Practicable"

3DT incorrectly claims that Section 2.1 of the Development Agreement required Bard to make two separate determinations: (1) that the development of a Bard Product incorporating the Precisive Navigation Technology was no longer commercially practicable, and that determination is (2) due to any of the circumstances listed within Section 2.1's romanettes.[2] (3DT Opp'n Br. at

[1] In addition to the arguments set forth herein, Bard incorporates by reference and refers the Court to arguments set forth in its Memorandum of Law in Opposition to 3DT's Motion for Summary Judgment. (ECF No. 92 (under seal).)

[2] 3DT claims that the Development Agreement does not provide Bard with the ability to cease Penske development "simply because it believes Modus II is superior" but rather requires an "express[] determin[ation]" that "Penske's

30-35.) 3DT's interpretation is wrong for several reasons.

First, 3DT's exclusive reliance on the definition of "practicable" conveniently ignores the first word in the phrase -- "commercially" -- which describes any practicability determination here. Black's Law Dictionary defines "commercial," in pertinent part,[3] as "[o]f, relating to, or involving the ability of a product or business to make a profit." *Commercial*, BLACK'S LAW DICTIONARY (11th ed. 2019). 3DT's omission of "commercially" is telling. Throughout its brief, 3DT conflates feasibility with commercial practicability. Viability is not equivalent to commercial practicability. Just because it is *possible* to continue development of the Precisive Navigation Technology does not mean that it is a sound business practice for Bard to do so. It is wholly consistent for Bard to hold out hope that it could bring the product to market in the future, while also realizing that development of the technology "to make a profit" is not, in Bard's reasonable business judgment, commercially practicable at a given moment in time.

Second, 3DT ignores that the two phrases it attempts to separate are joined by the words "due to," which means "because of" or "as a result of." *Due to,* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/due%20to (last visited Apr. 23, 2021). Using that definition, the sentence would read:

> . . . if Bard determines, in good faith, based upon its reasonable business judgment, that the Exploitation of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable <u>**["because of"**</u> or <u>**"as a result of"]**</u> . . . the creation, development and/or commercial availability of superior technology, then Bard shall have no obligation to continue to support the development of a Bard Product incorporating the Precisive Navigation Technology.

---

integration into a Bard Product is no longer commercially practicable due to the creation, development and/or commercial availability of Modus II." (Opp'n Br. 33.) Yet, the Agreement permits Bard to do <u>exactly that</u>.

[3] For completeness, the balance of the definition of "commercial" is "1. Of, relating to, or involving the buying and selling of goods; mercantile <commercial advertising>. 2. Resulting or accruing from commerce or exchange <commercial gains>. 3. Employed in trade; engaged in commerce <commercial travelers>. 4. Manufactured for the markets; put up for trade <commercial products>. . . . 6. Produced and sold in large quantities <commercial cosmetics>. 7. Pejorative. More concerned with money than with quality <he sold out and became commercial>."

Thus, the words "due to" make clear that the creation, development and/or commercial availability of a superior technology ***means*** that the development of the Precisive Navigation Technology is no longer commercially practicable. Development of a Bard Product incorporating the Precisive Navigation Technology is no longer commercially practicable, *by definition*, if any of the aforementioned events occur. 3DT's two allegedly separate determinations are one and the same.[4]

### B. Bard Exercised Its Good Faith, Reasonable Business Judgment in Determining What Constituted a Superior Technology and That a Superior Technology Existed After August 29, 2016

Displeased with the deal it struck nearly seven years ago, 3DT attempts to rewrite the language of the Development Agreement to strip Bard of its good faith discretionary powers. 3DT "may not rewrite the terms of an agreement because, in hindsight, it dislikes its terms." *Cambridge Petrol. Holdings, Inc. v. Lukoil Americas Corp*., 11 N.Y.S.3d 58, 59 (N.Y. App. Div. 2015). 3DT may not substitute Bard's judgment for its own in the face of a standard that bestows Bard the ability to make this good faith determination. "If [3DT is] dissatisfied with the consequences of [its] agreement, **the time to say so [was] at the bargaining table**." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co*., 86 N.Y.2d 685, 695 (N.Y. 1995) (third alteration in original) (emphasis added) (citations omitted).

As explained in Bard's opposition to 3DT's motion for summary judgment, Bard is given

---

[4] Moreover, contrary to 3DT's claim that Bard never made a separate commercial practicability determination, Bard explicitly quoted and relied upon Section 2.1 of the Development Agreement in its December 20, 2016 letter, including the commercial practicability language:

> Separately, I can confirm that Bard is currently focusing its attention on the development of an alternative, superior technology. As you may recall, **Section 2.1 of the Development Agreement provides that after August 29, 2016, Bard is not obligated to continue to support the Development of the Precisive Navigation Technology <u>if it determines, in good faith, based upon its reasonable business judgment</u>, that the exploitation of such technology is <u>no longer commercially practicable due to</u>, among other things, <u>the creation development and/or commercial availability of superior technology</u>.**

(App. Ex. 16 (emphasis added).) 3DT's reading of Section 2.1 and the December 20, 2016 letter is simply wrong.

deference, guided by its good faith and reasonable business judgment, to determine whether any of the triggering events defining when Penske development is no longer commercially practicable has occurred. The language describing those events reflects that they are necessarily subjective determinations. For example, the existence of "technological failure(s) of the Bard Product to perform to Bard-required specifications" clearly depend on Bard's judgment. This makes sense because Bard took complete ownership of this technology under the Development Agreement and Bard is a well-established, sophisticated, worldwide medical device manufacturer specializing in development and commercialization of [redacted] – the exact field in which the parties contemplated this technology would be used. And "[g]iven the deference afforded to corporations that contractually reserve to themselves the discretion to make decisions based on their business judgment, attacks on the methodology used, or the conclusion reached, are generally of little significance." *Gen. Motors Corp. v. Dealmaker, LLC*, No. 07-CV-141, 2009 WL 1310616, at *4 (N.D.N.Y. May 8, 2009).

3DT also claims that Bard never decided "that Modus II was superior to Penske *as a whole*." (Opp'n Br. at 35 (emphasis added).) Its argument misses the mark. First, Bard is not required to make this determination. That Penske may be superior in certain respects, and Modus II in others, is irrelevant. Bard need only determine that development was no longer commercially practicable "due to creation, development and/or commercial availability of superior technology." This is logical, because one company could deem a technology to be "superior" while another may not, because any determination will be informed by factors like the other products in a company's portfolio and in development, development costs, the company's business needs and opportunities for growth, its technical expertise, and market demand. Second, under the contract, "superiority" is a legal term of art, requiring a multifaceted assessment and not an assessment an engineer, or other non-lawyer, should make.

Further, despite 3DT's contention, (Opp'n Br. at 32), Bard need not *prove* to 3DT that a technology is superior – its good faith judgment that it is superior is sufficient under the parties' Agreement. Requiring Bard to do so would impose an obligation where none exists, particularly where 3DT failed to negotiate the right to notice of any Bard decision. "In cases of contract interpretation, it is well settled that when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms," *S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 277 (N.Y. 2005) (citations omitted), and that this is "particularly important" where "the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length," *id*. That is exactly what happened here. The Development Agreement must be enforced as written.

In its moving brief, Bard set forth the numerous reasons why it had good faith, reasonable business reasons for believing Modus II to be superior to Penske in several ways. (Bard Moving Br. 51-53.) These features include Modus II's design, particularly as a [redacted] (Joint SUMF ¶ 69, App. Ex. 7, Phillips Dep. Tr. 123:16-20; Joint SUMF ¶ 70, App. Ex. 7, Phillips Dep. Tr. 21:21-22:9; *see* Bard SUMF ¶ 31; App. Ex. 7, Phillips Dep. Tr. 19:25-20:2; Joint SUMF ¶ 71, App. Ex. 5, Misener Dep. Tr. 200:8-25.) And as also discussed in Bard's moving papers, Dr. Kassab's testimony supports the reasonableness of Bard's good faith decision. (Bard SUMF ¶ 32, Mantell 3/26 Decl., Ex. A, Kassab Dep. Tr. 121:1-11; 124:3-8). The question of whether Bard acted in good faith is a legal one. The *fact* that Bard determined that Modus II is superior to Penske in a variety of ways -- as Bard's 30(b)(6) witness, Anthony Misener, testified and its Vice President and General Manager wrote in his December 2016 letter to 3DT -- is not disputed. That 3DT may believe the Precisive Navigation Technology is superior to Modus II is irrelevant, and does not create a dispute of fact,

because the Development Agreement vests *Bard* with the discretion to use its good faith, reasonable business judgment to make that decision. That is exactly what Bard did. 3DT cannot insert itself into the superiority determination. *Gay v. Affourtit*, 76 F. Supp. 2d 517, 518 (S.D.N.Y. 1999) ("[T]o survive [a] motion for summary judgment, [the non-moving party] must offer evidence sufficient to suggest that a genuine issue of material fact exists.").

Moreover, whether Bard hopes to develop the Precisive Navigation Technology in the future has nothing to do with whether a superior technology existed in 2016, thus allowing Bard to discontinue development of the Penske technology at that time. Indeed, the Agreement makes this clear, as it expressly contemplates the situation in which Bard would discontinue development of the Precisive Navigation Technology after the three-year anniversary without paying the Full Milestone Payment, which would only be due to 3DT if at some future date Bard obtained 510(k) clearance for a Bard product incorporating the technology. 3DT's argument is without merit.

The undisputed evidence proves that Bard did exactly what the Development Agreement required – it acted in good faith, and exercised its sound business judgment to determine that a superior technology justified discontinuing development of Penske after more than three years. Accordingly, summary judgment for Bard is required.

### C. The Undisputed Facts Demonstrate that Bard Provided Commercially Reasonable Resources to the Penske Project For More than Three Years

As 3DT notes, "[a] Court's evaluation of a party's compliance with a 'commercially reasonable efforts' requirement does not involve a hindsight comparison of the party's actual conduct to what which could have been undertaken to produce a better result; a court should only evaluate whether the party's actual conduct was sufficient." (3DT Opp'n Br. at 37 (citing *Holland Loader*, 313 F. Supp. 3d at 472-73) (citing *Bear, Stearns Funding, Inc. v. Interface Grp. – Nevada, Inc.*, 2007 WL 1988150, at *22 (S.D.N.Y July 10, 2007)).) 3DT itself concedes that the standard for commercial reasonableness is not a demanding one: "At a minimum, though, a promise to use

commercially reasonable efforts requires that the promising party undertake **at least some activity**," and "requires at the very least **some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests**." (3DT Moving Br. 31, 32 (quoting *Holland Loader*, 313 F. Supp. 3d at 473) (emphases added).) Critically, "commercial[] reasonable[ness] . . . does not require a party to act against its own business interests, which it has a legal privilege to protect." *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568, 618 (S.D.N.Y. 2013) (internal quotations omitted).

Because "[t]he standard for satisfying commercial reasonability under New York law is a fairly lenient one," *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020), Bard's substantial investment of time and resources certainly satisfied this standard. For example, in *Sekisui Am. Corp. v. Hart*, the court determined a party could not recover on its counterclaim for breach of contract for failure to provide commercially reasonable efforts to market a breast cancer diagnostic assay and to take actions to obtain FDA approval. 15 F. Supp. 3d 359, 362, 370, 381 (S.D.N.Y. 2014). Even under a contractual standard unqualified by deference to a party's judgment (like the one here), the *Sekisui* court held that "considerable efforts" to obtain FDA clearance via the 510(k) process were taken. *Id*. at 381. Such efforts included "re-creating files" of data and traveling to Germany in unsuccessful attempts to obtain clinical data, until the company concluded that it would need new clinical studies performed in the United States costing $3.2 million and taking more than three years. *Id*. at 377, 381. Certainly, Bard performed more work on the Penske project than in *Sekisui*, given that *Sekisui* involved a 510(k) submission already made and under FDA review, and Penske needed to be developed from the ground up.

The contractual standard relaxes the standard set forth in case law and provides Bard with significant discretion "(**as determined by Bard**, in good faith, based upon its reasonable business judgment) with regard to the development of a Bard Product incorporating the Precisive

Navigation Technology." (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1) (emphasis added); *see also* App. Ex. 1, Purchase Agreement Section 2.04(b).) Bard's conduct easily met, and exceeded, this contractual threshold.[5]

For example, Bard assembled a cross-functional team consisting of a program leader at the helm, multiple engineers, a regulatory specialist focused on FDA clearance, and a marketing product manager. (Joint SUMF ¶¶ 20, 21 App. Ex. 5, Misener Dep. Tr. 10:8-11:2, 47:11-15; Joint SUMF ¶ 23, App. Ex. 7, Phillips Dep. Tr. 12:11-24; 13:3-10; 15:2-5, 14-15; Joint SUMF ¶ 23, App. Ex. 6, Decheek Dep. Tr. 9:17-10:7; 10:22-11:5; Joint SUMF ¶ 22, App. Ex. 5, Misener Dep. Tr. 80:21-81:15; Joint SUMF ¶ 23, App. Ex. 9, Davis Dep. Tr. 7:2-3, 18-22; Joint SUMF ¶ 23, App. Ex. 5, Misener Dep. Tr. 81:7-15.) The team held regular meetings and minutes were kept. (Joint SUMF ¶¶ 24, 25, App. Ex. 5, Misener Dep. Tr. 79:2-4, 20-23.) Bard performed multiple animal studies, including for the [redacted] (Joint SUMF ¶ 40, App. Ex. 5, Misener Dep. Tr. 245:18-20; App. Ex. 9 Davis Dep. Ex. 5), attempted to create a bench model from which they could obtain data in lieu of animal studies (Joint SUMF ¶ 45, App. Ex. 9, Davis Dep. Tr. 10:13-18), conducted market research studies, including smaller quantitative and larger qualitative studies, and attended physician conferences to obtain customer feedback (Joint SUMF ¶ 57, App. Ex. 6, Decheek Dep. Tr. 22:25-23:4; Joint SUMF ¶ 58, App. Ex. 6, Decheek Dep. Tr. 23:5-9). Importantly, the Bard team member responsible for the regulatory component spent a significant amount of time researching predicate devices upon which to base a 510(k) submission (Joint SUMF ¶ 52, App. Ex. 7, Phillips Dep. Tr. 54:11-14; Joint SUMF ¶ 53, App. Ex. 7, Phillips Dep. Tr. 51:12-15, 54:11-14) and had regular meetings with his supervisor about obtaining internal regulatory buy-in and the FDA's permission to market the device. (Joint SUMF ¶ 55, App. Ex. 7,

---

[5] Bard discussed its extensive efforts at length in its opposition to 3DT's motion for summary judgment but highlights here even the most basic efforts, which are undisputed, that satisfy this standard.

Phillips Dep. Tr. 37:4-10; Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-8.) After the third anniversary of the Agreements, the program leader requested a budget for external expenditures through the end of 2016, and confirmed that the project was still active. (Bard SUMF ¶ 43, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056304; Bard SUMF ¶ 44, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056333.) Both before and after the third anniversary, he contacted 3DT to negotiate an sign a Non-Disclosure Agreement to allow the parties to communicate about the project. (Joint SUMF ¶ 88, App. Ex. 4, Kassab Dep. Ex. 6; Joint SUMF ¶ 90, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 91, App. Ex. 14, BAS-3DT 0034928-0034929; Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929; Joint SUMF ¶ 96, App. Ex. 4, Kassab Dep. Ex. 7; Joint SUMF ¶ 97, App. Ex. 4, Kassab Dep. Ex. 7.) Most notably, the efforts to finalize the Concept Design Review Meeting Minutes continued; the regulatory team signed off in November 2016, and the final signature was obtained on December 8, 2016. (Joint SUMF ¶ 98, App. Ex. 8, Zentgraf Dep. Ex. 2; Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2.) Without doubt, these efforts constitute "at least some activity" and "some conscious exertion to accomplish the agreed goal." *Holland Loader*, 313 F. Supp. 3d at 473.

The Development Agreement calls for "commercially reasonable" support, *i.e.*, "some conscious exertion," "as determined by Bard, in good faith, based upon its reasonable business judgment." (Joint SUMF ¶ 14, App. Ex. 2, Development Agreement Section 2.1.) That is, the Agreement clearly allows Bard to adjust its resources as needed to "make a profit." *See Commercial*, BLACK'S LAW DICTIONARY (11th ed. 2019). Just as the Court or a law firm has many cases to work on, Bard has many medical devices in development. Bard always tried to have multiple projects in the pipeline at the same time. (Joint SUMF ¶ 66, App. Ex. 5, Misener Dep. Tr. 72:1-4.) Indeed, Anthony Misener testified that resources being "diverted in part due to another project … happens all the time." (Joint SUMF ¶ 67, App. Ex. 5, Misener Dep. Tr. 261:19-262:4.)

He also testified that "Penske or any other project that we work on" "certainly had surges of activity and then lulls in activity." (Bard SUMF ¶ 34, Mantell 3/26 Decl., Ex. C, Misener Dep. Tr. 210:6-16.)

Relatedly, 3DT argues – in the face of contrary documentary evidence in the record and without citation – that "a question of fact remains as to whether Bard's decision to stop development of Penske was even related to the alleged superiority of Modus II[.]" (Opp'n Br. at 34.) 3DT claims Ambergris caused a slowdown in the Penske project, which Bard does not deny. (*Id.*) The undisputed testimony of Bard's witnesses, and even the emails on which 3DT relies, make clear that this "lull" to develop Ambergris was temporary and the team would continue Penske development when this "urgent" project was complete. *See, e.g.*, Gibson Decl. Exs. 10, 13, 15. Further, 3DT cannot reasonably question Bard's good faith reasonable *business judgment*, which the Development Agreement expressly allows Bard to exercise, to temporarily prioritize Ambergris given that it is now commercialized and "making a profit" for Bard. Quite simply, the fact that Bard did not continuously prioritize the Penske project over all else for three years is by no means a breach of the parties' Agreement. Had Bard – or any other well-established medical device company for that matter – been asked to sign an agreement requiring as much, it surely would have refused. 3DT's interpretation of commercial reasonableness ignores the applicable contractual standard and defies reality, and must be rejected as a matter of law.

Further, the documentary evidence in the record (including emails that 3DT cites) establishes that the Penske project continued through 2016. For example, on January 11, 2016, Ed Burnside stated that "we slow development but continue Penske." (Gibson Decl. Ex. 10.) On February 9, 2016, Mr. Misener confirmed that "[t]he project is moving forward[.]" (Gibson Decl. Ex. 13.) As of June 8, 2016, the team was "still keeping [Penske] alive and keeping it in [their] thoughts." (Mantell 4/16/2021 Decl. Ex. C, Decheek Dep. Tr. 80:12-17.) In addition, Mr. Misener

requested budget for the Penske project through the end of that calendar year. (Bard SUMF ¶ 43, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056304, ¶ 44, Mantell 3/26 Decl. Ex. F, BAS-3DT 0056333.) Mr. Misener also finalized a new Non-Disclosure Agreement with Dr. Kassab less than two weeks prior to the third anniversary, (Joint SUMF ¶ 92, App. Ex. 14, BAS-3DT 0034929), and afterwards, exchanged emails with Dr. Kassab on next steps. (Joint SUMF ¶¶ 96, 97, App. Ex. 4, Kassab Dep. Ex. 7.) And, as of November 14, 2016, as 3DT itself confirmed in its Statement of Undisputed Material Facts (*see* 3DT SUMF ¶ 39), the team was still performing work on the project. (Gibson Dec. Ex. 8, Decheek Dep. Ex. 23.) 3DT claims that the estimated percentages of time each team member devoted to Penske during 2016 evidences that the project stopped, but the opposite is true. Indeed, 3DT does not, and cannot, claim that any of the team members spent 0% of their time on Penske during 2016. 3DT's contention that the Penske project stopped in January 2016 is unfounded, and simply untrue.

Even the most artful lawyer argument cannot create a dispute of fact that will defeat summary judgment. The facts are the facts. Tellingly, 3DT routinely omits context, which, under the governing contractual standard, is highly relevant to whether Bard exercised its discretion in good faith based on its reasonable business judgment. Bard refers the Court to its fulsome Response to 3DT's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, and calls out 3DT's most egregious inaccuracies, particularly with respect to Bard's 2016 activities, here:

- Obtaining full execution of the Concept Design Meeting Minutes (Opp'n Br. at 40) was not insignificant – the signatures moved the project forward, which is exactly what is required to satisfy the commercial reasonableness standard. Undisputed record evidence proves that this was not a minor task: "How meeting minutes work for a design review, all of the cross functions attend and they all give us actions, things that they're concerned about. There were multiple actions that came out of the concept review that we did, and then as the R&D lead, it's my job to satisfy all of those actions and bring all -- evidence or whatever the -- the person that made the request, to bring the information to them to mitigate their concerns and gain their signature." (App. Ex. 9, Davis Dep. Tr. 20:22-21:7.)

- Bard's regulatory efforts were significant, not merely having "a few discussions" (Opp'n Br. at 40, 49) or "occasionally discussing the regulatory strategy" (*id.* at 43). The undisputed facts

demonstrate that Mr. Phillips and his supervisor held regular meetings over the course of months to discuss the regulatory pathway. (Joint SUMF ¶ 81, App. Ex. 7, Phillips Dep. Tr. 101:1-8.)

- Reliance on Marketing Reports (*see, e.g.*, Opp'n Br. at 38, 39, 41) cannot be used to dispute Bard's efforts on the whole, as their contents were limited to marketing activities. For example, Mr. Decheek testified that the word "resources" in the January 2016 Marketing Monthly Report that were allegedly shifted to Ambergris (Gibson Dec. Ex. 8, Decheek Dep. Ex. 12) – the same language that repeats in the February 2016 and March 2016 Marketing Monthly Reports (Gibson Dec. Ex. 8, Decheek Dep. Ex. 13; Gibson Dec. Ex. 12) – means *himself*. The undisputed evidence reveals that Tony Decheek stated if there is no update in the April 2016 marketing report, "[i]t means I'm not working on anything." (Mantell 4/16/2021 Decl., Ex. C, Decheek Dep. Tr. 79:2-6 (emphasis added).)

- 3DT incorrectly claims that "Bard does not identify another development project that experienced such a drastic reduction in development activity and resulting delay in development timelines." (Opp'n Br. at 41.) Aside from the fact that Bard has no obligation to identify any other projects to 3DT, who is a competitor, the undisputed facts prove that *Modus II itself* is *still* under development even though it was acquired at about the same time as Penske and *was even prioritized* over Penske. Product development takes time.

- The undisputed facts demonstrate that Bard did not undertake any development efforts after December 2016 – after Concept Design Meeting Minutes were signed on December 8, 2016, (Joint SUMF ¶ 99, App. Ex. 8, Zentgraf Dep. Ex. 2.), not in January 2016 as 3DT posits, (Opp'n Br. at 42).

- Overall, 3DT uses lawyer arguments, not facts, to attempt to dispute what was necessary to commercialize this product, which is unsurprising because – lacking any firsthand experience – it does not know how to do so. Simply getting the technology to function is necessary but not sufficient to incorporate it into a Bard Product and obtain FDA §510(k) clearance. The undisputed *evidence* demonstrates that more is required, including a viable predicate (or two), material selection, and laboratory testing to demonstrate safety and effectiveness of a [redacted] for human use.

The Court should put aside 3DT's lawyer argument and hone in on the undisputed evidence, which requires summary judgment for Bard.

### D. The Opinions of 3DT's Expert, Mr. Waddell, Are Irrelevant to the Court's Analysis of the Contractual Standard Because He Cannot Create a Factual Dispute, His Opinions Are Based on False Assumptions, And He Has No Knowledge of Bard's Business.

As a threshold matter, under the Federal Rules of Civil Procedure, 3DT's expert offered opinions, not facts. Fed. R. Evid. 702. The facts are what they are – an expert cannot rewrite history to serve a party's interests, and expert *opinions* cannot create a dispute of *fact*. *CL-*

*Alexanders Laing & Cruickshank v. Goldfeld*, 739 F. Supp. 158, 164 (S.D.N.Y. 1990) (quoting *In re Agent Orange Prods. Liab. Litig*., 818 F.2d 187, 193 (2d Cir. 1987)), *cert. denied*, 487 U.S. 1234 (1988)) ("A particular set of facts 'cannot be established by mere speculation or idiosyncratic opinion, even if th[e] opinion [about the facts] is held by one who qualifies as an expert under Fed. R. Evid. 702.'" (alterations in original)). But that is exactly what 3DT tries to do here. (Opp'n Br. at 46 (stating Mr. Waddell's opinions "create a question of fact as to whether Bard ever provided commercially reasonable resources to the development of Penske").) This Court should reject 3DT's meritless, and outrageous, change of course to defeat summary judgment.

Moreover, 3DT's attempt to use their expert to craft their own favorable legal standard and then opine that Bard did not satisfy that standard, is improper. Mr. Waddell does not set the standard for commercial reasonableness – the Agreements governing the parties' relationship, and the law, do. *See Breezy Point Co-op., Inc. v. Cigna Prop. & Cas. Co.*, 868 F. Supp. 33, 36 (E.D.N.Y. 1994) (citing *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 508 (2d Cir.), *cert. denied*, 434 U.S. 861 (1977)). Mr. Waddell's invention of his own legal standard – "the effort and resources that a company with the size and resources of Bard would (and should) devote to successfully develop a product incorporating the Precisive Navigation Technology within a reasonable period of time" (Waddell Aff. ¶ 21, Ex. C at 1) – is not permitted.

3DT relies on *Holland Loader* for the proposition that the contractual standard requires input from experts as to industry standards. (*See* 3DT Moving Br. at 31 (quoting *Holland Loader*, 313 F. Supp. 3d at 469).) Unlike the Agreements at issue here, however, the agreement in that case contained an objective commercial reasonableness standard which would require input regarding industry standards. Here, the commercial reasonableness standard in the Agreements is "**as determined by Bard**," within the bounds of its good faith, consistent with informed decisions it could make pursuant to the business judgment rule (*i.e.* those made with the honest belief that

they are being made in Bard's own best interest). *See*, *supra*, Point I.A.-C. There is no question Bard's actions meet, and exceed, that standard.

Moreover, Mr. Waddell's opinions are untethered to the contractual standard, which provides deference to Bard's good faith determination based on Bard's reasonable business judgment, and therefore do not and cannot defeat summary judgment for Bard based on the contractual language at issue in this case.[6] That standard necessarily allows Bard to determine how to develop this technology consistent with Bard's regular business practices for successfully developing, obtaining FDA clearance, and commercializing hundreds of medical devices. But Mr. Waddell admits that he knows practically nothing about Bard's business:

> Q Based upon what you know about Bard, was there anything inconsistent with the development of this product as compared to the development of other products at the company?
>
> A I am not familiar with their development strategies for other products. I can only comment on this one. So I don't have a comparison, so I don't know how to answer that question.
>
> Q **<u>So you have no opinion one way or another as to whether or not the work that was done on this project was consistent with how Bard ordinarily conducts its business?</u>**
>
> A **<u>Yeah. I don't know how they ordinarily conduct their business, so I don't have a way to tell you that.</u>** All I can tell you about is my opinions on how they conducted this particular project.

(Mantell 4/16/2021 Decl., Ex. J, Waddell Dep. Tr. 91:10-25. (emphases added)). Mr. Waddell also admitted that he: (i) had no way to determine whether or not the activities related to the development of this product were different than the activities related to the development of other products "because [he] ha[d] no knowledge of how their other products' activities are performed,"

[6] 3DT claims that both parties retained experts "to opine on the sufficiency of Bard's development resources in light of development standards in the medical device industry." (3DT Moving Br. at 32.) However, that characterization is only partially accurate – 3DT's expert misguidedly opined as to industry standards, while Bard's expert, Mr. Haas, issued a report tailored to the contractual standard after, among other things, conducting an interview of Anthony Misener to obtain insight into Bard's process and perspective. (Mantell 4/16/2021 Decl., Ex. K, Haas Report.)

(*id*. at 93:13-18), (ii) "ha[d] no idea" whether the title of "systems engineer" existed at Bard (*id*. at 98:2-4), (iii) did not "believe that [he] kn[e]w of any of the processes that they were required to follow" in connection with the matter (*id*. at 80:12-17), and (iv) did not "know what their regulatory strategy was" so he had no criticisms of it (*id*. at 81:2-5).

Mr. Waddell wrote similarly revealing information in his report that:

- "This plan was *developed before being provided access to the 79 Bard documents* and was developed to contrast with the Penske project without bias from knowledge of actual project dates." (Waddell Aff., Ex. B at 3 (emphasis added).)
- "*Without knowing the specific disposable configurations to be used*, there was an assumption made that Bard would have sufficient disposable expertise." (*Id*. (emphasis added).)
- "The Waddell Development Plan *was developed based upon the methodology employed by the Waddell Group* when developing project development plans as a Project Manager." (*Id*. (emphasis added).)
- "This development *assumed* that Bard would need one iteration (2 tries) for each of the disposable items, and 2 iterations of the electronics / software." (*Id*. at 4 (emphasis added).)

Far more troubling, though, are Mr. Waddell's assumptions on which his purported opinions are based. By way of example, the *first* assumption in his report, unsupported by any cited facts, is: "3DT's Precisive Navigation Technology is safe and effective." (Waddell Aff., Ex. B at 4.) The FDA is the only entity that can make that determination upon review and analysis of substantial data. And certain of Bard's numerous animal studies yielded [redacted]. (Joint SUMF ¶ 40, App. Ex. 5, Misener Dep. Tr. 245:18-20; Joint SUMF ¶ 41, App. Ex. 9, Davis Dep. Tr. 40:5-8; Joint SUMF ¶ 42, App. Ex. 9, Davis Dep. Ex. 4; Joint SUMF ¶ 43, App. Ex. 7, Phillips Dep. Tr. 63:5-6, 13-21; Joint SUMF ¶ 44, App. Ex. 5, Misener Dep. Tr. 116:20-24.) *See Munn v. Hotchkiss Sch*., 24 F. Supp. 3d 155, 203 (S.D.N.Y. 2014) (expert testimony stricken for lack of "sufficient basis in facts or data"; "[d]etermining the factual basis for an expert's opinion and the soundness of an expert's

methodology falls within the 'gatekeeping' function of district judges"). For these reasons, the Court should disregard Mr. Waddell's "opinions" and the purported questions of "fact" they create.

## II. 3DT SHOULD BE EQUITABLY ESTOPPED FROM CLAIMING THAT QUESTIONS OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT FOR BARD BECAUSE IT MOVED FOR SUMMARY JUDGMENT CLAIMING SUCH FACTS WERE UNDISPUTED

After moving for summary judgment on the same issues as Bard, 3DT now claims that "questions of fact" exist that preclude grant of Bard's motion. This Court should equitably estop 3DT from talking out of both sides of its mouth. "The doctrine of equitable estoppel precludes a party at law and in equity from denying or asserting the contrary of any material fact which he has induced another to believe and to act on a particular manner." *Intelligent Digital Sys., LLC v. Beazley Ins. Co.*, 906 F. Supp. 2d 80, 94 (E.D.N.Y. 2012). In other words, "[i]n a broad sense, equitable estoppel is [a] bar that prevents one from asserting a claim or right that contradicts what one has said or done before or what has been legally established as true." *In re Zyprexa*, 433 F. Supp. 2d 268, 272 (E.D.N.Y. 2006) (citation omitted)); *see also Nasso v. Bio Reference Lab'ys, Inc.*, 892 F. Supp. 2d 439, 449 (E.D.N.Y. 2012) ("'Estoppel' generally means that one party in a dispute should not be permitted to reap any benefit from its own misrepresentations." (citation omitted)). Indeed, "[e]quitable estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result." *Nasso*, 892 F. Supp. 2d at 449 (citation omitted).

Here, 3DT represented to the Court – and to Bard – on multiple occasions that this matter is ripe for summary judgment, which necessarily requires that there be no genuine dispute of material fact. More specifically, in 3DT's December 23, 2020 Letter to the Court, it stated, "the undisputed facts demonstrate that Bard breached its development obligations by ceasing to provide commercially reasonable efforts in or around January 2016," and that "[f]or this reason alone, 3DT is entitled to summary judgment." (ECF No. 61 at 2). Later, in its moving brief, 3DT recognized

that the standard for summary judgment requires it to demonstrate that "there is 'no genuine dispute as to any material fact,'" (ECF No 75-1 at 22 (quoting *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F. Supp. 2d 596, 601 (S.D.N.Y. 2012)), which 3DT argued that it met (*see e.g.*, *id*. at 41).

Yet, 3DT outrageously included an entire Legal Argument section in its opposition to Bard's motion for summary judgment that claimed precisely the opposite: "A Question of Fact Exists as to Whether Bard Ever Provided Commercially Reasonable Resources to Penske." (Opp'n Br. at 43). For example, in the body of the brief, 3DT claimed that the following questions of fact exist:

- "whether Bard's decision to stop development of Penske was even related to the alleged superiority of Modus II" (*id.* at 34);
- "whether Bard provided commercially reasonable support from the date of acquisition through December 2015" (*id*. at 36) and "whether Bard ever provided commercially reasonable efforts" (*id*. at 49);
- based on 3DT's expert's opinions, "whether Bard ever provided commercially reasonable resources to the development of Penske" (*id*. at 46);
- "the existence and nature of the alleged [redacted] (*id*. at 48); and
- whether Bard breached the duty of good faith and fair dealing (*id*. at 54-55).

From the outset, Bard relied on 3DT's assertions that this matter was ripe for summary judgment, setting a joint briefing schedule to file competing summary judgment motions on the same core issues, and allocating significant resources to prepare and file the Joint Statement of Undisputed Material Facts, its own motion for summary judgment, and its opposition to 3DT's motion. 3DT cannot now – after Bard has spent countless hours and thousands of dollars – outrageously argue that there exist material "question[s] of fact" that preclude summary judgment. If 3DT truly stands by those assertions, it should withdraw its motion to prevent the Court from expending finite judicial resources on 3DT's filing. To ensure that 3DT will "not be permitted to

reap any benefit from its own misrepresentations," the Court should collaterally estop 3DT from setting forth any and all arguments asserting the existence of disputed material facts and give no consideration to same. *Nasso*, 892 F. Supp. 2d at 449. Utilization of equitable estoppel here will undoubtedly serve to prevent an "injustice [that] would otherwise result." *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996) (citations omitted).

## III. BARD IS ENTITLED TO SUMMARY JUDGMENT ON 3DT'S CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

3DT claims that Bard's "lack of transparency" and failure to inform it of problems with Penske was a breach of the covenant of good faith and fair dealing. (Opp'n Br. at 50-51.) But this argument does not make sense. 3DT ignores that the Development Agreement explicitly requires Bard to act in good faith. Because the contract requires good faith, no independent cause of action exists. *See ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y. 1997). Moreover, the duty of good faith and fair dealing does not require Bard to seek 3DT's assistance because Bard knew how to develop a Bard Product, which it does every day. 3DT sold this technology outright to Bard, a world-class medical device manufacturer who has brought countless products to market. CVC and PICC product development is the lifeblood of Bard's business – it did not require 3DT's assistance. If it had, it stands to reason that Bard would have aggressively pursued assistance with its efforts to commercialize a $30 million technology.

3DT also claims that the Non-Disclosure Agreement ("NDA") Anthony Misener sent to Dr. Kassab was "unnecessary" due to the SOW. (Opp'n Br. at 22, 40.) To be clear, while Dr. Kassab may have thought that the NDA between Bard and Dr. Kassab was unnecessary, he is mistaken. The SOW does not contain a confidentiality provision (*see generally* App. Ex. 3), or a provision for Dr. Kassab's consulting services, merely contemplating the possibility for "any 3DT scientific professional" to assist (*id.* at Section 5.1). Tellingly, none of the emails related to the NDA itself, which included Dr. Kassab's attorney, ever claimed that the NDA was "unnecessary"

at that time. Moreover, given the development work Bard had done in the three years since the Agreements were signed, it certainly needed an NDA to protect its intellectual property from a competitor. The Court should reject 3DT's argument.

Even more striking, Mr. Waddell's testimony does not support 3DT's position that Bard failed to exercise good faith in its performance. In response to a question asking whether he had an opinion as to "whether Bard acted in bad faith in connection with exercising its business judgment in connection with the development" of the Precisive Navigation Technology (92:1-4), Mr. Waddell testified that "**I have no knowledge of [Bard] acting in an unfair or deceptive manner** . . . I just don't know. I have no way of being able to determine that." (93:7-12.) Mr. Waddell does not and cannot assert, and 3DT has no basis to claim, that Bard failed act in good faith based upon its reasonable business judgment, in developing the Precisive Navigation Technology. On the contrary, Bard's efforts here are fully consistent with its efforts to develop hundreds of medical devices that it has successfully brought to market.

Summary judgment for Bard should be granted.

## CONCLUSION

For the foregoing reasons, Defendant Bard Access Systems, Inc. respectfully requests that this Court grant Bard Access Systems, Inc.'s Motion for Summary Judgment.

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

By: */s/ Natalie* H. Mantell
Natalie H. Mantell

Natalie H. Mantell
Meghan McSkimming
nmantell@mccarter.com
mmcskimming@mccarter.com

*Attorneys for Defendant*
*Bard Access Systems, Inc.*

Dated: April 23, 2021